**2025-1355**

# United States Court of Appeals for the Federal Circuit

HERON THERAPEUTICS, INC.,

*Plaintiff-Appellee,*

– v. –

FRESENIUS KABI USA, LLC,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Delaware in Case No. 1:22-cv-00985-WCB*

## OPENING BRIEF OF APPELLANT

IMRON T. ALY
HELEN H. JI
KEVIN M. NELSON
ARENTFOX SCHIFF LLP
*Counsel for Defendant-Appellant*
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500
imron.aly@afslaw.com
helen.ji@afslaw.com
kevin.nelson@afslaw.com

APRIL 25, 2025

COUNSEL PRESS (800) 4-APPEAL • (812522)

**U.S. Patent No. 9,561,229**
**Claims 9, 10, and 21**

8. An injectable pharmaceutical emulsion comprising:
0.7 wt/wt % aprepitant;
14 wt/wt % egg yolk lecithin;
9 wt/wt % to 10 wt/wt % soybean oil; and
a pH modifier, wherein the pH modifier is sodium oleate;
wherein the pH of the emulsion ranges from 7.5 to 9.0.

9. The emulsion according to claim **8**, wherein the emulsion further comprises 5 wt/wt % sucrose.

10. The emulsion according to claim **8**, wherein the emulsion further comprises 2 wt/wt % to 6 wt/wt % ethanol.

17. A method for treating nausea and vomiting in a subject in need thereof comprising administering to the subject the pharmaceutical emulsion according to claim **8**.

21. The method according to claim **17**, wherein the administering is intravenous.

**U.S. Patent No. 9,974,794**
**Claims 9 and 10**

8. A physically stable pharmaceutical composition suitable for intravenous administration comprising:
0.7 wt/wt % aprepitant;
14 wt/wt % egg yolk lecithin;
9 wt/wt % to 10 wt/wt % soybean oil; and
a pH modifier, wherein the pH modifier is sodium oleate;
wherein the pH of the composition ranges from 7.5 to 9.0.

9. The composition according to claim **8**, wherein the composition further comprises 5 wt/wt % sucrose.

10. The composition according to claim **8**, wherein the composition further comprises 2 wt/wt % to 6 wt/wt % ethanol.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1355

**Short Case Caption** Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC

**Filing Party/Entity** Fresenius Kabi USA, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/25/2025

Signature: /s/Helen H. Ji

Name: Helen H. Ji

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Fresenius Kabi USA, LLC | | Fresenius Kabi Pharmaceuticals Holding, LLC; Fresenius Kabi AG; Fresenius SE & Co. KGaA |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC

**CERTIFICATE OF INTEREST**

**4. Legal Representatives** (continued from page 3):

ArentFox Schiff LLP:

- Imron T. Aly
- Kevin M. Nelson
- Helen H. Ji
- Mallory McMahon
- Chad Watson
- Julie Vernon

Smith, Katzenstein & Jenkins, LLP:

- Neal C. Belgam
- Daniel A. Taylor
- Eve Ormerod

# Table of Contents

Statement of Jurisdiction....................1

Statement of the Issues....................1

Statement of the Case....................1

A. Aprepitant Background....................1

B. Procedural Posture....................3

C. The Trial Court Confirmed the Only Limitation in Question for Obviousness Was Lecithin Concentration....................4

Summary of the Argument....................7

Standard of Review....................10

Argument....................12

I. The Trial Court Erred in Its Determination Regarding Whether a POSA Would Have Been Motivated and Reasonably Expected Success to Use 14% Lecithin in an Aprepitant Emulsion Formulation....................12

A. The Trial Court's Factual Findings That CN845 Taught The Benefits of Increasing Emulsifier Concentration Would Have Motivated a POSA to Increase with a Reasonable Expectation of Success....................14

B. The Trial Court Erred by Failing to Consider the Prior Art As A Whole, And Focusing Too Heavily on Prior Art that Used Lower Amounts of Egg Lecithin As If They Implied Limits When They Did Not....................19

C. The Trial Court Clearly Erred in Failing to Find Motivation to Combine References and Increase Lecithin....................24

D. The Trial Court Erred in Failing to Find Reasonable Expectation of Success of the Lecithin Concentration Limitation....................28

1. The Trial Court Legally Erred by Failing to Consider Lecithin as a Result-Effective Variable for Routine Optimization ......29

2. The Trial Court's Findings of Facts Fail to Recognize the Ratios Taught by CN845 ......31

E. The Trial Court Clearly Erred when Finding 14% Egg Yolk Lecithin Was a "Substantial Departure" from the Prior Art ......34

F. The "Physically Stable" Requirement of the '794 Patent Claims Is an Inherent Property that Does Not Add Patentable Weight ......35

II. The Court's Objective Considerations Analysis Was Legally Flawed ......39

A. The Court's Lack of a Nexus Analysis Is Clear Legal Error, and Nexus Was Not Commensurate with the Asserted Claims' Scope ......40

1. There Is No Nexus Between a Long-Felt Need for a Product with Less Adverse Events and the Asserted Claims ......41

2. There Is No Nexus to Unexpected Results or Failure of Others as again the Court Did Not Compare the Asserted Claims to the Closest Prior Art ......43

3. There Cannot Be a Nexus Between Heron's Sales and the Asserted Claims Because the Court Specifically Found Any Success Was Due to Heron's Pricing ......45

B. The Trial Court's Legal and Factual Errors Led It to Find Long-Felt, Unmet Need, Which Still "Only Moderately" Favored Heron ......45

1. A Merely "Moderate" Need Cannot Show a Long-Felt Need as a Matter Of Law ......46

2. Doctors Knew How to Safely Administer Fosaprepitant to Address Any Alleged "Moderate Concerns" with ISAEs ......47

3. The Court Committed Legal Error by Focusing on a Small Subset of Patients Who May Experience Adverse Events ....... 49

C. The Trial Court's Unexpected Results and Failure of Others Analysis Is Legally Erroneous and Internally Inconsistent ....... 50

D. There Cannot Be Commercial Success Where the Court Found Cinvanti Sales Were Based on Heron's Discounted Pricing ....... 54

III. The Trial Court's Findings with Respect to Previously Dismissed Claims Are Moot ....... 55

Conclusion ....... 56

## Table of Authorities

*ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350 (Fed. Cir. 2015) ............ 47, 48

*Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*,
25 F.4th 1354 (Fed. Cir. 2022) ............................................................ 52

*Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034 (Fed. Cir. 2016) ......................... 11

*Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310 (Fed. Cir. 2008) .......................... 40

*Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342 (Fed. Cir. 1999) .............................. 36

*Bayer Pharma AG v. Watson Lab'ys., Inc.*,
874 F.3d 1316 (Fed. Cir. 2017) ............................................ 10, 11, 20, 27

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) ............................................................ 43, 52

*Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268 (Fed. Cir. 2021) ............... 55

*Cubist Pharms., Inc. v. Hospira, Inc.*, 805 F.3d 1112 (Fed. Cir. 2015) ................... 49

*Digitronics Corp. v. New York Racing Ass'n*, 553 F.2d 740 (2d Cir. 1977) ............ 54

*Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731 (Fed. Cir. 2013) .................... 53

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ................................................ 11, 53

*Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345 (Fed. Cir. 2025) .......... 27

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
946 F.3d 1322 (Fed. Cir. 2020) ................................................... 36, 37, 38

*In re Ethicon, Inc.*, 844 F.3d 1344 (Fed. Cir. 2017) ............................................... 24

*In re Gershon*, 372 F.2d 535 (C.C.P.A. 1967) ........................................................ 47

*In re PepperBall Techs., Inc.*, 469 F. App'x 878 (Fed. Cir. 2012) ........................... 47

*In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003) ..................................................... 31

*Intel Corp. v. PACT XRP Schweiz AG*, 61 F.4th 1373 (Fed. Cir. 2023) .................. 24

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
97 F.4th 915 (Fed. Cir. 2024) .................................................................. 43

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007) ...................................... passim

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007) .......... 39

*Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829 (Fed. Cir. 2015) ................................ 42

*Merck & Co., Inc. v. Biocraft Lab'ys, Inc.*,
874 F.2d 804 (Fed. Cir. 1989) .................................................................. 28

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) .................................................................. 45

*Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186 (Fed. Cir. 2014) .......... 36, 46

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009) ........................................................... 27, 42

*Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341 (Fed. Cir. 2024) .......................... 30

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007) .................. 11, 28, 29, 51

*See Intercont'l Great Brands LLC v. Kellogg N. Am. Co.*,
869 F.3d 1336 (Fed. Cir. 2017) .................................................................. 11

*Sjolund v. Musland*, 847 F.2d 1573 (Fed. Cir. 1988) .............................................. 41

*Spectrum Pharms., Inc. v. Sandoz Inc.*, 802 F.3d 1326 (Fed. Cir. 2015) ................ 43

*WBIP, LLC v. Kohler Company*, 829 F.3d 1317 (Fed. Cir. 2016) ........................... 49

*ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365 (Fed. Cir. 2018) ................................ 24

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION |
|---|---|
| ’229 patent | U.S. Patent No. 9,561,229 |
| ’794 patent | U.S. Patent No. 9,974,794 |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | Claims 9, 10, and 21 of the ’229 patent and claims 9 and 10 of the ’794 patent |
| CINV | chemotherapy induced nausea and vomiting |
| CN845 | Chinese Patent Application Publication No. CN102379845A, titled “Aprepitant microemulsion for injection and preparation method thereof,” filed on November 3, 2011 |
| Emend IV | Emend for Injection |
| FDA | United States Food and Drug Administration |
| Fresenius’s ANDA Product | The drug product that is the subject of Abbreviated New Drug Application No. 214639 |
| Fresenius | Fresenius Kabi USA, LLC |
| Heron | Heron Therapeutics, Inc. |
| Hingorani | U.S. Patent Appl. Pub. No. 2013/0317016 A1F |
| HLB | Hydrophilic-Lipophilic Balance |
| IV | intravenous |
| ISAEs | Injection Site Adverse Events |
| Liu | Jie Liu et al., *Progress in Research of Injectable Microemulsion*, 42 CHINESE J. PHARMACEUTICALS 300 (2011) |
| NDA | New Drug Application |
| PFAT5 | Percentage of fat globules greater than 5 microns |
| PS80 | Polysorbate 80 |
| POSA | person of ordinary skill in the art |
| [page]:[line] | format for trial transcript citations |
| USP | United States Pharmacopeia |
| USP 729 | United States Pharmacopeia, Chapter 729 (2014) |
| USPTO | United States Patent and Trademark Office |

| ABBREVIATION | DESCRIPTION |
|---|---|
| Washington | C. Washington, *Stability of Lipid Emulsions for Drug Delivery*, 20 ADVANCED DRUG DELIVERY REVS. 131 (1996) |
| Zhou | Wei Zhou et al., *Preparation of Aprepitant Emulsion for Intravenous Injection*, 43 CHINESE J. PHARMS. 1003 (2012) |

## Statement of Related Cases

No appeal in this matter was previously before this Court or any appellate court.

The following pending matters involve the patents-at-issue in this appeal as well as additional related patents:

- Heron Therapeutics, Inc. v. Azurity Pharmaceuticals, Inc. et al, 1-24-cv-00830-WCB (D. Delaware) [previously Heron Therapeutics, Inc. v. Slayback Pharma LLC et al, 2-24-cv-00423 (D. New Jersey)];

- Heron Therapeutics, Inc. v. Mylan Pharmaceuticals Inc., 1-24-cv-00043 and 1-23-cv-01015 (D. Delaware)

- Heron Therapeutics, Inc. v. Qilu Pharmaceutical Co., Ltd. et al., 1-25-cv-00357 (D. Delaware)

## Statement of Jurisdiction

Heron filed Hatch-Waxman litigation against Fresenius in the District of Delaware asserting infringement of, among others, the ’229 patent and the ’794 patent. At trial, only the five Asserted Claims were in dispute. All other patents/claims were dismissed with prejudice prior to trial. After a bench trial before the Honorable William C. Bryson, sitting by designation in the District of Delaware, the trial court entered Findings of Fact and Conclusions of Law (Appx1-Appx58), along with a final judgment (Appx59-61), finding infringement and no invalidity of the Asserted Claims. Fresenius timely filed its Notice of Appeal (Appx3829-3830). This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a).

## Statement of the Issues

1. Whether claims 9, 10, and 21 of the ’229 patent and claims 9 and 10 of the ’794 patent are invalid for obviousness under 35 U.S.C. § 103, where the prior art taught a person of ordinary skill in the art to add egg yolk lecithin in order to increase stability, and the alleged secondary considerations were deemed weak and did not have sufficient nexus to the claims.

## Statement of the Case

### A. Aprepitant Background

The Asserted Claims relate to formulations of aprepitant. Appx4. In 1993, third party Merck developed the drug compound aprepitant and in 2003 developed an oral aprepitant product called Emend. Appx7; Appx4386. The old oral Emend

product "was an incredibly important advance" in treating CINV when administered with other anti-emetics. Appx2957-Appx2958(583:21-585:5); *see also* Appx4382, Appx4386, Appx3287(913:4-13).

Long before the September 2014 patent priority date, and until CN845 published in 2012, aprepitant was believed to be difficult to formulate as an injectable solution because it was known to have low solubility in either oil or water alone. Appx8. So at the time Merck was working with its newly invented aprepitant, the drug was first formulated as an oral capsule and then a prodrug version was developed using fos-aprepitant, available in 2003 under the tradename Emend IV. Appx7-Appx9; Appx4386; Appx2498-Appx2499 (124:24-125:8).

Years later (and just before the patent priority date), prior art confirmed that liquid injectable formulations—specifically for aprepitant—could be made using *emulsions*. Appx10-Appx11. Emulsions contain oil/water mixed phases, enabling aprepitant liquid formulations. Appx13. In 2012, two prior art references established this approach: CN845 and Zhou. Appx10. Heron implemented the teachings of these references, and even expressly relied on CN845 when developing its claimed emulsion formulation. Appx40. Despite having no prior experience working with emulsions, named inventor Han (or Hannah) Han arrived at the claimed formulation within six months. Appx40. Heron then used known test parameters to confirm the stability properties of the formulation.

### B. Procedural Posture

Before trial, the trial court granted Heron's motion for partial summary judgment of infringement on claims 1-11 of the '229 patent and denied Heron's motion for summary judgment on all other claims of the '229 and '794 patents. Subsequently, the parties jointly moved to dismiss with prejudice all claims except for the five Asserted Claims. The Court entered the joint motion on June 28, 2024. Appx2150-Appx2153.

Following a bench trial, the trial court issued its Findings of Fact and Conclusions of Law on December 3, 2024. Appx1-58. The trial court found (1) Plaintiffs proved by a preponderance of the evidence infringement of all Asserted Claims;[1] and (2) Defendant failed to show by clear and convincing evidence that the Asserted Claims are invalid. Appx57. The trial court concluded that "[t]he issue of obviousness in this case is a close one." Appx57. The court explained that "[c]lear and convincing evidence is a high standard, and even though Fresenius made a strong showing in various respects in support of its claim that the asserted claims would have been obvious, in the end I concluded that Fresenius's showing was not clear and convincing." Appx57-Appx58.

[1] The trial court's findings incorrectly referenced an infringement finding for previously dismissed claims, addressed *infra* at Section III.

The trial court's "close" call description was even after requiring an express motivation to combine in the prior art, and specific numeric lecithin-level disclosures as opposed to teachings to increase lecithin to increase emulsion stability. The trial court's findings were based on an incorrect application of the law as well as a clearly erroneous view of the facts, and should be reversed.

### C. The Trial Court Confirmed the Only Limitation in Question for Obviousness Was Lecithin Concentration

As the trial court noted, "Claim 8 of the '794 patent is representative of all five asserted claims" and is reproduced in its entirety below for reference:

> 8. A physically stable pharmaceutical composition suitable for intravenous administration comprising:
>
> 0.7 wt/wt % aprepitant.
> 14 wt/wt % egg yolk lecithin.
> 9 wt/wt % to 10 wt/wt % soybean oil; and
> a pH modifier, wherein the pH modifier is sodium oleate.
> wherein the pH of the composition ranges from 7.5 to 9.0.

Appx5, Appx97.

As the trial court concluded, "[t]he question in this case […] is whether it would have been obvious, based on the prior art, to devise a stable aprepitant formulation suitable for injection that would satisfy the limitations of the asserted claims of the '229 and '794 patents." Appx31. The trial court recognized that, as of the priority date, aprepitant (and its prodrug fosaprepitant) were FDA approved to treat CINV. Appx6-Appx9. At that time, aprepitant was approved as an oral drug and fosaprepitant was an intravenous formulation. Appx7-Appx9. The trial court

correctly found that a POSA would have been motivated to develop an intravenous formulation of aprepitant. Appx30. The trial court properly credited CN845 as a "game changer" that "marked a departure from [prior] convention by using an emulsion to create an injectable formulation containing a drug that is not soluble in either water or oil." Appx11. CN845 specifically taught applying known emulsion components to prepare liquid injectable aprepitant formulations.

The prior art CN845 and Zhou references guided the POSA on preparing aprepitant emulsion formulations, including specific examples. When comparing the Asserted Claims to the prior art, the trial court found the prior art disclosed all claim elements except one: the amount of the emulsifier egg yolk phospholipid.[2] The trial court confirmed the CN845 teachings, including the classes of excipients, the components, and the amounts:

> As relevant to the patents in suit, the examples and claims of CN845 specifically call out the use of soybean oil as one of the components that can serve as the oil for injection (examples 1, 4, 5, 6, and 7; claim 1), egg yolk phospholipid as the emulsifier (examples 1, 4, 5, 6, and 7; claim 6),[] ethanol as the co-emulsifier (examples 1, 4, 5, 6, and 7; claim 7), glycerin as the protective agent (examples 1, 4, 5, 6, and 7; claim 8) and water for injection (all examples and claim 9). JTX 71 at 9. In addition to listing each of the substances set forth above, the eight examples in CN845 identify substitutes that can be used in place of several of those compounds. As relevant here, in Example 2 of CN845

[2] The trial court's findings use the terms "egg yolk phospholipid," "lecithin," and "egg yolk lecithin" interchangeably. Appx12.

> sucrose is substituted for the glycerin component listed as the protective agent in claims 1 and 8 of that reference. JTX 71 at 9, 15.

Appx11-Appx12. The trial court compared these and other relevant CN845 disclosures to the Asserted Claims, finding them nearly identical:

> The concentration of aprepitant in the asserted claims is 0.7 wt/wt%, which falls well within the range set forth in the CN845 specification (0.05% to 2%), JTX 71 at 13, and is close to the concentration set forth in several of the examples in CN845. The concentration of soybean oil in the asserted claims is 9% to 10%, which falls well within the range set forth in the CN845 specification (5% to 30%) and includes the concentration of soybean oil in Example 7 of CN845, which is 9.5%. *Id.* at 17. And the pH of the composition in the asserted claims ranges from 7.5 to 9.0, which overlaps with the 6.0 to 8.0 pH value of the emulsion in CN845. *Id.*

Appx32-Appx33 (internal footnotes omitted).

Regarding the excipient sodium oleate, the trial court found that a POSA would have known sodium oleate could be used to modify pH when applying CN845 and correctly concluded "the choice of sodium oleate would have been obvious." Appx42-Appx43. Sodium oleate was also the sodium salt of the pH modifier expressly used in Zhou. Appx12-Appx13; Appx2190; Appx2575-Appx2576 (201:12-202:5), Appx2533-Appx2534 (159:12-160:5); Appx3790 (1416:9-12). Moreover, prior emulsion formulations used sodium oleate to adjust the pH of the formulation. Appx42; Appx2925 (551:4-8).

Thus, there remained only one limitation in dispute: the *amount* of egg yolk lecithin. The trial court agreed that CN845 and Zhou taught using egg yolk lecithin,

and specifically for aprepitant emulsions; however, the express disclosure was in a range up to 10% whereas the claimed amount was 14%. Based on this 4% difference in the amount of egg yolk lecithin, the trial court declined to find obviousness of the Asserted Claims. Appx43.

## Summary of the Argument

In this case, Appellee pharmaceutical company obtained patent protection for a reformulation of a previously known drug, following a then-recently published formulation guide for that particular drug. Nothing in the reformulation is new or worthy of patent protection. The drug is old, the formulation elements were expressly taught, and the only difference from the prior art is a slight increase of one ingredient (lecithin) that the prior art already suggested would be useful and a POSA would know to increase to help aid formulation properties. The claims thus would have been obvious to a POSA, and this Court should reverse the trial court's holding to the contrary.

The two patents at issue in this case—the '229 patent and the '794 patent—cover reformulations of the compound aprepitant, a drug used to prevent certain nausea and vomiting. The aprepitant compound was originally created by a third party (Merck) in 2003, and developed and sold as an oral dosage form. Due to the low solubility of the aprepitant compound, and the state of the art back in 2003, Merck did not create a liquid formulation of aprepitant. Years later, however, a group

of third-party researchers discovered how to prepare liquid formulations of aprepitant and published their findings in 2012 as the CN845 and Zhou prior art references. These references fundamentally changed the state of the art, and laid out exactly how a POSA should formulate liquid aprepitant for intravenous use. Heron followed CN845's guide just as any POSA would, resulting in the claimed formulation.

The trial court itself acknowledged the strengths of Fresenius's positions, finding "[t]he issue of obviousness in this case is a close one." Appx57. The trial court's finding teetered on the "clear and convincing evidence" burden of proof but ultimately found the evidence fell short. Appx57. However, the trial court applied an overly rigid analysis and failed to apply the appropriate *KSR* standard for obviousness. Notably, when reaching its conclusion, the trial court failed to resolve its own factual findings that the prior art taught a POSA to use more lecithin in order to increase stability, and instead assumed that a POSA would have been limited to the explicit disclosures of CN845—akin to an anticipation test.

The asserted claims of the '229 and '794 patents are invalid as obvious. As the trial court confirmed, prior art reference CN845 disclosed all claim limitations except one: the specific claimed amount of egg yolk lecithin (14%). Appx43; *see also* Appx32-Appx33, Appx41-Appx42. The trial court acknowledged that CN845 disclosed a range up to 10% egg yolk lecithin. Appx33. It also found a POSA would

have been motivated to further modify CN845 specifically to improve stability, sufficient to bridge the gap from 10% to 14% lecithin. Appx29-Appx30. That was the only "missing" limitation in CN845. Yet the trial court even found a POSA would have recognized increasing emulsifier (such as lecithin) would have allowed for certain complexation and surface area to increase stability for aprepitant liquid formulations, specifically confirming a POSA would have been "encourag[ed]" to increase lecithin concentration to improve formulation stability. Appx14-Appx15, Appx39-Appx40. These findings should have resulted in an ultimate finding of obviousness supported by these statements justifying motivation and reasonable expectation of success.

Although the trial court's factual findings validated the mapped-out pathway for a POSA to apply CN845 and slightly increase (*e.g.*, 10% to 14%) the amount of lecithin to increase stability, the court erred in ultimately finding 14% lecithin non-obvious because the prior art did not expressly teach this amount. The trial court's analysis applied a heightened test by effectively requiring an express teaching of 14% aprepitant within the four corners of CN845 itself; however, as the case law demonstrates, a POSA is not an "automaton" and the trial court did not address the prior art as a whole, which explained that increasing the amount of emulsifier (including egg yolk lecithin specifically) improved stability. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007). The trial court also did not address the fact

that the *ratio* of egg yolk lecithin to aprepitant was already covered by CN845, which, in view of the other prior art presented at trial, would have resulted in the corresponding claimed 14% lecithin amount.

The trial court further erred by finding that the secondary considerations of long-felt but unmet need, unexpected results and failure of others, and commercial success each "moderately" or "only slightly" favored Heron. These findings were made without the required nexus analysis connecting any of the secondary considerations to the proper scope of the Asserted Claims—including the fact that all claims require 14% lecithin instead of other amounts—yet neither Heron nor the trial court addressed why that resulted in any secondary consideration. Moreover, these secondary considerations do not affect the strong obviousness evidence in view of the trial court's own CN845-based findings. *See, e.g.*, *Bayer Pharma AG v. Watson Lab'ys., Inc.*, 874 F.3d 1316, 1328-29 (Fed. Cir. 2017) (reversing non-obviousness where prior art disclosed all formulation components, even without disturbing secondary considerations findings).

This Court should reverse the nonobviousness judgment for the Asserted Claims.

**Standard of Review**

This Court reviews a decision following a bench trial *de novo* for errors of law and applies clearly erroneous review for findings of fact. *Pfizer, Inc. v. Apotex, Inc.*,

480 F.3d 1348, 1359 (Fed. Cir. 2007). A factual finding is clearly erroneous if, despite some supporting evidence, "the reviewing Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Pfizer*, 480 F.3d at 1359.

The "ultimate judgment of obviousness is a legal determination," even though it is based on underlying factual inquiries, including (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness. *KSR*, 550 U.S. at 427; *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The determination of whether a POSA would have been motivated to combine prior art or would have had a reasonable expectation of success is a factual determination. *See Intercont'l Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1343 (Fed. Cir. 2017); *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047-48, 1051 (Fed. Cir. 2016). Requiring express motivation or assuming that a POSA would only be motivated to combine products "forthcoming or currently available on the market" shows clear error. *Bayer*, 874 F.3d at 1324.

## Argument

### I. The Trial Court Erred in Its Determination Regarding Whether a POSA Would Have Been Motivated and Reasonably Expected Success to Use 14% Lecithin in an Aprepitant Emulsion Formulation

The trial court found every element of the claims disclosed and obvious from the prior art except one—the 14 wt/wt% egg yolk lecithin over the CN845's 10 wt/wt%. Appx43. The trial court expressly recognized CN845 as a "game changer" for intravenous aprepitant formulations, necessarily demonstrating that CN845 was the first to provide liquid aprepitant emulsion examples, and taught larger percentage amounts of emulsifier than other emulsions disclosed in the earlier art. Appx11. Yet the trial court disregarded how a POSA would have reasonably applied and extended CN845 beyond the 10% level as part of routine experimentation, based on other prior art and a POSA's knowledge of emulsion principles. Fresenius disputes the court's ultimate factual determination of whether motivation and reasonable expectation exist for this limitation.

"[A] court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 401. The trial court agreed with Fresenius that egg yolk lecithin was known in the prior art for use in formulating aprepitant. Appx15. It agreed CN845 used a higher percent amount of emulsifier specifically for aprepitant than other prior art emulsions for other drugs. Appx16. It agreed "CN845 recommended the use of an emulsifier at the top of the

0.5% to 10% range disclosed in that publication, and that nothing in the publication indicated that a concentration any higher than 10% would cause the emulsion to fail." Appx33-Appx34. It agreed a POSA would have recognized that increasing emulsifier would benefit solubility and stability for aprepitant, based on the POSA's understanding that increasing lecithin amounts meant (a) increased surface area between the oil and water phases in an emulsion, where aprepitant could reside, and (b) permitting direct lecithin complexation with aprepitant so as to maintain the drug in solution. Appx17-Appx18, Appx34, Appx40. The trial court even agreed "the possibility of complexation—and the resulting increase in the stability of the emulsion—would be a factor encouraging a POSA to consider using an increased concentration of the emulsifier." Appx40. Nevertheless, the trial court found a POSA would not have pursued aprepitant formulations using more than 10% emulsifier—including the claimed 14% level—simply because that specific amount was not already disclosed in CN845. That rationale invoked an anticipation analysis, whereas obviousness must be more flexible by its very nature and reliance on a POSA's knowledge and how a POSA would have applied the prior art knowledge beyond the four corners of one reference.

As explained below, the trial court's factual findings were wholly sufficient to establish motivation and reasonable expectation of success for the lecithin limitation under the clear and convincing standard, such that the trial court's ultimate

factual conclusion of no motivation and reasonable expectation of success was clear error. The trial court clearly erred legally and factually by: too rigidly requiring disclosure of the 14% lecithin amount in the prior art as opposed to routine optimization for this known result-effective variable, and improperly treating references that did not contradict a POSA's understanding of CN845 as if teaching away had been asserted, when it was not.

### A. The Trial Court's Factual Findings That CN845 Taught The Benefits of Increasing Emulsifier Concentration Would Have Motivated a POSA to Increase with a Reasonable Expectation of Success

The trial court's factual findings properly established the clear motivation and expectation for a POSA to increase the lecithin concentration in an aprepitant formulation: adding lecithin would have been expected to increase stability and meet USP standards governing stability criteria. Fresenius and its experts at trial provided the rationale for why and how a POSA would have further improved the CN845 and Zhou aprepitant formulations by increasing the lecithin concentration. And the trial court expressly credited this POSA understanding, although it did not apply that POSA knowledge to the teachings of CN845.

First, the trial court correctly found a POSA would have been motivated to further improve the CN845 formulations to meet regulatory guidelines, including USP stability requirements. Appx29-Appx30 ("After learning that CN845 and Zhou had success with solubilizing aprepitant in an emulsion suitable for intravenous

injection, a POSA would recognize that the next step toward commercializing an intravenous aprepitant emulsion would be to modify the formulation to meet regulatory requirements in the United States, including the USP guidelines.”).

Second, the trial court confirmed a POSA would have recognized the scientific rationale behind CN845’s technique of increasing emulsifier to increase aprepitant solubility, so as to extend the added-emulsifier approach once CN845 established it. The trial court found “a POSA would have known that, up to a point, increasing the concentration of the emulsifier in the aprepitant emulsion would increase the surface area of the interface between the oil and water phases of the emulsion, thus potentially increasing the stability of the composition.” Appx34. The scientific basis was explained by Dr. Rabinow, and validated by the trial court. Appx13 (“I found [Dr. Rabinow’s] testimony on the science of emulsions to be credible and consistent with the other evidence in the case.”). In particular:

> Dr. Rabinow explained that an emulsifier, such as the egg yolk lecithin used in CN845, is a compound that has both a hydrophilic and a lipophilic component. The hybrid nature of the lecithin molecule allows it to bind with both oil and water. Tr. 134:22–135:4. The emulsifier coats the oil globules in an oil-in-water mixture and causes an emulsion to form at the interface between the oil and water phases of the solution. The hydrophilic ends of the emulsifier molecules project into the water phase of the solution, and the lipophilic ends of those molecules project into the oil globules. As Dr. Rabinow explained, that “satisfies the solubility needs of both phases in one and the same molecule, which is situated at the interface” of the oil and water phases of the solution. Tr. 135:6–14. ***Although aprepitant will not dissolve in either the oil or the water, it is drawn to the emulsion interface between the two phases.*** Tr. 362:1–4. Dr. Rabinow testified that a POSA would understand that

> the process described in the CN845 reference, which led to the formation of a clear solution, meant that the emulsifier must be solubilizing the drug. Tr. 158:11–18.

Appx13-Appx14 (emphasis added).

In short, a POSA would have known that aprepitant is not soluble in water or oil independently; based on CN845, the POSA would have known aprepitant can be solubilized in an emulsion (i.e., mixture of water and oil) because it forms a complex with the emulsifier and can be loaded at the interface between the oil and the water—"the only real estate available to accommodate the drug." Appx2529-Appx2531 (155:20-157:14). From there, the POSA also knew—as confirmed by emulsion references like Washington—that increasing "emulsifier results in generating smaller oil globules, which in turn provides more total surface area for the interface between the emulsion's oil and water phases." Appx14. Thus, a POSA would have known from CN845, Washington, and basic emulsion principles that increasing emulsifier amounts allows for more space for aprepitant to be held in the emulsion without falling out of solution, i.e., providing stability. Appx2510-Appx2511(136:10-137:11); Appx13-Appx15.

While of course there may be some theoretical upper limit to the amount of lecithin to be used, there was no such limit shown in the prior art, and no reason to stop at CN845's 10% amount. As Dr. Rabinow explained, a POSA recognizing the benefits of increasing emulsifier would lead to the next step: "[t]he natural question

would be have they gone high enough." Appx2599 (225:8-24). A POSA thus would have known to start with CN845 and use lecithin in amounts higher than CN845 did, particularly when optimizing the formulation specifically for USP physical stability. Appx2592 (218:13-25), Appx2599 (225:8-24). And relevant to reasonable expectation of success, "[t]here's nothing that said [a POSA] couldn't go higher." Appx2619-Appx2620 (245:22-246:5). Indeed, the trial court expressly found that "nothing in the [CN845] publication indicated that a concentration any higher than 10% would cause the emulsion to fail." Appx33-Appx34.

The trial court perhaps went astray by focusing the starting point on the Zhou reference, which was one implementation of CN845. The trial court framed the obviousness question this way: whether "a POSA would have had a motivation to ***modify Zhou's formulation*** by increasing the amount of egg yolk lecithin to concentrations well above the range disclosed in CN845." Appx41 (emphasis added). Zhou was but only one way to implement CN845, and the trial court acknowledged the Zhou formulation did not yet meet USP stability standards and there was room for further improvement. Appx16-Appx17, Appx27 ("the POSA would have known from the Zhou article that the method used in CN845 produced an aprepitant emulsion that was stable, as measured by a standard somewhat less demanding than the applicable USP standard, *see* JTX115 at 10, giving rise to a motivation to improve the stability of the formulation to meet the USP standard.").

CN845, the trial court expressly found, was the "game changer" that "transformed" the state of the art for aprepitant formulations. Appx11. What precisely was this game changing approach? CN845 "used a significantly higher level of emulsifier [*i.e.* egg yolk lecithin] than other formulations." Appx16. CN845 recommended egg yolk lecithin in the range of 0.5-10%, with 8-10% preferred. Appx33. That amount was "up to eight times as much emulsifier as had been used in conventional emulsions." Appx33. And as the trial court correctly credited, a POSA would have understood that this initial increased emulsifier level benefitted formulations of low-solubility drugs like aprepitant by increasing surface area and permitting complexation, both ways of keeping aprepitant stable in an emulsion formulation. Appx13. Whether complexation itself had been measured was not required, because the POSA's understanding is what governed: the trial court credited that the "possibility of complexation—and the resulting increase in stability of the emulsion—would be a factor encouraging a POSA to consider using an increased concentration of the emulsifier." Appx40. Given the trial court's own assessment of POSA knowledge, there was no reasonable basis for it to assume that a POSA's knowledge would stop and start only with the express disclosure of CN845 or Zhou, when the evidence uniformly showed that a POSA understood the principle that increasing emulsifier increased stability.

### B. The Trial Court Erred by Failing to Consider the Prior Art As A Whole, And Focusing Too Heavily on Prior Art that Used Lower Amounts of Egg Lecithin As If They Implied Limits When They Did Not

Despite its findings confirming the pathway carved out by CN845, the trial court clearly erred in its analysis of the lecithin concentration by giving undue weight to prior art references containing lesser amounts of lecithin for *other* drugs and *other* purposes. Here, the trial court relied on three general categories of evidence beyond CN845 in its analysis of the lecithin concentration:

1. Zhou (Appx34);
2. Testimony and references for the general proposition that "above a certain level, increasing the emulsifier level will not further improve stability" (Appx34-Appx35), while confirming 10% was not shown to be that "certain level"; and
3. Other examples, such as FDA-approved non-aprepitant products, that used low concentrations of lecithin as sufficient for their purposes (Appx35-38).

As a preliminary matter, the trial court's overall description of this evidence demonstrates the flaw in the analysis: "Heron points to evidence that *would not have encouraged* a POSA to consider an emulsifier concentration as high as 14%." Appx34 (emphasis added). In effect, rather than review the prior art as a whole and consider whether the claimed invention would have been obvious, the trial court

looked to whether or not there was any example that did not use 14% lecithin and prematurely concluded that meant nonobviousness. That was error. This is not a teaching away case, and Plaintiffs did not assert teaching away. No evidence taught away from increasing CN845's 10% emulsifier to 14%. The trial court even precluded evidence on teaching away, because Plaintiffs' experts never opined on it. Appx3698 (Tr.1324:15-25). So the fact that *some* references did not encourage a POSA to increase emulsifier levels, is quite different from the prior art instructing not to use increased levels. The trial court, nevertheless, assumed these were the same. Yet it is clear that not every prior art reference needs to motivate a POSA to the claimed invention; sufficient motivation from the prior art as a whole is the requirement and the trial court's other findings showed that motivation had been sufficiently substantiated. *See Bayer*, 874 F.3d at 1324. That there may have been other obvious approaches, or that other prior art implemented other formulations, does not mean that the claimed inventions were nonobvious.

The three categories of materials relied upon by the trial court are addressed below:

**Zhou:** The trial court did not expressly make any findings crediting Heron's characterizations of Zhou as an "optimized" formulation, but nevertheless relied upon Zhou's 2.5% egg yolk lecithin concentration as somehow limiting motivation to use even CN845's lecithin concentration range. *See* Appx34. It was clear error,

therefore, to treat the Zhou chosen level as constraining without recognizing *why* the lower concentration was sufficient in the context of that reference, and without discussing *why* a POSA would ignore any number other than Zhou's 2.5% lecithin when applying CN845's broader disclosure and for a POSA seeking USP stability standards. Zhou was certainly not optimizing a formulation to meet USP standards, as both parties agreed, and Zhou was using much less drug (0.25% aprepitant in its proof-of-concept formulations), which a POSA would have understood required less emulsifier. Appx4562-Appx4574, Appx2702 (328:9-23). Zhou itself even expressly explained egg yolk lecithin's purpose as "play[ing] the role of solubilization in this recipe" and sufficiently stabilized 0.25% aprepitant for its specific tests, one step yet removed from the USP stability standards the trial court correctly agreed a POSA would have next pursued. Appx4572; Appx29-Appx30.

**Upper and Lower Limits for Emulsifiers:** The trial court's analysis appears to have been unduly influenced by testimony that there is *some* theoretical upper limit after which increasing emulsifier is no longer beneficial to an aprepitant formulation. Without any evidence setting that limit at the 10% shown in the CN845 reference, there was no basis to assume a POSA would have started and stopped there, especially in view of the trial court's finding that "a POSA would recognize that the next step [after CN845 and Zhou] toward commercializing an intravenous aprepitant emulsion would be to modify the formulation to meet regulatory

requirements in the United States, including the USP guidelines." Appx29-Appx30. After all, the prior art identified no upper boundary beyond which emulsifiers would hinder aprepitant emulsions; indeed, the experts agreed no particular level had yet been shown to be detrimental for any aprepitant formulation in the prior art. Appx2541-Appx2542 (167:16-168:5), Appx2590 (216:7-18); Appx3800-Appx3801 (1426:14-1427:2). The trial court expressly found no such discouragement either, noting that CN845 directed the POSA to higher amounts of emulsifier than standard emulsions for other drugs and further that "nothing in the [CN845] publication indicated that a concentration any higher than 10% would cause the emulsion to fail." Appx33-Appx34. The mere fact that a POSA would have understood there to be some theoretical upper limit to exist, without more, does not mean or suggest that 10% reflected that upper limit. The trial court already found the opposite, when it found that a POSA would have further tweaked CN845 for optimization in view of USP standards. Appx29-Appx30.

**Other Low Lecithin Examples:** The additional references on which the court relied that disclosed formulations having supposedly low concentrations of lecithin included Hingorani, Washington, and Liu. But a POSA would have understood from those references that adding emulsifier improved stability, even though in some cases they used absolute lecithin amounts that were lower than 14%. A POSA is not required to simply copy the numeric values used for other formulations. And

considering the prior art as a whole regarding preparation of an aprepitant emulsion formulation, includes acknowledging the context that these references predated CN845 and thus were not applying its game-changing teachings to use excess lecithin. Each of Hingorani, Washington, and Liu provided a POSA with understanding relevant to the function and suitability of an emulsifier for aprepitant formulations. *See*, *e.g.*, Appx2174, Appx2177, Appx2179, Appx2182, Appx2184, Appx2189-Appx2190. The trial court did not address the proper question: whether (and how) a POSA would have applied that knowledge in determining the amount of emulsifier to use with an *aprepitant* formulation consistent with *KSR*'s obviousness mandate to be evaluated in a flexible manner that credits the POSA's common sense and creativity. *KSR*, 550 U.S. at 421. The answer to that question required applying the POSA's knowledge to the prior art, not just taking the prior art at face value and assuming that a POSA's only choice was to copy it as-is; for obviousness, the POSA analysis must by definition take information from the prior art that goes beyond the face of one particular reference and extend it to obvious implementations. *Id.* at 421-22. Similarly, the trial court looked to *other* non-aprepitant FDA-approved references that used 1.2% lecithin concentrations for *other* purposes, and which were sufficiently stable without needing even the levels of emulsifier that CN845 described. In particular, FDA-approved products for other drugs used 1.2% emulsifier, as part of those formulations. But the POSA would not

have restricted the prior art to only those products that already had FDA approval, and ignoring CN845's teachings about aprepitant in particular, so the trial court relied "too heavily on the commercial availability." *Bayer*, 874 F.3d at 1324.

### C. The Trial Court Clearly Erred in Failing to Find Motivation to Combine References and Increase Lecithin

"The normal desire of artisans to improve upon what is already generally known can provide the motivation to optimize variables such as the percentage of a known polymer for use in a known device." *In re Ethicon, Inc.*, 844 F.3d 1344, 1351 (Fed. Cir. 2017); *see also KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."). The "motivation" analysis is "a flexible one." *Intel Corp. v. PACT XRP Schweiz AG*, 61 F.4th 1373, 1379 (Fed. Cir. 2023). For example, a "motivation to combine may be found explicitly or implicitly in market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018) (citing *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013)).

Crediting Dr. Rabinow's explanation of how to use increased emulsifier to provide complexation and surface area to increase stability, the trial court correctly found a POSA would have been "encourag[ed]" to increase emulsifier concentration

of CN845 to achieve improvements to formulation stability based on the complexation principles. Appx40 ("I credit his [Rabinow] testimony that the possibility of complexation—and the resulting increase in the stability of the emulsion—would be a factor encouraging a POSA to consider using an increased concentration of the emulsifier.").

That finding—of "a factor encouraging" increased emulsifier—should have meant that a POSA would have been motivated to increase emulsifier concentration as a part of routine experimentation. Despite the clear motivation to increase complexation by increasing lecithin, the trial court concluded that "[i]n view of the general consistency of the references in disclosing emulsifier concentrations well below 10%, I find that a POSA would not have had a motivation to increase the concentration of lecithin above 10%, including a concentration of at least 14%, and would not have had a reasonable expectation of success with an emulsifier level that high." Appx40-Appx41. This is legal and factual error because it looks to a subset of prior art focused on commercially available products and not on how a POSA would have understood and applied the prior art. Ultimately, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. The idea that a formulator would have recognized and been "encourag[ed]" by the benefits of increased emulsifier for an aprepitant formulation, and yet somehow would not have been motivated to increase emulsifier levels from 10% to 14%

because that exact recipe had not already been used conflates obviousness with anticipation.

As explained *supra* at Section I.B, the trial court erred by assuming that the existence of *alternative* options (i.e., lower lecithin amounts in other formulations), meant that a POSA would not have been motivated to implement CN845 by increasing lecithin. But none of these teachings are sufficient to *contradict* the trial court's own factual findings on the teachings from CN845 and Zhou specifically about aprepitant, and the POSA's understanding of complexation and knowledge for how to implement those references to reach USP-level stability. To the contrary, nothing in the prior art set a ceiling on a POSA's implementation.

In effect, even without any evidence that exceeding 10% would cause any issue—and the trial court's express finding that CN845 showed no such issue either—the trial court unreasonably restricted the POSA's implementation to only what CN845 already disclosed. That was error, including under *KSR*. Because CN845 was understood to be a "game changer," its revelations cannot be tempered by the simple fact that it did not already disclose 14% aprepitant. After all, CN845 was a "game changer," not a "game ender."

The Federal Circuit has long recognized that obviousness "does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current

invention." *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1355-56 (Fed. Cir. 2025) (internal citations omitted); *see also Bayer*, 874 F.3d at 1328 ("[O]bviousness does not require that the motivation be the best option, only that it be a suitable option from which the prior art did not teach away."). The same standard should have been applied here: any findings made by the trial court suggesting that some prior art used a lower lecithin amount does not and cannot negate the factual findings confirming the motivation for a POSA to increase lecithin when implementing CN845 and following the POSA's knowledge of emulsions and complexations.

As the Supreme Court has cautioned, "courts should avoid 'overemphasis on the importance of published articles and the explicit content of issued patents.'" *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 419). For example, in *Perfect Web Techs.*, the Federal Circuit upheld an obviousness finding where it was "common sense" to "try again" as claimed. Similarly, common sense applies here; a POSA would have been motivated to continue increasing emulsifier to find the ideal limit, and to increase stability in order to meet USP standards with a reasonable expectation of success. Appx2599 (225:8-24) ("[t]he natural question would be have they gone high enough."). The trial court's own factual findings thus are sufficient to support reversal, because the

findings confirm evidence showed a motivation based on CN845 and a POSA's knowledge and understanding of emulsion principles.

### D. The Trial Court Erred in Failing to Find Reasonable Expectation of Success of the Lecithin Concentration Limitation

To show obviousness, "only a reasonable expectation of success, not a guarantee, is needed." *Pfizer*, 480 F.3d at 1364 (citations omitted). "[C]ase law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Id*. "Indeed, a rule of law equating unpredictability to patentability" would mean that any new stable formulation "would be separately patentable" just because stability "must be verified through testing." *Id*. Put another way, absolute predictability is "not the criterion." *Merck & Co., Inc. v. Biocraft Lab'ys, Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989).

The trial court's finding on the one hand that a POSA would have understood increasing emulsifier concentration would increase stability but on the other hand finding no reasonable expectation of success of achieving stability with increased emulsifier concentration is clearly erroneous. The unrebutted testimony was that a POSA would expect increasing emulsifier levels increased surface area and complexation opportunities, both helpful to stabilize aprepitant. *See supra* at Sections I.A. The trial court found that a POSA would have understood these

principles to apply. Appx13-Appx14. A reasonable expectation of success requires nothing more. *See Pfizer*, 480 F.3d at 1364. Yet the trial court nevertheless still erred in this analysis for the same reasons as explained above. *See supra* at I.A-C.

Additionally, as explained below, the trial court legally erred by failing to recognize the ratios of components taught by the prior art and to consider lecithin as a result-effective variable for routine optimization.

#### 1. The Trial Court Legally Erred by Failing to Consider Lecithin as a Result-Effective Variable for Routine Optimization

The trial court erred by separately requiring a reference that disclosed already disclosed aprepitant formulations with 14% lecithin, whereas the law is not so exacting. Specifically, the trial court erroneously rejected the proposition that "even absent an applicable reference, a POSA would have been motivated to increase the concentration of egg yolk lecithin above the range disclosed in CN845 and up to as much as 14%." Appx39. Because the trial court looked only to see whether 14% had already been used with aprepitant, it held "this is not a case involving routine optimization within a range of values disclosed in the prior art," and improperly declined to assess whether the optimization was routine or obvious beyond this determination. Appx39.

The routine optimization analysis, however, does not require a range expressly disclosed in the prior art. *See, e.g.*, *Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341,

1348 (Fed. Cir. 2024) ("That does not mean, however, that the determination whether or not a variable is result-effective is only appropriate when there is such an overlap."). Instead, this Court has held

> "[a] routine optimization analysis generally requires consideration [of] whether a person of ordinary skill in the art would have been motivated, with a reasonable expectation of success, to bridge any gaps in the prior art to arrive at a claimed invention. Where that gap includes a parameter not necessarily disclosed in the prior art, it is not improper to consider whether or not it would have been recognized as result-effective. If so, then the optimization of that parameter is 'normally obvious.'"

*Id.* (citing *In re Antonie*, 559 F.2d 618, 620 (C.C.P.A. 1977)).

Dr. Rabinow, however, provided unrebutted testimony that the lecithin level is the result-effective variable, Appx2540 (166:11-20), Appx2590 (216:1-18), Appx2593 (219:18-23), Appx2599 (225:8-24), and that all of the other formulation components were used in ordinary amounts as compared to ordinary emulsions, Appx2508 (134:6-18). The trial court credited the named inventor's assertion that "[t]he emulsion is very complex," Appx40; however, the court ignored the POSA's approach to emulsion stability testing, which the evidence showed required nothing more than routine experimentation. For example, Plaintiff's expert Dr. Little conceded "the performance of a stability test is routine," and agreed that is so "even if it takes a long time." Appx3767 (1393:7-14). This admission confirmed that optimizing for stability testing was "generally recognized as routine." *Pfizer*, 94 F.4th at 1348-49. Additionally, nothing suggested modifying the remaining

excipients within the ranges disclosed in the prior art would impair the formulation's success. Instead, the prior art disclosed operative ranges, contained no objection for testing more than the 10% already used in CN845, and taught adding lecithin helped stability. *See In re Peterson*, 315 F.3d 1325, 1329-30 (Fed. Cir. 2003). Moreover, the trial evidence showed no proof of criticality that the claimed 14% was special. To the contrary, Dr. Little admitted, for example, that Example 3 in the patents-in-suit used the lower 11.7% lecithin and still satisfied the Court's claim construction for a "physically stable" formulation. Appx3785 (1411:3-24).

### 2. The Trial Court's Findings of Facts Fail to Recognize the Ratios Taught by CN845

The trial court's factual findings additionally failed to recognize the high emulsifier-to-drug ratios already disclosed in CN845, specifically up to 49:1 emulsifier:aprepitant. The trial court looked only for an express teaching of 14% lecithin as an *absolute amount*, rather than broader disclosures about lecithin-to-aprepitant *ratios*, when the two correspond to one another numerically. The prior art disclosed appropriate ratios that included the ratio of lecithin to aprepitant mathematically corresponding to the claimed amounts.

The trial court selectively used ratios when assessing obviousness. When it came to evidence that showed using high absolute amounts of lecithin, the trial used ratios to disregard that evidence. It found that "references that use high concentrations of egg yolk lecithin" corresponded to a ratio less than the Asserted

Claims computed "ratio of 20:1" (14% egg lecithin and 0.7% aprepitant). Appx38-Appx39 (fn9). But when it came to the routine optimization analysis, the trial court failed to address the fact that the 20:1 ratio fell well within the "robust" ratio range of up to 49:1 that CN845 and other prior art references already disclosed. *See* Appx19, Appx2573-Appx2574 (169:17-170:1), Appx2324. For example, Hingorani disclosed ratios of 12:1 emulsifier to drug. Appx2636 (262:22-25), Appx2323; Appx4303. In context, therefore, a POSA would have understood relative amounts—represented by ratios—were just as useful as absolute amounts; however, the trial court did not address the ratios as part of its routine optimization analysis.

The trial court's inconsistent approach to ratios, employing them to distinguish prior art, while ignoring them when evaluating CN845, led to an incorrect result. In fact, the importance of relative amounts extends not just to the lecithin:aprepitant ratio, but also to the lecithin:oil ratio, all consistently showing that CN845 paved the way for the POSA to implement obvious variations. For example, CN845's Example 7 disclosed 9.8g egg yolk phospholipid and 9.5g soybean oil when the formulation included 0.2g aprepitant. Appx4357. Like the Asserted Claims, this Example alone already demonstrated aprepitant formulations containing more emulsifier than oil, and a high ratio of emulsifier to aprepitant.

As a scientific matter, a POSA would have appreciated that the ratios of amounts are useful because the relative amounts of components help show how and

when an emulsion remains stable, and CN845 demonstrated a range of ratios with examples justifying the range. Appx19. Based on the unrebutted testimony that adding emulsifier increases available surface area and complexation opportunities for aprepitant, a POSA would have appreciated that there is a ratio relationship: more aprepitant can remain stable longer with more emulsifier. Appx34. The trial court already made factual findings supporting these conclusions, but did not apply them in its obviousness analysis. For example, the court's recognition that "a POSA would have known that, up to a point, increasing the concentration of the emulsifier in the aprepitant emulsion would increase the surface area of the interface between the oil and water phases of the emulsion, thus potentially increasing the stability of the composition" confirms a POSA would have known, and at least reasonably expected, a proportional functional relationship between the amount of emulsifier, aprepitant, and/or oil that would allow aprepitant to be solubilized. Appx34. The CN845 teachings, therefore, are not limited only to the actual amounts disclosed, but also to their corresponding ratios, and again the trial court itself acknowledged that these ratios would have been relevant. Appx38-Appx39 (fn9). The trial court clearly erred in failing to find that a POSA would have had a reasonable expectation based on the prior art's ratios of ingredients that using the claimed emulsifier-to-drug ratio would retain, if not improve, formulation stability to meet USP standards.

### E. The Trial Court Clearly Erred when Finding 14% Egg Yolk Lecithin Was a "Substantial Departure" from the Prior Art

The trial court's finding that "the limitation requiring a 14% concentration of egg yolk lecithin was a substantial departure from what was taught in the relevant prior art" represents clear error within the court's analysis. Appx43. The trial court did not explain why 14% reflected a "substantial departure" from the prior art, nor is that conclusion supported by the evidence. Heron had not even argued that 14% was "substantially different" than the 10% disclosed in CN845; its argument was that 14% was much higher than the 1.2% used for other drugs in prior art FDA-approved products. *E.g.*, Appx2225-Appx2295. The trial court's finding therefore is not supported by the evidence.

The overwhelming evidence showed that 14% is not substantially different than 10%. For example, Dr. Little admitted that the 11.7% lecithin from Example 3 in the patents-in-suit satisfied the court's claim construction for a "physically stable" formulation, and thus added no benefit to the 14% lecithin examples. Appx3785 (1411:3-24); Appx76. The trial court did not acknowledge this evidence in its findings. There certainly was no assertion or finding that the operable 11.7% lecithin was somehow a "substantial departure" from 10%. Similarly, Heron's own reproduction of CN845 demonstrated 4 days of stability for formulations containing 9.95% lecithin, while the patent examples using 14% lecithin corresponded to 7 days

of stability. ’299 patent; ’794 patent. These were not substantial differences, either in lecithin amounts used or corresponding stability impact.

Further, the prior art Liu reference, which the court found had “at least some application to an emulsion such as the emulsions in CN845,” disclosed that emulsions can have phospholipids “between 5% and 30%.” Appx37, Appx18 (citing 4490-Appx4491). So even if a specific prior art range had been required within which to operate, the trial court’s own analysis acknowledges that Liu is relevant and taught absolute amounts of up to 30% emulsifier. The trial court, however, improperly discounted Liu for clearly erroneous reasons including that the reference was not directed solely to phospholipids and incorrectly found the reference was directed to a different type of oil. Appx37. However, it was undisputed that the difference between 10% and 14% emulsifier is not substantially different from the prior art disclosure of between 5% to 30% emulsifier. Thus, when considering the prior art as a whole, and the trial court’s recognition that Liu would have been relevant to a POSA, the trial court erred by failing to permit the POSA to apply routine optimization within the 5% to 30% range.

### F. The “Physically Stable” Requirement of the ’794 Patent Claims Is an Inherent Property that Does Not Add Patentable Weight

If a limitation is “the natural result of the combination of elements explicitly disclosed by the prior art,” then it is inherent and adds no patentable weight to the

rest of the claim. *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195-96 (Fed. Cir. 2014). That is because "[t]he discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). For that reason, confirmatory test data is relevant and dispositive even if that data was not published in the prior art. *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329-30 (Fed. Cir. 2020). Importantly, for an inherent property, there is no requirement to separately show a reasonable expectation of success. *Id.* at 1331-32.

The Asserted Claims are substantively the same, except that the claims of the '794 patent add a "physically stable" formulation requirement. The trial court construed that phrase to mean "the composition must satisfy the criteria set forth in [USP <729>], a reference work that contains standards for various pharmaceuticals. USP <729> requires that for oil-in-water emulsions (i.e., emulsions of oil droplets suspended in water) intended for intravenous injection, the mean droplet size in the composition must satisfy the following criteria: (1) the suspended droplets must not exceed 500 nanometers in diameter; and (2) the population of fat globules greater than five microns in diameter must not exceed 0.05% (a standard referred to as "PFAT5")." Appx5 (citing Appx4587, Appx4589). The trial court also held this had to be true for only "a period of at least one week" or seven days. Appx5-Appx6. In

other words, the term “physically stable” was construed to match the already-established USP <729> standard, which the trial court correctly agreed that a POSA would have targeted. Appx29-Appx30.

As discussed above, the Asserted Claims of the ’229 patent would have been obvious to a POSA applying CN845 and POSA knowledge (such as reflected in Washington), because the POSA would have sought to increase the stability of CN845 formulations to meet USP stability. Once arrived at the claimed formulation components, the corresponding stability goes hand-in-hand with the formulation itself, making stability an inherent property. *Hospira*, 946 F.3d at 1332.

The parties agreed at trial that the physical stability of a formulation is an inherent property of that formulation. For example, to show infringement, Heron’s expert Dr. Little relied on the stability testing of Heron’s own product as proof of Fresenius’s product characteristics, based on the argument that because stability is an inherent property of a formulation, one could apply the test results from Heron’s formulation to Fresenius’s same formulation. Appx23-Appx25. The trial court credited this testimony. Appx23-Appx25. While the trial court made no separate inherency finding, it did find that because they used identical formulations, “Fresenius’s ANDA product should meet the same physical stability criteria as Cinvanti®.” Appx24. For the same reasons, when applying the same test data for obviousness, because the formulation itself would have been obvious to a POSA, the

stability results confirm the inherent stability property associated with the claimed formulation. Put another way, the fact that Heron reported test results for an obvious formulation does not make the formulation non-obvious. *Hospira*, 946 F.3d at 1332.

In the alternative, the evidence showed a reasonable expectation of success that the claimed "physically stable" formulations could be made. That is because CN845 reported workable emulsions, and because Zhou demonstrated promising early stage stability testing and showed results. Indeed, CN845 and Zhou both already revealed they met the particle size part of the "physically stable" term, since both reported less than 500-micron particle sizes, and Dr. Little admitted that the prior art already showed aprepitant emulsion formulations that met the claimed particle size requirement. Appx3769 (1395:6-12). These and other results supported the conclusion that a POSA would have expected that adding more emulsifier would result in increased stability, specifically to meet the claimed USP standards. Appx2612-Appx2613 (238:3-239:5), Appx2510-Appx2511 (136:10-137:11), Appx2730-Appx2731 (356:15-357:14); Appx2615 (241:15-25). In particular, CN845 reported that, even after applying a "stress" test, disclosed emulsion formulations survived autoclaving. Appx2620 (246:9-18); Appx4356-Appx4357. Zhou optimized a proposed aprepitant formulation not yet for USP but for the more preliminary "$K_e$ variable", yet already reported a battery of promising stability test results. Appx4571 (Table 4); *see also* Appx2576-Appx2578 (202:16-204:13). Even

Dr. Little testified that Zhou used $K_e$, which "gives you some stability criterion," which he understood to be different from USP. Appx3642 (1268:16-1269:3). CN845 and Zhou demonstrated to a POSA that aprepitant emulsions were physically stable, and gave confidence to a POSA that they could meet USP standards for stability, at least for one week. Appx2568 (194:6-22).

## II. The Court's Objective Considerations Analysis Was Legally Flawed

The trial court additionally erred in its objective considerations analysis. The trial court agreed that Fresenius's obviousness presentation was strong, and had the trial court found prima facie obviousness by properly considering CN845 and POSA knowledge, then the weak supporting secondary considerations could not change that obviousness assessment. *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (finding that even "substantial evidence of commercial success, praise, and long felt need" was "inadequate" to overcome a strong prima facie showing of obviousness). Along those lines, the trial court concluded "the evidence of objective considerations provides some support for Heron's argument that the two asserted patents would not have been obvious, but ***the objective considerations are not powerful factors bearing on the issue of obviousness here***." Appx52 (emphasis added). The trial court's findings that certain objective consideration weighed "slightly" or "moderately" in Heron's favor were legally erroneous and cannot outweigh the *prima facie* case of obviousness. Specifically,

the trial court found "the long-felt, unmet need evidence weighs moderately in Heron's favor; the commercial success factor weighs slightly in Heron's favor; and the failure of others and unexpected results evidence weighs moderately in Heron's favor" and "[t]he remaining categories of secondary evidence have no significant bearing on the issue of obviousness in this case." Appx52. However, the trial court failed to mention nexus at all, and the evidence fails to support that the secondary considerations found by the court are commensurate with the scope of the Asserted Claims. The trial court also committed additional legal errors in its analysis of each secondary consideration; that, in combination with clear factual errors, improperly tipped the scales marginally to Heron's side. Ultimately, the trial court's findings disregarded the scope of the Asserted Claims and were premised on the incorrect comparison to everything but CN845, even though CN845 was the closest prior art.

### A. The Court's Lack of a Nexus Analysis Is Clear Legal Error, and Nexus Was Not Commensurate with the Asserted Claims' Scope

"[O]bjective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support." *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (quoting *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983)). Here, the court committed legal error by failing to consider nexus (evidenced by failing to mention nexus at all) or even explaining how there is any nexus between the secondary considerations and the Asserted Claims.

### 1. There Is No Nexus Between a Long-Felt Need for a Product with Less Adverse Events and the Asserted Claims

The trial court's long-felt need analysis is incongruent with the scope of the Asserted Claims and inconsistent with existing law. The trial court did not address why the claimed 14% lecithin addressed any long-felt need, as opposed to any other formulation with lecithin and without polysorbate 80 ("PS80"). The court found long-felt need favored Heron—though only moderately—presumably based on purported less ISAEs with Cinvanti® as compared to fosaprepitant and because aprepitant does not contain an excipient called PS80. But the Asserted Claims do not require a product that reduces any adverse events, and do not compare adverse event rates with fosaprepitant. *See* Appx79, Appx97. Moreover, PS80 is not excluded from the Asserted Claims; in fact, the Claims use the term "comprising" and thus allow for the use of PS80. *Id*. Therefore, the court's basis for long-felt but unmet need is not commensurate with the scope of the Asserted Claims. *See Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) (reversing jury verdict of non-obviousness because claimed device solved problem but configuration was not part of claim).

Further, the court's findings are inconsistent with the legal requirement for a long-felt but unmet need. The court held "the level of concern [with fosaprepitant] was moderate and could be minimized by countermeasures," and that "the motivation to [develop an aprepitant formulation with less side effects than fosaprepitant] was not an urgent or compelling one." Appx47. These findings by

themselves indicate there was not a long-felt need that went unmet, because physicians already addressed any concerns with other measures.

In addition, the trial court ignored CN845. CN845 taught aprepitant formulations without PS80 (Appx4354-4357, Appx2626-2627, Appx2629), but the trial court did not address this critical prior art in the comparison. Without comparing to the closest prior art, the trial court did not have sufficient basis to find even the "moderate" level of long-felt need because CN845 already addressed it. Because the prior art already solved any alleged need, that need could not be "sufficiently connected with the novel elements of the asserted claims." *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 838 (Fed. Cir. 2015).

Finally, there is no nexus to any long-felt need as there was no evidence demonstrating Cinvanti® met any long-felt need. *See Perfect Web Techs*, 587 F.3d at 1332-33 (affirming rejection of expert testimony of "improved efficiency" where no data showed any quantifiable improvement). The court recognized Heron's own data showed Cinvanti® did not show a measurable improvement in ISAEs over fosaprepitant (Emend® IV). Appx46. Specifically, a Heron-commissioned article (Appx4605) found no statistical difference in the number of ISAEs for Cinvanti and Emend IV, (Appx4602-4603, Appx3026-3028, Appx3030) and that when other PS80-containing fosaprepitant products are included in the analysis the incidences of ISAEs were "the same" (Appx3028); *see also* Appx4601-4602 (Table 3)).

Moreover, Heron and its expert admitted Cinvanti® was approved because it is clinically interchangeable with fosaprepitant, supporting the conclusion that there are not improved ISAEs with Cinvanti®. Appx2896-2897, Appx3455-3456; *see also* Appx3026-3028. *See Spectrum Pharms., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1335-36 (Fed. Cir. 2015) (finding no long-felt unmet need because claimed improved product was clinically interchangeable with prior art product).

#### 2. There Is No Nexus to Unexpected Results or Failure of Others as again the Court Did Not Compare the Asserted Claims to the Closest Prior Art

The trial court's lack of a nexus analysis is also problematic in connection with its evaluation of unexpected results and failure of others, where the court did not compare the stability of the Asserted Claims to the closest prior art. "To be particularly probative, evidence of [secondary considerations] must establish that there is a difference between the results obtained and those of the ***closest prior art***…." *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014) (emphasis added); *see also Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 933 (Fed. Cir. 2024).

The trial court found the stability of the claimed product was unexpected at seven days whereas Heron's "reproduction" of the prior art was stable for only four days. Appx48. This comparison did consider lecithin differences, but the court ignored the differences other than lecithin percentage associated with this modest

three-day stability improvement; the pH had been changed too. It was undisputed that the Asserted Claims require a formulation pH of between 7.5 – 9.0 (and the tested more stable formulations had pH of 8.7 or 8.8), whereas the pH of Heron's prior art reproduction was set to the much lower 6.5-7.0 even though the prior art disclosed broader ranges. Appx2660; Appx2666-2667; Appx76-77, Appx79, Appx5915-5918, Appx2875-2877, Appx4570-4571, Appx3793-3795. The evidence was undisputed that pH was key in making a stable aprepitant product, so setting up the experiment to fail without controlling for pH rendered any test result comparison meaningless. Appx2660-2661.

Relatedly, there is no nexus regarding alleged failure of others as there was no showing others failed to make a stable aprepitant IV formulation at any time, much less ***after*** CN845 published. Appx49 ("There was no evidence at trial that others who had access to the CN845 application had tried and failed to formulate an emulsion stable enough to satisfy the USP standards, and there was no evidence that others in the field regarded Heron's success as unexpected after the groundbreaking work had been done by the Chinese scientists."). There was simply no evidence of any failure using lecithin percentages above 10%, and the district court thus made the wrong comparison by referring to earlier pre-CN845 work. With no evidence of a failure by others or unexpected results after the closest prior art became publicly known, there cannot be any nexus to the Asserted Claims.

### 3. There Cannot Be a Nexus Between Heron's Sales and the Asserted Claims Because the Court Specifically Found Any Success Was Due to Heron's Pricing

The trial court found the alleged benefits of Heron's commercial product were "partially attributable" to sales of its product, but the lack of any showing of a nexus between those alleged benefits and the claims is legal error. The trial court did not address the fact that the Cinvanti® aprepitant formulation was not on the market at the same time as the prior art aprepitant formulation, so Heron had not made the showing that using 14% lecithin or any other claim limitation resulted in any success. None of the purported "benefits" the court found that made Cinvanti® "successful" (Appx51)—it is an IV product, does not have PS80, does not "come with a risk of side effects," can be administered as an IV push, and can be stored at room temperature—are connected to the Asserted Claims at all. In fact, several of those properties were already disclosed in the prior art. *See, e.g.*, Appx4353; Appx3732-3733; *see Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005). It is legal error that the court failed to show any connection between any "benefits" of Cinvanti® that allegedly led to commercial sales and the Asserted Claims themselves.

## B. <u>The Trial Court's Legal and Factual Errors Led It to Find Long-Felt, Unmet Need, Which Still "Only Moderately" Favored Heron</u>

The court's long-felt need analysis also improperly focused on a subset of the full claim scope, found a "moderate" concern equated a long-felt need where the

evidence showed no need actually existed, and misapplied the law as any need was already met by existing knowledge on how to safely administer fosaprepitant.

#### 1. A Merely "Moderate" Need Cannot Show a Long-Felt Need as a Matter Of Law

The trial court's finding that doctors had "moderate" concerns of ISAEs with fosaprepitant and that doctors viewed Heron's PS80-free Cinvanti® product as having a "modest" benefit over fosaprepitant are insufficient to establish a long-felt need. *Par Pharm.*, 773 F.3d at 1200 (affirming no long-felt need where claimed formulation was "preferable"). The undisputed evidence showed medical professionals did not recognize a "long-felt but unmet need" for a safer alternative to fosaprepitant.

First, a Heron survey, cited by the court, showed doctors were not concerned with fosaprepitant's safety. *See* Appx5203, Appx5271 (reporting doctors were "generally satisfied with [fosaprepitant] safety and indicate a low level of concern regarding [ISAEs] and hypersensitivity," and had "'[l]ow level stakeholder awareness of [PS80] and lower awareness of [PS80] in" fosaprepitant); Appx5271 (reporting a "perceived lack of clinical differentiation between Cinvanti and [fosaprepitant]…was viewed as only impacting a small patient population, ***which would not be a differentiator vs. Emend IV***" (emphasis added)). To be sure, there is always a general motivation for safer and more readily administrable drugs (Appx3079), but that general proposition does not reasonably lead to a conclusion

that fosaprepitant was unsafe. Second, Dr. Markman provided unrebutted testimony that there was no biological link between ISAEs and the PS80 in fosaprepitant. Appx2973-2974, Appx3022. Without evidence of any biological link, "it goes without saying that there could not possibly be any evidence of [] a long-felt need…." *In re Gershon*, 372 F.2d 535, 539 (C.C.P.A. 1967).

The trial court noted the Mayo Clinic had switched its guidelines to recommending oral aprepitant as opposed to fosaprepitant (Appx47); however, that recommendation was only for patients who were co-administered dexamethasone, a vesicant chemotherapy drug known to cause ISAEs, through a peripheral line. Appx4641, Appx4644; Appx2991-2997. Moreover, the Mayo Clinic determined that dexamethasone, ***not*** fosaprepitant, was the cause of the ISEAs. *Id*. Thus, the evidence did not support there was any long-felt unmet need.

**2. Doctors Knew How to Safely Administer Fosaprepitant to Address Any Alleged "Moderate Concerns" with ISAEs**

Even if doctors were concerned about fosaprepitant causing ISAEs, the undisputed evidence showed medical professionals knew how to address any such concern and, therefore, any "need" was not unmet as a matter of law. Evidence of long-felt need is not probative if "others had previously solved the long-felt need," even if not in the same way as the claimed invention. *In re PepperBall Techs., Inc.*, 469 F. App'x 878, 882 (Fed. Cir. 2012); *see also ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1362 (Fed. Cir. 2015). Medical professionals knew how to

eliminate the risk of ISAEs when co-administering fosaprepitant and dexamethasone: use the “majority approach” and administer the drugs through a central line instead of a peripheral line. Appx2991-2997, Appx2999-3005, Appx3013-3015, Appx3022, Appx3028-3030; Appx4604; Appx4634, JTX154.5, Appx4644, Appx4649, Appx4651, Appx4653-4654, Appx4794. Medical professionals also used other “countermeasures,” e.g., using a non-vesicant chemotherapy drug (Appx4631), using lower concentrations or diluting the drugs (Appx3016-3017, Appx3038-3039, Appx5910), and administering the drugs in the same bag (Appx3039-3040; Appx5912-5913, Appx3028; Appx4601-4602, Appx4604).

The court held these “workarounds” indicated there was a problem with fosaprepitant; however, even if true, descriptions of successful countermeasures in the prior art “eliminate any serious contention that there was a long-felt need” for the claimed invention. *See ABT*, 797 F.3d at 1362. In *ABT*, the Federal Circuit found no long-felt need because the prior art addressed the benefits allegedly provided by the claimed periodic fan operation function for HVAC systems in a different way than the claims. *Id.* at 1355, 1362. The same is true here. In fact, the trial court expressly held that the “motivation to [develop an aprepitant formulation with less ISAEs] was not an urgent or compelling one,” Appx47, showing that the countermeasures sufficiently addressed any purported long-felt but unmet need.

This case is different from *WBIP, LLC v. Kohler Company*, 829 F.3d 1317, 1334 (Fed. Cir. 2016), where the "workarounds" showed a problem with the prior art, but did not solve those problems—deadly carbon dioxide was still getting into the houseboats despite changes to the prior art engine. That is not the case here: administration countermeasures with fosaprepitant was recognized by medical professionals as eliminating any ISAEs when co-administered with toxic cancer drugs. In fact, Heron's expert admitted that fosaprepitant is "still used by doctors today" (Appx3455), confirming that there was no long-felt, unmet need.

#### 3. The Court Committed Legal Error by Focusing on a Small Subset of Patients Who May Experience Adverse Events

It was legal error for the court to address alleged long-felt but unmet need only in connection with patients who could not use a central line and who might then experience ISAEs, which is a small minority of patients encompassed by the Asserted Claims. *See Cubist Pharms., Inc. v. Hospira, Inc.*, 805 F.3d 1112, 1126 (Fed. Cir. 2015) (finding no long-felt need where the prior art was not effective for only 5% of cases). Even for that small subset, the court found only a "moderate" concern with fosaprepitant adverse events, that there was not an urgent or compelling motivation to address this concern, and that the concern was overcome using "countermeasures." Appx47. Yet from these findings the court held that the long-felt-need factor "moderately" favored Heron because the countermeasures were not available for all patients and therefore a risk of fosaprepitant adverse events

"remained a concern in at least some instances"—hypothetical patients that could not receive medication through a central line. Appx45, Appx47. The trial court confirmed, however, the experts' agreement that a vast majority of patients were administered their drugs through a central line, and that the use of a central line (along with other countermeasures, as mentioned above) avoided any ISAEs patients may have experienced when co-administered fosaprepitant with dexamethasone. Appx45; Appx4604 (85% of patients used central line); Appx4644 (central line used for "majority of patients") Appx2995-2996, Appx3028-3029, Appx3036-3037. The document cited by the court clearly stated that any "*perceived* lack of clinical differentiation between Cinvanti and [fosaprepitant]…was viewed as *only impacting a small number of patients*…." (Appx5271) (emphasis added). The court's analysis is therefore legally flawed as the Asserted Claims are not limited to a few hypothetical patients who may not be able to receive fosaprepitant through a central line or port.

### C. The Trial Court's Unexpected Results and Failure of Others Analysis Is Legally Erroneous and Internally Inconsistent

The trial court correctly held "[t]here was no evidence at trial that others who had access to the CN845 application had tried and failed to formulate an emulsion stable enough to satisfy the USP standards, and there was no evidence that others in the field regarded Heron's success as unexpected after the groundbreaking work had been done by the Chinese scientists." Appx49. That is because, as the court properly

found, CN845 was accurately characterized as "a 'game changer' that 'transformed' the state of the art for aprepitant formulations." Appx11. So the court's conclusion that unexpected results and failure of others favored Heron, even "only moderately," is unsupportable.

There is no way to reconcile the court's finding that "there was no evidence that others in the field regarded Heron's success as unexpected after the groundbreaking work had been done by the Chinese scientists," (Appx49), with its determination that there are unexpected results rending the claims nonobvious. The trial court made no finding about what a POSA would have expected *a priori*, and neither it nor Heron ever articulated "what the skilled artisan would have expected" after the game-changing disclosure of CN845, which precludes a finding of an unexpected result. *See Pfizer*, 480 F.3d at 1371. In fact, Heron's expert Dr. Little actually admitted a POSA would have had no stability expectation because "[b]efore you do the test, if you look at CN845, there is no information on stability." Appx3807-3808.

Further, as mentioned above, the court's analysis was not based on a comparison with the closest prior art, i.e., a CN845 formulation with a pH between 7.5-9.0. *See* Section II.A.2. Heron's "reproduction" of CN845 was also flawed as Dr. Han, who had no prior experience formulating emulsions (Appx40), did not follow any specific example in reproducing CN845 (Appx2867-2868) and could not

explain why she chose the amounts of excipients she used or why she did not make another formulation within the broad ranges disclosed by CN845 after falling 3 days short of making a "physically stable" formulation, as that term was construed (Appx2864-2868).

In addition, the trial court also erred in concluding that there is a difference in kind and not degree between the 4 days of stability Heron achieved with its "reproduction" of CN845 and the 7 days of stability required by the Asserted Claims. Appx48. Specifically, the trial court failed to "evaluate the significance and 'kind' of expected results along with the unexpected results." *See Bristol-Myers*, 752 F.3d at 977 (finding a drug that is "more potent" is a difference in degree); *Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1374 (Fed. Cir. 2022). The court found that a formulation that is not stable for one week "becomes almost impossible to commercialize." Appx48 (citing Appx2914-2916). There was no basis for this finding, except the conclusory opinion offered by Dr. Little, who did not explain why seven days would be suddenly commercializable when three days would not. Moreover, the trial court's finding was contradicted by the unrebutted testimony that the difference in stability between Heron's prior art reproduction and its Asserted Claims (4 days versus 7 days) did not change the way the drug worked, **only the duration of stability** (Appx2667-2668). That is only a difference in degree, not kind. And "[r]esults which differ by percentages are differences in degree rather

than kind, where the modification of the percentage is within the capabilities of one skilled in the art at the time." *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013).

Finally, the court also erred in its failure-of-others analysis. Again, the court acknowledged that there was no evidence anyone failed ***after*** the game changing CN845; that should have ended the failure of others analysis as any previous alleged failures were rendered irrelevant. *See, e.g., Graham*, 383 U.S. at 36 (holding prior art addressed differences between claims and older art and that "unsuccessful attempts to reach a solution to the problems confronting [inventor] made before that time became wholly irrelevant."). Regardless of whether Merck previously was able to make an injectable aprepitant formulation,[3] both CN845 and Zhou (as well as others) *succeeded* in making injectable aprepitant before the asserted patents. Appx2620, Appx4354; Appx2578, Appx4566, Appx4571. It is also irrelevant that an injectable aprepitant product had not been brought to the market in 20 years; Merck launched fosaprepitant midway through that period, and it would have had little motivation to develop an injectable aprepitant product to directly compete against its own injectable product. *See Digitronics Corp. v. New York Racing Ass'n*, 553 F.2d

[3] Heron's expert Dr. Hale did not work on aprepitant formulations at Merck and could not identify any aprepitant formulations that Merck tried but failed to make. (Appx3364-3365; Appx3345)

740, 749 (2d Cir. 1977) (finding "dominant company had no incentive to make the [patented] change because its former system…was good enough to dominate the market, and no one else was willing to make the needed investment further to upgrade its operation, in view of that domination").

### D. There Cannot Be Commercial Success Where the Court Found Cinvanti Sales Were Based on Heron's Discounted Pricing

It was undisputed Cinvanti® pricing drove sales and market share, and the court's analysis on this issue is internally inconsistent. The trial court acknowledged that "the success of Cinvanti® has been attributable to Heron's pricing strategy ***rather than to the advantages of the patented formulation***," that it was "true that Heron priced Cinvanti® below Emend IV® when Cinvanti® launched," and that Heron acknowledged "the attractive price of the product was a factor motivating customers to move from Emend IV® to Cinvanti®." Appx52 (emphasis added). This should have ended the commercial success analysis as clearly the pricing of Cinvanti®, and not any alleged unclaimed benefits of the product, drove sales and market share. After all, while the court found that being a PS80-free product was one of the so-called advantages demonstrating commercial success, it is undisputed that Cinvanti® lost market share to PS80-containing products when those products were priced lower than Cinvanti®. Appx3555-3556.

Further, any alleged benefits of Cinvanti® were already disclosed in the prior art. *See* Section II.B; *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1278-

79 (Fed. Cir. 2021) (rejecting commercial success because no evidence tied to unique characteristics of claim). There was no way for the court to separate Heron's discount pricing from any alleged benefits of Cinvanti® in the commercial success context. Thus, there was no reason[4] for the court to even "slightly" favor Heron on commercial success when "the pricing strategies followed by Heron have had a *significant role* to play in giving Cinvanti® as large a market share as it has." Appx52 (emphasis added).

## III. The Trial Court's Findings with Respect to Previously Dismissed Claims Are Moot

The trial court's findings of fact and conclusions of law included language suggesting findings for certain claims that had been dismissed with prejudice prior to trial.[5] *See* Appx57 (finding infringement of "claims 9 and 10 of the '794 patent, in addition to claims 1–11 and 21 of the '229 patent"). The Final Judgment entered by the trial court, however, correctly addressed only the five claims disputed at trial:

---

[4] The trial court found "Fresenius acknowledged that Cinvanti® is 'doing exceedingly well in the market,' which has motivated Fresenius to develop a generic version of Cinvanti®." Appx51. But this statement by a non-corporate representative does not prove commercial success because it does not mention any basis for any sales and thus does not provide any nexus to the Asserted Claims.

[5] The parties jointly agreed prior to trial to dismiss with prejudice all claims except for the five Asserted Claims. Appx2146-2149. The Court's corresponding June 28, 2024 order stated "no final determination ha[d] yet been reached in this action" with regard to all claims beyond the 5 remaining for trial, and dismissed those claims with prejudice. Appx2150-2153.

claims 9, 10, and 21 of the ’229 patent and claims 9 and 10 of the ’794 patent. Appx59. Because the Federal Circuit reviews judgments and not opinions, this appeal directly addresses the five claims addressed in the Final Judgment. However, to the extent there remains ambiguity as to the impact of the dismissed claims, the trial court’s findings of fact and conclusions of law with respect to claims 1-8 and 11 of the ’229 patent should be overturned.

## Conclusion

For the foregoing reasons, the judgment of the trial court should be reversed.

Respectfully Submitted,

*/s/ Helen H. Ji*

Imron T. Aly
Helen H. Ji
Kevin M. Nelson
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500
imron.aly@afslaw.com
helen.ji@afslaw.com
kevin.nelson@afslaw.com
*Counsel for Defendant-Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1355

**Short Case Caption:** Heron Therapeutics, Inc v. Fresenius Kabi USA, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,295 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 04/25/2025

Signature: /s/ Helen H. Ji

Name: Helen H. Ji

Save for Filing

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HERON THERAPEUTICS, INC., | § | |
| *Plaintiff*, | § | |
| v. | § | **FILED UNDER SEAL** |
| FRESENIUS KABI USA, LLC, | § | Civil Action No. 22-985-WCB |
| *Defendant*. | § | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a Hatch-Waxman Act case. The plaintiff, Heron Therapeutics, Inc., has sued the defendant, Fresenius Kabi USA, LLC, for patent infringement under 35 U.S.C. § 271(e)(2). Fresenius argues that it does not infringe two of the claims at issue in the case and that the asserted claims of the two patents in suit are invalid for obviousness under 35 U.S.C. § 103 and for failure to satisfy the written description requirement of 35 U.S.C. § 112(a).

## I. Procedural Background

The Hatch-Waxman Act is the name commonly used to refer to the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (codified at 21 U.S.C. §§ 355, 360(cc) and 35 U.S.C. §§ 156, 271, 282), as amended by the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066. The Hatch-Waxman Act was designed to strike a balance between two competing policy interests: (1) to induce pioneering research and development of new drugs; and (2) to enable competitors to bring low-cost generic copies of those drugs to market rapidly if those drugs are not entitled to patent

protection. *See Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002). To promote those objectives, the Hatch-Waxman Act provides for a prompt determination of whether drugs made and sold by brand-name pharmaceutical companies are protected by valid patents. If the patents are held to be infringed and not invalid, the covered drugs cannot be made and sold by generic manufacturers until the patents expire. If the patents are held to be invalid or not infringed, the Act provides a mechanism for prompt approval of the generic versions of the drugs by the U.S. Food and Drug Administration ("FDA"), which regulates the sale of pharmaceutical drugs in this country.

To obtain the necessary FDA approval to market a new drug, a pharmaceutical company must file a New Drug Application ("NDA"). That application is designed to show the FDA, through rigorous testing procedures, that the drug is safe and effective for its proposed uses. After considering the application, and often after extended negotiations with the pharmaceutical company, the FDA may grant the application and authorize the company to market the drug for particular indications. The company is restricted to marketing the drug for those indications, as dictated by FDA regulations that govern both labeling and advertising for all prescription drugs. *See* 21 C.F.R. §§ 201.1–201.327 (labeling), *id.* § 202.1 (advertising).

To speed up the approval process for generic drugs, the Hatch-Waxman Act provides that a generic drug manufacturer may submit an Abbreviated New Drug Application ("ANDA") for approval by the FDA. If the generic company intends to market a drug that is bio-equivalent to the first pharmaceutical company's approved drug, the ANDA may rely on the safety and efficacy studies previously submitted as part of the first company's NDA.

Under the Hatch-Waxman Act, NDA holders are required to notify the FDA of all patents that "claim [] the drug for which the [NDA] applicant submitted the application . . . and with respect to which a claim of patent infringement could reasonably be asserted." 21 U.S.C. § 355(b)(1), (c)(2). The FDA lists such patents in a publication titled "Approved Drug Products with Therapeutic Equivalence Evaluations," which is commonly referred to as the "Orange Book." *See Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1318 (Fed. Cir. 2012); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1045 (Fed. Cir. 2010).

The Hatch-Waxman Act creates what is referred to as an "artificial" type of infringement that allows for the adjudication of the parties' rights regarding patents that would be infringed if the ANDA were issued and the generic product made, used, or sold in this country. *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990); *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1351 (Fed. Cir. 2004). In particular, 35 U.S.C. § 271(e)(2)(A) provides that it shall be an act of patent infringement to submit an ANDA for a drug claimed in a patent or the use of which is claimed in a patent if the purpose of the submission of the ANDA is to obtain approval to engage in the commercial manufacture, use, or sale of the drug claimed in the patent, or the use of which is claimed in the patent, before the patent's expiration.

Heron is the owner of U.S. Patent Nos. 9,561,229 ("the '229 patent") and 9,974,794 ("the '794 patent"), the two patents asserted in this case. Heron holds NDA No. 209296 for an injectable emulsion for intravenous use, containing 130mg/18mL aprepitant as one of the active ingredients. It markets and sells the product in the United States under the name Cinvanti®.

Cinvanti® is indicated for the treatment of emesis, also known as vomiting and nausea. The asserted patents are listed in the Orange Book as covering Cinvanti®. Fresenius filed ANDA

No. 214639, seeking approval for a product containing an injectable aprepitant emulsion. The Reference Listed Drug for Fresenius's ANDA product is Cinvanti®. Based on Fresenius's ANDA filing, Heron is accusing Fresenius of infringing several claims of the '229 patent and the '794 patent under 35 U.S.C. § 271(e)(2)(A).

**II. The Asserted Claims**

The asserted patents are both titled "Emulsion Formulations of Aprepitant" and are directed to pharmaceutical formulations for intravenous use developed by Dr. Thomas B. Ottoboni and Dr. Han Han.[1] The claims asserted in this case are claims 9, 10, and 21 of the '229 patent and claims 9 and 10 of the '794 patent. The priority date for both patents is September 19, 2014.

Emulsions are systems that consist of two immiscible liquid phases, such as oil and water, one of which is dispersed throughout the other in the form of fine droplets. Lipid emulsions for intravenous use consist of oil suspended in an aqueous dispersion. *See* JTX 76 at 4. The formulation typically comprises a phospholipid, such as egg yolk lecithin, glycerol, and water. Oil is mixed into the dispersion, leading to the formation of globules of triglycerides surrounded by a layer of the phospholipid. It is important that the globules remain small for purposes of intravenous injection, as larger globules can coalesce into large droplets that can result in lipid deposition in a patient's organs, with serious consequences, while smaller globules provide optimal stability and safety. *Id.*

[1] Dr. Han is identified as "Han Han" in the patents, but was frequently referred to as "Hannah Han" in the trial testimony and in some of the documents introduced into evidence at trial.

Claim 8 of the ’794 patent, from which claims 9 and 10 of the ’794 patent depend, is representative of all five asserted claims of the two patents in suit. That claim recites:

> 8. A physically stable pharmaceutical composition suitable for intravenous administration comprising:
>
> 0.7 wt/wt % aprepitant.
> 14 wt/wt % egg yolk lecithin.
> 9 wt/wt % to 10 wt/wt % soybean oil; and
> a pH modifier, wherein the pH modifier is sodium oleate.
> wherein the pH of the composition ranges from 7.5 to 9.0.

Claims 9 and 10 of the ’794 patent add additional limitations regarding the concentrations of sucrose (5 wt/wt %) and ethanol (between 2 and 6 wt/wt %), respectively. The claims of the ’229 patent largely mirror those of the ’794 patent; they differ only in that the claims of the ’229 patent do not require that the composition be “physically stable.” Claim 21 of the ’229 patent is directed to a method of treating nausea and vomiting with the claimed composition by intravenous administration. Cinvanti® is the commercial embodiment of both patents.

“Physically stable,” for purposes of the asserted patents, means, first, that the composition must satisfy the criteria set forth in chapter 729 of the United States Pharmacopeia (“USP <729>”), a reference work that contains standards for various pharmaceuticals. USP <729> requires that for oil-in-water emulsions (i.e., emulsions of oil droplets suspended in water) intended for intravenous injection, the mean droplet size in the composition must satisfy the following criteria: (1) the suspended droplets must not exceed 500 nanometers in diameter; and (2) the population of fat globules greater than five microns in diameter must not exceed 0.05% (a standard referred to as “PFAT5”). JTX 120 at 4, 6. In addition, the asserted claims require, as a measure of physical stability, that the emulsions have no aprepitant crystals that are visible when viewed at a magnification of 4x to 10x, after being stored either at 5º Celsius or at room temperature for a

period of at least one week.[2] *See* '229 patent, col. 8, ll. 5–21; '794 patent, col. 8, ll. 5–21; Dkt. No. 54 at 14–15.

### III. Background of the Problem

A major problem for patients undergoing cancer treatment is the nausea and vomiting associated with chemotherapy. Chemotherapy Induced Nausea and Vomiting ("CINV") can result in treatment delays, can require dose reductions of the chemotherapy medication, and sometimes can result in patients prematurely discontinuing chemotherapy. JTX 128 at 6. It is critical that CINV be managed in the first treatment cycle, or it will continue to be problematic in subsequent cycles. *Id.*

Anti-emetic drugs designed to block the neurotransmitters associated with nausea and vomiting can prevent CINV. One category of anti-emetic drugs works on neurokinin-1 or "NK-1" receptors, which are located in the brain and the peripheral nervous system and are stimulated by peptides that are released in response to stressful or noxious stimuli. *See* Tr. 894:11–895:8. When stimulated by those peptides, the NK-1 receptors signal that the body has ingested something

---

[2] The evidence at trial made clear that the references to 4x and 10x magnification in the common specification were shorthand for a total magnification of 40x and 100x, due to the fact that one magnifying component in the light path of a standard microscope (the eyepiece) has a fixed magnification of 10x, and the second magnifying component (the objective lens) has a variable magnification. The variable magnifying components referred to in the asserted patents have powers of 4x and 10x, so the total magnification of the system is 40x to 100x. *See* Tr. 22:15–23:12, 69:13–23, 71:20–72:3, 476:3–8. Although some confusion resulted from the court's initial understanding that the references to 4x and 10x in the patents represented the total magnification, the evidence at trial established that the references to 4x and 10x were shorthand for a total magnification of 40x to 100x, which is the correct understanding of the meaning of the patents' references to 4x and 10x. *See* '229 patent, col. 8, ll. 14–15; *id.*, col. 21, ll. 23–24; '794 patent, col. 8, ll. 14–15; *id.*, col. 21, ll. 12–13.

noxious, and they induce nausea and vomiting to expel the offending substance. *Id.* The NK-1 receptor pathway is one of the primary mechanisms underlying CINV.

NK-1 receptor antagonists can prevent nausea and vomiting. As the name suggests, those drugs work by inhibiting the NK-1 receptors, so as to prevent the triggering of a vomit response. The first NK-1 receptor antagonist to be discovered was aprepitant, which was developed by Merck & Co. Aprepitant is the active ingredient in both Heron's drug Cinvanti® and Fresenius's ANDA product. NK-1 receptor antagonists such as aprepitant are especially valuable in combatting CIVN because they supplement other anti-emetic drugs by preventing the recurrence of nausea and vomiting well after the initial chemotherapy session, a phenomenon referred to as "delayed emesis." Tr. 584:22–585:5.

Dr. Jeffrey Hale, one of the inventors of the aprepitant molecule, testified at trial on behalf of Heron. *See* Tr. 890:6–10. As Dr. Hale explained, aprepitant is highly effective in treating emesis. It is difficult to formulate, however, because although it has excellent biological properties, it has poor physical properties. Tr. 891:13–16. In particular, aprepitant is insoluble in either oil or water. Tr. 900:10–14. In characterizing the compound, Dr. Hale likened the physical properties of aprepitant to those of "cement dust." Tr. 901:17–902:1. Despite the challenges of working with such a compound, Merck was ultimately able to formulate aprepitant for oral ingestion. Tr. 917:3–22. Merck's solution to the problem of developing a method for oral delivery of aprepitant was to devise a capsule consisting of nanoparticles of aprepitant, each surrounded by a surfactant. Tr. 121:11–17; JTX 82. Merck's oral aprepitant product was approved by the FDA in 2003 and is sold under the brand name Emend®.

Oral administration of aprepitant, however, presented problems. A drug taken orally must go through the stomach and the liver before reaching the bloodstream and ultimately the brain. That process exposes the drug to the risks of not being fully absorbed or being metabolized in part or in whole before it reaches the bloodstream. Merck discovered that oral administration of aprepitant could result in unacceptable variations in the level of bioavailability of the drug from patient to patient. Tr. 909:15–910:8. In addition, even apart from the patient-to-patient variations in bioavailability, the oral formulation of aprepitant proved to be less than ideal. Oral administration of the drug is ineffective in cases in which the patient begins vomiting before the drug is digested. And because the oral formulation needs to be taken well in advance of a chemotherapy session, it is typically not taken under the supervision of a medical professional. As a result, the oral formulation presents problems of patient compliance. Tr. 577:23–578:16.

For those reasons, even after developing Emend®, formulators at Merck sought to develop an aprepitant solution that could be delivered through injection or intravenous administration.[3] The scientists at Merck initially focused on maintaining the biological properties of aprepitant while improving its physical characteristics relating to solubility. Those efforts, however, were unsuccessful because of the aprepitant molecule's poor solubility characteristics. While he was employed at Merck, Dr. Hale attempted to ionize aprepitant in order to create a soluble sulfonic

---

[3] An injectable drug is typically administered by syringe into the patient's muscle tissue, while a drug delivered intravenously is administered directly into the patient's bloodstream, either into a peripheral vein (such as in the patient's arm or hand) or into a vein closer to the patient's heart, typically through a "central line" or "central port" that is designed for intravenous administration of drugs during chemotherapy. *See* Tr. 613:8–616:19, 638:11–25. For convenience, I will refer to both forms of administration as types of injection.

acid salt. PTX 3 at 1. He succeeded in ionizing the aprepitant, but the drug readily precipitated out of solution, and as a result the composition did not prove sufficiently stable to be a viable pharmaceutical product.

Eventually, Merck abandoned its efforts to develop a soluble aprepitant formulation and pivoted to pursue a new molecule with better physical properties. Although Merck failed to create an intravenous formulation of aprepitant, it succeeded in creating an intravenous NK-1 receptor antagonist based on a related active ingredient called fosaprepitant. Tr. 942:7–10.

Fosaprepitant is a "prodrug" of aprepitant. That is, it is not itself pharmacologically active, but is metabolically converted into aprepitant after it is introduced into the body. Tr. 124:11–23; JTX 82 at 5. Fosaprepitant differs from aprepitant in that it contains an additional phosphate group, which renders the molecule 6000 times more soluble in water than aprepitant. *See* Tr. 938:15–21. Fosaprepitant circulates in the body in the soluble prodrug form before phosphatase enzymes in the blood and liver cleave the phosphate group and convert the fosaprepitant into aprepitant. Tr. 940:11–24. Merck markets fosaprepitant as Emend IV®. Emend IV® received FDA approval in 2008. Merck's fosaprepitant patents expired in 2019, allowing generic entry.

Although Emend IV® and the generic injectable fosaprepitant products proved effective in treating emesis, practitioners reported injection site reactions and hypersensitivity reactions in some patients taking Emend IV®. These adverse events were frequently attributed to polysorbate 80, one of the excipients in Merck's Emend IV® product. *See* Tr. 122:12–123:7 ("There were issues of allergic type of reactions" to polysorbate 80.), 235:9–18, 252:23–253:3, 469:13–470:22, 1035:6–19, 1050:2–1051:7, 1064:22–1065:5; 1428:25–1429:11.

Although there was no firm scientific consensus as of 2014 that formulations containing polysorbate 80 and fosaprepitant were responsible for the adverse reactions that clinicians had observed, concerns regarding the fosaprepitant/polysorbate 80 formulations were significant enough that the Mayo Clinic changed its guidelines in 2011 to recommend the use of oral aprepitant rather than the intravenous fosaprepitant/polysorbate 80 formulation. *See* JTX 137 at 2.

In addition to the concerns about the possible side effects of Emend IV®, the fosaprepitant-based product had the disadvantage that synthesizing fosaprepitant involved a series of complex reactions and that the cost of producing fosaprepitant was greater than the cost of producing aprepitant. Tr. 143:19–144:3; JTX 71 at 12.

### IV. The Prior Art

In 2012, a group of researchers in China succeeded in creating an injectable aprepitant formulation in the form of a lipid emulsion. The group published their results in a Chinese patent application, which was introduced into evidence in this case as JTX 71. Wei Zhou, one of the inventors on the Chinese patent application, was the lead author on an article published the same year, which expanded on the work described in the patent application. The article, which was titled "Preparation of Aprepitant Emulsion for Intravenous Injection" ("Zhou" or "the Zhou article"), was introduced into evidence at trial as JTX 115. Although aprepitant is not soluble either in water or in oil, the researchers responsible for the Chinese patent application and the Zhou article were able to dissolve aprepitant in an emulsion formed at the interface between the water and oil phases of the solution to create a stable injectable aprepitant formulation that did not contain polysorbate 80.

The Chinese patent application, referred to as CN845, is titled "Aprepitant microemulsion for injection and preparation method thereof." According to Dr. Barrett Rabinow, Fresenius's expert on pharmaceutical formulations, CN845 was a "game changer" that "transformed" the state of the art for aprepitant formulations. Tr. 132:21–133:15, 326:2–4. Based on all the evidence at trial, I find that characterization to be accurate.

At the time CN845 was published, Dr. Rabinow explained, the conventional wisdom was that emulsions were appropriate only for water-insoluble drugs that were soluble in oil. Tr. 133:2–10. CN845 marked a departure from that convention by using an emulsion to create an injectable formulation containing a drug that is not soluble in either water or oil. Tr. 133:12–15. According to Dr. Rabinow, "[t]hat was not really done before." Tr. 133:15.

Dr. Rabinow explained that the abstract of CN845 "tells you exactly what classes of excipients you need." Tr. 133:19–20. In addition to the aprepitant, he explained, CN845 "specifies you need oil for injection, an emulsifier, protective agent, and water. And it also gives you concentration windows for each of those." Tr. 133:20–24. In particular, CN845 lists the following components of the injectable aprepitant emulsions and the ranges of their concentrations to be used in the composition: "0.05 to 2 percent of aprepitant, 5 to 30 percent of oil for injection, 0.5 to 10 percent of emulsifier, 1 to 10 percent of co-emulsifier, 5 to 20 percent of protective agent and 60 to 80 percent of water for injection." JTX 71 at 1. The reference also includes descriptions of eight exemplary formulations, which set forth particular amounts of each of the components falling within the above ranges. *Id.* at 14–17.

CN845 contains lists of particular compounds that can be used for each of the categories of excipients. As relevant to the patents in suit, the examples and claims of CN845 specifically

call out the use of soybean oil as one of the components that can serve as the oil for injection (examples 1, 4, 5, 6, and 7; claim 1), egg yolk phospholipid as the emulsifier (examples 1, 4, 5, 6, and 7; claim 6),[4] ethanol as the co-emulsifier (examples 1, 4, 5, 6, and 7; claim 7), glycerin as the protective agent (examples 1, 4, 5, 6, and 7; claim 8) and water for injection (all examples and claim 9). JTX 71 at 9.

In addition to listing each of the substances set forth above, the eight examples in CN845 identify substitutes that can be used in place of several of those compounds. As relevant here, in Example 2 of CN845 sucrose is substituted for the glycerin component listed as the protective agent in claims 1 and 8 of that reference. JTX 71 at 9, 15.

CN845 extolls the virtues of the disclosed aprepitant microemulsion for injection. It notes that the microemulsion features uniform particle size and low viscosity, is thermodynamically stable, and enhances the stability of otherwise unstable drugs. JTX 71 at 12. CN845 concludes that the small size of the particles and the dispersion of the drug within the emulsion makes the emulsion a suitable vehicle for direct injection into patients. JTX 71 at 12.

The Zhou article supplemented the disclosures in the CN845 application. Zhou reported the optimal concentration of ingredients in the formulation to be 0.25% aprepitant, 2.5% egg yolk phospholipid, 0.125% oleic acid, 15% soybean oil, ethanol, and water. JTX 115 at 9 (reporting

---

[4] The parties and the witnesses refer variously to that emulsifier as "egg yolk phospholipid," "lecithin," and "egg yolk lecithin." For purposes of this case, the three terms refer to the same compound, which is a fatty substance that is both hydrophilic and lipophilic and is known to be suitable for use in emulsions. Egg yolk lecithin is the principal component in the commercial product referred to as "Lipoid E 80." *See* Tr. 537:10–19.

optimal quantities); *id.* at 11 (explaining that oleic acid is used as a co-emulsifier to improve the activity of the egg yolk phospholipid (the emulsifier), making it easier to obtain an emulsion with smaller particle sizes). Importantly, Zhou reported that the emulsion prepared according to the directions set forth in the article was stable after three months of storage and that no stratification or de-emulsification was detected. JTX 115 at 10.

In his testimony early in the trial, Dr. Rabinow provided an instructive tutorial on the chemistry involved in the creation of a stable emulsion, with reference to the components used in the two Chinese references and in the ’229 and ’794 patents. Tr. 133:25–137:11, ,138:16–141:8. I found his testimony on the science of emulsions to be credible and consistent with the other evidence in the case.

Dr. Rabinow explained that an emulsifier, such as the egg yolk lecithin used in CN845, is a compound that has both a hydrophilic and a lipophilic component. The hybrid nature of the lecithin molecule allows it to bind with both oil and water. Tr. 134:22–135:4. The emulsifier coats the oil globules in an oil-in-water mixture and causes an emulsion to form at the interface between the oil and water phases of the solution. The hydrophilic ends of the emulsifier molecules project into the water phase of the solution, and the lipophilic ends of those molecules project into the oil globules. As Dr. Rabinow explained, that “satisfies the solubility needs of both phases in one and the same molecule, which is situated at the interface” of the oil and water phases of the solution. Tr. 135:6–14. Although aprepitant will not dissolve in either the oil or the water, it is drawn to the emulsion interface between the two phases. Tr. 362:1–4. Dr. Rabinow testified that a POSA would understand that the process described in the CN845 reference, which led to the

formation of a clear solution, meant that the emulsifier must be solubilizing the drug. Tr. 158:11–18.

The experts for both parties agreed that emulsions can be unstable. If the components are not carefully selected and prepared, an emulsion can degrade through flocculation (in which the oil droplets form adherent masses) and coalescence (in which the interface between the individual oil droplets is lost, resulting in a layer of free oil). JTX 113 at 13.

Dr. Rabinow stated that, up to a point, adding a large amount of an emulsifier can counteract degradation and contribute to the stability of the emulsion. He explained that the emulsifier results in generating smaller oil globules, which in turn provides more total surface area for the interface between the emulsion's oil and water phases. Tr. 136:23–137:11. To stabilize the emulsion, he testified, it is necessary to have "adequate emulsifier levels to keep the oil globules separate and distinct and prevent them from first approaching each other, then merging, then coagulating, then rising to the surface." Tr. 138:8–11.

The stabilization of emulsions is enhanced, according to Dr. Rabinow, by a process known as complexation. In that process, the addition of a co-emulsifier, such as ethanol, solubilizes the emulsion. Because the aprepitant and emulsifier molecules are drawn to one another, solubilizing the composition allows the aprepitant molecules to approach the emulsifier molecules more freely, resulting in the formation of a complex between the two. Tr. 138:19–139:5, 147:24–148:3, 151:6–152:16. Although CN845 did not identify the phenomenon that resulted from the process it disclosed as "complexation," Dr. Rabinow testified that a person of ordinary skill in the art would understand that the effect of the process described in CN845 would be to facilitate the creation of a complex between the emulsifier and aprepitant molecules, which makes the composition more

stable and less likely to separate into discrete oil and water phases. *See* JTX 71 at 12; Tr. 152:25–154:15.

The components of the emulsion disclosed in CN845 are similar to the components claimed in the ’229 and ’794 patents. The emulsifier used in most of the examples in CN845 is egg yolk lecithin; the oil used in most of the examples is soybean oil; and the co-emulsifier used in most of the examples is ethanol. *See* JTX 71 at 8–10. Each of those components performs the same role in the ’229 and ’794 patents as in CN845.

Dr. Rabinow stated that as of the priority date for the two asserted patents, a person of ordinary skill in the art (a "POSA") considering emulsifier and oil options would prefer egg yolk lecithin and soybean oil, which had been used in other drugs that had been given to tens of millions of patients, and thus had "a huge track record." Tr. 146:16–25. Dr. Rabinow characterized egg yolk lecithin as being in a "class by itself" compared with other candidate emulsifiers, as it was commercially available and did not present risks of side-effects of the sort presented by other known emulsifiers. Tr. 147:1–12. And he explained that among the candidate co-emulsifiers, ethanol had the lowest boiling point, which made it an attractive option, as it could be evaporated from the composition without needing a high temperature that could risk oxidizing the emulsifier and oil. Tr. 147:19–148:13.

For the protective agent, Dr. Rabinow explained, a person of ordinary skill would consider various options, including glycerin or sucrose. Tr. 148:20–149:7. CN845 provides for the inclusion of a protective agent in amounts between 5% and 20% and reports that the protective agent can be one of eight compounds, including glycerin and sucrose. JTX 71 at 13. Claim 9 of the ’229 and claim 9 of the ’794 patent recite the use of a 5% concentration of sucrose.

Although the CN845 patent application set forth a concentration range for the emulsifier of 0.5% to 10%, it described the preferred concentration of emulsifier as falling at the high end of that range, between 8% and 10%. *See* JTX 71 at 13 ("The preferred mass percentage of each component is. . . .8% - 10% of emulsifier"), *id.* at 9 (claim 9); *id.* at 16 (Example 5 containing 10% egg yolk lecithin); *id.* at 17 (Example 7 containing 9.8% egg yolk lecithin); *id.* at 15 (Example 2 containing 10% poloxymer, identified as an alternative emulsifier).

At trial, Dr. Rabinow testified that CN845 "transformed" the state of the art in 2012 by teaching how to formulate an aprepitant emulsion. Tr. 132:21–133:15. CN845 began with standard emulsion ingredients, including oil, water, an emulsifier, a co-emulsifier, and a protective agent. *See* JTX 71; Tr. 134:6–18. CN845 deviated from the prior art, however, in that it used a significantly higher level of emulsifier than other formulations—up to as much as 10%. That amount, Dr. Rabinow stated, was "something like eight times what the conventional levels of emulsifier are in commercially available emulsions." Tr. 155:20–156:3.

According to Dr. Rabinow, a POSA familiar with the prior art regarding emulsions would immediately have understood from CN845 that aprepitant dissolved at the interface of the oil and water; in other words, a POSA would have understood "exactly what is happening [in CN845], what the result is, and why." Tr. 171:2–3.

CN845 and Zhou reported success in creating an injectable aprepitant formulation with each of the examples they described, and Zhou tested one of the formulations for stability and found it stable. However, the Zhou reference tested that emulsion under a standard referred to as $K_e$. That standard differs from the applicable USP standard for stability, which is the minimum standard that the FDA expects all medications to satisfy when submitted for approval. Tr. 208:9–

209:11. When testing the formulations approximating those described in Zhou and CN845, Heron determined that neither the "optimal" formulation in Zhou nor the examples in CN845 were stable enough to satisfy the needs of a commercial product. *See* Tr. 406:4–8, 409:2–410:25, 490:24–491:10, 541:9–542:7.

At trial, Fresenius relied on several other prior art references to show what a POSA would know about making an injectable aprepitant emulsion as of the 2014 priority date for the two patents in suit. The principal references that Fresenius relied on, other than CN845 and Zhou, were a 1996 article by Washington, titled "Stability of Lipid Emulsions for Drug Delivery," JTX 113; a 2011 article by Liu, titled "Progress in Research of Injectable Microemulsion," JTX 93; and a 2011 review article by Khan, titled "Basics of Pharmaceutical Emulsions: A Review," JTX 91.

The Washington reference discussed emulsion systems for drug delivery generally and noted that although emulsions had been used with oil-soluble drugs, they had not been used with water-soluble drugs or drugs not soluble in either oil or water. JTX 113 at 2. Washington noted that phospholipid emulsifiers are especially suitable for pharmaceutical formulations, *see* JTX 113 at 3, a point reiterated by Dr. Rabinow, *see* Tr. 222:21–25 (discussing the low incidence of adverse reactions, high biological compatibility, and strong safety profiles of phospholipids). Washington noted that drugs that are poorly soluble in both water and oil (such as aprepitant) "can only be loaded into an emulsion by adsorbing to the [oil] droplet interface," and that "it is often necessary to post-load emulsions with them, in order to have a large surface area available for loading." JTX 113 at 9.

Dr. Rabinow pointed to the Washington article as support for his conclusion "that you can only load such drugs onto the droplet interface. So, if you want to have a good chance of loading

the drug onto the interface, you've got to have a large interface." Tr. 174:8–12. Dr. Rabinow continued, "[Y]ou want to have a large surface area, which means you need to have more emulsifier to stabilize that increased surface area. So, the implication is you need a lot more emulsifier to generate the increased surface area so that you can situate your drug at that interface." Tr. 176:21–177:2. Dr. Rabinow concluded that a POSA would recognize that the solubility problems with the formulations in CN845 could be overcome by increasing the amount of egg yolk lecithin in those formulations. *See* Tr. 177:10–178:1.

Fresenius relied on the Liu reference principally for the proposition that the amounts of surfactants (including phospholipids) that are used in microemulsions can be between 5% and 30%. JTX 93 at 10–11. That range encompasses both the 10% maximum emulsifier concentration disclosed in CN845 and the 14% emulsifier concentration set forth in Heron's asserted claims. Based on Liu, Dr. Rabinow testified that a POSA would consider working in an "operative range" of emulsifier concentration from "5 to 30 percent." Tr. 228:15–20; *see also* Tr. 219:24–220:4, 223:1–8.

Fresenius looked to the Khan reference to show that it was known at the time that "the amount of emulsifying agent is one of the most important factors having an influence on the emulsion stability." JTX 91 at 5. Based on a prior study, Kahn explained that emulsifier concentration "has a great impact on emulsion stability." Kahn added that there is a "concentration window" outside of which emulsion stability declines. If the emulsifier concentration is too low, Kahn explained, the emulsion becomes unstable because of the agglomeration of oil droplets that are not kept apart from one another by the emulsifier. If the emulsifier concentration is too high, "emulsion instability occurs because of rapid coalescing." *Id.*; Tr. 168:11–169:13.

While acknowledging the risk of using too much emulsifier, Dr. Rabinow noted that the inventors of CN845 had "tested a broad dynamic range" of emulsifier concentrations, and "[i]t seemed as though everything they tried worked. . . . [I]t was a robust process and manufacturing procedure." Tr. 169:17–170:1; *see also* Tr. 166:11–15 (The examples in CN845 show "[y]ou're dealing with a very robust process. It works with a lot of different combinations.").

According to Dr. Rabinow, in light of what was disclosed in CN845 and Zhou, all that would be left for a POSA to do would be to "come up with a commercializable formulation, which means it would have to comply with USP guidelines in order to be submitted to FDA. So, what he would do is start with the formulations that were specified in the patent" and "employ routine optimization to ensure that they would comply with USP." Tr. 167:8–15.

Dr. Steven Little, Heron's formulation expert, noted that Zhou regarded an emulsifier concentration of 2.5% as optimal. He found no sound support in the prior art for Fresenius's contention that a POSA would select on a much higher concentration such as the 14% emulsifier concentration set forth in the asserted claims as a matter of routine optimization of the formulations described in CN845 and Zhou. Tr. 1288:17–1289:6.

**V. Development of the Patented Invention**

Dr. Ottoboni joined Heron in 2012, and began researching ways to formulate an aprepitant-based product that would not have the adverse side effects associated with Emend IV®. Tr. 548:12–18, 548:21–549:2. Initially, he sought to use cosolvents and surfactants in an effort to solubilize aprepitant, but those approaches proved unsuccessful. Tr. 520:10–21.

In early 2014, Dr. Ottoboni and Dr. Han began researching other efforts to formulate aprepitant emulsions. Dr. Ottoboni testified that "the goal of the project was to develop a product

that we hoped would be safer than Emend for injection when administered to people." Tr. 548:24–549:2. Dr. Han explained that the ultimate objective was "to develop an emulsion system that contains safe excipients for patients, including not containing polysorbate 80." Tr. 470:20–22.

Dr. Ottoboni and Dr. Han (who conducted much of the experimental work) began their work on the emulsion project with the Chinese patent application, CN845, and the related journal article by Zhou, both of which had announced the successful solubilization of aprepitant by use of an emulsion.[5] *See* Tr. 474:15–475:6, 488:24–489:11, 490:21–491:5, 501:7–505:20, 545:3–546:21. Dr. Han testified that the project marked the first time she had ever made an emulsion formulation and the first time she had ever tested and evaluated the stability of emulsion formulations. Tr. 467:13–23. She said that she educated herself on how to make an emulsion formulation by "looking to review articles to help me understand emulsion stability," Tr. 467:24–468:2, and that she educated herself on testing the stability of the resulting formulations by looking to the USP, which contains the standards for stability that the FDA requires such formulations to meet, Tr. 468:5–469:3.

Dr. Han started with the disclosures in the CN845 patent application. In her laboratory notebook, she wrote at the time that "[t]he initial formulation process of the oil-in-water emulsion containing aprepitant was adapted from patent CN 102,379,845," *i.e.*, the Chinese patent application CN845. *See* Tr. 474:20–23; DTX 262 at 11 (same statement in the Formulation Development Report prepared for the project); *see also* Tr. 549:10–18. That initial formulation,

[5] The Heron team obtained a translation of the CN845 patent application in late March of 2014. Tr. 538:13–24. The provisional application from which the two patents in suit derived was filed on September 19 of the same year.

however, showed visible aprepitant crystals under polarized light at 10x magnification after 24 hours, and therefore did not satisfy the Heron team's objectives regarding stability. Tr. 475:2–18. Dr. Han spent several months attempting to create an aprepitant formulation based on the ranges disclosed in CN845, hoping to discover a formulation that would prove to be physically stable under USP standards. *See* Tr. 491:15–25. After failing to develop a formulation in which aprepitant did not crystallize within the first week, Dr. Han concluded that "[t]he compositions in [CN845] resulted in an unstable emulsion." Tr. 492:15–16.

After determining that the formulations described in CN845 and the optimized formulation in Zhou were not sufficiently stable to satisfy the requirements for a marketable drug, Drs. Han and Ottoboni experimented with different formulations to optimize the emulsion for stability. *See generally* DTX 259; Tr. 465:1–6, 542:15–543:2. They were unsuccessful until they began experimenting with emulsifier concentrations higher than the range of concentrations disclosed in CN845. Through what Dr. Han described as "trial-and-error," she and Dr. Ottoboni eventually succeeded in developing the stable aprepitant emulsion that was the subject of the '229 and '794 patents. Tr. 465:1–6, 508:9–11. Their emulsion contained 14% egg yolk lecithin, a concentration four percentage points above the concentration range set forth in the 2012 Chinese patent application. That emulsion formed the basis for the first intravenous aprepitant product that was approved by the FDA for administration to patients in the United States. Tr. 506:5–12. Heron now markets that formulation as Cinvanti®.

**VI. Infringement by Fresenius's ANDA Product**

I previously granted Heron's motion for partial summary judgment of infringement of claims 1–11 of the '229 patent. Dkt. No. 150. Then, shortly before trial began, the parties

stipulated to a finding that Fresenius's ANDA product infringes claim 21 of the '229 patent. Dkt. No. 174 at ¶ 5. In view of the summary judgment order, the parties further stipulated that "the sole remaining infringement dispute for claims 9 and 10 of the '794 patent is whether Fresenius's ANDA product meets the 'physically stable' claim limitation" that applies to dependent claims 9 and 10 through dependent claim 8. *Id.* at ¶ 6. That issue was litigated at trial.

Heron presented several theories of infringement. Heron's first theory as to why Fresenius's product meets the "physically stable" limitation is that Fresenius's request for approval of a product not containing aprepitant crystals is sufficient to prove infringement under *Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 731 F.3d 1271, 1279 (Fed. Cir. 2013). Heron's theory, however, mischaracterizes the law under *Sunovion*.

In *Sunovion*, the Federal Circuit held that where "an ANDA specification defines a compound such that it meets the limitations of an asserted claim," the ANDA product infringes, regardless of whether there is evidence that the ANDA product will be manufactured in a way that does not meet one of those limitations. *See* 731 F.3d at 1280. "When an ANDA is silent with respect to infringement," however, *Sunovion* is inapplicable. *Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1382, 1387–88 (Fed. Cir. 2014). I do not doubt that, as Heron argues, Fresenius's goal is to avoid the formation of aprepitant crystals in its ANDA product. But the ANDA itself does not explicitly say that Fresenius's product meets the particular microscopy test for visible particles set forth in the asserted claims, as would be required to infringe the claims under this theory. *Sunovion* is therefore inapplicable to this case.

Rather than *Sunovion*, the correct infringement analysis in this case is dictated by *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1570 (Fed. Cir. 1997). In *Glaxo*, the Federal Circuit

explained that "[t]he relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product." *Id.* Although Heron's *Sunovion*-based argument is unpersuasive, I find that Heron has carried its burden of proving that Fresenius's ANDA product will more likely than not meet the physical stability limitation of claims 9 and 10 of the '794 patent.

As noted, the '794 patent defines a "physically stable" emulsion as one that satisfies not only the criteria of USP <729> (requiring a mean droplet size not exceeding 500 nanometers and a PFAT5 not exceeding 0.05%), but also Heron's microscopy test (requiring that the formulation exhibit no visible aprepitant crystals when viewed at magnification of 4x to 10x after being stored either at 5º Celsius or at room temperature for a period of at least one week). '794 patent, col. 8, ll. 5–21. At trial, Dr. Little testified that Fresenius's ANDA product has a mean droplet size between 45 and 75 nanometers and a PFAT5 of not more than 0.05%. *See* Tr. 32:15–33:4. That testimony was unrebutted, and I credit it. Dr. Little also testified that Fresenius's ANDA product would not be likely to contain visible aprepitant crystals when viewed at a magnification of 4x to 10x after being stored either at 5º Celsius or at room temperature for a period of at least one week.

To be sure, Heron did not actually use the microscopy test on Fresenius's ANDA product. Instead, Dr. Little explained that Fresenius's product satisfied the "ultracentrifugation test," which Dr. Little explained was a more exacting test for detecting aprepitant crystals than the crystal visibility test at 4x to 10x magnification. *See* Tr. 36:22–37:12; *see also* JTX 33 at 2 (Fresenius's regulatory filing to the FDA asserting that no crystals were observed after ultracentrifugation); JTX 34 at 14 ("no crystals observed after ultracentrifugation"); Tr. 103:17–104:20 (confirming that no crystal content had been observed in any of Fresenius's exhibit batches during testing).

Based on the results of the ultracentrifugation test, Dr. Little concluded that Fresenius's product would necessarily contain no visible aprepitant crystals when viewed at magnifications of 4x to 10x after being stored either at 5º Celsius or at room temperature for a period of at least one week. *See* Tr. 33:16–37:15.

Dr. Little's conclusion was consistent with Fresenius's own submission to the FDA reporting that Fresenius's ANDA product contained no crystals after ultracentrifugation. *See* JTX 33 at 2. Furthermore, Dr. Little's testimony at trial that Fresenius's ultracentrifugation test is more stringent than the test set forth in the '794 patent for stability was unrebutted. *See* Tr. 36:22–37:12. I credit Dr. Little's testimony that a product that forms no crystals under Fresenius's ultracentrifugation test would also form no observable crystals under the microscopy test set forth in the asserted claims of Heron's patents. *See id.*; JTX 33 at 2; JTX 28 at 9; JTX 34 at 14.

Dr. Little's conclusion is further supported by the undisputed fact that Cinvanti® itself meets the '794 patent's physical stability requirement. *See* Tr. 21:2–22:21; JTX 49 at 41–43 (showing that no crystals were observed by microscopy in Cinvanti® at storage conditions between 2 and 8 degrees Celsius after six months); *id.* at 47–49 (showing the same at 25 degrees Celsius). Fresenius asserts that its ANDA product is identical to Cinvanti®. *See* JTX 192 at 2. If Fresenius is correct that the two products are identical in composition, then Fresenius's ANDA product should meet the same physical stability criteria as Cinvanti®, including that the product contains no visible aprepitant crystals when viewed at magnifications of 4x to 10x (i.e., 40x to 100x of actual magnification). And in fact, the evidence at trial showed that Fresenius's ANDA represented that the composition of Fresenius's product had the same components in the same amounts as Cinvanti®. Tr. 23:23–27:15, 85:5–87:20, 88:7–89:19, 95:8–99:11; JTX 33; JTX 26 at

9; JTX 38 at 25–26 (Fresenius's drug product "uses the same formulation as the [Reference Listed Drug] product, Cinvanti®.").[6]

In sum, based on Dr. Little's analysis of the physical stability of Fresenius's ANDA product and the compositional features of that product, Tr. 38:25–39:7, I find as a factual matter that Fresenius's ANDA product satisfies the "physical stability" limitations in claim 8 (and thus dependent claims 9 and 10) of the '794 patent. I therefore find that Fresenius's ANDA product infringes claims 9 and 10 of the '794 patent.

## VII. Obviousness of the Asserted Claims

The principal disputed issue in this case is whether Heron's asserted claims would have been obvious in light of the prior art in existence as of the September 19, 2014, priority date of the '229 and '794 patents.

Obviousness under 35 U.S.C. § 103 is a question of law based on underlying findings of fact. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The underlying factual considerations "include the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations" bearing on obviousness. *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 736 (Fed. Cir. 2013) (citing *Graham*, 383 U.S. at 17–18, and *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007)). "The obviousness analysis should not be conducted 'in a narrow, rigid manner,' but should instead focus

[6] The fact that Fresenius concedes that its ANDA product is identical to Cinvanti® may not be sufficient by itself to prove that the ANDA product will satisfy the physical stability limitation in the '794 patent, but it supports the other evidence in the case indicating that Fresenius's ANDA product meets that limitation.

on whether a claimed invention is merely 'the result [] of ordinary innovation,' which is not entitled to patent protection." *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 595 (D. Del. 2018) (quoting *KSR*, 550 U.S. at 427–28), aff'd sub nom. *Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019).

An obviousness determination "requires finding that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so." *Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341, 1347 (Fed. Cir. 2024) (quoting *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019), and *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018)). The party in a district court proceeding challenging the validity of issued claims bears the burden of proving that the asserted claims would have been obvious and must do so by clear and convincing evidence. *See Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 973 (Fed. Cir. 2014).

**A. Summary of the Parties' Positions**

In brief summary, Fresenius's theory of obviousness is that the Chinese patent application, CN845, disclosed an emulsion consisting of essentially the same components and prepared by the same process as the emulsion disclosed in Heron's '229 and '794 patents. Fresenius argues that the only significant difference between the two is that CN845 disclosed a range in the emulsifier concentration between 0.5% and 10% (with an optimal level at 8% to 10%), while the '229 and '794 patents recited an emulsifier concentration of 14%. According to Fresenius, a POSA would have been motivated to use the slightly higher concentration of emulsifier as a matter of routine

optimization and would have had a reasonable expectation of success in obtaining a stable emulsion using that higher emulsifier concentration.

A POSA would have been motivated to consider the higher emulsifier concentration, according to Fresenius, based on other prior art and the POSA's knowledge. Specifically, the POSA would have known from the Zhou article that the method used in CN845 produced an aprepitant emulsion that was stable, as measured by a standard somewhat less demanding than the applicable USP standard, *see* JTX 115 at 10, giving rise to a motivation to improve the stability of the formulation to meet the USP standard. The POSA would also have known from the Liu reference that for certain stable emulsions (referred to as microemulsions) the emulsifier concentration can be as high as 30%, *see* JTX 93 at 10, inviting optimization of the CN845 formulations by using emulsion concentrations slightly higher than the range set forth in CN845. Finally, the POSA would have known that to solubilize drugs such as aprepitant that are not soluble in either oil or water, the drug must be adsorbed into the interface between the oil and water phases of the solution, JTX 113 at 9, and for that mechanism to be effective, a larger amount of the emulsifier is required than would be required to dissolve a drug that is insoluble in water but is soluble in oil, *see* Tr. 228:25–229:8, 229:22–230:6.

Heron's theory of the case for nonobviousness begins with the fact that the 14% concentration of emulsifier in the asserted claims is not within the 0.5% to 10% range set forth in CN845, and therefore is not subject to the principle that a claim that falls within a range disclosed in the prior art is presumed obvious. In addition, Heron points out that the 2012 Zhou article suggested that the optimal concentration for the emulsifier disclosed in CN845 was 2.5%, which is toward the lower end of the 0.5% to 10% range set forth in CN845. According to Heron, the

work of Zhou and his collaborators, as reflected in both CN845 and the Zhou article, does not suggest to a POSA that emulsions containing an emulsifier concentration above the maximum 10% level set forth in CN845 would be likely to be stable.

Heron also notes that the claims of the ’229 and ’794 patents recite the use of sodium oleate as a pH modifier, whereas the CN845 application does not specify a particular agent for pH modification, but merely instructs “adjusting the pH” of the composition. JTX 71 at 14. The evidence at trial, according to Heron, did not show that the use of sodium oleate as a pH adjuster would have been obvious to a POSA as of the priority date of the patents in suit.

### B. Person of Ordinary Skill in the Art

The parties in this case do not materially disagree about the qualifications of a POSA. Fresenius’s position is that a POSA would have “an advanced degree in pharmaceutical formulation, pharmaceutical chemistry, medicinal chemistry, or a related field and experience with intravenous emulsions.” Tr. 129:19–130:6. Such a person would also have access to a physician with experience treating cancer patients. *Id.* Heron’s position is that a POSA could have a lower level of education, such as a bachelor’s degree in a relevant field, provided that the individual has a “commensurate degree of experience in the real world.” Tr. 1212:24–1214:3. Despite the minor differences between those definitions, the parties’ definitions are functionally equivalent. Both parties’ experts agreed that their respective opinions on the issue of obviousness would be the same under either definition of “a person of ordinary skill.” *See* Tr. 130:15–17, 1214:6–14. I therefore do not regard it as necessary to decide which party’s definition of a person of ordinary skill in the art to accept.

### C. Framing of the Obviousness Question

The parties disagree about the proper framing of the obviousness question. In particular, they disagree about how to characterize the problem to be solved facing a POSA as of the patents' priority date. Fresenius argues that the problem was to develop a stable intravenous aprepitant formulation. Heron argues that the problem to be solved was to develop an intravenous NK-1 receptor antagonist without the negative side effects associated with fosaprepitant.

The framing of the problem to be solved is a question of fact. *See Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 859 (Fed. Cir. 2015) ("Whether a person of ordinary skill in the art would narrow the research focus to lead to the invention depends on the facts."). I agree with Fresenius and find that a POSA would have identified creating a stable intravenous aprepitant formulation as the problem to be solved.

The prior art would have provided a POSA with a clear motivation to develop an intravenous aprepitant product. The evidence introduced at trial showed that it was well known at the time of the invention that aprepitant had excellent biological properties but that its physical properties made it difficult to formulate for intravenous administration. *See, e.g.*, Tr. 891:13–16. The evidence also showed that formulators have sought to create a soluble aprepitant formulation since aprepitant was first discovered. *See, e.g.*, PTX 3 at 1 (Dr. Hale's research publication stating, "Since the availability of both an oral and an intravenous formulation of [aprepitant] was deemed to be necessary in order to provide maximum clinical flexibility with this compound, we sought ways to overcome the solubility issues associated with it.").

After learning that CN845 and Zhou had success with solubilizing aprepitant in an emulsion suitable for intravenous injection, a POSA would recognize that the next step toward

commercializing an intravenous aprepitant emulsion would be to modify the formulation to meet regulatory requirements in the United States, including the USP guidelines. *See* Tr. 208:17–19, 209:12–17 (Dr. Rabinow testifying that a POSA would be familiar with the USP guidelines and would know that an injectable aprepitant emulsion would need to comply with the USP<729> standard to gain FDA approval).

Heron argues that a POSA would have experimented with intravenous formulations for other NK-1 receptor antagonists, such as the compounds rolapitant and netupitant. *See* Tr. 944:17–945:11. Even if that assertion is true, it does not negate the evidence that there was a motivation to create an intravenous aprepitant product. *See PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014) ("Our precedent . . . does not require that the motivation be the best option, only that it be a *suitable* option from which the prior art did not teach away" (citing *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d at 738, and *Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1376 (Fed. Cir. 2013)); *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004). But the incentive to seek an aprepitant-based solution rather than experimenting with other NK-1 receptor antagonists would have been strong, as aprepitant had been shown to be safe and highly effective in the course of years of clinical experience. Tr. 128:13–129:11. Thus, I agree with Fresenius that a POSA would have been motivated to overcome aprepitant's inherent solubility problems to develop an intravenous formulation.

Heron also accuses Fresenius of relying on hindsight in framing the obviousness question. As Heron notes, the Federal Circuit has repeatedly cautioned against defining the problem to be solved in terms of the patented solution. *See Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998) ("Defining the problem in terms of its solution reveals

improper hindsight in the selection of the prior art relevant to obviousness."); *see also Insite*, 783 F.3d at 859 (explaining that "an overly narrow statement of the problem can represent a form of prohibited reliance on hindsight, because often the inventive contribution lies in defining the problem in a new revelatory way." (cleaned up)); *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) (Using the invention "to define the problem that the invention solves" is "a form of prohibited reliance on hindsight.); *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). Heron's argument, however, is refuted by the position taken by scientists working in the field that it was desirable to develop a way to dissolve aprepitant so that it could be formulated for intravenous administration. *See, e.g.*, PTX 3 at 1 ("[T]he availability of both an oral and an intravenous formulation of [aprepitant] was deemed to be necessary in order to provide maximum clinical flexibility with this compound."). Such expressions would have provided sufficient reason for a POSA to pursue the claimed formulations. *See Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316, 1324 (Fed. Cir. 2017) ("Here, the motivation to formulate an ODT [oral disintegrating tablet] version of vardenafil is plainly evident from the face of multiple prior art references disclosing ODT formulations of ED [erectile dysfunction] drugs. No further rationale for developing vardenafil ODT was necessary.").

In summary, a POSA would have envisioned the problem to be developing an intravenous formulation of aprepitant. The question in this case, therefore, is whether it would have been obvious, based on the prior art, to devise a stable aprepitant formulation suitable for injection that would satisfy the limitations of the asserted claims of the '229 and '794 patents. *See KSR*, 550 U.S. at 419–20 (explaining that claims are invalid as obvious where "there existed at the time of

invention a known problem for which there was an obvious solution encompassed by the . . . claims."). Thus, as to the framing of the problem to be solved, I agree with Fresenius.

**D. Differences Between the Claims and the Prior Art**

The parties dispute whether the formulations recited in the asserted claims were more stable than the formulations in CN845 and Zhou. I find that the patented formulations were shown to have superior physical stability as compared to aprepitant emulsions similar to those disclosed in CN845 and Zhou. Examples 4 and 5 in the common specification of the asserted patents were prepared in a manner generally consistent with the formulations set forth in CN845 and Zhou. While the optimized formulation set forth in Zhou satisfied the $K_e$ test for stability, the corresponding formulations in Examples 4 and 5 of the '229 and '794 patents did not satisfy the microscopy test for stability that Drs. Ottoboni and Han used and that was incorporated into the asserted claims. In both of those formulations, crystal formation was observed within four days after preparation. *See* '229 patent, col. 18, line 16, through col. 19, line 26; '794 patent, col. 18, line 16, through col. 19, line 23. By contrast, the formulations in Examples 1, 2, 3, and 6 of the asserted claims, which were based on the formulations set forth in the asserted claims of those patents, were found to pass the microscopy test and also to satisfy the requirements of USP<729>.

The recited features of the asserted claims are similar to those set forth in CN845 in several respects. The concentration of aprepitant in the asserted claims is 0.7 wt/wt%, which falls well within the range set forth in the CN845 specification (0.05% to 2%), JTX 71 at 13, and is close to

the concentration set forth in several of the examples in CN845.[7] The concentration of soybean oil in the asserted claims is 9% to 10%, which falls well within the range set forth in the CN845 specification (5% to 30%) and includes the concentration of soybean oil in Example 7 of CN845, which is 9.5%. *Id.* at 17. And the pH of the composition in the asserted claims ranges from 7.5 to 9.0, which overlaps with the 6.0 to 8.0 pH value of the emulsion in CN845. *Id.*

According to Heron, there are two important differences between the claimed formulations and the Chinese prior art references. First, the concentration of egg yolk lecithin differs: CN845 recommends a concentration of egg yolk lecithin emulsifier of 0.5% to 10% (with a preferred concentration of 8% to 10%), while the asserted claims recite a concentration of 14% egg yolk lecithin. Second, CN845 refers to the use of a pH modifier to produce the appropriate pH levels for its formulations, but it does not disclose the use of any specific pH modifier, while the claims of the asserted Heron patents recite the use of sodium oleate as a pH modifier.

**E. Evidence as to the Motivation to Increase Lecithin Concentration**

At the time of the invention, a person of skill in the art would have recognized that the Chinese formulators had successfully solubilized aprepitant in an emulsion by using up to eight times as much emulsifier as had been used in conventional emulsions. In addition, the Zhou article showed that at least one formulation achieved a degree of stability, as measured by the $K_e$ centrifugation test. A POSA also would have recognized that CN845 recommended the use of an emulsifier at the top of the 0.5% to 10% range disclosed in that publication, and that nothing in the

[7] Examples 1, 4, and 6 of CN845 contain 0.5% of aprepitant, while Example 8 contains 1% of aprepitant. JTX 71 at 14–17.

publication indicated that a concentration any higher than 10% would cause the emulsion to fail. More generally, a POSA would have known that, up to a point, increasing the concentration of the emulsifier in the aprepitant emulsion would increase the surface area of the interface between the oil and water phases of the emulsion, thus potentially increasing the stability of the composition. And a POSA would be aware that the Liu review article published in 2011 had characterized the concentration of surfactants (including phospholipids) used in microemulsions as being between 5% and 30%.

On the other hand, Heron points to evidence that would not have encouraged a POSA to consider an emulsifier concentration as high as 14%. In his testimony, Dr. Little focused on the Zhou article, which was published in 2012, shortly after CN845. Tr. 1253:2–9. Dr. Little explained that a POSA confronted with CN845's broad range of emulsifier concentrations would look to the inventors' other work—namely, the results reported in the Zhou article—for further guidance when picking the concentration within CN845's range to focus on. *See* Tr. 1254:4–1255:25. Dr. Little noted that the Zhou article disclosed that the "optimal formulation" of an aprepitant emulsion would contain only 2.5% egg yolk lecithin, in contrast to the 8% to 10% concentration level suggested in CN845. JTX 115 at 1, 6, 7; *see also* Tr. 1257:10–14 (Little), 349:2–7 (Rabinow).

Dr. Little further testified that there was no general rule that increasing the concentration of the emulsifier component would result in a more stable emulsion; to the contrary, he testified that high levels of emulsifier would have a destabilizing effect. *See* Tr. 1286:14–1288:13. He added that "a formulation scientist . . . [is] trying to decrease [the emulsifier] to get the lowest amount that you can for it to be stable. Because if you add any more than that, you're going to

cause problems with other design parameters that you have and potentially cause instabilities." Tr. 1288:7–13. Dr. Rabinow agreed in part, acknowledging that there is a point at "which the amount of the emulsifier clearly becomes counterproductive." Tr. 249:18–252:1.

Fresenius relies on the Khan reference, JTX 91, which stated that the "amount of emulsifying agent is one of the most important factors having an influence on the emulsion stability." *Id*. at 5. But Kahn added that "[a]t high emulsifier concentration emulsion instability occurs because of rapid coalescence." *Id.* That disclosure is consistent with the undisputed expert testimony that, above a certain level, increasing the emulsifier level will not further improve stability. *See, e.g.*, Tr. 1286:24–1287:20.

Dr. Little pointed out that as of 2014 other products using lecithin as an emulsifier employed concentrations of lecithin in the low single digits,[8] and he stated his opinion that "going up to 14 percent is not what a person of ordinary skill in the art would even be thinking about doing." Tr. 1282:13–19. That opinion, Heron argues, is consistent with Zhou's characterization of the emulsifier concentration level of 2.5% as optimal.

Heron also challenges the applicability of the Liu reference to the technology at issue in this case on the ground that Liu referred to "microemulsions," not "emulsions." Heron argues that microemulsions are quite different from conventional emulsions of the sort recited in the asserted

[8] For example, the aprepitant emulsion disclosed in the Hingorani patent application publication relied on by Fresenius, JTX 21, contained only 1.2% lecithin. Tr. 262:131–21, 327:25–328:8, 1284:17–1286:7. Similarly, the emulsions described in the Washington reference, JTX 113, also relied on by Fresenius, contained only 1.2% lecithin. Tr. 364:8–365:24; JTX 113 at 2.

claims, and that the range of 5% to 30% for microemulsions referred to in Liu has no application to the emulsions at issue in this case.

In support of that position, Dr. Little testified that even though CN845 used the term "microemulsion" to describe the emulsion in that reference, a POSA, reading CN845, would "understand that it's talking about an emulsion." Tr. 1375:16–1376:7. He explained that microemulsions are thermodynamically stable, while classical emulsions are not, and that the two have very different properties. Tr. 1240:19–1241:16, 1295:10–1296:3.

Dr. Rabinow agreed that under the "technical, classical definition" of an emulsion, making an emulsion requires energy to be put into the system, whereas making a microemulsion does not. Tr. 162:2–24, 340:4–16. As Dr. Rabinow put it, in the case of a microemulsion, "you don't add energy . . . you just bring the ingredients together, and miraculously you form your microemulsion." Tr. 162:14–16. Dr. Rabinow therefore agreed with Dr. Little that under the classical definition of an emulsion, the emulsions created by the inventors on the CN845 application would be considered emulsions, not microemulsions, because they required the input of energy to formulate. *See* Tr. 162:9–24, 1240:21–1241:16. The inventors of the CN845 application, according to Dr. Rabinow, appear to have referred to their emulsions as "microemulsions" simply because the particles were much smaller than the particles that would be present in an ordinary emulsion. Tr. 161:3–14.

While acknowledging the differences between emulsions and microemulsions, Tr. 161:3–14, 338:18–19, Dr. Rabinow testified that the differences between the two are irrelevant to the range of emulsifier concentrations disclosed by Liu, because "[b]iocompatibility and safety are similar for microemulsions or emulsions," and the concentration of the emulsifier is "a safety,

biocompatibility consideration." Tr. 339:3–4, 12–13. For that reason, he concluded, a POSA would have understood Liu's reference to a suitable emulsifier concentration of between 5 and 30% in microemulsions to be equally applicable to classical emulsions. Tr. 338:23–339:13.

I agree with Fresenius that a person of skill in the art would consider the Liu reference to have at least some application to an emulsion such as the emulsions in CN84 and Zhou, in which the particles were much smaller than in classical emulsions. That is not to say, however, that Liu provides convincing evidence that a POSA would be motivated to use an emulsifier concentration as high as 14%. Dr. Little pointed out a number of other reasons that a POSA would not find the information in Liu to be of use in optimizing either CN845 or Zhou. Tr. 1289:13–17. First, Dr. Little explained that Liu was directed to emulsions in which the oil component consisted of medium-chain triglycerides, not long-chain triglycerides, such as the soybean oil used in Zhou and CN845. Tr. 1292:8–1293:7. Second, Dr. Little noted that Liu is principally concerned with water-in-oil emulsions, not oil-in-water emulsions such as the emulsions in Zhou and CN845. Tr. 1291:2–20, 1299:15–1300:21. Third, Dr. Little testified that Liu is not directed solely to the use of phospholipids such as egg yolk lecithin, but refers to a wide range of surfactants; thus, the Liu reference does not teach the use of concentrations of up to 30% of egg yolk lecithin. Tr. 1295:10–24. Finally, Dr. Little noted that Liu does not discuss aprepitant emulsions at all. Tr. 1293:21–1294:7. Based on those observations, Dr. Little concluded that a POSA would not look to the statement in Liu about surfactant concentrations "in order to get surfactant concentrations to apply to an emulsion like CN '845, Zhou, and the patents-in-suit." Tr. 1300:22–1301:5. In view of those differences, I discount the relevance of Liu to establishing motivation for a POSA to use an emulsifier concentration above 10%. That conclusion is further bolstered by the fact that Liu's

reference to an emulsifier concentration of 5 to 30% is made in passing and the fact that Liu does not offer any disclosures as to how the specific concentration would be selected from that range, which Liu itself describes as "relatively large." *See* JTX 93 at 10.

Consistent with Dr. Little's critique that Liu does not discuss egg yolk lecithin, Dr. Rabinow admitted that he "did not identify a single prior art document that disclosed a formulation containing more than 10 percent egg lecithin." Tr. 338:2–9. And the evidence showed that as of 2014, all FDA-approved emulsions based on egg yolk lecithin used concentrations of 1.2% or less. Tr. 327:5–9. Dr. Rabinow pointed out that the Washington reference "says you need to expand the surface area of the interface, which would necessarily imply additional emulsifiers required," Tr. 365:15–21, but the example formulations discussed in the Washington reference contain only 1.2% lecithin, *see* Tr. 364:21–365:1. Moreover, the only reference dealing specifically with aprepitant used a concentration of only about 1% egg yolk lecithin. *See* JTX 21 at 8; Tr. 327:25–328:5 (Rabinow); Tr. 1286:2–7 (Little). In short, the other prior art references taught emulsifier concentrations at the low end of the 0.5% to 10% range disclosed in CN845 and close to or below the 2.5% concentration disclosed in Zhou. Those references would therefore suggest to a POSA that formulators should focus on emulsifier concentrations well below 10% rather than concentrations in excess of 10%. And the fact that all these emulsions used concentrations of egg yolk lecithin below the minimum recommended concentration in Liu further supports discounting the reference in Liu to emulsifier concentrations between 5 and 30%.[9]

[9] During his testimony, Dr. Rabinow identified several references that use high concentrations of egg yolk lecithin: a 2014 article by Agarwal, JTX 67; a 1991 European patent application, JTX 74; and a 2009 article by Yue, JTX 114. I find those references not to be probative

I find unpersuasive Dr. Rabinow's testimony that, even absent an applicable reference, a POSA would have been motivated to increase the concentration of egg yolk lecithin above the range disclosed in CN845 and up to as much as 14%. Fresenius contends that a POSA would be able to derive a 14% concentration of egg yolk lecithin as the appropriate emulsifier concentration as a matter of "routine optimization." But this is not a case involving routine optimization within a range of values disclosed in the prior art. *See Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.3d 1341, 1347–49 (Fed. Cir. 2024); *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1005–10 (Fed. Cir. 2018). The 14% lecithin concentration in the '229 and '794 patents was not within the 0.5% to 10% range discussed in CN845. For that reason, the analysis in cases dealing with routine optimization within a range disclosed in the prior art is inapplicable here.

Heron challenges Dr. Rabinow's testimony about complexing and his conclusion that a POSA would have considered increasing the emulsifier concentration in order to facilitate complexing between the aprepitant and emulsifier molecules, but, as explained above, I find Dr. Rabinow's testimony about the phenomenon of complexing to be credible. Moreover, what is important about Dr. Rabinow's testimony about complexing is not whether there were actual

---

of the issues in this case because (1) they do not discuss aprepitant, Tr. 357:15–17; (2) they do not discuss intravenous formulations, Tr. 357:18–358:5; and (3) they disclose a lecithin-to-active-ingredient ratio of 3:1 or less, while the asserted claims recite a ratio of 20:1, Tr. 356:10–14, 330:10–13. In view of those differences, those references are not analogous to the formulations in the asserted patents, so I credit Dr. Little's testimony that a POSA would not understand those references to indicate that the concentration of egg yolk lecithin should be increased above the levels suggested in the CN845 or Zhou references. *See* Tr. 1304:4–1305:19. In any event, Fresenius relies on those references only as examples of complexation, and not to show that a POSA would use a high concentration of lecithin in an aprepitant emulsion.

complexes formed in the aprepitant emulsion, but that a POSA at the time of the invention would have understood that complexes can form between emulsifier and aprepitant molecules if enough emulsifier is present, and that the consequence of the complexation is to increase the stability of the emulsion. Therefore, I credit his testimony that the possibility of complexation—and the resulting increase in the stability of the emulsion—would be a factor encouraging a POSA to consider using an increased concentration of the emulsifier.

Nonetheless, I also credit Dr. Han's explanation that "[t]he emulsion is very complex. The ratio of lecithin to aprepitant, oil to aprepitant, sodium oleate used, everything is important to make a stable emulsion." Tr. 508:1–16. I also find credible Dr. Han's testimony that the claimed invention was developed through "a lot of trial-and-error experiments." *Id.* As Dr. Little testified, a person seeking to improve on the formulation set forth in CN845 would not necessarily modify the concentration of the emulsifier in the first instance, but "may modify something else from the Zhou formulation." Tr. 1281:22–1282:7.

The fact that the Heron group was able to develop its formulation in only about six months after focusing on the Chinese patent application as a starting point for its emulsion experiments—particularly in light of Dr. Han's lack of prior experience working with emulsions—provides some support for Fresenius's obviousness argument. It is not enough, however, to justify the conclusion that a POSA would be motivated to increase the level of emulsifier concentration as high as 14% and that the POSA would have a reasonable expectation of success in producing a stable emulsion with an emulsifier concentration that high. In view of the general consistency of the references in disclosing emulsifier concentrations well below 10%, I find that a POSA would not have had a motivation to increase the concentration of lecithin above 10%, including a concentration of at

least 14%, and would not have had a reasonable expectation of success with an emulsifier level that high.

Accordingly, based on the evidence summarized above, I find that Fresenius has not shown by clear and convincing evidence that a POSA would have had a motivation to modify Zhou's formulation by increasing the amount of egg yolk lecithin to concentrations well above the range disclosed in CN845, especially when the person would be working within the ranges disclosed in CN845 for every other ingredient. *See* Tr. 227:18–228:14, 224:8–20. Nor would a POSA have had a reasonable expectation of success with such a formulation.

### F. Evidence as to the pH Modifier

Claim 8 of both patents includes a pH modifier as one of the components of the injectable pharmaceutical emulsion. The claims specify sodium oleate as the pH modifier, although they do not state what amount of sodium oleate should be used; instead, the claims simply say that the pH of the emulsion must fall within the range between 7.5 and 9.0. Fresenius argues that the use of sodium oleate as a pH modifier in the formulation would have been obvious to a POSA in light of the prior art.

CN845 disclosed adjusting the pH in its formulations to between 6.0 and 8.0, JTX 71 at 10, 13, 14, but it did not identify a specific pH modifier or an amount of such modifier to be used. While Dr. Little testified that the most common basic pH modifier is sodium hydroxide, Tr. 1219:2–18, 1309:9–25, Dr. Rabinow testified that as of the priority date it was not "considered a big deal" to use sodium oleate in an emulsion especially in view of the fact that "oleate was already used in commercialized emulsions," Tr. 425:3–8.

When Dr. Ottoboni was asked whether Heron was the first company to use sodium oleate as a pH adjuster, he responded that sodium oleate "was present in one other pharmaceutical formulation that I'm aware of." Tr. 551:4–8. In addition, during the examination of the application that led to the asserted patents, the examiner found that it would have been obvious to one of ordinary skill in the art to use sodium oleate to adjust the pH of the claimed formulations. The examiner observed that CN845 (which the examiner referred to as "Zhou et al.") did "not recite any particular agent as preferred for adjusting the pH, therefore any suitable compounds may be used. In the absence of unexpected results or other evidence to the contrary, the selection of sodium oleate is the mere selection of a material suitable for the intended use." JTX 2 at 88.

Heron has not suggested that there is any special reason that the asserted claims called for sodium oleate as the designated pH adjuster, as opposed to a more common pH adjuster such as sodium hydroxide. In fact, the common specification of both patents in suit states that although sodium oleate is used in examples 1, 2, and 3 to adjust the pH of the emulsion, "[o]ther pH modifiers that may be used include but are not limited to sodium hydroxide, potassium hydroxide, magnesium hydroxide, Tris, sodium carbonate and sodium linoleate." '229 patent, col. 11, ll. 63–66; '794 patent, col. 11, ll. 63–66.[10] I therefore find that a POSA would have been aware that a

[10] Heron argues that it would not have been obvious to use sodium oleate as a pH adjuster because of concerns that sodium oleate could cause hemolysis (rupturing of red blood cells). The evidence at trial, however, showed it was known that in an emulsion formulation sodium oleate migrates to the emulsion and enters the emulsion membrane where it is sequestered from interfering with red blood cells. *See* Tr. 383:22– 385:2; JTX 88 at 1. Dr. Rabinow explained why the concern expressed about hemolysis in one of the references introduced at trial, JTX 112, was unwarranted, particularly in light of the evidence that sodium oleate was commonly used in emulsion formulations. *See* Tr. 207:13–208:1; JTX 76 at 4. Heron did not rebut Dr. Rabinow's testimony on that point, and I credit that testimony.

number of compounds could be used as pH adjusters, including sodium oleate, and that in the absence of any reason to believe sodium oleate would have been superior to other similar compounds, such as those listed as suitable substitutes in the specification, the choice of sodium oleate would have been obvious. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) (finding a strong case of obviousness when claim recited "a combination of elements that were all known in the prior art, and all that was required to obtain that combination was to substitute one well-known cooling agent [i.e., component] for another").

* * * * *

To summarize my findings on the issues of obviousness, I find that all but two of the limitations found in the asserted claims of the '229 and '794 patents fall within the ranges of components identified in CN845. The two "missing" limitations are the concentration of 14% egg yolk lecithin and the use of sodium oleate as a pH modifier. I find that the sodium oleate limitation would have been obvious based on the disclosures in the common specification of the asserted patents, and the knowledge of a POSA regarding pH modifiers. However, I find that the limitation requiring a 14% concentration of egg yolk lecithin was a substantial departure from what was taught in the relevant prior art and what a POSA would have been motivated to use in such an emulsion with a reasonable expectation of success. For that reason, I conclude that the asserted claims of the two patents in suit would not have been obvious.

### G. Objective Considerations

Even though I have concluded that Fresenius has not shown that the asserted claims would have been obvious based on an analysis of the prior art references from the perspective of a person of ordinary skill in the art, I will address the issue of how the "objective considerations" bear on

the issue of obviousness, as those considerations serve as a "fundamental part of the overall § 103 obviousness inquiry." *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1077–79 (Fed. Cir. 2012). The objective considerations on which the parties focused at trial were the alleged (1) long-felt unmet need for an injectable form of aprepitant; (2) failure of others to satisfy that need and the unexpected nature of the invention; (3) industry skepticism regarding the invention, praise from others in the industry, and copying of the invention by others; and (4) commercial success of the product based on the invention. *See Apple Inc. v. Samsung*, 839 F.3d 1034, 1052–53 (Fed. Cir. 2016 (en banc).

**1. Long-Felt Unmet Need**

Heron's expert on medical oncology, Dr. Eric Roeland, testified that prior to the inventors' work that led to the patents at issue in this case, "there was a long-felt unmet need for an NK-1 receptor antagonist that was equally as efficacious [as fosaprepitant] with fewer related side effects." Tr. 1058:23–1059:2. He added that oncologists preferred intravenous formulations of such drugs because of concerns about bioavailability and patient compliance with oral formulations. Tr. 1017:12–1018:7, 1020:15–1021:16 (explaining that patients frequently experience problems adhering to instructions for taking oral medications, and that oral delivery of drugs is not as direct as intravenous delivery, resulting in lower bioavailability of the drug); *see also* JTX 137 at 1–2. Dr. Roeland concluded that Cinvanti® satisfied that unmet need "[b]ecause it was equally as efficacious [as fosaprepitant] and had fewer related infusion site reactions." Tr. 1060:9–1061:2.

Dr. Maurie Markman, Fresenius's expert on cancer treatment, including preventing emesis and CINV, disagreed with Dr. Roeland on the issue of long-felt need. He testified that the industry had developed workarounds designed to solve the problems associated with the use of fosaprepitant in anti-emetic drugs such as Emend IV®. Those workarounds included diluting the dosage of fosaprepitant, *see* Tr. 730:14–731:18, and using a "central line" or "port" to administer the fosaprepitant, i.e., a subcutaneous device through which drugs can be administered directly into the patient's veins, *see* Tr. 614:22–616:19.

Fresenius argues that the fact that such workarounds could minimize the risks associated with Emend IV® indicates that there was no unmet need for Heron's invention. To the contrary, I find, however, that the evidence shows there was pressure in the industry to find a solution to the problems that were associated with oral aprepitant formulations and injectable fosaprepitant formulations that were eventually solved by Cinvanti®. Moreover, the evidence shows that workarounds such as the use of a central line or port were not available or advisable in all cases, so the risk of adverse reactions to the fosaprepitant-based drugs remained a concern in at least some instances.

In pushing back on the issue of long-felt unmet need, Fresenius points to a survey conducted by Heron prior to the launch of Cinvanti® in which Heron concluded that healthcare professionals were "generally satisfied with IV Emend safety and indicate low level of concern regarding [injection site reactions] and hypersensitivity." JTX 177 at 30. The survey further concluded that there was a "[l]ow level of stakeholder awareness of [polysorbate 80] and lower awareness of [polysorbate 80] in IV Emend." *Id.* In addition, the survey found that there was a "perceived lack of clinical differentiation of Cinvanti vs. Emend IV (e.g. Cinvanti's Polysorbate

80 free characteristic was viewed as only impacting a small patient population, which would not be a differentiator vs. Emend IV)." *Id.* at 98.

Based on Dr. Markman's testimony and a 2022 study of the safety and efficacy of injectable NK-1 receptor antagonist formulations, Fresenius argues that the safety and efficacy of Emend IV® and Cinvanti® were "the same." Tr. 653:9–654:23 (citing JTX 127 at 5). In fact, however, the study cited by Dr. Markman concluded that although there were relatively few infusion site events with either Cinvanti® or Emend IV®, patients who received Emend IV® had a slightly higher risk of infusion site reactions, but the small number of events reported meant that the incremental risk was not deemed statistically significant. JTX 127 at 6–7. The study concluded that to reduce the risk of infusion site adverse events with a fosaprepitant-based emetic, physicians should either use a workaround with a central port line or substitute Cinvanti® as the emetic of choice.

Heron's evidence showed that the side effects from the available fosaprepitant formulations, which included the surfactant polysorbate 80, were a matter of some concern to practitioners.[11] *See* Tr. 1203:15–23 (prior to launch, "health care providers view[ed] surfactant-

---

[11] Although Fresenius argues that the evidence did not prove that the polysorbate 80 in Emend IV® was responsible for the increased number of side effects, Heron introduced a number of publications that reached the opposite conclusion. *See* JTX 139 at 1, 16; JTX 150 at 2; JTX 148 at 2; JTX 155 at 10; JTX 142 at 28; Tr. 1035:6–12, 1046:20–1054:20 (Dr. Roeland). Dr. Markman analyzed those studies at length and pointed out methodological weaknesses in the studies that undercut Heron's contention that the adverse reactions in patients receiving Emend IV® were attributable to the polysorbate 80 in that formulation. Tr. 607:10–660:12. In any event, however, with one exception those studies were published after the 2014 priority date for the two patents in suit and therefore contribute little if anything to the risks associated with Emend IV® that were perceived as of the time of the filing of the provisional application on which the patents are based. The one exception, JTX 146, was a Japanese study that Dr. Markman regarded as irrelevant

free formulation as a worthwhile benefit versus Emend IV, although modest," and that "there was some modest view that the polysorbate 80-free formulation was of a benefit"). For example, as noted above, after switching from oral aprepitant to intravenous fosaprepitant as an anti-emetic, a Mayo Clinic study reported that "infusion site adverse events were a prominent and substantial problem for a significant number of patients." JTX 137 at 2. In light of that experience, the Mayo Clinic in 2011 changed its guidelines, recommending the use of oral aprepitant rather than fosaprepitant with certain forms of chemotherapy treatment. *Id*. Moreover, the FDA-approved labels for Emend IV® and Cinvanti® both contained a warning regarding hypersensitivity, but only the label for Emend IV® contained a warning for infusion site reactions, indicating that the infusion site reactions were a known risk associated with Emend IV®. *Compare* JTX 129 at 1 (label for Emend IV®) *with* JTX 51 at 1 (label for Cinvanti®).

Taken as a whole, the evidence supports a finding that although healthcare providers were aware of the risk of adverse reactions from the polysorbate 80 in fosaprepitant products such as Emend IV®, the level of concern was moderate and could be minimized by countermeasures, such as the use of a central port for administering the drug. I therefore find that while at the time of the invention there was some degree of interest in developing an aprepitant formulation that would avoid the side effects of the fosaprepitant treatments, the motivation to do so was not an urgent or compelling one. Thus, I find that the "long-felt, unmet need" factor weighs in Heron's favor, but only moderately.

---

because, among other issues, the concentration of fosaprepitant given to the patients in that study was much higher than is permitted in the United States. Tr. 641:10–645:12.

**2. Failure of Others and Unexpected Results**

Dr. Little explained at trial that the formulations disclosed in CN845 and the Zhou article formed crystals within four days, and thus were not sufficiently stable for commercial use, while the formulations recited in the claims were shown to have long-term stability. *See* Tr. 1344:20–1346:5. He based his opinion on a comparison of Cinvanti® with the formulations set forth in Examples 4 and 5 of the common specification of the asserted patents, which approximate the formulations described in CN845 and Zhou. The difference, he testified, is a difference in kind, not just in degree. Tr. 1346:10–14. Long-term stability is critical to commercialization, Dr. Little explained, because if a formulation is not stable for at least one week, "it becomes almost impossible to commercialize." *See* Tr. 541:23–542:7. I credit that testimony, especially in view of the fact that it was essentially unrebutted.[12]

There was also testimony at trial that the aprepitant molecule had been known for 20 years before Cinvanti®, yet no intravenous aprepitant formulation had been brought to market at any point during that period. The absence of a marketable intravenous or injectable aprepitant formulation is notable in view of the fact that during the same period an injectable fosaprepitant formulation was available. *See* Tr. 1322:25–1323:7. It is also significant that Merck was unsuccessful in its efforts to develop an injectable aprepitant formulation. *See* Tr. 914:18–919:1. Dr. Hale, who was employed by Merck while Merck was attempting to develop such a formulation,

---

[12] Fresenius asserts that the ability to commercialize a product is irrelevant. I find that argument entirely unpersuasive. It is readily apparent that a drug that cannot be commercialized is of reduced value and does not represent success for an industry that is focused on bringing new pharmaceutical products to market.

testified that his reaction upon learning about Heron's product was surprise that "someone had cracked this problem that we [*i.e.*, Merck] weren't able to solve" in the "20 years previously, or anyone else between then and the time that Heron did this." Tr. 955:23–956:5. As Dr. Hale put it, his reaction at the time was "surprise[], but kudos, good job." *Id.* I find that testimony credible and corroborated by the publications introduced at trial stating that the "sparing water solubility of [aprepitant] precludes its formulation in a vehicle acceptable for intravenous administration in humans." *See* PTX 3 at 1; JTX 82 at 5. Thus, the secondary considerations of the failure of others and the unexpected results achieved by the inventors weigh in Heron's favor.

A significant mitigating factor in that regard is that the inventors had the advantage of starting their project with the CN845 application in hand, and were able to file their provisional application within about six months of beginning work on the project. There was no evidence at trial that others who had access to the CN845 application had tried and failed to formulate an emulsion stable enough to satisfy the USP standards, and there was no evidence that others in the field regarded Heron's success as unexpected after the groundbreaking work had been done by the Chinese scientists. The "failure of others" and "unexpected results" factors thus favor Heron, but only moderately.

**3. Industry Skepticism, Praise, and Copying**

There was little evidence at trial bearing on whether the patented invention was met by skepticism within the industry or was greeted by praise. Although Dr. Hale regarded the invention of a stable aprepitant formulation suitable for injection or infusion to be a breakthrough, Heron did not introduce evidence that the industry as a whole was skeptical that such a formulation could be

made, nor did Heron offer evidence that there was widespread praise for the invention in the industry. Those related objective considerations are therefore not at issue in this case.

The presence of copying, although recognized as bearing on nonobviousness in many instances, is also not a relevant consideration in this case. Because an ANDA filer must demonstrate bioequivalence to the branded NDA product in order to obtain FDA approval, Tr. 283:5–22, copying is not ordinarily regarded as probative of nonobviousness in a Hatch-Waxman Act case. *Adapt Pharma Operations Ltd. v. Teva Pharms. USA*, *Inc.*, 25 F.4th 1354, 1374 (Fed. Cir. 2022) (quoting *Bayer*, 713 F.3d at 1377); *see also* Tr. 1349:12–15.

Heron argues that copying is a relevant secondary consideration in this case because Fresenius could have avoided copying Cinvanti® by changing the formulation of its ANDA product and seeking FDA approval for its product by filing what is known as a "section 505(b)(2) application." *See* 21 U.S.C. § 355(b)(2). A section 505(b)(2) applicant may seek approval for a product that is not identical to the NDA product. If the applicant does so, the applicant must demonstrate that the proposed drug is safe and effective, but the applicant is permitted to rely at least in part on clinical studies previously submitted to the FDA. As a result, that course of action can be easier than beginning from scratch with an original NDA, but it is still considerably more burdensome than filing an ANDA based entirely on the NDA application filed by the original applicant. *See AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1046 (Fed. Cir. 2010); *Takeda Pharms., U.S.A., Inc. v. Burwell*, 78 F. Supp. 3d 65, 71–72 (D.D.C. 2015), *aff'd in part and vacated in part on other grounds*, 691 F. App'x 634 (D.C. Cir. 2016). Fresenius's choice to file an ANDA rather than a section 505(b)(2) application is therefore not persuasive evidence of nonobviousness.

The factors of industry skepticism, praise, and copying thus provide no significant support for Heron on the issue of nonobviousness and must be regarded as neutral.

**4. Commercial Success**

Finally, Heron points to the commercial success of Cinvanti® as a further indication of the nonobviousness of the claimed invention. Heron points out that Cinvanti® enjoys a substantial share of the market for intravenous NK-1 receptor antagonists. That share reached a high of 43% in 2019 before generic fosaprepitant entered the market. Cinvanti®'s share of the market has since stabilized at 25% to 28%. Fresenius acknowledged that Cinvanti® is "doing exceedingly well in the market," which has motivated Fresenius to develop a generic version of Cinvanti®. JTX 186 at 5.

The critical question on this issue is what is responsible for Cinvanti®'s commercial success. Heron contends that Cinvanti® has proved successful because it provides the benefits of intravenous delivery, while being free of polysorbate 80, and thus, unlike the injectable fosaprepitant products, it does not come with the risk of side effects in the form of injection-site adverse reactions. In addition, Heron contends that Cinvanti® is more convenient to use than the competing fosaprepitant drugs. Heron notes that Cinvanti® can be administered in a two-minute intravenous "push," rather than an extended 20- to 30-minute infusion process. Tr. 1066:19–1071:5. Moreover, Cinvanti® can be stored at room temperature for up to 60 days, and in refrigeration for 12 months. Tr. 779:3–9, 1339:8–1340:8. And Cinvanti® comes in a vial and does not have to be reconstituted by a medical professional at the time it is administered. Tr. 1068:9–1069:1.

On the other hand, Fresenius introduced evidence that the success of Cinvanti® has been attributable to Heron's pricing strategy rather than to the advantages of the patented formulation. *See, e.g.*, Tr. 836:12–841:14. It is true that Heron priced Cinvanti® below Emend IV® when Cinvanti® launched. *See* Tr. 1188:15–1189:3. And, as Heron acknowledges, the attractive price of the product was a factor motivating customers to move from Emend IV® to Cinvanti®. JTX 158 at 94; *see also* Tr. 824:25–825:19. Weighing the competing evidence, I conclude that the commercial success of Cinvanti® has been at least partly attributable to its properties compared to the competing products, but that the pricing strategies followed by Heron have had a significant role to play in giving Cinvanti® as large a market share as it has. On balance, then, I find that the commercial success factor favors Heron, but only slightly.

* * * * *

In sum, I find that the long-felt, unmet need evidence weighs moderately in Heron's favor; the commercial success factor weighs slightly in Heron's favor; and the failure of others and unexpected results evidence weighs moderately in Heron's favor. The remaining categories of secondary evidence have no significant bearing on the issue of obviousness in this case. Taken all together, the evidence of objective considerations provides some support for Heron's argument that the two asserted patents would not have been obvious, but the objective considerations are not powerful factors bearing on the issue of obviousness here.

## VIII. Written Description

In addition to obviousness, Fresenius argues that the asserted claims are invalid for failing to provide an adequate written description of the claimed inventions. According to Fresenius, the

specification does not demonstrate that the inventors were in possession of the full range of the claimed subject matter when the applications for the asserted patents were filed.

Section 112(a) of the Patent Act provides, in pertinent part, that the specification "shall contain a written description of the invention." 35 U.S.C. § 112(a). The purpose of the written description requirement is to ensure that the "inventor actually invented the invention claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The specification's disclosure is sufficient when it "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art," *id.*, and it is "highly dependent on the facts of each case," *Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1342 (Fed. Cir. 2021). As with other invalidity issues, the patent challenger bears the burden of proof on this issue, and "must establish by clear and convincing evidence that the written description requirement was not met, in light of the presumption of validity." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1364 (Fed. Cir. 2003).

The presentations of the parties at trial relating to the written description issue were quite brief. In slightly more than one page of testimony, Dr. Rabinow noted that the claimed pH range for each of the asserted claims was pH 7.5 to pH 9. He contended that the specification did not support a range that broad because the "examples that were alleged to be found to be viable, stable formulations [were] all done in a very narrow pH range of something like 8.7 to 8.8," and a POSA would not "believe that the named inventors of the [two asserted patents] possessed the range 7.5 to 9.0 for the claimed formulations." Tr. 306:25–307:20.

The common specification of the two asserted patents showed that in the pertinent examples of operative embodiments of the inventions, the formulations had pH values of between 8.74 and 8.92. *See* '229 patent, col. 20, line 57, through col. 21, line 11; '794 patent, col. 20, ll. 54–67. Fresenius's argument is that the inventors failed to show that they had possession of the full claimed pH range (7.5 to 9.0) because there were no examples showing formulations with a pH between 7.5 and 8.74.

Heron responds that the common specification discloses that "[i]n one embodiment, the composition has a pH of about 6 to 9, 7 to 9, 7.5 to 9, 7.5 to 8.5, 8 to 9, 6 to 8, 7 to 8, or 6, 7, 8, or 9." '299 patent, col. 4, ll. 65–67; '794 patent, col. 4, ll. 65–67. Those references in the common specification, however, simply list pH ranges between 6 and 9 and thus add little to the written description provided by the original claims themselves, which include a somewhat narrower range of pH values of 7.5 to 9.0.

The more pertinent portion of the specification is the passage that describes the aqueous phase of the formulation as including "a pH-modifying agent," and notes that sodium oleate is used in Examples 1, 2, and 3 of the specification "to adjust the pH of the emulsion to about 6 to 9, depending on the desired emulsion formulation." '229 patent, col. 11, ll. 58–61; '794 patent, col. 11, ll. 58-61. That passage of the specification then continues as follows:

> The aqueous phase is produced by mixing water with the tonicity agent and sodium oleate as the pH modifying agent. Other pH modifiers that may be used include but are not limited to sodium hydroxide, potassium hydroxide, magnesium hydroxide, Tris, sodium carbonate and sodium linoleate. The pH modifier used is effective for adjusting the pH of the emulsion to a preferred pH of about 6 to 9, or about 6, 7, 8, or 9.

’229 patent, col. 11, line 61, through col. 12, line 2; ’794 patent, col. 59, line 61, through col. 12, line 2.

Although the specification reported that Examples 1, 2, 3, and 6, as tested, had pH values of between 8.74 and 8.80, *see* ’794 patent, col. 20, ll. 54–67, the statement in the specification refers to the permissible pH values for those examples as being between pH 6 and pH 9 and explains how those pH values are obtained, thus providing support for the claimed pH range of 7.5 to 9.0.

The question presented by this issue is whether Fresenius has proved, by clear and convincing evidence, that the inventors have failed to show that they had possession of the claimed compositions with pH values of between 7.5 and 9.0. With respect to the ’229 patent, the answer is straightforward. Claim 8 of the patent, from which the asserted claims depend, merely sets forth the components of a composition; it does not contain any requirement of efficacy or stability. Therefore, the mere recitation of the range of pH values in the specification and in the claims is sufficient to satisfy the written description requirement of 35 U.S.C. § 112.

The issue is less clear-cut with respect to the ’794 patent, because claim 8 of that patent, from which the asserted claims depend, requires that the composition be “physically stable.” Thus, the written description requirement demands that the patent establish that the inventors had possession not just of compositions with pH values between 7.5 and 9.0, but also of compositions with pH values between those two values that are physically stable.

“There is no rigid requirement that the disclosure contain ‘either examples or an actual reduction to practice.’” *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1308 (Fed. Cir. 2015) (quoting *Ariad*, 598 F.3d at 1352; *see also Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366

(Fed. Cir. 2006) ("[E]xamples are not necessary to support the adequacy of a written description."). To the contrary, the written description requirement is satisfied if, for example, the specification provides enough representative embodiments to show that the inventor was in possession of the full scope of the claim. *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1164 (Fed. Cir. 2019). All that is required to satisfy the written description requirement is that the patent disclosure "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1350; *see also Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1136 (Fed. Cir. 2018) (same); *Allergan*, 796 F.3d at 1308 ("[T]he proper inquiry is whether the patentee has provided an adequate description that 'in a definite way identifies the claimed invention' in sufficient detail that a person of ordinary skill would understand that the inventor had made the invention at the time of filing."), *quoting Ariad*, 598 F.3d at 1352.

It is true that none of the examples in the common specification of the two patents in suit explicitly shows that the claimed compositions of the '794 patent are physically stable at a pH of between 7.5 and 8.74. But the burden of showing lack of an adequate written description falls on Fresenius, and Fresenius has not shown that the examples set forth in the specification for compositions having a pH of 8.74 and above would not be representative of compositions with a pH as low as 7.5. To the contrary, the discussion in the specification of using a pH modifying agent to adjust the pH of the emulsion to a preferred pH of between 6 and 9 indicates that the inventors understood that their invention would be operative over a wide pH range. Because Fresenius has not suggested any reason to believe that the exemplary composition, which was shown to be stable at a pH of 8.74 would not also be stable at a pH of 7.5, the lower end of the

claimed pH range, Fresenius has failed to show by clear and convincing evidence that the asserted claims of the '794 patent lack adequate written description.

The specification's disclosures distinguish this case from *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320 (Fed. Cir. 2000), relied on by Fresenius. In that case, the limitation claimed a characteristic that was "not discussed even in passing in the disclosure." 230 F.3d at 1327. That is not the case here, given the explicit disclosure covering the full range of the challenged claim limitation regarding pH values and examples covering at least a portion of the range of that challenged claim limitation. Accordingly, I find that Fresenius has not shown by clear and convincing evidence that the claims are invalid for failing to satisfy 35 U.S.C. § 112(a).

## IX. Conclusion

For the foregoing reasons, I hold that Heron has proved by a preponderance of the evidence that Fresenius's ANDA product infringes claims 9 and 10 of the '794 patent, in addition to claims 1–11 and 21 of the '229 patent, which were previously determined to be infringed. I further hold that Fresenius has not proved by clear and convincing evidence that the asserted claims are invalid for obviousness under 35 U.S.C. § 103 or for the lack of adequate written description under 35 U.S.C. § 112.

The issue of obviousness in this case is a close one. The case was skillfully presented by both sides, and the expert witnesses for both sides were knowledgeable and helpful to the court. In the end, the dispositive factor was the burden of proof. Clear and convincing evidence is a high standard, and even though Fresenius made a strong showing in various respects in support of its claim that the asserted claims would have been obvious, in the end I concluded that Fresenius's

showing was not clear and convincing, and that Fresenius therefore did not satisfy that demanding standard of proof.

Heron is directed to file a proposed form of judgment in accordance with these Findings of Fact and Conclusions of Law within five days of the issuance of this order.

* * * * *

The briefs that Fresenius submitted in support of its proposed findings of fact and conclusions of law in this case were both submitted under seal. For that reason, I have filed this opinion under seal. Within ten business days of the issuance of this order, Fresenius is directed to advise the court by letter whether any portions of this order should remain under seal, and if so which portions. Any request that portions of the order remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 3rd day of December 2024.

William C. Bryson

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HERON THERAPEUTICS, INC.,<br>Plaintiff,<br>v.<br>FRESENIUS KABI USA, LLC,<br>Defendant. | C.A. No. 22-985-WCB |

**FINAL JUDGMENT**

1. Final Judgment is entered in favor of Plaintiff Heron Therapeutics, Inc. ("Heron") and against Defendant Fresenius Kabi USA, LLC ("Fresenius")[1] on all claims and counterclaims with respect to United States Patent No. 9,561,229 ("the '229 patent") and United States Patent No. 9,974,794 ("the '794 patent"). The court holds that the manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of Fresenius's Abbreviated New Drug Application ("ANDA") product that is the subject of ANDA No. 214639 before the expiration of these patents would infringe claims 9, 10, and 21 of the '229 patent and claims 9 and 10 of the '794 patent. The court also holds that claims 9, 10, and 21 of the '229 patent and claims 9 and 10 of the '794 patent are not invalid.

2. Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of Fresenius's ANDA No. 214639 shall be no earlier than the latest date of expiration of the '229 and

[1] Pursuant to the Stipulation and Order Dismissing Without Prejudice Defendant Fresenius Kabi AG and Amending Caption to Reflect the Same (D.I. 13 ¶ 1), Fresenius Kabi AG is bound by this Final Judgment, as well as any stipulation, decision, order, or judgment, including any injunction, rendered as to Fresenius in this action.

’794 patents. If Heron becomes entitled to any other exclusivities that are not referenced herein, Heron may apply to the court for further relief as may be appropriate.

3. Pursuant to 35 U.S.C. § 271(e)(4)(B), Fresenius is hereby enjoined from making, using, offering to sell, or selling within the United States, or importing into the United States, the product that is the subject of ANDA No. 214639 until no earlier than the latest date of expiration of the ’229 and ’794 patents.

4. In accordance with 21 C.F.R. § 314.107(e), Fresenius shall submit a copy of this Final Judgment to the FDA within fourteen (14) days of the date of entry of this Final Judgment by the Court.

5. Pursuant to Fed. R. Civ. P. 54, D. Del. LR 54.1, and 28 U.S.C. § 1920, Heron may seek its costs, subject to Paragraphs 6 and 7, in an amount to be determined by the Clerk of the Court.

6. In the event that a party appeals this Final Judgment, any motion for attorneys’ fees or submission of a bill of costs, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed within 60 days after the expiration of the time to petition for certiorari to the United States Supreme Court or, if the appeal is withdrawn or dismissed, within 60 days after such withdrawal or dismissal.

7. In the event that no party appeals this Final Judgment, any motion for attorneys’ fees or submission of a bill of costs, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed within 60 days after the expiration of the time for filing a notice of appeal under Fed. R. App. P. 3 and 4.

IT IS SO ORDERED.

SIGNED this 9th day of December, 2024.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

US009561229B2

(12) **United States Patent**
**Ottoboni et al.**

(10) **Patent No.: US 9,561,229 B2**
(45) **Date of Patent: *Feb. 7, 2017**

(54) **EMULSION FORMULATIONS OF APREPITANT**

(71) Applicant: **Heron Therapeutics, Inc.**, Redwood City, CA (US)

(72) Inventors: **Thomas B. Ottoboni**, Belmont, CA (US); **Han Han**, Mountain View, CA (US)

(73) Assignee: **Heron Therapeutics, Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/083,071**

(22) Filed: **Mar. 28, 2016**

(65) **Prior Publication Data**

US 2016/0206622 A1 Jul. 21, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/859,013, filed on Sep. 18, 2015.

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***A61K 9/00*** | (2006.01) |
| ***A61K 31/535*** | (2006.01) |
| ***A61K 31/5377*** | (2006.01) |
| ***A61K 9/107*** | (2006.01) |

(Continued)

(52) **U.S. Cl.**

CPC ......... ***A61K 31/5377*** (2013.01); ***A61K 9/0019*** (2013.01); ***A61K 9/0024*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC .. A61K 31/5377; A61K 9/0019; A61K 9/107; A61K 9/0024; A61K 47/44; A61K 47/12; A61K 47/24; A61K 47/26; A61K 47/10

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,616,330 A 4/1997 Kaufman et al.
2007/0071777 A1 * 3/2007 Bromer ............... A61K 9/1075 424/400

(Continued)

FOREIGN PATENT DOCUMENTS

CN 102379845 A 3/2012
WO WO 2005/016308 A1 2/2005

(Continued)

OTHER PUBLICATIONS

Written Opinion of the International Searching Authority, PCT/US2015/051050 (WO 2016/044784 A1), (document notes date of completion as "see PCT/ISA/210," which is dated Dec. 18, 2015), 6 pages.*

(Continued)

*Primary Examiner* — Anna Pagonakis
*Assistant Examiner* — Miriam A Levin
(74) *Attorney, Agent, or Firm* — McDermott Will & Emery LLP

(57) **ABSTRACT**

Disclosed herein are novel pharmaceutical formulations of aprepitant suitable for parenteral administration including intravenous administration. Also included are formulations including both aprepitant and dexamethasone sodium phosphate. The pharmaceutical formulations are stable oil-in-water emulsions for non-oral treatment of emesis and are particularly useful for treatment of subjects undergoing highly emetogenic cancer chemotherapy.

**21 Claims, 4 Drawing Sheets**




*Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*

D. Del 1:22-00985-WCB

**JTX 001**

**Related U.S. Application Data**

(60) Provisional application No. 62/052,948, filed on Sep. 19, 2014.

(51) **Int. Cl.**
***A61K 47/10*** (2006.01)
***A61K 47/12*** (2006.01)
***A61K 47/24*** (2006.01)
***A61K 47/26*** (2006.01)
***A61K 47/44*** (2006.01)

(52) **U.S. Cl.**
CPC .............. ***A61K 9/107*** (2013.01); ***A61K 47/10*** (2013.01); ***A61K 47/12*** (2013.01); ***A61K 47/24*** (2013.01); ***A61K 47/26*** (2013.01); ***A61K 47/44*** (2013.01)

(58) **Field of Classification Search**
USPC ........................................ 424/400; 514/230.8
See application file for complete search history.


(56) **References Cited**

U.S. PATENT DOCUMENTS

2011/0009362 A1 1/2011 Joshi et al.
2013/0236501 A1 9/2013 Booth et al.
2013/0317016 A1 11/2013 Hingorani et al.
2016/0024092 A1 1/2016 Wan et al.
2016/0082013 A1 3/2016 Ottoboni et al.

FOREIGN PATENT DOCUMENTS

WO WO 2009/124756 A1 10/2009
WO WO 2011/158053 A1 12/2011
WO WO 2013/177501 A2 11/2013
WO WO 2014/005606 A1 1/2014
WO WO 2014/209962 A1 12/2014

OTHER PUBLICATIONS

International Search Report from PCT Patent Application No. PCT/US2015/051050 mailed Dec. 18, 2015.
Zhou et al,, "Preparation of Aprepitant emulsion for intravenous injection", Chinese Journal of Pharmaceuticals, vol. 43, No. 12, pp. 1003-1006 (2012) English Translation Only.
International Search Report from PCT Patent Application No. PCT/2016/015992 mailed Jun. 3, 2016.
The Pharmaceutics and Compounding Laboratory, "Emulsions: Preparation and Stabilization, Methods of emulsion preparation", 1 page, Online article accessed May 26, 2016 from http://pharmlabs.unc.edu/labs/emulsions/prep.htm.

* cited by examiner



FIG. 1A




FIG. 1B



FIG. 1C




FIG. 1D


Fosaprepitant
Aprepitant Emulsion
Plasma Aprepitant (ng/mL)
8000
6000
4000
2000
0
Hours
0
2
4
6
8
10
12
14

FIG. 2

JTX-1.0005






FIG. 3

HERON_0000005


Dexamethasone Phosphate
Aprep Dex Emulsion
Plasma Dexamethosone (ng/mL)
150
100
50
0
0
4
8
12
16
20
Hours

FIG. 4

# EMULSION FORMULATIONS OF APREPITANT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/859,013, filed Sep. 18, 2015, which claims the benefit of U.S. Provisional Application No. 62/052,948 filed on Sep. 19, 2014, the disclosures of which are fully incorporated by reference in their entirety.

## TECHNICAL FIELD

The disclosure relates generally to emulsion formulations and systems for the intravenous or parenteral administration of aprepitant for treatment of emesis. The emulsion formulations are stable for prolonged periods of time. Also described are methods for preparing the stable aprepitant emulsions and pharmaceutical formulations.

## BACKGROUND

Aprepitant, having the chemical name 5-[[(2R,3S)-2-[(1R)-1-[3,5-bis(trifluoromethyl)phenyl]ethoxy]-3-(4-fluorophenyl)-4-morpholinyl]methyl]-1,2-dihydro-3H-1,2,4-triazol-3-one, has the structure:



Aprepitant is indicated for the prevention of acute and delayed nausea and vomiting associated with initial and repeat courses of highly emetogenic cancer chemotherapy. Aprepitant is currently available in the United States as an oral capsule, however due to the nausea and vomiting experienced by patients, it is desirable to formulate aprepitant as a liquid suitable for parenteral or intravenous administration.

Liquid formulations containing aprepitant are very challenging to make as aprepitant is a molecule having poor solubility and poor permeability characteristics. One means of addressing this challenge is to prepare an emulsion which may both allow preparation of an injectable formulation as well as enhance bioavailability of the aprepitant once administered.

Intravenous emulsions should have a very small droplet size to circulate in the bloodstream without causing capillary blockage and embolization. These size limits are typified by USP33-NF28 General Chapter <729> for Globule Size Distribution in Lipid Injectable Emulsions, hereinafter referred to as USP <729>, which defines universal limits for (1) mean droplet size not exceeding 500 nm or 0.5 μm and (2) the population of large-diameter fat globules, expressed as the volume-weighted percentage of fat greater than 5 μm (PFAT5) not exceeding 0.05%, irrespective of the final lipid concentration.



Emulsion formulations must be physically stable. The droplet size limits defined in USP <729> apply throughout the assigned shelf life. All true emulsions are thermodynamically unstable and may over time undergo a range of processes which tend to increase the droplet size. These include direct droplet coalescence, when two droplets collide and form a single new droplet, and aggregation, in which droplets adhere together to form larger masses. Aggregation may in some cases be a precursor of further coalescence into larger droplets. These processes may result in large aggregates rising to the surface of the container, a phenomenon known as 'creaming', and ultimately to free oil being visible on the emulsion surface, known as 'cracking'.

Emulsion formulations must also be chemically stable. The drug substance may degrade; for example, lipophilic drugs will partition into the oil phase, which will confer some degree of protection, but hydrolytic degradation may still occur at the oil-water interface. Possible chemical degradation within parenteral fat emulsions includes oxidation of unsaturated fatty acid residues present in triglyceride and lecithin, and hydrolysis of phospholipids leading to the formation of free fatty acids (FFA) and lysophospholipids. Such degradants lower pH, which may then promote further degradation. Thus, pH should be controlled during manufacture and parenteral emulsion formulations may include a buffering agent to provide additional control. Any decrease in pH over the assigned shelf-life may be indicative of chemical degradation.

In the present application, emulsion formulations were prepared and characterized to identify a formulation and process that will allow aprepitant to be incorporated into an emulsion for intravenous injection and remain stable during the shelf life of the formulation.

## BRIEF SUMMARY

The following aspects and embodiments thereof described and illustrated below are meant to be exemplary and illustrative, not limiting in scope.

In one aspect, a pharmaceutical composition suitable for intravenous administration is provided which comprises a stable emulsion comprising an oil phase, wherein the oil phase comprises aprepitant, a surfactant and a co-surfactant; and an aqueous phase, wherein the aqueous phase comprises water, a tonicity agent and a pH-adjusting agent. In some embodiments, the pH-adjusting agent is a buffer.

In one embodiment, the composition is an oil-in-water emulsion comprising an oil selected from the group consisting of structurally modified or hydrolyzed coconut oil, olive oil, soybean oil, safflower oil, triglycerides, octyl and decyl glycerate, ethyl oleate, glyceryl linoleate, ethyl linoleate, glyceryl oleate, cholesteryl oleate/linoleate or a mixture thereof.

In one embodiment, the composition comprises about 5 wt/wt % (weight/weight %) to 15 wt/wt %, 5 wt/wt % to 10 wt/wt %, 7 wt/wt % to 10 wt/wt % or 8 wt/wt % to 9 wt/wt % oil. In another embodiment, the oil is soybean oil.

In one embodiment, the composition comprises about 10 wt/wt % to 20 wt/wt %, 12 wt/wt % to 17 wt/wt %, 13 wt/wt % to 16 wt/wt %, 13 wt/wt % to 15 wt/wt %, or 13 wt/wt % to 14 wt/wt % emulsifier. In another embodiment, the composition comprises about 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt % or 20 wt/wt % emulsifier. In another embodiment the emulsifier is a lecithin. In another embodiment the lecithin is an egg yolk lecithin.

In one embodiment, the composition comprises about 20 wt/wt % to 50 wt/wt %, 30 wt/wt % to 50 wt/wt %, 35 wt/wt % to 45 wt/wt %, 30 wt/wt % to 45 wt/wt %, 37 wt/wt % to 42 wt/wt %, 38 wt/wt % to 40 wt/wt %, 30 wt/wt %, 31 wt/wt %, 32 wt/wt %, 33 wt/wt %, 34 wt/wt %, 35 wt/wt %, 36 wt/wt %, 37 wt/wt %, 38 wt/wt %, 39 wt/wt %, 40 wt/wt %, 41 wt/wt %, 42 wt/wt %, 43 wt/wt %, 44 wt/wt %, 45 wt/wt %, 46 wt/wt %, 47 wt/wt %, 48 wt/wt %, 49 wt/wt %, 50 wt/wt % of oil expressed as a percentage of the weight of the oil per the sum of weight of oil, emulsifier and oleate in a unit of the composition. In another embodiment, the oil is soybean oil.

In one embodiment, the composition comprises about 40 wt/wt % to 80 wt/wt %, 50 wt/wt % to 70 wt/wt %, 55 wt/wt % to 65 wt/wt %, 57 wt/wt % to 63 wt/wt %, 58 to 60 wt/wt %, 35 wt/wt % to 40 wt/wt %, 30 wt/wt % to 40 wt/wt %, 50 wt/wt %, 51 wt/wt %, 52 wt/wt %, 53 wt/wt %, 54 wt/wt %, 55 wt/wt %, 56 wt/wt %, 57 wt/wt %, 58 wt/wt %, 59 wt/wt %, 60 wt/wt %, 61 wt/wt %, 62 wt/wt %, 63 wt/wt %, 64 wt/wt %, 65 wt/wt %, 66 wt/wt %, 67 wt/wt %, 68 wt/wt %, 69 wt/wt %, 70 wt/wt % of emulsifier expressed as a percentage of the weight of emulsifier per the sum of weight of oil, emulsifier and oleate in a unit of the composition. In another embodiment the emulsifier is a lecithin. In another embodiment the lecithin is an egg yolk lecithin.

In one embodiment, the ratio of oil to aprepitant (wt %:wt %) in the composition ranges from about 11:1 to 20:1, 11:1 to 15:1, 12:1 to 16:1, 12:1 to 14:1, 11:1 to 15:1, 12:1 to 14:1, 12.5:1 to 13.5:1, 13:1 to 14:1, or 12:1 to 15:1. In another embodiment, the ratio of oil to aprepitant (wt %:wt %) in the composition is about 11:1 to 20:1, 11:1 to 15:1, 12:1 to 16:1, 12:1 to 14:1, 11:1, 11.5:1, 12:1, 12.5:1, 13:1, 13.5:1, 14:1, 14.5:1 or 15:1, 15.5:1, 16:1.

In one embodiment, the ratio of emulsifier to aprepitant (wt %:wt %) in the composition ranges from about 15:1 to 30:1, 20:1 to 25:1, 18:1 to 22:1 or 10:1 to 30:1. In another embodiment, the ratio of emulsifier:aprepitant (wt %:wt %) in the composition is about 15:1, 18:1, 19:1, 20:1, 21:1, 22:1 23:1, 24:1, or 25:1.

In one embodiment, the ratio of (emulsifier plus oil) to aprepitant (wt %:wt %) in the composition ranges from about 20:1 to 40:1, 25:1 to 35:1, 30:1 to 35:1. In another embodiment, the ratio of oil:aprepitant is about 25:1, 26:1, 27:1, 28:1, 29:1 30:1, 31:1, 32:1, 33:1, 34:1, 35:1, 36:1, 37:1, 38:1 or 40:1.

In one embodiment, the ratio of emulsifier to oil (wt %:wt %) in the composition ranges from about 0.5:1 to 4:1, 1:1 to 2:1, or 1.25:1 to 1.75:1. In another embodiment, the ratio of emulsifier to oil (wt %:wt %) in the composition is about 0.5:1, 0.5:1, 0.6:1, 0.7:1, 0.8:1, 0.9:1, 1:1, 1.1:1, 1.2:1, 1.3:1, 1.4:1, 1.5:1, 1.6:1, 1.7:1, 1.8:1, 1.9:1, 2:1, 1.05:1, 1.15:1, 1.25:1, 1.35:1, 1.45:1, 1.55:1, 1.65:1, 1.75:1, 1.85:1, or 1.95:1.

In one embodiment, a therapeutic dose comprises about 1 to 4 g, 1.5 to 3 g, 1.8 to 2.8 g, 2.3 to 2.8 g, 1.8 to 2.3 g, 1 g, 1.1 g, 1.2 g, 1.3 g, 1.4 g, 1.5 g, 1.6 g, 1.7 g, 1.8 g, 1.9 g, 2 g, 2.1 g, 2.2 g, 2.3 g, 2.4 g, 2.5 g, 2.6 g, 2.7 g, 2.8 g, 2.9 g, 3 g, 3.1 g, 3.2 g, 3.3 g, 3.4 g, 3.5 g, 3.6 g, 3.7 g, 3.8 g, 3.9 g, 4 g emulsifier. In another embodiment, the emulsifier is a lecithin. In another embodiment the emulsifier is egg yolk lecithin.

In one embodiment, a therapeutic dose comprises about 0.5 to 3 g, 1 to 2.5 g, 1 to 2 g, 1 to 1.5 g, 1.5 g to 2 g, 0.5 g 0.6 g, 0.7 g, 0.8 g, 0.9 g, 1 g, 1.1 g, 1.2 g, 1.3 g, 1.4 g, 1.5 g, 1.6 g, 1.7 g, 1.8 g, 1.9 g, 2 g, 2.1 g, 2.2 g, 2.3 g, 2.4 g, 2.5 g oil. In another embodiment, the oil is soybean oil.



In one embodiment, the emulsifier is a phospholipid. In another embodiment, the emulsifier is selected from the group consisting of egg phospholipids, soy phospholipids, phosphatidylcholines, phosphatidylethanolamines, phosphatidylserines, phosphatidylglycerols, phosphatidylinositols, phosphatidic acids, mixed chain phospholipids, lysophospholipids, hydrogenated phospholipids, partially hydrogenated phospholipids, and mixtures thereof.

In one embodiment, the composition comprises a co-surfactant. In another embodiment, the co-surfactant is ethanol.

In one embodiment, the composition comprises about 0 wt/wt % to 10 wt/wt %, 1 wt/wt % to 9 wt/wt %, or 2 wt/wt % to 6 wt/wt % co-surfactant. In another embodiment, the composition comprises less than 10 wt/wt %, less than 9 wt/wt %, less than 8 wt/wt %, less than 7, less than 6 wt/wt %, less than 5 wt/wt %, less than 4 wt/wt %, less than 3 wt/wt %, less than 2 wt/wt % or less than 1 wt/wt % co-surfactant.

In one embodiment, the composition comprises about 0 wt/wt % to 10 wt/wt %, 1 wt/wt % to 9 wt/wt %, or 2 wt/wt % to 6 wt/wt % ethanol. In another embodiment, the composition comprises less than 10 wt/wt %, less than 9 wt/wt %, less than 8 wt/wt %, less than 7, less than 6 wt/wt %, less than 5 wt/wt %, less than 4 wt/wt %, less than 3 wt/wt %, less than 2 wt/wt % or less than 1 wt/wt % ethanol.

In one embodiment, the emulsion comprises an aqueous phase which comprises a tonicity agent, a pH-adjusting agent, and water.

In one embodiment, the emulsion comprises an aqueous phase which comprises an osmotic agent, a pH-adjusting agent, and water.

In one embodiment, the emulsion comprises an aqueous phase which comprises a tonicity agent, an osmotic agent, a pH-adjusting agent, and water.

In one embodiment, the aqueous phase further comprises a buffer.

In one embodiment, the aqueous phase comprises a buffer but does not comprise a pH-adjusting agent which is different than the buffer. In another embodiment, the buffer functions as both a pH-adjusting agent and a buffer.

In another embodiment, when the aqueous phase comprises a buffer, the composition contains no tonicity agent.

In one another embodiment, the buffer is selected from the group consisting of phosphate buffer, citrate buffer, Tris buffer, carbonate buffer, succinate buffer, maleate buffer and borate buffer. In another embodiment, the buffer is selected from the group, phosphate buffered saline (PBS), modified PBS (PBS-mod) and citrate buffer.

In one embodiment, the aqueous phase comprises a buffer, that when mixed with the oil phase will provide a substantially isotonic oil in water emulsion.

In one embodiment, the osmotic agent is selected from the group consisting of glycerol, sorbitol, xylitol, mannitol, glucose, trehalose, maltose, sucrose, raffinose, lactose, dextran, polyethylene glycol, or propylene glycol. In another embodiment, the osmotic agent is an inorganic salt such as sodium chloride and mixtures thereof.

In one embodiment, the pH adjusting agent is selected from the group consisting of sodium hydroxide, potassium hydroxide, magnesium hydroxide, sodium carbonate, Tris, sodium linoleate, sodium oleate, potassium carbonate, potassium linoleate, potassium oleate, and mixtures thereof.

In one embodiment, the composition has a pH of about 6 to 9, 7 to 9, 7.5 to 9, 7.5 to 8.5, 8 to 9, 6 to 8, 7 to 8, or 6, 7, 8 or 9.

In one embodiment, the composition comprises about 0 wt/wt % to 25 wt/wt %, 2 wt/wt % to 20 wt/wt %, 3 wt/wt % to 15 wt/wt %, or 3 wt/wt % to 8 wt/wt % tonicity agent. In another embodiment, the composition comprises about 1 wt/wt %, 2 wt/wt %, 3 wt/wt %, 4 wt/wt %, 5 wt/wt %, 6 wt/wt %, 7 wt/wt %, 8 wt/wt %, 9 wt/wt %, or 10 wt/wt %, 11 wt/wt %, 12 wt/wt %, 13 wt/wt %, 14 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt %, or 20 wt/wt %, 21 wt/wt %, 22 wt/wt %, 23 wt/wt %, 24 wt/wt %, 25 wt/wt % tonicity agent. In still another embodiment, the composition comprises no tonicity agent.

In one embodiment, the composition comprises about 0 wt/wt % to 25 wt/wt %, 2 wt/wt % to 20 wt/wt %, 3 wt/wt % to 15 wt/wt %, or 3 wt/wt % to 8 wt/wt % osmotic agent. In another embodiment, the composition comprises about 1 wt/wt %, 2 wt/wt %, 3 wt/wt %, 4 wt/wt %, 5 wt/wt %, 6 wt/wt %, 7 wt/wt %, 8 wt/wt %, 9 wt/wt %, or 10 wt/wt %, 11 wt/wt %, 12 wt/wt %, 13 wt/wt %, 14 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt %, or 20 wt/wt %, 21 wt/wt %, 22 wt/wt %, 23 wt/wt %, 24 wt/wt %, 25 wt/wt % osmotic agent. In still another embodiment, the composition comprises no osmotic agent.

In one embodiment, the aqueous phase comprises a dose of dexamethasone sodium phosphate in a dose of the composition. In another embodiment, the dose of dexamethasone sodium phosphate ranges from about 0.5 mg to 30 mg, 0.5 mg to 25 mg, 1 mg to 20 mg, 10 mg to 20 mg, or 3 mg to 16 mg. In another embodiment, the dose of dexamethasone sodium phosphate is about 9 mg or 16 mg in a dose of the composition.

In one embodiment, the oil phase comprises a dose of dexamethasone in a dose of the composition. In another embodiment, the dose of dexamethasone ranges from about 0.5 mg to 30 mg, 0.5 mg to 20 mg, 1 mg to 18 mg, 10 mg to 20 mg, or 3 mg to 16 mg. In another embodiment, the dose of dexamethasone is about 8 mg or 12 mg in a dose of the composition.

In one embodiment, the emulsion comprises about 0.002 wt/wt % to 0.2 wt/wt %, 0.003 wt/wt % to 0.16 wt/wt %, 0.02 wt/wt % to 0.1 wt/wt % dexamethasone sodium phosphate.

In one embodiment, the composition is a stable system maintaining an intensity-weighted mean particle size as determined by dynamic light scattering (DLS) of about 50 nm to 1000 nm, 50 to 500 nm, 50 nm to 400 nm, 50 nm to 300 nm, 50 nm to 200 nm or 50 nm to 100 nm. In another embodiment, the average droplet size is maintained above 500 nm for a period of at least 1 month, 3 months, 6 months, 9 months, 12 months, 2 years or 3 years at room temperature. In another embodiment, the average droplet size is maintained above 500 nm for a period of at least 1 month, 3 months, 6 months, 9 months, 12 months, 2 years or 3 years at 5° C.

In another aspect, a method for preparing an emulsion comprising aprepitant and suitable for parenteral administration is provided.

In one embodiment, the administration is intravenous administration.

In one embodiment, the method comprises: a) preparing an oil phase by dissolving aprepitant and an emulsifier in ethanol, then adding in oil to generate an oil-based mixture; b) preparing an aqueous phase by mixing water, optionally with a tonicity agent, optionally with an osmotic agent and optionally with a pH modifier and optionally with a buffer to generate an aqueous mixture; c) combining the oil-based mixture and the aqueous mixture and subjecting this to high speed homogenization to generate a crude emulsion; and d) subjecting the crude emulsion to high pressure homogenization to generate a fine emulsion.



In one embodiment, preparing the oil phase further comprises dissolving dexamethasone with the aprepitant and the emulsifier in the ethanol.

In one embodiment, the method comprises: a) preparing an oil phase by dissolving aprepitant and an emulsifier in ethanol and oil to generate an oil-based mixture; b) preparing an aqueous phase by mixing water, optionally with a tonicity agent, optionally with an osmotic agent and optionally with a pH modifier and optionally with a buffer to generate an aqueous mixture; c) combining the oil-based mixture and the aqueous mixture and subjecting this to high speed homogenization to generate a crude emulsion; and d) subjecting the crude emulsion to high pressure homogenization to generate a fine emulsion.

In one embodiment, preparing the oil phase further comprises dissolving dexamethasone with the aprepitant and the emulsifier in the ethanol and oil.

In one embodiment, preparing the aqueous phase further comprises mixing dexamethasone with the water, tonicity agent, pH modifier, and a buffer. In another embodiment, the dexamethasone is a salt of dexamethasone. In still another embodiment, the dexamethasone is dexamethasone sodium phosphate.

In one embodiment, the method further comprises sterilizing the fine emulsion to generate the final emulsion, wherein the final emulsion is suitable for injection into a subject.

In one embodiment, the dissolution in ethanol is performed at a temperature of about 25° C. to 80° C., 40° C. to 75° C., 60° C. to 70° C., or at about 25° C., 35° C., 45° C., 60° C., 65° C., 70° C. or 75° C.

In one embodiment, the high-speed homogenization is performed at a speed of about 2,000 rpm (revolutions per minute) to 25,000 rpm. In another embodiment, the high-speed homogenization is performed at a speed of about 20,000 rpm. In yet another embodiment, the high-speed homogenization is performed at a speed of about 3600 rpm.

In one embodiment, the high-speed homogenization is performed for a time period of about 0.5 min to 1 hour, 1 min to 45 min, or 1 min to 30 min. In another embodiment, the high-speed homogenization is performed for a time period of about 20 to 40 min or for about 30 min.

In one embodiment, the high-speed homogenization is performed at about 10° C. to about 60° C., 20° C. to about 60° C., about 30° C. to about 50° C., or about 35° C. to about 45° C. In another embodiment, the high-speed homogenization is performed at about 25° C., 30° C., 35° C., 40° C., 45° C. or 50° C.

In one embodiment, the high-pressure homogenization is performed at a pressure of about 10,000 psi (pounds per square inch) to 30,000 psi. In another embodiment, the high-pressure homogenization is performed at a pressure of about 20,000 psi.

In one embodiment, the high-pressure homogenization is performed with cooling. In another embodiment, the high-pressure homogenization is performed with cooling which is sufficient to bring the temperature of the emulsion at the outlet of the process to about 0° C. to about 60° C., about 10° C. to about 40° C., about 20° C. to about 30° C., or to about 20° C., 25° C. or 30° C. within the time period.

In one embodiment, the sterilizing the fine emulsion comprises filtering the fine emulsion through a nylon filter. In another embodiment, the nylon filter is a Posidyne® filter. In yet another embodiment, the filter has a pore size of about 0.2 μm (micrometers).

Additional embodiments of the present compositions and methods and the like, will be apparent from the following description, drawings, examples, and claims. As can be appreciated from the foregoing and following description, each and every feature described herein, and each and every combination of two or more of such features, is included within the scope of the present disclosure provided that the features included in such a combination are not mutually inconsistent. In addition, any feature or combination of features may be specifically excluded from any embodiment of the present invention. Additional aspects and advantages of the present invention are set forth in the following description and claims, particularly when considered in conjunction with the accompanying examples and drawings.

## BRIEF DESCRIPTION OF DRAWINGS

FIGS. **1**A-D provides microscope images of samples from Examples 1, 2, 3 and 6 after a freeze-thaw cycle. FIG. **1**A: Example 1, FIG. **1**B: Example 2, FIG. **1**C: Example 3, FIG. **1**D: Example 6.

FIG. **2** shows plasma levels of aprepitant after injection of a fosaprepitant solution (•) or an aprepitant emulsion prepared as described herein (▲).

FIG. **3** shows plasma levels of aprepitant after injection of a solution of fosaprepitant (▲) or after injection of an emulsion containing aprepitant and dexamethasone prepared as described herein (•).

FIG. **4** shows plasma levels of dexamethasone after injection of a solution of dexamethasone sodium phosphate (•) or after injection of an emulsion containing aprepitant and dexamethasone prepared as described herein (▲).

## DETAILED DESCRIPTION

Various aspects now will be described more fully hereinafter. Such aspects may, however, be embodied in many different forms and should not be construed as limited to the embodiments set forth herein; rather, these embodiments are provided so that this disclosure will be thorough and complete, and will fully convey its scope to those skilled in the art.

### I. DEFINITIONS

As used in this specification, the singular forms “a,” “an,” and “the” include plural referents unless the context clearly dictates otherwise. Thus, for example, reference to a “polymer” includes a single polymer as well as two or more of the same or different polymers, reference to an “excipient” includes a single excipient as well as two or more of the same or different excipients, and the like.

Where a range of values is provided, it is intended that each intervening value between the upper and lower limit of that range and any other stated or intervening value in that stated range is encompassed within the disclosure. For example, if a range of 1 μm to 8 μm is stated, it is intended that 2 μm, 3 μm, 4 μm, 5 μm, 6 μm, and 7 μm are also explicitly disclosed, as well as the range of values greater than or equal to 1 μm and the range of values less than or equal to 8 μm. As used herein, the term “about” means ±5%, ±10%, or ±20% of the value being modified.

The term “emulsion” or “emulsion formulation” means a colloidal dispersion of two immiscible liquids in the form of droplets, whose diameter, in general, is between 10 nanometers and 100 microns. An emulsion is denoted by the symbol O/W (oil-in-water) if the continuous phase is an aqueous solution and by W/O (water-in-oil) if the continuous phase is an oil. Other examples of emulsions such as O/W/O (oil-in-water-oil) include oil droplets contained within aqueous droplets dispersed in a continuous oil phase.

“Physically stable” emulsions will meet the criteria under USP <729>, which defines universal limits for (1) mean droplet size not exceeding 500 nm or 0.5 μm and (2) the population of large-diameter fat globules, expressed as the volume-weighted percentage of fat greater than 5 μm (PFAT5) not exceeding 0.05%, at 5° C. or room temperature for a designated storage time period. In addition, physically stable emulsions will have no visible aprepitant crystals upon storage at 5° C. or room temperature for a designated time period. Crystals are considered visible when viewed at magnification of 4× to 10×. An emulsion is physically stable if it meets the criteria under USP <729> and aprepitant crystals are not visible upon storage at 5° C. or room temperature for a time period equal to or at least 1 week, 2 weeks, 4 weeks, 1 month, 2 months, 6 months, 1 year or 2 years.

“Chemically stable” emulsions of the disclosure are ones in which the concentration of the active component (i.e., the drug being delivered) does not change by more than about 20% under appropriate storage conditions for at least 1 month. In certain embodiments, the aprepitant concentration in an emulsion of the present disclosure does not change by more than about 5%, 10%, 15% or 20% under appropriate storage conditions for at least 1, 2, 3, 4, 5, 6, 9, 12, 15, 18, or 24 months.

In one example, the stable emulsion compositions of the disclosure are stable over a wide range of temperatures, e.g., −20° C. to 40° C. The compositions of the disclosure may be stored at about 5° C. to about 25° C.

“Oil phase” in a water-in-oil emulsion refers to all components in the formulation that individually exceed their solubility limit in the water phase; these are materials that generally have solubilities of less than 1% in distilled water, however, water phase components such as salts may decrease the solubility of certain oils resulting in their partitioning into the oil phase. The oil phase refers to the non-aqueous portion of a water-in-oil emulsion.

“Aqueous phase” or “water phase” in a water-in-oil emulsion refers to the water present and any components that are water soluble, i.e., have not exceeded their solubility limit in water. “Aqueous phase”, as used herein, includes a water-containing liquid which can contain pharmaceutically acceptable additives such as acidifying, alkalizing, buffering, chelating, complexing and solubilizing agents, antioxidants and antimicrobial preservatives, humectants, suspending and/or viscosity modifying agents, tonicity and wetting or other biocompatible materials. The aqueous phase refers to the non-oil portion of a water-in-oil emulsion.

An “emulsifier” refers to a compound that deters the separation of the injectable emulsion into individual oil and aqueous phases. Emulsifiers useful in the present disclosure generally are (1) compatible with the other ingredients of the stable emulsions of the present disclosure, (2) do not interfere with the stability or efficacy of the drugs contained in the emulsions, (3) are stable and do not deteriorate in the preparation, and (4) are non-toxic.

Suitable emulsifiers include, but are not limited to, propylene glycol mono- and di-fatty acid esters, polyoxyethylene sorbitan fatty acid esters, polyoxyethylene fatty acid esters, polyoxyethylene-polyoxypropylene co-polymers and block co-polymers, salts of fatty alcohol sulphates, sorbitan fatty acid esters, esters of polyethylene-glycol glycerol

ethers, oil and wax based emulsifiers, glycerol monostearate, glycerine sorbitan fatty acid esters and phospholipids.

A "phospholipid" refers to a triester of glycerol with two fatty acids and one phosphate ion. Exemplary phospholipids useful in the present invention include, but are not limited to, phosphatidyl chlorine, lecithin (a mixture of choline ester of phosphorylated diacylglyceride), phosphatidylethanolamine, phosphatidylglycerol, phosphatidic acid with about 4 to about 22 carbon atoms, and more generally from about 10 to about 18 carbon atoms and varying degrees of saturation. The phospholipids can have any combination of fatty acid as its fatty acyl side chain, for example, the phospholipids can have a saturated fatty acid such as a decanoic acid, lauric acid, myristic acid, palmitic acid, stearic acid, icosanoic acid, (a C20 saturated fatty acid); sodium behenic acid, or an unsaturated fatty acid such as myristoleic acid, palmitoleic acid, oleic acid, sodium linoleic acid, alpha linolenic acid, sodium arachidonic acid, eicosapentanoic acid, and the like. The two fatty acyl residues on the phospholipids may be the same or they may be different fatty acids. The phospholipid component of the drug delivery composition can be either a single phospholipid or a mixture of several phospholipids. The phospholipids should be acceptable for the chosen route of administration.

In one aspect, the phospholipids used as emulsifiers in the present invention are naturally occurring phospholipids from a natural origin. For example, naturally occurring lecithin is a mixture of the diglycerides of stearic, palmitic, and oleic acids, linked to the choline ester of phosphoric acid, commonly called phosphatidylcholine, and can be obtained from a variety of sources such as eggs and soya beans. Soy lecithin and egg lecithin (including hydrogenated versions of these compounds) have been characterized in various compositions and are generally recognized to be safe, have combined emulsification and solubilization properties, and tend to be broken down into innocuous substances more rapidly than most synthetic surfactants.

The term "lecithin" includes a complex mixture of acetone-insoluble phosphatides, of which phosphatidylcholine is a significant component. The term lecithin is also used as a synonym for phosphatidylcholine. Useful lecithins include, but are not limited to, eggyolk-, egg-, soybean-, and corn-derived lecithin. In one embodiment, the emulsifier is lecithin, such as egg yolk-derived lecithin. The terms egg lecithin and egg yolk derived lecithin are used interchangeable throughout. The compositions described herein preferably comprise lecithin as an emulsifier.

The amount of phospholipids, by weight, in the emulsions of the present disclosure may be within a range of about 10 wt/wt % to about 20 wt/wt %, 11 wt/wt % to 19 wt/wt %, 11 wt/wt % to 15 wt/wt %, 12 wt/wt % to 13 wt/wt %, 13 wt/wt % to 14 wt/wt %, 13 wt/wt % to 20 wt/wt %, or 12 wt/wt % to 18 wt/wt %. In certain embodiments, the phospholipids in the emulsions are at a concentration, by weight, about 11 wt/wt %, 12 wt/wt %, 12.5 wt/wt %, 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, or 15 wt/wt %.

"Oil" refers to an organic liquid of mineral, vegetable, animal, essential or synthetic origin, including, for example, aliphatic or wax-based hydrocarbons, aromatic hydrocarbons or mixed aliphatic and aromatic hydrocarbons.

The term "buffer" or "buffered" as used herein means a solution containing both a weak acid and its conjugate base, whose pH changes only slightly upon addition of acid or base. As used herein, the phrase "buffering agent" means a species whose inclusion in a solution provides a buffered solution.



The term "therapeutic agent" describes any natural or synthetic compound which has a biological activity.

## II. APREPITANT EMULSION AND METHODS OF MAKING

The present disclosure is directed to stable pharmaceutical compositions including aprepitant, a surfactant or mixtures of surfactants, a co-surfactant, an oil, with an aqueous phase. The composition is in the form of an oil-in-water emulsion which remains stable over an extended period of time and which is suitable for dilution and intravenous administration.

The active agent, e.g., aprepitant, is present in the oil phase with an emulsifier, a co-emulsifier and an oil. The oil phase is then combined with an aqueous phase comprising water and a tonicity agent as described below to generate the stable emulsion. Prior to combining the oil phase with the aqueous phase, the oil phase will have an oil:aprepitant ratio of about 13:1. Use of this ratio was surprisingly found to produce, when mixed with the water phase, an emulsion which is more stable as compared to an emulsion in which the oil phase contains an oil:aprepitant ratio of less than about 12:1 or 11:1, and/or greater than about 15:1, 20:1, or 30:1.

Moreover, the present compositions also possess favorable stability properties when the amount of emulsifier in the oil phase is greater than the amount of oil. For example, the oil phase contains an emulsifier:oil ratio of about 5:1 to 1:1, 3:1 to 1:1 or a ratio of about 1.5:1. Such ratios of emulsifier: oil have surprisingly been found to impart greater stability on the final emulsion which is suitable for injection into a patient. For example, an aprepitant emulsion having a phospholipid:oil ratio within the oil phase of about 1.5:1 was found to have greater stability than a similar aprepitant emulsion, wherein the oil phase comprises a phospholipid: oil ratio of about 0.01:1, 0.1:1, 0.5:1 or 0.9:1.

### 1. Oil Phase

The oil (hydrophobic) phase comprises an oil. Triglycerides are exemplary oils for use in the compositions described herein. In certain embodiments the oil is or comprises a vegetable oil. "Vegetable oil" refers to oil derived from plant seeds or nuts. Vegetable oils are typically "long-chain triglycerides" (LCTs), formed when three fatty acids (usually 14 to 22 carbons in length, with unsaturated bonds in varying numbers and locations, depending on the source of the oil) form ester bonds with the three hydroxyl groups on glycerol. In certain embodiments, vegetable oils of highly purified grade (also called "super refined") are used to ensure safety and stability of the oil-in-water emulsions. In certain embodiments hydrogenated vegetable oils, which are produced by controlled hydrogenation of the vegetable oil, may be used. Exemplary vegetable oils include but are not limited to almond oil, babassu oil, black currant seed oil, borage oil, canola oil, castor oil, coconut oil, corn oil, cottonseed oil, olive oil, peanut oil, palm oil, palm kernel oil, rapeseed oil, safflower oil, soybean oil, sunflower oil and sesame oil. Hydrogenated and/or or partially hydrogenated forms of these oils may also be used. In specific embodiments, the oil is or comprises safflower oil, sesame oil, corn oil, olive oil and/or soybean oil. In more specific embodiments, the oil is or comprises safflower oil, and/or soybean oil. The oil is present in the emulsion at about 9 wt/wt %,

though this may vary between about 5 wt/wt % to 12 wt/wt % or 9 wt/wt % to 10 wt/wt %.

The aprepitant is first mixed with an emulsifier such as a phospholipid emulsifier. Examples 1, 2, 3 and 6 below describe emulsions made using an egg lecithin. The phophoplipid emulsifier is added to a concentration of greater than 10 wt/wt %, 11 wt/wt %, 12 wt/wt % or 13 wt/wt % of the emulsion but less than 15 wt/wt %, 17 wt/wt % or 20 wt/wt % of the emulsion.

The mixture of aprepitant and emulsifier is dissolved in a co-emulsifier such as a short chain alcohol (1 to 6 carbons). In Examples 1, 2, 3 and 6 below, the co-emulsifier is ethanol. The mixture is mixed at an elevated temperature, such as at about 60° C. or 70° C. or at an elevated temperature within the range of about 50° C. or 70° C., until the aprepitant and emulsifier are dissolved. This mixture is then combined with the oil, such as soybean oil, by mixing again at an elevated temperature such as at about 60° C. to produce the oil phase containing the aprepitant. Excess co-emulsifier can be removed by standard evaporation methods including heating, or pressure reduction, or a combination thereof such employed in a rotary evaporator. In this process, about 10% to 100%, 20% to 95%, 80% to 100%, 90% to 100%, or 95% to 100% of the ethanol evaporates depending on preparation scale, any pressure reduction, and heating time.

In one embodiment, the aprepitant and the emulsifier are dissolved in a co-emulsifier and an oil. In Examples 1, 2, 3 and 6 below, the co-emulsifier is ethanol, the oil is soybean oil, however, the methods can be used with any one or more of the co-emulsifiers and oils described herein. The mixture is mixed at an elevated temperature, such as at about 60° C. or 70° C. or at an elevated temperature within the range of about 50° C. or 70° C., at least until the aprepitant and emulsifier are dissolved to produce the oil phase containing aprepitant. The mixture of aprepitant, emulsifier, co-emulsifier and oil are mixed at the elevated temperature for about 15 min to 120 min, about 15 min to 45 min, about 30 min to 90 min, or for about 15 min, 30 min or 50 min.

Excess co-emulsifier can be removed by standard evaporation methods including heating, or pressure reduction, or a combination thereof in a rotary evaporator. During this process, about 10% to 100%, 20% to 95%, 80% to 100%, 90% to 100%, or 95% to 100% of the ethanol evaporates depending on preparation scale, any pressure reduction, and heating time.

In one embodiment, dexamethasone is added to the oil phase comprising the aprepitant, emulsifier and oil to generate an oil phase comprising both aprepitant and dexamethasone prior to mixing with the aqueous phase to generate the pharmaceutical emulsion for injection. Dexamethasone is added to the oil phase to provide a dose of about 12 mg dexamethasone.

2. Aqueous Phase

The aqueous phase of the aprepitant emulsion can be a mixture of water and a tonicity agent, including those such as but not limited to sucrose, mannitol, glycerin or dextrose or a mixture thereof. Also included in the aqueous phase is a pH-modifying agent. Sodium oleate is used in Examples 1, 2 and 3 below to adjust the pH of the emulsion to about 6 to 9, depending on the desired emulsion formulation. The aqueous phase is produced by mixing water with the tonicity agent and sodium oleate as the pH modifying agent. Other pH modifiers that may be used include but are not limited to sodium hydroxide, potassium hydroxide, magnesium hydroxide, Tris, sodium carbonate and sodium linoleate. The pH modifier used is effective for adjusting the pH of the



emulsion to a preferred pH of about 6 to 9, 7 to 8, or about 6, 7, 8 or 9. The aqueous phase can readily form by mixing at room temperature.

The aqueous phase may further contain a buffering agent to promote stability of the emulsion formulation. The drug substance may degrade; for example, lipophilic drugs will partition into the oil phase, which will confer some degree of protection, but hydrolytic degradation may still occur at the oil-water interface. Possible chemical degradation within parenteral fat emulsions includes oxidation of unsaturated fatty acid residues present in triglyceride and lecithin, and hydrolysis of phospholipids leading to the formation of free fatty acids (FFA) and lysophospholipids. Such degradants lower pH, which may then promote further degradation. Thus, pH should be controlled during manufacture and emulsion formulations may include a buffering agent to provide additional control. Any decrease in pH over the assigned shelf-life may be indicative of chemical degradation. Suitable buffers are well known to the person skilled in the art and include but are not limited to a phosphate buffer, citrate buffer, Tris buffer, carbonate buffer, succinate buffer, maleate buffer or borate buffer. Tris buffer is used in Example 11 below to adjust the pH of the emusion to about 8 to 9. In a particular embodiment, the buffer is selected from the group, phosphate buffered saline (PBS), modified PBS (PBS-mod) and citrate buffer. In a particular embodiment, the aqueous phase comprises a buffer, that when mixed with the oil phase will provide a substantially isotonic oil in water emulsion.

Buffering agents useful for the presently described compositions include, but are not limited to, a phosphate buffer, citrate buffer, Tris buffer, carbonate buffer, succinate buffer, maleate buffer or borate buffer. In a particular embodiment, the buffer is selected from the group, phosphate buffered saline (PBS), modified PBS (PBS-mod) and citrate buffer. In a particular embodiment, the aqueous phase comprises a buffer, that when mixed with the oil phase will provide a substantially isotonic oil in water emulsion. In some embodiments, when the aqueous phase contains a buffering agent, the aqueous phase does not include a tonicity agent. Also, when a buffer is added to the aqueous phase, a pH-adjusting agent may not be added to the aqueous phase. It is understood that a buffer can be added to the aqueous phase or the buffer can be added to the emulsion.

In some embodiments, the aqueous phase contains a tonicity agent such as sucrose. The tonicity agent is added to an aqueous phase having about 0% to 30%, 0% to 25% or about 20% of the tonicity agent (wt/wt). It was surprisingly found that a composition containing about 20% sucrose wt/wt in the aqueous phase produced an emulsion that was particularly stable as determined by freeze-thaw testing. Accordingly, preferred embodiments include an emulsion in which the aqueous phase comprises a tonicity agent which imparts greater chemical and/or physical stability as compared to an emulsion wherein the aqueous phase contains less than about 10%, 15% or 20% wt/wt tonicity agent or more than about 30%, 40% or 50% wt/wt tonicity agent.

In one embodiment, the aqueous phase further comprises dexamethasone sodium phosphate (also referred to as "dexamethasone phosphate"). Dexamethasone sodium phosphate is a corticosteroid which is freely soluble in water. Daily dosages for dexamethasone sodium phosphate range from about 0.5 mg to 20 mg, more preferably from about 14 mg to 18 mg or 16 mg, depending on the severity of the disease or disorder. Accordingly, an aprepitant emulsion further comprising dexamethasone may contain dexamethasone sodium phosphate in the aqueous phase. Accordingly, the

aqueous phase of an emulsion suitable for intravenous administration may contain about 0.5 mg to 20 mg, 14 mg to 18 mg or about 16 mg dexamethasone sodium phosphate.

In another embodiment, a solution of dexamethasone sodium phosphate can be mixed into the fine emulsion prior to sterile filtration to prepare an emulsion containing dexamethasone sodium phosphate in the aqueous phase,

3. Aprepitant Emulsion

The pharmaceutical aprepitant compositions of the present disclosure are sterile oil-in-water emulsions comprising the aqueous and oil phases described above. Also encompassed by the disclosure are methods for preparing stable emulsions comprising aprepitant which are suitable for intravenous administration and which can be prepared according to the conventional manufacturing procedures using aseptic techniques.

The aqueous phase is combined with the oil phase, under high-speed homogenization to produce a coarse emulsion. As described in Examples 1, 2, 3, 4, 5 and 6, the combined aqueous and oil phases is homogenized using an IKA Ultra-Turrax T25 dispersing instrument at a speed of 20,000 rpm for 1 min. The speed used in this first homogenization step may vary, for example, from 2000 rpm to 25,000 rpm, or from 15,000 rpm to 22,000 rpm. The time of the homogenization step can also vary, for example, from 0.5 min to 1 hour, or from 1 min to 45 min. This crude emulsion is then homogenized into a fine emulsion by a high-pressure homogenizer, which may be a microfluidizer. The interaction chamber and the cooling coil portions of the microfluidizer are cooled by water, such as by an ice bath. The temperature of the ice bath may be between 0 to 10° C., or 2 to 6° C. The temperature of the emulsion coming out of the high-pressure homogenization may be between 0 to 60° C., 15° C., to 60° C., 20° C. to 40° C., or at about 25° C. The microfluidizer is first primed with water, then the crude emulsion is introduced. The output from the homogenizer is initially run to waste to remove priming water, and priming water and emulsion mixtures, and then collected in a clean vessel when the stream becomes consistent in appearance. The high-pressure homogenizer cycle may be repeated to sufficiently reduce oil droplet size. The pressure used for the homogenization may vary. The pressures may be between 5000 and 30,000 psi. The number of passes through the microfluidizer may vary in order to achieve the desired droplet size. The number of passes may be from about 2 to 20, 2 to 15, 4 to 15, 4 to 12 or 7 to 8.

The pharmaceutical formulation may then be passed through a filter system at room temperature, and/or autoclaved, to achieve sterilization. The filters used to achieve sterilization may be chosen by the skilled artisan and may have a nominal pore size of 0.2 μm. The filter material used may vary. In one embodiment, the filter is nylon. In another embodiment, the filter is a Posidyne® filter (covalent charge-modified Nylon 6,6 membrane which exhibits a net positively-charged zeta potential in aqueous solutions). For large scale production the method above may need to be modified. A skilled practitioner could combine these materials in a different order and using different processing equipment to achieve the desired end result.

In one embodiment of the disclosure, the homogenization can be done in repeated cycles to achieve an emulsion in which the oil particle/globule size is less than 2 microns (μm) with intermediate cooling of the homogenized product to a temperature less than about 25° C.

The final emulsion comprises an oil portion (oil phase) dispersed in an aqueous portion (aqueous phase). The ratio of components to the aprepitant within the oil phase is an



important characteristic of the emulsion which may affect stability of the formulation prepared for injection. As described above, the oil phase comprises aprepitant, an oil and an emulsifier, examples of which are provided herein.

The final aprepitant emulsion contains 0.7 wt/wt % aprepitant, but may range from about 0.2 wt/wt % to 1.5 wt/wt %, 0.4 wt/wt % to 1.0 wt/wt % or 0.6 wt/wt % to 0.7 wt/wt %. An emulsion is prepared which contains about 130 mg aprepitant, however, preparations may also be prepared according to the present disclosure which contain about 100 mg to 1000 mg, 100 mg to 500 mg, 250 mg to 750 mg or 100 mg to 200 mg aprepitant.

In one embodiment, the ratio of oil:aprepitant (wt %:wt %) within the oil phase ranges from about 11:1 to 15:1, 12:1 to 14:1, 13:1 to 13.5:1, 13:1 to 14:1, or 12:1 to 15:1. In another embodiment, the ratio of oil: aprepitant is about 11:1, 11.5:1, 12:1, 12.5:1, 13:1, 13.5:1, 14:1, 14.5:1 or 15:1.

The ratio of emulsifier to aprepitant may also vary. For example, the ratio of emulsifier:aprepitant (wt %:wt %) within the oil portion ranges from about 15:1 to 30:1, 20:1 to 25:1, 18:1 to 22:1 or 10:1 to 30:1. In one embodiment, the emulsifier:aprepitant (wt %:wt %) is about 15:1, 18:1, 19:1, 20:1, 21:1, 22:1 or 23:1.

The ratio of components within the oil phase may alternatively be expressed in the ratio of (emulsifier plus oil): aprepitant (wt %:wt %). Ratios envisioned in the present disclosure may range from about 20:1 to 40:1, 25:1 to 35:1, 30:1 to 35:1 or 33:1 to 37:1, or may be, for example, about 30:1, 32:1, 33:1, 34:1, 35:1, 36:1, 37:1, 38:1 or 40:1.

The composition of the present disclosure has a significant advantage in terms of reduced toxicity as compared to injectable formulations which may contain less desirable excipients such as detergents, e.g., Tween-20 or Tween-80. The present formulations take advantage of the ability to solubilize therapeutically effective amounts of aprepitant in an oil phase which can then be used to generate an emulsion suitable for injection. Accordingly, described herein are pharmaceutical emulsion compositions containing aprepitant and optionally dexamethasone or dexamethasone sodium phosphate, wherein the emulsion does not comprise a detergent.

The composition of the present disclosure gives a product suitable for parenteral use because of low particle size. The composition of the present disclosure is easy to use as the product can be diluted with an agent such as an aqueous solution of sucrose, an aqueous solution of maltose or dextrose 5% injection or normal saline to achieve the required concentration for parenteral administration. The composition of the present disclosure also has a prolonged shelf life and hence is suitable for a readily marketable product.

The compositions of the disclosure are both chemically and physically stable. A physically stable emulsion of the invention is one which can be stored under appropriate conditions for at least 1, 2, 3, 4, 5, 6, 9, 12, 15, 18, 24 or 36 months, without an increase in average droplet size above that allowed as stated in USP <729>. As well, the population of large-diameter fat globules should be within the limits stated in USP <729>.

Droplet size limits defined in USP <729> apply throughout the assigned shelf life, which for a commercial pharmaceutical formulation may extend to 2-3 years or longer. All true emulsions are thermodynamically unstable and may over time undergo a range of processes which tend to increase the droplet size. These include direct droplet coalescence, when two droplets collide and form a single new droplet, and aggregation, in which droplets adhere together

to form larger masses. Aggregation may in some cases be a precursor of further coalescence into larger droplets. These processes may result in large aggregates rising to the surface of the container, a phenomenon known as 'creaming', and ultimately to free oil being visible on the emulsion surface, known as 'cracking'.

Droplet size measurements such as those defined in USP<729> can measure the initial increases in size, and hence are predictive of emulsion physical stability, at early times, long before the formulation shows macroscopic visible changes. Accordingly, the emulsions as described herein are stable compositions having an intensity-weighted mean droplet diameter less than about 500 nm, 400 am, 300 nm, 200 nm or 100 nm.

The oil or particle droplet size, i.e. diameter, according to the present disclosure is measured using a dynamic light scattering (DLS) instrument, such as the Malvern Zetasizer 4000, Malvern Zetasize Nano S90 or preferably the Malvern Zetasizer Nano ZS. Intensity-weighted particles sizes were recorded, since they do not require the knowledge of the refractive index of the particle. In Malvern Zetasizer instruments, there are two fits for determining the intensity-weighted diameter of the oil droplet size. The first is a cumulant fit that is used to determine the Z-average diameter; this fit can additionally give the polydispersity index (PDI). This cumulant fit is recommended for monodisperse samples possessing a PDI of lower than 0.2. The second is a non-negative least squares (NNLS) fit. This gives the Peak 1 diameter, Peak 2 diameter and Peak 3 diameter. This is more suitable for polydisperse samples having a PDI of greater than 0.2.

The emulsion preparations as described herein may further comprise a preservative in quantities that preserve the composition. Suitable preservatives used in some of the embodiments of present disclosure include, but are not limited to, disodium edetate, tocopherol, benzalkonium chloride, methyl, ethyl, propyl or butylparaben, benzyl alcohol, phenylethyl alcohol, benzethonium, chlorobutanol, potassium sorbate or combination thereof.

## III. MEDICAL USE

The pharmaceutical compositions of the present disclosure can be used for the prevention or treatment of emesis and provide a non-oral option for patients undergoing highly or moderately emetogenic chemotherapy. The disclosure thus encompasses a method of treatment comprising intravenously administering an aprepitant emulsion as described herein to a subject undergoing highly or moderately emetogenic chemotherapy.

Another embodiment relates to the use of the pharmaceutical formulations of the disclosure in the manufacture of a medicament for use preventing or treating emesis in a subject in need thereof.

The amount of the aprepitant and optionally dexamethasone required for use in the methods of the disclosure may vary with the method of administration and condition of the patient, and the degree of therapy required, and will be ultimately at the discretion of the attendant physician or clinician.

## IV. EXAMPLES

The following examples are illustrative in nature and are in no way intended to be limiting.



### Preparing of Aprepitant Emulsions for Intravenous Injection

#### Example 1

To prepare the aprepitant emulsion, an oil phase was first prepared by combining 750 mg of aprepitant and 15.0 g of egg lecithin (LIPOID E 80) with 12.0 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added in 10.0 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 5.60 g of sucrose and 0.500 g of sodium oleate in 70.0 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 1 below and a microscope image of the sample is provided in FIG. 1A. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using non-negative least squares (NNLS) fit gave a Peak 1 diameter of 99 nm. The intensity-weighted mean particle size determined using cumulant fit provided a Z-average diameter of 87 nm. The zeta potential was measured to be −43 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.74. This aprepitant-containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

TABLE 1

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.750 | 0.679 | 1 |
| Lipoid E 80 | 15.0 | 13.6 | 20 |
| Soybean Oil | 10.0 | 9.05 | 13.3 |
| Ethanol[1] | 8.59 | 7.78 | 11.5 |
| Sucrose | 5.60 | 5.07 | 7.5 |
| Sodium Oleate | 0.500 | 0.453 | 0.667 |
| Water for Injection | 70.0 | 63.4 | 93.3 |
| Total | 110 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

#### Example 2

To prepare the aprepitant emulsion, an oil phase was first prepared by combining 450 mg of aprepitant and 9.00 g of egg lecithin (LIPOID E 80) with 4.0 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added 6.00 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 3.36 g of sucrose and 0.300 g of sodium oleate in 42.0 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to

produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 2 below and a microscope image of the sample is provided in FIG. 1B. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using NNLS fit gave a Peak 1 diameter of 127 nm. The intensity-weighted mean particle sized determined using cumulant fit provided a Z-average diameter of 101 nm. The zeta potential was measured to be −47 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.77. This aprepitant-containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

TABLE 2

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.450 | 0.714 | 1 |
| Lipoid E 80 | 9.00 | 14.3 | 20 |
| Soybean Oil | 6.00 | 9.52 | 13.3 |
| Ethanol[1] | 1.89 | 3.00 | 4.20 |
| Sucrose | 3.36 | 5.33 | 7.47 |
| Sodium Oleate | 0.300 | 0.476 | 0.667 |
| Water for Injection | 42.0 | 66.7 | 93.3 |
| Total | 63.0 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

Example 3

To prepare the aprepitant emulsion, an oil phase was first prepared by combining 450 mg of aprepitant and 9.00 g of egg lecithin (LIPOID E 80) with 6.0 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added in 6.00 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 15.62 g of sucrose and 0.300 g of sodium oleate in 42.0 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 3 below and a microscope image of the sample is provided in FIG. 1C. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using NNLS fit gave a Peak 1 diameter of 88 nm. The intensity-weighted mean particle sized determined using cumulant fit provided a Z-average diameter of 68 nm. The zeta potential was measured to be −42 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.80. This aprepitant-containing emulsion is to be diluted with water for injection by 4-fold prior to injection.



TABLE 3

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.450 | 0.587 | 1 |
| Lipoid E 80 | 9.00 | 11.7 | 20 |
| Soybean Oil | 6.00 | 7.83 | 13.3 |
| Ethanol[1] | 3.27 | 4.26 | 7.26 |
| Sucrose | 15.6 | 20.4 | 34.7 |
| Sodium Oleate | 0.300 | 0.391 | 0.667 |
| Water for Injection | 42.0 | 54.8 | 93.3 |
| Total | 76.6 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

Alternate Aprepitant Emulsion Formulation for Intravenous Injection

Example 4

An aprepitant emulsion was prepared which has less than 10% wt/wt of the phospholipid emulsifier and which was adjusted to a pH of less than 8.0. To prepare the aprepitant emulsion, an oil phase was first prepared by combining 450 mg of aprepitant and 6.67 g of egg lecithin (LIPOID E 80) with 7.2 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm. Heating and stirring was carried out until the ethanol was evaporated and a thick residue was observed. To the resultant solution was added in 6.00 g of soybean oil and an appropriate amount of ethanol to obtain a clear oil phase upon heating at 60° C. The aqueous phase was prepared by dissolving 3.36 g of sucrose in 50.5 ml of water for injection at 60° C. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. The pH of this crude emulsion was adjusted to 7.0 and then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 4 below. Within 4 days post preparation at room temperature, crystals were observed in the product by microscopy.

TABLE 4

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.450 | 0.672 | 1 |
| Lipoid E 80 | 6.67 | 9.95 | 14.8 |
| Soybean Oil | 6.00 | 8.96 | 13.3 |
| Sucrose | 3.36 | 5.02 | 7.47 |
| Water for Injection | 50.5 | 75.4 | 112 |
| Total | 67.0 | 100 | — |

Example 5

An aprepitant emulsion was prepared which contains oleic acid. To prepare the aprepitant emulsion, an oil phase was first prepared by combining 250 mg of aprepitant, 2.50 g of egg lecithin (LIPOID E 80), 15.0 g of soybean oil and 125 mg of oleic acid. Ten ml of ethanol was added to dissolve the mixture at 70° C. The ethanol was removed by

pressure reduction in a 70° C. water bath to yield a clear oil phase. A preheated aqueous phase containing 82.1 ml of water for injection at 70° C. was added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was passed 8 times through an ice-cooled high-pressure micro-fluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 5 below. Within 4 days post-preparation at room temperature, crystals were observed in the product by microscopy.

TABLE 5

| Component | Amount (g) | Concentration (w/w %) | Ratio to aprepitant |
|---|---|---|---|
| Aprepitant | 0.250 | 0.250 | 1 |
| Lipoid E 80 | 2.50 | 2.50 | 10 |
| Soybean Oil | 15.0 | 15.0 | 60 |
| Oleic Acid | 0.125 | 0.125 | 0.5 |
| Water for Injection | 82.1 | 82.1 | 328 |
| Total | 100 | 100 | — |

Preparing of Emulsions Containing Aprepitant and Dexamethasone Sodium Phosphate for Intravenous Injection

Example 6

To prepare an injectable emulsion containing aprepitant and dexamethasone sodium phosphate, an oil phase was first prepared by combining 773 mg of aprepitant and 15.5 g of egg lecithin (LIPOID E 80) with 10.3 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added in 10.3 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 5.77 g of sucrose and 0.515 g of sodium oleate in 71.1 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure micro-fluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. Dexamethasone sodium phosphate (93.5 mg) dissolved in 1 ml of water for injection was mixed into the fine emulsion. This resultant fine emulsion containing both aprepitant and dexamethasone sodium phosphate was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion



composition are provided in Table 6 below and a microscope image of the sample is provided in FIG. 1D. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using NNLS fit gave a Peak 1 diameter of 95 nm. The intensity-weighted mean particle size determined using cumulant fit provided a Z-average diameter of 70 nm. The zeta potential was measured to be −43 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.92. This aprepitant and dexamethasone sodium phosphate containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

TABLE 6

| Component | Amount (g) | Concentration (w/w %) | Ratio to aprepitant |
|---|---|---|---|
| Aprepitant | 0.773 | 0.688 | 1 |
| Dexamethasone Sodium Phosphate | 0.0935 | 0.0832 | 0.121 |
| Lipoid E 80 | 15.5 | 13.8 | 20 |
| Soybean Oil | 10.3 | 9.17 | 13.3 |
| Ethanol[1] | 7.31 | 6.51 | 9.47 |
| Sucrose | 5.77 | 5.14 | 7.47 |
| Sodium Oleate | 0.515 | 0.459 | 0.667 |
| Water for Injection | 72.1 | 64.2 | 93.3 |
| Total | 112 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

Example 7

Stability of the Aprepitant Emulsion at Room Temperature and 5° C.

Stability of the aprepitant emulsions prepared as described in Examples 1, 2 3 and 6 was measured by incubating each emulsion preparation at room temperature (about 25° C.) or at 5° C. Mean particle size and percentage of fat globules above 5 μm were measured using DLS and light obscuration respectively to determine if they satisfy USP <729>. The emulsions were also inspected by microscopy for aprepitant crystals. Example 1 was stable at room temperature for 2 months, that is, the mean particle size and percentage of fat globules above 5 μm satisfied USP <729>. Additionally, no aprepitant crystals were visible by microscopy. After 2 months storage at room temperature, creaming was observed in Examples 1 and 6. This corresponded with the observation of aprepitant crystals. Examples 2 and 3 were stable at room temperature for 3 and 2 months respectively. After these time points, aprepitant crystals were observed in these formulations. Storage at 5° C. resulted in longer emulsion stability for Examples 1, 2, 3 and 6. Table 7 shows the characterizations of Examples 1, 2, 3 and 6 and their respective stabilities at room temperature and at 5° C.

TABLE 7

| Sample | PDI | Particle Size as Peak 1 Diameter (nm) | Particle Size as Z-Average Diameter (nm) | Zeta Potential (mV) | pH | Stability at 25° C. per USP <729> (months) | Stability at 5° C. per USP <729> |
|---|---|---|---|---|---|---|---|
| Example 1 | 0.122 | 99 | 87 | −43 | 8.74 | 2 | >10 months |
| Example 2 | 0.200 | 127 | 101 | −47 | 8.77 | 3 | >10 months |

TABLE 7-continued

| Sample | PDI | Particle Size as Peak 1 Diameter (nm) | Particle Size as Z-Average Diameter (nm) | Zeta Potential (mV) | pH | Stability at 25° C. per USP <729> (months) | Stability at 5° C. per USP <729> |
|---|---|---|---|---|---|---|---|
| Example 3 | 0.219 | 88 | 68 | −42 | 8.80 | 2 | >10 months |
| Example 6 | 0.244 | 95 | 70 | −43 | 8.92 | 2 | >10 months |

## Example 8

### Stability of the Aprepitant Emulsion to Freeze-Thaw Cycle

The aprepitant emulsions prepared according to Examples 1, 2, 3 and 6 were tested for stability upon exposure to a freeze-thaw cycle. Samples from the Examples 1, 2, 3 and 6 were stored at −20° C. overnight. They were thawed to room temperature the next day and visualized by microscopy. Prior to freezing, all samples did not present any visible particles under the microscope. FIG. **1** shows microscope images, at 10×, of emulsions after the freeze-thaw cycle (Examples 1, 2, 3 and 6 are shown as FIGS. **1** A, B, C, and D, respectively). Emulsions prepared as described in examples 1, 2 and 6 showed visible particles after exposure to freezing. Only Example 3 was stable after freezing. As FIG. **1**C shows, no visible particles were observed for the formulation of Example 3. This enhanced stability was conferred by the presence of a large concentration of sucrose (20 w/w % in Example 3 compared to 5 w/wt % in Examples 1, 2 and 6).

## Example 9

The pharmacokinetics of an aprepitant emulsion prepared according to Example 1 was determined. Two groups of six male Sprague-Dawley rats each were injected intravenously with, respectively, fosaprepitant in solution or aprepitant emulsion prepared according to Example 1. All drugs were administered at an effective concentration equivalent to 14 mg/kg aprepitant. Blood from all rats was collected at the appropriate time intervals and processed to plasma by centrifugation. Plasma samples were analyzed by LC-MS/MS for aprepitant and fosaprepitant, as appropriate. A plasma concentration versus time curve of aprepitant for the emulsion described in Example 1 and for fosaprepitant is presented in FIG. **2** (fosaprepitant in solution, •; aprepitant emulsion, ▲). The curves indicate the initial aprepitant level reached immediately after injection of the aprepitant emulsion was almost 3 times higher than the initial aprepitant level reached immediately after injection of the fosaprepitant solution. Plasma levels of aprepitant resulting from each injection, however, were essentially the same by the 3-hour time point indicating the formulations were bioequivalent except for a delay in the conversion of fosaprepitant to aprepitant.

## Example 10

The pharmacokinetics of an aprepitant and dexamethasone sodium phosphate combination emulsion prepared according to Example 6 was determined. Male Sprague-Dawley rats each were injected intravenously with fosaprepitant solution (group 1), dexamethasone sodium phosphate solution (group 2), or an emulsion containing aprepitant and dexamethasone sodium phosphate prepared according to Example 6 (group 3). Groups 1 and 2 consisted of six rats each; for group 3, twelve rats were injected with the aprepitant and dexamethasone sodium phosphate combination emulsion to allow for the collection of sufficient samples for the measurement of both active ingredients.

In groups 1 and 3, a dose was administered at an effective drug concentration equivalent to 2 mg/kg aprepitant. In groups 2 and 3, a dose was administered at an effective drug concentration equivalent to 0.24 mg/kg dexamethasone sodium phosphate. Blood from all rats was collected at the appropriate time intervals and processed to plasma by centrifugation. Plasma samples were analyzed by LC-MS/MS for dexamethasone, aprepitant, and fosaprepitant, as appropriate.

FIGS. **3** and **4** present the plasma concentration versus time curve of aprepitant and dexamethasone, respectively. FIG. **3** compares the aprepitant plasma concentration versus time curve resulting from injection of the emulsion described in Example 6 (FIG. **3**, •) vs. injection of a solution of fosaprepitant (FIG. **3**, ▲). FIG. **4** compares the dexamethasone plasma concentration versus time curve resulting from injection of a dexamethasone sodium phosphate solution (FIG. **4**, •) vs. injection of the emulsion described in Example 6. The curves indicate that the aprepitant in the emulsion is released approximately simultaneously with the dexamethasone sodium phosphate. The presence of dexamethasone sodium phosphate in the emulsion does not affect the pharmacokinetics of aprepitant.

## Example 11

To prepare the aprepitant emulsion comprising a buffering agent, an oil phase is first prepared by combining 750 mg of aprepitant, 15.0 g of egg lecithin (LIPOID E 80), 10.0 g of soybean oil and 3.75 ml of ethanol. This mixture is dissolved by heating and stirring at 70° C. and 200 rpm for 30 min. The aqueous phase is prepared by dissolving 2.17 g of sucrose and 0.500 g of sodium oleate in a mixture of 4.1 ml of 1M Tris buffer (pH 8.4) and 65.9 ml of water for injection. This mixture is stirred at 300 rpm at room temperature for 30 min. The aqueous phase is then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion is then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion is sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). Dynamic light scattering is used to determine the intensity-weighted particle size using NNLS fit to give the Peak 1 diameter, the intensity-weighted mean particle sized is determined using cumulant fit to provide the Z-average diameter. The zeta potential is measured by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano

ZS). This aprepitant-containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

While a number of exemplary aspects and embodiments have been discussed above, those of skill in the art will recognize certain modifications, permutations, additions and sub-combinations thereof. It is therefore intended that the following appended claims and claims hereafter introduced are interpreted to include all such modifications, permutations, additions and sub-combinations as are within their true spirit and scope.

What is claimed is:

**1**. An injectable pharmaceutical emulsion comprising:
0.4 wt/wt % to 1.0 wt/wt % aprepitant;
13 wt/wt % to 15 wt/wt % egg yolk lecithin;
9 wt/wt % to 10 wt/wt % soybean oil; and
a pH modifier, wherein the pH modifier is sodium oleate;
wherein the pH of the emulsion ranges from 7.5 to 9.0.

**2**. The emulsion according to claim **1**, wherein the emulsion comprises 0.7 wt/wt % aprepitant.

**3**. The emulsion according to claim **1**, wherein the emulsion comprises 14 wt/wt % egg yolk lecithin.

**4**. The emulsion according to claim **1**, wherein the emulsion further comprises 3 wt/wt % to 8 wt/wt % sucrose.

**5**. The emulsion according to claim **1**, wherein the emulsion further comprises 5 wt/wt % sucrose.

**6**. The emulsion according to claim **1**, wherein the emulsion further comprises 2 wt/wt % to 6 wt/wt % ethanol.

**7**. The emulsion according to claim **1**, wherein the emulsion further comprises less than 6 wt/wt % ethanol.

**8**. An injectable pharmaceutical emulsion comprising:
0.7 wt/wt % aprepitant;
14 wt/wt % egg yolk lecithin;
9 wt/wt % to 10 wt/wt % soybean oil; and
a pH modifier, wherein the pH modifier is sodium oleate;
wherein the pH of the emulsion ranges from 7.5 to 9.0.



**9**. The emulsion according to claim **8**, wherein the emulsion further comprises 5 wt/wt % sucrose.

**10**. The emulsion according to claim **8**, wherein the emulsion further comprises 2 wt/wt % to 6 wt/wt % ethanol.

**11**. The emulsion according to claim **8**, wherein the emulsion further comprises less than 4 wt/wt % ethanol.

**12**. A method for treating nausea and vomiting in a subject in need thereof comprising administering to the subject the pharmaceutical emulsion according to claim **1**.

**13**. The method according to claim **12**, wherein the nausea and vomiting is chemotherapy induced nausea and vomiting.

**14**. The method according to claim **13**, wherein the chemotherapy induced nausea and vomiting is in response to highly emetic chemotherapy.

**15**. The method according to claim **13**, wherein the chemotherapy induced nausea and vomiting is in response to moderately emetic chemotherapy.

**16**. The method according to claim **12**, wherein the administering is intravenous.

**17**. A method for treating nausea and vomiting in a subject in need thereof comprising administering to the subject the pharmaceutical emulsion according to claim **8**.

**18**. The method according to claim **17**, wherein the nausea and vomiting is chemotherapy induced nausea and vomiting.

**19**. The method according to claim **18**, wherein the chemotherapy induced nausea and vomiting is in response to highly emetic chemotherapy.

**20**. The method according to claim **18**, wherein the chemotherapy induced nausea and vomiting is in response to moderately emetic chemotherapy.

**21**. The method according to claim **17**, wherein the administering is intravenous.

* * * * *

US009974794B2

(12) **United States Patent**
**Ottoboni et al.**

(10) **Patent No.:** **US 9,974,794 B2**
(45) **Date of Patent:** ***May 22, 2018**

(54) **EMULSION FORMULATIONS OF APREPITANT**

(71) Applicant: **Heron Therapeutics, Inc.**, Redwood City, CA (US)

(72) Inventors: **Thomas B. Ottoboni**, Belmont, CA (US); **Han Han**, Mountain View, CA (US)

(73) Assignee: **Heron Therapeutics, Inc.**, San Diego, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days. days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/705,208**

(22) Filed: **Sep. 14, 2017**

(65) **Prior Publication Data**

US 2018/0000829 A1 Jan. 4, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/859,013, filed on Sep. 18, 2015, now Pat. No. 9,808,465.
(Continued)

(51) **Int. Cl.**
***A61K 31/5377*** (2006.01)
***A61K 47/44*** (2017.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ ***A61K 31/5377*** (2013.01); ***A61K 9/0019*** (2013.01); ***A61K 9/0024*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. A61K 31/5377; A61K 31/573; A61K 47/10; A61K 47/12; A61K 47/18;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,616,330 A 4/1997 Kaufman et al.
9,561,229 B2 * 2/2017 Ottoboni ........... A61K 31/5377
(Continued)

FOREIGN PATENT DOCUMENTS

CN 102379845 A * 3/2012 ......... A61K 31/5377
CN 102379845 A 3/2012
(Continued)

OTHER PUBLICATIONS

Applicant initiated interview, Examiner's Summary, dated Aug. 31, 2016, for U.S. Appl. No. 15/083,071, now U.S. Pat. No. 9,561,229. (4 pages) (Year: 2016).*
(Continued)

*Primary Examiner* — Ernst V Arnold
*Assistant Examiner* — Miriam A Levin
(74) *Attorney, Agent, or Firm* — McDermott Will & Emery LLP

(57) **ABSTRACT**

Disclosed herein are novel pharmaceutical formulations of aprepitant suitable for parenteral administration including intravenous administration. Also included are formulations including both aprepitant and dexamethasone sodium phosphate. The pharmaceutical formulations are stable oil-in-water emulsions for non-oral treatment of emesis and are particularly useful for treatment of subjects undergoing highly emetogenic cancer chemotherapy.

**21 Claims, 4 Drawing Sheets**






*Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*

D. Del 1:22-00985-WCB

**JTX 007**

HERON_0000078

**Related U.S. Application Data**

(60) Provisional application No. 62/052,948, filed on Sep. 19, 2014.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 47/26* | (2006.01) |
| *A61K 47/24* | (2006.01) |
| *A61K 9/00* | (2006.01) |
| *A61K 31/573* | (2006.01) |
| *A61K 9/107* | (2006.01) |
| *A61K 47/10* | (2017.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/18* | (2017.01) |

(52) **U.S. Cl.**
CPC ............ ***A61K 9/107*** (2013.01); ***A61K 31/573*** (2013.01); ***A61K 47/10*** (2013.01); ***A61K 47/12*** (2013.01); ***A61K 47/18*** (2013.01); ***A61K 47/24*** (2013.01); ***A61K 47/26*** (2013.01); ***A61K 47/44*** (2013.01)

(58) **Field of Classification Search**
CPC ........ A61K 47/24; A61K 47/26; A61K 47/44; A61K 9/0019; A61K 9/0024; A61K 9/107
USPC ........................................ 514/230.8; 424/400
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0071777 | A1 | 3/2007 | Bromer et al. |
| 2011/0009362 | A1 | 1/2011 | Joshi et al. |
| 2011/0038925 | A1 | 2/2011 | Wan et al. |
| 2013/0236501 | A1 | 9/2013 | Booth et al. |
| 2013/0317016 | A1 | 11/2013 | Hingorani et al. |
| 2016/0024092 | A1 | 1/2016 | Wan et al. |
| 2016/0082013 | A1 | 3/2016 | Ottoboni et al. |
| 2016/0206622 | A1 | 7/2016 | Ottoboni et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 2005/016308 | A1 | 2/2005 |
| WO | WO 2009/124756 | A1 | 10/2009 |
| WO | WO 2011/158053 | A1 | 12/2011 |
| WO | WO 2013/177501 | A2 | 11/2013 |
| WO | WO 2014/005606 | A1 | 1/2014 |
| WO | WO 2014/209962 | A1 | 12/2014 |
| WO | WO 2016/044784 | A1 | 3/2016 |

OTHER PUBLICATIONS

Declaration of Thomas Ottoboni under 37 C.F.R. § 1.132, filed Sep. 1, 2016 in regard to U.S. Appl. No. 15/083,071, now U.S. Pat. No. 9,561,229. (9 pages) (Year: 2016).*

Lipoid GmbH, Lipoid Product Finder, [Retrieved from internet <URL: http://www.lipoid.com/en/node/105 >], (2018), 1 page. (Year: 2018).*

Lipoid GmbH, Lipoid Product Finder (print-friendly version), [Retrieved from internet <URL: http://www.lipoid.com/en/print/105 >], ( 2018), 2 pages. (Year: 2018).*

Zhou et al., Preparation of Aprepitant Emulsion for Intravenous Injection, Chinese Journal of Pharmaceuticals (2012), 43(12): 1003-1006 (English language translation), 4 pages. (Year: 2012).*

Cassileth et al., "Antiemetic efficacy of dexamethasone therapy in patients receiving cancer chemotherapy", Arch. Intern. Med., vol. 143, No. 7, pp. 1347-1349 (1983) Abstract.

Drugs.com, "Dexamethasone Sodium Phosphate", online article accessed from http://web.archive.org/web/20141224130045/http://www.drugs.com/pro/dexamethasone-sodium-phosphate.html retrieved from the internet Mar. 31, 2017.

Aziz, "Neurokinin-1 receptor antagonists for chemotherapy-induced nausea and vomiting", Ann. Palliat. Med., vol. 1, No. 2, pp. 130-136 (2012).

Hargreaves et al., "Development of aprepitant, the first neurokinin-1 receptor antagonist for the prevention of chemotherapy-induced nausea and vomiting", Ann. N.Y. Acad. Sci., vol. 1222, pp. 40-48 (2011).

International Search Report and Written Opinion from PCT Patent Application No. PCT/US2015/051050 dated Dec. 18, 2015, Application now published as International Publication No. WO2016/044784 on Mar. 24, 2016.

International Search Report from PCT Patent Application No. PCT/2016/015992 dated Jun. 3, 2016.

Navari et al., "Reduction of cisplatin-induced emesis by a selective neurokinin-1-receptor antagonist. L-754,030 Antiemetic Trials Group", N. Engl. J. Med., vol. 340, No. 3, pp. 190-195 (1999).

Sun et al., "Compatibility of intravenous fosaprepitant with intravenous 5-HT3 antagonists and corticosteroids", Cancer Chemother. Pharmacol., vol. 72, No. 3, pp. 509-513 (2013).

The Pharmaceutics and Compounding Laboratory, "Emulsions: Preparation and Stabilization, Methods of emulsion preparation", 1 page, Online article accessed May 26, 2016 from http://pharmlabs.unc.edu/labs/emulsions/prep.htm.

Zhou et al., "Preparation of Aprepitant emulsion for intravenous injection", Chinese Journal of Pharmaceuticals, vol. 43, No. 12, pp. 1003-1006 (2012) English Translation Only.

* cited by examiner



FIG. 1A




FIG. 1B



FIG. 1C




FIG. 1D


Fosaprepitant
Aprepitant Emulsion
Plasma Aprepitant (ng/mL)
8000
6000
4000
2000
0
Hours
0
2
4
6
8
10
12
14

**FIG. 2**

JTX-7.0005






**FIG. 3**

HERON_0000082



Dexamethasone Phosphate
Aprep Dex Emulsion
Plasma Dexamethosone (ng/mL)
150
100
50
0
0
4
8
12
16
20
Hours


FIG. 4

# EMULSION FORMULATIONS OF APREPITANT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application in a continuation of U.S. application Ser. No. 14/859,013, filed Sep. 18, 2015, which claims the benefit of U.S. Provisional Application No. 62/052,948 filed on Sep. 19, 2014, the disclosures of which are fully incorporated by reference in their entirety.

## TECHNICAL FIELD

The disclosure relates generally to emulsion formulations and systems for the intravenous or parenteral administration of aprepitant for treatment of emesis. The emulsion formulations are stable for prolonged periods of time. Also described are methods for preparing the stable aprepitant emulsions and pharmaceutical formulations.

## BACKGROUND

Aprepitant, having the chemical name 5-[[(2R,3S)-2-[(1R)-1-[3,5-bis(trifluoromethyl)phenyl]ethoxy]-3-(4-fluorophenyl)-4-morpholinyl]methyl]-1,2-dihydro-3H-1,2,4-triazol-3-one, has the structure:



Aprepitant is indicated for the prevention of acute and delayed nausea and vomiting associated with initial and repeat courses of highly emetogenic cancer chemotherapy. Aprepitant is currently available in the United States as an oral capsule, however due to the nausea and vomiting experienced by patients, it is desirable to formulate aprepitant as a liquid suitable for parenteral or intravenous administration.

Liquid formulations containing aprepitant are very challenging to make as aprepitant is a molecule having poor solubility and poor permeability characteristics. One means of addressing this challenge is to prepare an emulsion which may both allow preparation of an injectable formulation as well as enhance bioavailability of the aprepitant once administered.

Intravenous emulsions should have a very small droplet size to circulate in the bloodstream without causing capillary blockage and embolization. These size limits are typified by USP33-NF28 General Chapter <729> for Globule Size Distribution in Lipid Injectable Emulsions, hereinafter referred to as USP <729>, which defines universal limits for (1) mean droplet size not exceeding 500 nm or 0.5 μm and (2) the population of large-diameter fat globules, expressed as the volume-weighted percentage of fat greater than 5 μm (PFAT5) not exceeding 0.05%, irrespective of the final lipid concentration.



Emulsion formulations must be physically stable. The droplet size limits defined in USP <729> apply throughout the assigned shelf life. All true emulsions are thermodynamically unstable and may over time undergo a range of processes which tend to increase the droplet size. These include direct droplet coalescence, when two droplets collide and form a single new droplet, and aggregation, in which droplets adhere together to form larger masses. Aggregation may in some cases be a precursor of further coalescence into larger droplets. These processes may result in large aggregates rising to the surface of the container, a phenomenon known as 'creaming', and ultimately to free oil being visible on the emulsion surface, known as 'cracking'.

Emulsion formulations must also be chemically stable. The drug substance may degrade; for example, lipophilic drugs will partition into the oil phase, which will confer some degree of protection, but hydrolytic degradation may still occur at the oil-water interface. Possible chemical degradation within parenteral fat emulsions includes oxidation of unsaturated fatty acid residues present in triglyceride and lecithin, and hydrolysis of phospholipids leading to the formation of free fatty acids (FFA) and lysophospholipids. Such degradants lower pH, which may then promote further degradation. Thus, pH should be controlled during manufacture and parenteral emulsion formulations may include a buffering agent to provide additional control. Any decrease in pH over the assigned shelf-life may be indicative of chemical degradation.

In the present application, emulsion formulations were prepared and characterized to identify a formulation and process that will allow aprepitant to be incorporated into an emulsion for intravenous injection and remain stable during the shelf life of the formulation.

## BRIEF SUMMARY

The following aspects and embodiments thereof described and illustrated below are meant to be exemplary and illustrative, not limiting in scope.

In one aspect, a pharmaceutical composition suitable for intravenous administration is provided which comprises a stable emulsion comprising an oil phase, wherein the oil phase comprises aprepitant, a surfactant and a co-surfactant; and an aqueous phase, wherein the aqueous phase comprises water, a tonicity agent and a pH-adjusting agent. In some embodiments, the pH-adjusting agent is a buffer.

In one embodiment, the composition is an oil-in-water emulsion comprising an oil selected from the group consisting of structurally modified or hydrolyzed coconut oil, olive oil, soybean oil, safflower oil, triglycerides, octyl and decyl glycerate, ethyl oleate, glyceryl linoleate, ethyl linoleate, glyceryl oleate, cholesteryl oleate/linoleate or a mixture thereof.

In one embodiment, the composition comprises about 5 wt/wt % (weight/weight %) to 15 wt/wt %, 5 wt/wt % to 10 wt/wt %, 7 wt/wt % to 10 wt/wt % or 8 wt/wt % to 9 wt/wt % oil. In another embodiment, the oil is soybean oil.

In one embodiment, the composition comprises about 10 wt/wt % to 20 wt/wt %, 12 wt/wt % to 17 wt/wt %, 13 wt/wt % to 16 wt/wt %, 13 wt/wt % to 15 wt/wt %, or 13 wt/wt % to 14 wt/wt % emulsifier. In another embodiment, the composition comprises about 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt % or 20 wt/wt % emulsifier. In another embodiment the emulsifier is a lecithin. In another embodiment the lecithin is an egg yolk lecithin.

In one embodiment, the composition comprises about 20 wt/wt % to 50 wt/wt %, 30 wt/wt % to 50 wt/wt %, 35 wt/wt % to 45 wt/wt %, 30 wt/wt % to 45 wt/wt %, 37 wt/wt % to 42 wt/wt %, 38 wt/wt % to 40 wt/wt %, 30 wt/wt %, 31 wt/wt %, 32 wt/wt %, 33 wt/wt %, 34 wt/wt %, 35 wt/wt %, 36 wt/wt %, 37 wt/wt %, 38 wt/wt %, 39 wt/wt %, 40 wt/wt %, 41 wt/wt %, 42 wt/wt %, 43 wt/wt %, 44 wt/wt %, 45 wt/wt %, 46 wt/wt %, 47 wt/wt %, 48 wt/wt %, 49 wt/wt %, 50 wt/wt % of oil expressed as a percentage of the weight of the oil per the sum of weight of oil, emulsifier and oleate in a unit of the composition. In another embodiment, the oil is soybean oil.

In one embodiment, the composition comprises about 40 wt/wt % to 80 wt/wt %, 50 wt/wt % to 70 wt/wt %, 55 wt/wt % to 65 wt/wt %, 57 wt/wt % to 63 wt/wt %, 58 to 60 wt/wt %, 35 wt/wt % to 40 wt/wt %, 30 wt/wt % to 40 wt/wt %, 50 wt/wt %, 51 wt/wt %, 52 wt/wt %, 53 wt/wt %, 54 wt/wt %, 55 wt/wt %, 56 wt/wt %, 57 wt/wt %, 58 wt/wt %, 59 wt/wt %, 60 wt/wt %, 61 wt/wt %, 62 wt/wt %, 63 wt/wt %, 64 wt/wt %, 65 wt/wt %, 66 wt/wt %, 67 wt/wt %, 68 wt/wt %, 69 wt/wt %, 70 wt/wt % of emulsifier expressed as a percentage of the weight of emulsifier per the sum of weight of oil, emulsifier and oleate in a unit of the composition. In another embodiment the emulsifier is a lecithin. In another embodiment the lecithin is an egg yolk lecithin.

In one embodiment, the ratio of oil to aprepitant (wt %:wt %) in the composition ranges from about 11:1 to 20:1, 11:1 to 15:1, 12:1 to 16:1, 12:1 to 14:1, 11:1 to 15:1, 12:1 to 14:1, 12.5:1 to 13.5:1, 13:1 to 14:1, or 12:1 to 15:1. In another embodiment, the ratio of oil to aprepitant (wt %:wt %) in the composition is about 11:1 to 20:1, 11:1 to 15:1, 12:1 to 16:1, 12:1 to 14:1, 11:1, 11.5:1, 12:1, 12.5:1, 13:1, 13.5:1, 14:1, 14.5:1 or 15:1, 15.5:1, 16:1.

In one embodiment, the ratio of emulsifier to aprepitant (wt %:wt %) in the composition ranges from about 15:1 to 30:1, 20:1 to 25:1, 18:1 to 22:1 or 10:1 to 30:1. In another embodiment, the ratio of emulsifier:aprepitant (wt %:wt %) in the composition is about 15:1, 18:1, 19:1, 20:1, 21:1, 22:1 23:1, 24:1, or 25:1.

In one embodiment, the ratio of (emulsifier plus oil) to aprepitant (wt %:wt %) in the composition ranges from about 20:1 to 40:1, 25:1 to 35:1, 30:1 to 35:1. In another embodiment, the ratio of oil:aprepitant is about 25:1, 26:1, 27:1, 28:1, 29:1 30:1, 31:1, 32:1, 33:1, 34:1, 35:1, 36:1, 37:1, 38:1 or 40:1.

In one embodiment, the ratio of emulsifier to oil (wt %:wt %) in the composition ranges from about 0.5:1 to 4:1, 1:1 to 2:1, or 1.25:1 to 1.75:1. In another embodiment, the ratio of emulsifier to oil (wt %:wt %) in the composition is about 0.5:1, 0.5:1, 0.6:1, 0.7:1, 0.8:1, 0.9:1, 1:1, 1.1:1, 1.2:1, 1.3:1, 1.4:1, 1.5:1, 1.6:1, 1.7:1, 1.8:1, 1.9:1, 2:1, 1.05:1, 1.15:1, 1.25:1, 1.35:1, 1.45:1, 1.55:1, 1.65:1, 1.75:1, 1.85:1, or 1.95:1.

In one embodiment, a therapeutic dose comprises about 1 to 4 g, 1.5 to 3 g, 1.8 to 2.8 g, 2.3 to 2.8 g, 1.8 to 2.3 g, 1 g, 1.1 g, 1.2 g, 1.3 g, 1.4 g, 1.5 g, 1.6 g, 1.7 g, 1.8 g. 1.9 g, 2 g, 2.1 g, 2.2 g, 2.3 g, 2.4 g, 2.5 g, 2.6 g, 2.7 g, 2.8 g. 2.9 g, 3 g, 3.1 g, 3.2 g, 3.3 g, 3.4 g, 3.5 g, 3.6 g, 3.7 g, 3.8 g. 3.9 g, 4 g emulsifier. In another embodiment, the emulsifier is a lecithin. In another embodiment the emulsifier is egg yolk lecithin.

In one embodiment, a therapeutic dose comprises about 0.5 to 3 g, 1 to 2.5 g, 1 to 2 g, 1 to 1.5 g, 1.5 g to 2 g, 0.5 g 0.6 g, 0.7 g, 0.8 g, 0.9 g, 1 g, 1.1 g, 1.2 g, 1.3 g, 1.4 g, 1.5 g, 1.6 g, 1.7 g, 1.8 g. 1.9 g, 2 g, 2.1 g, 2.2 g, 2.3 g, 2.4 g, 2.5 g oil. In another embodiment, the oil is soybean oil.



In one embodiment, the emulsifier is a phospholipid. In another embodiment, the emulsifier is selected from the group consisting of egg phospholipids, soy phospholipids, phosphatidylcholines, phosphatidylethanolamines, phosphatidylserines, phosphatidylglycerols, phosphatidylinositols, phosphatidic acids, mixed chain phospholipids, lysophospholipids, hydrogenated phospholipids, partially hydrogenated phospholipids, and mixtures thereof.

In one embodiment, the composition comprises a co-surfactant. In another embodiment, the co-surfactant is ethanol.

In one embodiment, the composition comprises about 0 wt/wt % to 10 wt/wt %, 1 wt/wt % to 9 wt/wt %, or 2 wt/wt % to 6 wt/wt % co-surfactant. In another embodiment, the composition comprises less than 10 wt/wt %, less than 9 wt/wt %, less than 8 wt/wt %, less than 7, less than 6 wt/wt %, less than 5 wt/wt %, less than 4 wt/wt %, less than 3 wt/wt %, less than 2 wt/wt % or less than 1 wt/wt % co-surfactant.

In one embodiment, the composition comprises about 0 wt/wt % to 10 wt/wt %, 1 wt/wt % to 9 wt/wt %, or 2 wt/wt % to 6 wt/wt % ethanol. In another embodiment, the composition comprises less than 10 wt/wt %, less than 9 wt/wt %, less than 8 wt/wt %, less than 7, less than 6 wt/wt %, less than 5 wt/wt %, less than 4 wt/wt %, less than 3 wt/wt %, less than 2 wt/wt % or less than 1 wt/wt % ethanol.

In one embodiment, the emulsion comprises an aqueous phase which comprises a tonicity agent, a pH-adjusting agent, and water.

In one embodiment, the emulsion comprises an aqueous phase which comprises an osmotic agent, a pH-adjusting agent, and water.

In one embodiment, the emulsion comprises an aqueous phase which comprises a tonicity agent, an osmotic agent, a pH-adjusting agent, and water.

In one embodiment, the aqueous phase further comprises a buffer.

In one embodiment, the aqueous phase comprises a buffer but does not comprise a pH-adjusting agent which is different than the buffer. In another embodiment, the buffer functions as both a pH-adjusting agent and a buffer.

In another embodiment, when the aqueous phase comprises a buffer, the composition contains no tonicity agent.

In one another embodiment, the buffer is selected from the group consisting of phosphate buffer, citrate buffer, Tris buffer, carbonate buffer, succinate buffer, maleate buffer and borate buffer. In another embodiment, the buffer is selected from the group, phosphate buffered saline (PBS), modified PBS (PBS-mod) and citrate buffer.

In one embodiment, the aqueous phase comprises a buffer, that when mixed with the oil phase will provide a substantially isotonic oil in water emulsion.

In one embodiment, the osmotic agent is selected from the group consisting of glycerol, sorbitol, xylitol, mannitol, glucose, trehalose, maltose, sucrose, raffinose, lactose, dextran, polyethylene glycol, or propylene glycol. In another embodiment, the osmotic agent is an inorganic salt such as sodium chloride and mixtures thereof.

In one embodiment, the pH adjusting agent is selected from the group consisting of sodium hydroxide, potassium hydroxide, magnesium hydroxide, sodium carbonate, Tris, sodium linoleate, sodium oleate, potassium carbonate, potassium linoleate, potassium oleate, and mixtures thereof.

In one embodiment, the composition has a pH of about 6 to 9, 7 to 9, 7.5 to 9, 7.5 to 8.5, 8 to 9, 6 to 8, 7 to 8, or 6, 7, 8 or 9.

In one embodiment, the composition comprises about 0 wt/wt % to 25 wt/wt %, 2 wt/wt % to 20 wt/wt %, 3 wt/wt % to 15 wt/wt %, or 3 wt/wt % to 8 wt/wt % tonicity agent. In another embodiment, the composition comprises about 1 wt/wt %, 2 wt/wt %, 3 wt/wt %, 4 wt/wt %, 5 wt/wt %, 6 wt/wt %, 7 wt/wt %, 8 wt/wt %, 9 wt/wt %, or 10 wt/wt %, 11 wt/wt %, 12 wt/wt %, 13 wt/wt %, 14 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt %, or 20 wt/wt %, 21 wt/wt %, 22 wt/wt %, 23 wt/wt %, 24 wt/wt %, 25 wt/wt % tonicity agent. In still another embodiment, the composition comprises no tonicity agent.

In one embodiment, the composition comprises about 0 wt/wt % to 25 wt/wt %, 2 wt/wt % to 20 wt/wt %, 3 wt/wt % to 15 wt/wt %, or 3 wt/wt % to 8 wt/wt % osmotic agent. In another embodiment, the composition comprises about 1 wt/wt %, 2 wt/wt %, 3 wt/wt %, 4 wt/wt %, 5 wt/wt %, 6 wt/wt %, 7 wt/wt %, 8 wt/wt %, 9 wt/wt %, or 10 wt/wt %, 11 wt/wt %, 12 wt/wt %, 13 wt/wt %, 14 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt %, or 20 wt/wt %, 21 wt/wt %, 22 wt/wt %, 23 wt/wt %, 24 wt/wt %, 25 wt/wt % osmotic agent. In still another embodiment, the composition comprises no osmotic agent.

In one embodiment, the aqueous phase comprises a dose of dexamethasone sodium phosphate in a dose of the composition. In another embodiment, the dose of dexamethasone sodium phosphate ranges from about 0.5 mg to 30 mg, 0.5 mg to 25 mg, 1 mg to 20 mg, 10 mg to 20 mg, or 3 mg to 16 mg. In another embodiment, the dose of dexamethasone sodium phosphate is about 9 mg or 16 mg in a dose of the composition.

In one embodiment, the oil phase comprises a dose of dexamethasone in a dose of the composition. In another embodiment, the dose of dexamethasone ranges from about 0.5 mg to 30 mg, 0.5 mg to 20 mg, 1 mg to 18 mg, 10 mg to 20 mg, or 3 mg to 16 mg. In another embodiment, the dose of dexamethasone is about 8 mg or 12 mg in a dose of the composition.

In one embodiment, the emulsion comprises about 0.002 wt/wt % to 0.2 wt/wt %, 0.003 wt/wt % to 0.16 wt/wt %, 0.02 wt/wt % to 0.1 wt/wt % dexamethasone sodium phosphate.

In one embodiment, the composition is a stable system maintaining an intensity-weighted mean particle size as determined by dynamic light scattering (DLS) of about 50 nm to 1000 nm, 50 to 500 nm, 50 nm to 400 nm, 50 nm to 300 nm, 50 nm to 200 nm or 50 nm to 100 nm. In another embodiment, the average droplet size is maintained below 500 nm for a period of at least 1 month, 3 months, 6 months, 9 months, 12 months, 2 years or 3 years at room temperature. In another embodiment, the average droplet size is maintained below 500 nm for a period of at least 1 month, 3 months, 6 months, 9 months, 12 months, 2 years or 3 years at 5° C.

In another aspect, a method for preparing an emulsion comprising aprepitant and suitable for parenteral administration is provided.

In one embodiment, the administration is intravenous administration.

In one embodiment, the method comprises: a) preparing an oil phase by dissolving aprepitant and an emulsifier in ethanol, then adding in oil to generate an oil-based mixture; b) preparing an aqueous phase by mixing water, optionally with a tonicity agent, optionally with an osmotic agent and optionally with a pH modifier and optionally with a buffer to generate an aqueous mixture; c) combining the oil-based mixture and the aqueous mixture and subjecting this to high speed homogenization to generate a crude emulsion; and d) subjecting the crude emulsion to high pressure homogenization to generate a fine emulsion.



In one embodiment, preparing the oil phase further comprises dissolving dexamethasone with the aprepitant and the emulsifier in the ethanol.

In one embodiment, the method comprises: a) preparing an oil phase by dissolving aprepitant and an emulsifier in ethanol and oil to generate an oil-based mixture; b) preparing an aqueous phase by mixing water, optionally with a tonicity agent, optionally with an osmotic agent and optionally with a pH modifier and optionally with a buffer to generate an aqueous mixture; c) combining the oil-based mixture and the aqueous mixture and subjecting this to high speed homogenization to generate a crude emulsion; and d) subjecting the crude emulsion to high pressure homogenization to generate a fine emulsion.

In one embodiment, preparing the oil phase further comprises dissolving dexamethasone with the aprepitant and the emulsifier in the ethanol and oil.

In one embodiment, preparing the aqueous phase further comprises mixing dexamethasone with the water, tonicity agent, pH modifier, and a buffer. In another embodiment, the dexamethasone is a salt of dexamethasone. In still another embodiment, the dexamethasone is dexamethasone sodium phosphate.

In one embodiment, the method further comprises sterilizing the fine emulsion to generate the final emulsion, wherein the final emulsion is suitable for injection into a subject.

In one embodiment, the dissolution in ethanol is performed at a temperature of about 25° C. to 80° C., 40° C. to 75° C., 60° C. to 70° C., or at about 25° C., 35° C., 45° C., 60° C., 65° C., 70° C. or 75° C.

In one embodiment, the high-speed homogenization is performed at a speed of about 2,000 rpm (revolutions per minute) to 25,000 rpm. In another embodiment, the high-speed homogenization is performed at a speed of about 20,000 rpm. In yet another embodiment, the high-speed homogenization is performed at a speed of about 3600 rpm.

In one embodiment, the high-speed homogenization is performed for a time period of about 0.5 min to 1 hour, 1 min to 45 min, or 1 min to 30 min. In another embodiment, the high-speed homogenization is performed for a time period of about 20 to 40 min or for about 30 min.

In one embodiment, the high-speed homogenization is performed at about 10° C. to about 60° C., 20° C. to about 60° C., about 30° C. to about 50° C., or about 35° C. to about 45° C. In another embodiment, the high-speed homogenization is performed at about 25° C., 30° C., 35° C., 40° C., 45° C. or 50° C.

In one embodiment, the high-pressure homogenization is performed at a pressure of about 10,000 psi (pounds per square inch) to 30,000 psi. In another embodiment, the high-pressure homogenization is performed at a pressure of about 20,000 psi.

In one embodiment, the high-pressure homogenization is performed with cooling. In another embodiment, the high-pressure homogenization is performed with cooling which is sufficient to bring the temperature of the emulsion at the outlet of the process to about 0° C. to about 60° C., about 10° C. to about 40° C., about 20° C. to about 30° C., or to about 20° C., 25° C. or 30° C. within the time period.

In one embodiment, the sterilizing the fine emulsion comprises filtering the fine emulsion through a nylon filter. In another embodiment, the nylon filter is a Posidyne® filter. In yet another embodiment, the filter has a pore size of about 0.2 μm (micrometers).

Additional embodiments of the present compositions and methods and the like, will be apparent from the following description, drawings, examples, and claims. As can be appreciated from the foregoing and following description, each and every feature described herein, and each and every combination of two or more of such features, is included within the scope of the present disclosure provided that the features included in such a combination are not mutually inconsistent. In addition, any feature or combination of features may be specifically excluded from any embodiment of the present invention. Additional aspects and advantages of the present invention are set forth in the following description and claims, particularly when considered in conjunction with the accompanying examples and drawings.

## BRIEF DESCRIPTION OF DRAWINGS

FIGS. **1**A-D provide microscope images of samples from Examples 1, 2, 3 and 6 after a freeze-thaw cycle. FIG. **1**A: Example 1, FIG. **1**B: Example 2, FIG. **1**C: Example 3, FIG. **1**D: Example 6.

FIG. **2** shows plasma levels of aprepitant after injection of a fosaprepitant solution (●) or an aprepitant emulsion prepared as described herein (▲).

FIG. **3** shows plasma levels of aprepitant after injection of a solution of fosaprepitant (▲) or after injection of an emulsion containing aprepitant and dexamethasone prepared as described herein (●).

FIG. **4** shows plasma levels of dexamethasone after injection of a solution of dexamethasone sodium phosphate (●) or after injection of an emulsion containing aprepitant and dexamethasone prepared as described herein (▲).

## DETAILED DESCRIPTION

Various aspects now will be described more fully hereinafter. Such aspects may, however, be embodied in many different forms and should not be construed as limited to the embodiments set forth herein; rather, these embodiments are provided so that this disclosure will be thorough and complete, and will fully convey its scope to those skilled in the art.

## I. DEFINITIONS

As used in this specification, the singular forms "a," "an," and "the" include plural referents unless the context clearly dictates otherwise. Thus, for example, reference to a "polymer" includes a single polymer as well as two or more of the same or different polymers, reference to an "excipient" includes a single excipient as well as two or more of the same or different excipients, and the like.

Where a range of values is provided, it is intended that each intervening value between the upper and lower limit of that range and any other stated or intervening value in that stated range is encompassed within the disclosure. For example, if a range of 1 μm to 8 μm is stated, it is intended that 2 μm, 3 μm, 4 μm, 5 μm, 6 μm, and 7 μm are also explicitly disclosed, as well as the range of values greater than or equal to 1 μm and the range of values less than or equal to 8 μm. As used herein, the term "about" means±5%, ±10%, or ±20% of the value being modified.

The term "emulsion" or "emulsion formulation" means a colloidal dispersion of two immiscible liquids in the form of droplets, whose diameter, in general, is between 10 nanometers and 100 microns. An emulsion is denoted by the symbol O/W (oil-in-water) if the continuous phase is an



aqueous solution and by W/O (water-in-oil) if the continuous phase is an oil. Other examples of emulsions such as O/W/O (oil-in-water-oil) include oil droplets contained within aqueous droplets dispersed in a continuous oil phase.

"Physically stable" emulsions will meet the criteria under USP <729>, which defines universal limits for (1) mean droplet size not exceeding 500 nm or 0.5 μm and (2) the population of large-diameter fat globules, expressed as the volume-weighted percentage of fat greater than 5 μm (PFAT5) not exceeding 0.05%, at 5° C. or room temperature for a designated storage time period. In addition, physically stable emulsions will have no visible aprepitant crystals upon storage at 5° C. or room temperature for a designated time period. Crystals are considered visible when viewed at magnification of 4× to 10×. An emulsion is physically stable if it meets the criteria under USP <729> and aprepitant crystals are not visible upon storage at 5° C. or room temperature for a time period equal to or at least 1 week, 2 weeks, 4 weeks, 1 month, 2 months, 6 months, 1 year or 2 years.

"Chemically stable" emulsions of the disclosure are ones in which the concentration of the active component (i.e., the drug being delivered) does not change by more than about 20% under appropriate storage conditions for at least 1 month. In certain embodiments, the aprepitant concentration in an emulsion of the present disclosure does not change by more than about 5%, 10%, 15% or 20% under appropriate storage conditions for at least 1, 2, 3, 4, 5, 6, 9, 12, 15, 18, or 24 months.

In one example, the stable emulsion compositions of the disclosure are stable over a wide range of temperatures, e.g., −20° C. to 40° C. The compositions of the disclosure may be stored at about 5° C. to about 25° C.

"Oil phase" in a water-in-oil emulsion refers to all components in the formulation that individually exceed their solubility limit in the water phase; these are materials that generally have solubilities of less than 1% in distilled water, however, water phase components such as salts may decrease the solubility of certain oils resulting in their partitioning into the oil phase. The oil phase refers to the non-aqueous portion of a water-in-oil emulsion.

"Aqueous phase" or "water phase" in a water-in-oil emulsion refers to the water present and any components that are water soluble, i.e., have not exceeded their solubility limit in water. "Aqueous phase", as used herein, includes a water-containing liquid which can contain pharmaceutically acceptable additives such as acidifying, alkalizing, buffering, chelating, complexing and solubilizing agents, antioxidants and antimicrobial preservatives, humectants, suspending and/or viscosity modifying agents, tonicity and wetting or other biocompatible materials. The aqueous phase refers to the non-oil portion of a water-in-oil emulsion.

An "emulsifier" refers to a compound that deters the separation of the injectable emulsion into individual oil and aqueous phases. Emulsifiers useful in the present disclosure generally are (1) compatible with the other ingredients of the stable emulsions of the present disclosure, (2) do not interfere with the stability or efficacy of the drugs contained in the emulsions, (3) are stable and do not deteriorate in the preparation, and (4) are non-toxic.

Suitable emulsifiers include, but are not limited to, propylene glycol mono- and di-fatty acid esters, polyoxyethylene sorbitan fatty acid esters, polyoxyethylene fatty acid esters, polyoxyethylene-polyoxypropylene co-polymers and block co-polymers, salts of fatty alcohol sulphates, sorbitan fatty acid esters, esters of polyethylene-glycol glycerol

ethers, oil and wax based emulsifiers, glycerol monostearate, glycerine sorbitan fatty acid esters and phospholipids.

A "phospholipid" refers to a triester of glycerol with two fatty acids and one phosphate ion. Exemplary phospholipids useful in the present invention include, but are not limited to, phosphatidyl chlorine, lecithin (a mixture of choline ester of phosphorylated diacylglyceride), phosphatidylethanolamine, phosphatidylglycerol, phosphatidic acid with about 4 to about 22 carbon atoms, and more generally from about 10 to about 18 carbon atoms and varying degrees of saturation. The phospholipids can have any combination of fatty acid as its fatty acyl side chain, for example, the phospholipids can have a saturated fatty acid such as a decanoic acid, lauric acid, myristic acid, palmitic acid, stearic acid, icosanoic acid, (a C20 saturated fatty acid); sodium behenic acid, or an unsaturated fatty acid such as myristoleic acid, palmitoleic acid, oleic acid, sodium linoleic acid, alpha linolenic acid, sodium arachidonic acid, eicosapentanoic acid, and the like. The two fatty acyl residues on the phospholipids may be the same or they may be different fatty acids. The phospholipid component of the drug delivery composition can be either a single phospholipid or a mixture of several phospholipids. The phospholipids should be acceptable for the chosen route of administration.

In one aspect, the phospholipids used as emulsifiers in the present invention are naturally occurring phospholipids from a natural origin. For example, naturally occurring lecithin is a mixture of the diglycerides of stearic, palmitic, and oleic acids, linked to the choline ester of phosphoric acid, commonly called phosphatidylcholine, and can be obtained from a variety of sources such as eggs and soya beans. Soy lecithin and egg lecithin (including hydrogenated versions of these compounds) have been characterized in various compositions and are generally recognized to be safe, have combined emulsification and solubilization properties, and tend to be broken down into innocuous substances more rapidly than most synthetic surfactants.

The term "lecithin" includes a complex mixture of acetone-insoluble phosphatides, of which phosphatidylcholine is a significant component. The term lecithin is also used as a synonym for phosphatidylcholine. Useful lecithins include, but are not limited to, eggyolk-, egg-, soybean-, and corn-derived lecithin. In one embodiment, the emulsifier is lecithin, such as egg yolk-derived lecithin. The terms egg lecithin and egg yolk derived lecithin are used interchangeable throughout. The compositions described herein preferably comprise lecithin as an emulsifier.

The amount of phospholipids, by weight, in the emulsions of the present disclosure may be within a range of about 10 wt/wt % to about 20 wt/wt %, 11 wt/wt % to 19 wt/wt %, 11 wt/wt % to 15 wt/wt %, 12 wt/wt % to 13 wt/wt %, 13 wt/wt % to 14 wt/wt %, 13 wt/wt % to 20 wt/wt %, or 12 wt/wt % to 18 wt/wt %. In certain embodiments, the phospholipids in the emulsions are at a concentration, by weight, about 11 wt/wt %, 12 wt/wt %, 12.5 wt/wt %, 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, or 15 wt/wt %.

"Oil" refers to an organic liquid of mineral, vegetable, animal, essential or synthetic origin, including, for example, aliphatic or wax-based hydrocarbons, aromatic hydrocarbons or mixed aliphatic and aromatic hydrocarbons.

The term "buffer" or "buffered" as used herein means a solution containing both a weak acid and its conjugate base, whose pH changes only slightly upon addition of acid or base. As used herein, the phrase "buffering agent" means a species whose inclusion in a solution provides a buffered solution.

The term "therapeutic agent" describes any natural or synthetic compound which has a biological activity.

## II. APREPITANT EMULSION AND METHODS OF MAKING

The present disclosure is directed to stable pharmaceutical compositions including aprepitant, a surfactant or mixtures of surfactants, a co-surfactant, an oil, with an aqueous phase. The composition is in the form of an oil-in-water emulsion which remains stable over an extended period of time and which is suitable for dilution and intravenous administration.

The active agent, e.g., aprepitant, is present in the oil phase with an emulsifier, a co-emulsifier and an oil. The oil phase is then combined with an aqueous phase comprising water and a tonicity agent as described below to generate the stable emulsion. Prior to combining the oil phase with the aqueous phase, the oil phase will have an oil:aprepitant ratio of about 13:1. Use of this ratio was surprisingly found to produce, when mixed with the water phase, an emulsion which is more stable as compared to an emulsion in which the oil phase contains an oil:aprepitant ratio of less than about 12:1 or 11:1, and/or greater than about 15:1, 20:1, or 30:1.

Moreover, the present compositions also possess favorable stability properties when the amount of emulsifier in the oil phase is greater than the amount of oil. For example, the oil phase contains an emulsifier:oil ratio of about 5:1 to 1:1, 3:1 to 1:1 or a ratio of about 1.5:1. Such ratios of emulsifier: oil have surprisingly been found to impart greater stability on the final emulsion which is suitable for injection into a patient. For example, an aprepitant emulsion having a phospholipid:oil ratio within the oil phase of about 1.5:1 was found to have greater stability than a similar aprepitant emulsion, wherein the oil phase comprises a phospholipid: oil ratio of about 0.01:1, 0.1:1, 0.5:1 or 0.9:1.

### 1. Oil Phase

The oil (hydrophobic) phase comprises an oil. Triglycerides are exemplary oils for use in the compositions described herein. In certain embodiments the oil is or comprises a vegetable oil. "Vegetable oil" refers to oil derived from plant seeds or nuts. Vegetable oils are typically "long-chain triglycerides" (LCTs), formed when three fatty acids (usually 14 to 22 carbons in length, with unsaturated bonds in varying numbers and locations, depending on the source of the oil) form ester bonds with the three hydroxyl groups on glycerol. In certain embodiments, vegetable oils of highly purified grade (also called "super refined") are used to ensure safety and stability of the oil-in-water emulsions. In certain embodiments hydrogenated vegetable oils, which are produced by controlled hydrogenation of the vegetable oil, may be used. Exemplary vegetable oils include but are not limited to almond oil, babassu oil, black currant seed oil, borage oil, canola oil, castor oil, coconut oil, corn oil, cottonseed oil, olive oil, peanut oil, palm oil, palm kernel oil, rapeseed oil, safflower oil, soybean oil, sunflower oil and sesame oil. Hydrogenated and/or or partially hydrogenated forms of these oils may also be used. In specific embodiments, the oil is or comprises safflower oil, sesame oil, corn oil, olive oil and/or soybean oil. In more specific embodiments, the oil is or comprises safflower oil, and/or soybean oil. The oil is present in the emulsion at about 9 wt/wt %,

though this may vary between about 5 wt/wt % to 12 wt/wt % or 9 wt/wt % to 10 wt/wt %.

The aprepitant is first mixed with an emulsifier such as a phospholipid emulsifier. Examples 1, 2, 3 and 6 below describe emulsions made using an egg lecithin. The phospholipid emulsifier is added to a concentration of greater than 10 wt/wt %, 11 wt/wt %, 12 wt/wt % or 13 wt/wt % of the emulsion but less than 15 wt/wt %, 17 wt/wt % or 20 wt/wt % of the emulsion.

The mixture of aprepitant and emulsifier is dissolved in a co-emulsifier such as a short chain alcohol (1 to 6 carbons). In Examples 1, 2, 3 and 6 below, the co-emulsifier is ethanol. The mixture is mixed at an elevated temperature, such as at about 60° C. or 70° C. or at an elevated temperature within the range of about 50° C. or 70° C., until the aprepitant and emulsifier are dissolved. This mixture is then combined with the oil, such as soybean oil, by mixing again at an elevated temperature such as at about 60° C. to produce the oil phase containing the aprepitant. Excess co-emulsifier can be removed by standard evaporation methods including heating, or pressure reduction, or a combination thereof such employed in a rotary evaporator. In this process, about 10% to 100%, 20% to 95%, 80% to 100%, 90% to 100%, or 95% to 100% of the ethanol evaporates depending on preparation scale, any pressure reduction, and heating time.

In one embodiment, the aprepitant and the emulsifier are dissolved in a co-emulsifier and an oil. In Examples 1, 2, 3 and 6 below, the co-emulsifier is ethanol, the oil is soybean oil, however, the methods can be used with any one or more of the co-emulsifiers and oils described herein. The mixture is mixed at an elevated temperature, such as at about 60° C. or 70° C. or at an elevated temperature within the range of about 50° C. or 70° C., at least until the aprepitant and emulsifier are dissolved to produce the oil phase containing aprepitant. The mixture of aprepitant, emulsifier, co-emulsifier and oil are mixed at the elevated temperature for about 15 min to 120 min, about 15 min to 45 min, about 30 min to 90 min, or for about 15 min, 30 min or 50 min.

Excess co-emulsifier can be removed by standard evaporation methods including heating, or pressure reduction, or a combination thereof in a rotary evaporator. During this process, about 10% to 100%, 20% to 95%, 80% to 100%, 90% to 100%, or 95% to 100% of the ethanol evaporates depending on preparation scale, any pressure reduction, and heating time.

In one embodiment, dexamethasone is added to the oil phase comprising the aprepitant, emulsifier and oil to generate an oil phase comprising both aprepitant and dexamethasone prior to mixing with the aqueous phase to generate the pharmaceutical emulsion for injection. Dexamethasone is added to the oil phase to provide a dose of about 12 mg dexamethasone.

2. Aqueous Phase

The aqueous phase of the aprepitant emulsion can be a mixture of water and a tonicity agent, including those such as but not limited to sucrose, mannitol, glycerin or dextrose or a mixture thereof. Also included in the aqueous phase is a pH-modifying agent. Sodium oleate is used in Examples 1, 2 and 3 below to adjust the pH of the emulsion to about 6 to 9, depending on the desired emulsion formulation. The aqueous phase is produced by mixing water with the tonicity agent and sodium oleate as the pH modifying agent. Other pH modifiers that may be used include but are not limited to sodium hydroxide, potassium hydroxide, magnesium hydroxide, Tris, sodium carbonate and sodium linoleate. The pH modifier used is effective for adjusting the pH of the emulsion to a preferred pH of about 6 to 9, 7 to 8, or about 6, 7, 8 or 9. The aqueous phase can readily form by mixing at room temperature.



The aqueous phase may further contain a buffering agent to promote stability of the emulsion formulation. The drug substance may degrade; for example, lipophilic drugs will partition into the oil phase, which will confer some degree of protection, but hydrolytic degradation may still occur at the oil-water interface. Possible chemical degradation within parenteral fat emulsions includes oxidation of unsaturated fatty acid residues present in triglyceride and lecithin, and hydrolysis of phospholipids leading to the formation of free fatty acids (FFA) and lysophospholipids. Such degradants lower pH, which may then promote further degradation. Thus, pH should be controlled during manufacture and emulsion formulations may include a buffering agent to provide additional control. Any decrease in pH over the assigned shelf-life may be indicative of chemical degradation. Suitable buffers are well known to the person skilled in the art and include but are not limited to a phosphate buffer, citrate buffer, Tris buffer, carbonate buffer, succinate buffer, maleate buffer or borate buffer. Tris buffer is used in Example 11 below to adjust the pH of the emulsion to about 8 to 9. In a particular embodiment, the buffer is selected from the group, phosphate buffered saline (PBS), modified PBS (PBS-mod) and citrate buffer. In a particular embodiment, the aqueous phase comprises a buffer, that when mixed with the oil phase will provide a substantially isotonic oil in water emulsion.

Buffering agents useful for the presently described compositions include, but are not limited to, a phosphate buffer, citrate buffer, Tris buffer, carbonate buffer, succinate buffer, maleate buffer or borate buffer. In a particular embodiment, the buffer is selected from the group, phosphate buffered saline (PBS), modified PBS (PBS-mod) and citrate buffer. In a particular embodiment, the aqueous phase comprises a buffer, that when mixed with the oil phase will provide a substantially isotonic oil in water emulsion. In some embodiments, when the aqueous phase contains a buffering agent, the aqueous phase does not include a tonicity agent. Also, when a buffer is added to the aqueous phase, a pH-adjusting agent may not be added to the aqueous phase. It is understood that a buffer can be added to the aqueous phase or the buffer can be added to the emulsion.

In some embodiments, the aqueous phase contains a tonicity agent such as sucrose. The tonicity agent is added to an aqueous phase having about 0% to 30%, 0% to 25% or about 20% of the tonicity agent (wt/wt). It was surprisingly found that a composition containing about 20% sucrose wt/wt in the aqueous phase produced an emulsion that was particularly stable as determined by freeze-thaw testing. Accordingly, preferred embodiments include an emulsion in which the aqueous phase comprises a tonicity agent which imparts greater chemical and/or physical stability as compared to an emulsion wherein the aqueous phase contains less than about 10%, 15% or 20% wt/wt tonicity agent or more than about 30%, 40% or 50% wt/wt tonicity agent.

In one embodiment, the aqueous phase further comprises dexamethasone sodium phosphate (also referred to as "dexamethasone phosphate"). Dexamethasone sodium phosphate is a corticosteroid which is freely soluble in water. Daily dosages for dexamethasone sodium phosphate range from about 0.5 mg to 20 mg, more preferably from about 14 mg to 18 mg or 16 mg, depending on the severity of the disease or disorder. Accordingly, an aprepitant emulsion further comprising dexamethasone may contain dexamethasone sodium phosphate in the aqueous phase. Accordingly, the

aqueous phase of an emulsion suitable for intravenous administration may contain about 0.5 mg to 20 mg, 14 mg to 18 mg or about 16 mg dexamethasone sodium phosphate.

In another embodiment, a solution of dexamethasone sodium phosphate can be mixed into the fine emulsion prior to sterile filtration to prepare an emulsion containing dexamethasone sodium phosphate in the aqueous phase,

3. Aprepitant Emulsion

The pharmaceutical aprepitant compositions of the present disclosure are sterile oil-in-water emulsions comprising the aqueous and oil phases described above. Also encompassed by the disclosure are methods for preparing stable emulsions comprising aprepitant which are suitable for intravenous administration and which can be prepared according to the conventional manufacturing procedures using aseptic techniques.

The aqueous phase is combined with the oil phase, under high-speed homogenization to produce a coarse emulsion. As described in Examples 1, 2, 3, 4, 5 and 6, the combined aqueous and oil phases is homogenized using an IKA Ultra-Turrax T25 dispersing instrument at a speed of 20,000 rpm for 1 min. The speed used in this first homogenization step may vary, for example, from 2000 rpm to 25,000 rpm, or from 15,000 rpm to 22,000 rpm. The time of the homogenization step can also vary, for example, from 0.5 min to 1 hour, or from 1 min to 45 min. This crude emulsion is then homogenized into a fine emulsion by a high-pressure homogenizer, which may be a microfluidizer. The interaction chamber and the cooling coil portions of the microfluidizer are cooled by water, such as by an ice bath. The temperature of the ice bath may be between 0 to 10° C., or 2 to 6° C. The temperature of the emulsion coming out of the high-pressure homogenization may be between 0 to 60° C., 15° C., to 60° C., 20° C. to 40° C., or at about 25° C. The microfluidizer is first primed with water, then the crude emulsion is introduced. The output from the homogenizer is initially run to waste to remove priming water, and priming water and emulsion mixtures, and then collected in a clean vessel when the stream becomes consistent in appearance. The high-pressure homogenizer cycle may be repeated to sufficiently reduce oil droplet size. The pressure used for the homogenization may vary. The pressures may be between 5000 and 30,000 psi. The number of passes through the microfluidizer may vary in order to achieve the desired droplet size. The number of passes may be from about 2 to 20, 2 to 15, 4 to 15, 4 to 12 or 7 to 8.

The pharmaceutical formulation may then be passed through a filter system at room temperature, and/or autoclaved, to achieve sterilization. The filters used to achieve sterilization may be chosen by the skilled artisan and may have a nominal pore size of 0.2 μm. The filter material used may vary. In one embodiment, the filter is nylon. In another embodiment, the filter is a Posidyne® filter (covalent charge-modified Nylon 6,6 membrane which exhibits a net positively-charged zeta potential in aqueous solutions). For large scale production the method above may need to be modified. A skilled practitioner could combine these materials in a different order and using different processing equipment to achieve the desired end result.

In one embodiment of the disclosure, the homogenization can be done in repeated cycles to achieve an emulsion in which the oil particle/globule size is less than 2 microns (μm) with intermediate cooling of the homogenized product to a temperature less than about 25° C.

The final emulsion comprises an oil portion (oil phase) dispersed in an aqueous portion (aqueous phase). The ratio of components to the aprepitant within the oil phase is an important characteristic of the emulsion which may affect stability of the formulation prepared for injection. As described above, the oil phase comprises aprepitant, an oil and an emulsifier, examples of which are provided herein.

The final aprepitant emulsion contains 0.7 wt/wt % aprepitant, but may range from about 0.2 wt/wt % to 1.5 wt/wt %, 0.4 wt/wt % to 1.0 wt/wt % or 0.6 wt/wt % to 0.7 wt/wt %. An emulsion is prepared which contains about 130 mg aprepitant, however, preparations may also be prepared according to the present disclosure which contain about 100 mg to 1000 mg, 100 mg to 500 mg, 250 mg to 750 mg or 100 mg to 200 mg aprepitant.

In one embodiment, the ratio of oil:aprepitant (wt %:wt %) within the oil phase ranges from about 11:1 to 15:1, 12:1 to 14:1, 13:1 to 13.5:1, 13:1 to 14:1, or 12:1 to 15:1. In another embodiment, the ratio of oil:aprepitant is about 11:1, 11.5:1, 12:1, 12.5:1, 13:1, 13.5:1, 14:1, 14.5:1 or 15:1.

The ratio of emulsifier to aprepitant may also vary. For example, the ratio of emulsifier:aprepitant (wt %:wt %) within the oil portion ranges from about 15:1 to 30:1, 20:1 to 25:1, 18:1 to 22:1 or 10:1 to 30:1. In one embodiment, the emulsifier:aprepitant (wt %:wt %) is about 15:1, 18:1, 19:1, 20:1, 21:1, 22:1 or 23:1.

The ratio of components within the oil phase may alternatively be expressed in the ratio of (emulsifier plus oil): aprepitant (wt %:wt %). Ratios envisioned in the present disclosure may range from about 20:1 to 40:1, 25:1 to 35:1, 30:1 to 35:1 or 33:1 to 37:1, or may be, for example, about 30:1, 32:1, 33:1, 34:1, 35:1, 36:1, 37:1, 38:1 or 40:1.

The composition of the present disclosure has a significant advantage in terms of reduced toxicity as compared to injectable formulations which may contain less desirable excipients such as detergents, e.g., Tween-20 or Tween-80. The present formulations take advantage of the ability to solubilize therapeutically effective amounts of aprepitant in an oil phase which can then be used to generate an emulsion suitable for injection. Accordingly, described herein are pharmaceutical emulsion compositions containing aprepitant and optionally dexamethasone or dexamethasone sodium phosphate, wherein the emulsion does not comprise a detergent.

The composition of the present disclosure gives a product suitable for parenteral use because of low particle size. The composition of the present disclosure is easy to use as the product can be diluted with an agent such as an aqueous solution of sucrose, an aqueous solution of maltose or dextrose 5% injection or normal saline to achieve the required concentration for parenteral administration. The composition of the present disclosure also has a prolonged shelf life and hence is suitable for a readily marketable product.

The compositions of the disclosure are both chemically and physically stable. A physically stable emulsion of the invention is one which can be stored under appropriate conditions for at least 1, 2, 3, 4, 5, 6, 9, 12, 15, 18, 24 or 36 months, without an increase in average droplet size above that allowed as stated in USP <729>. As well, the population of large-diameter fat globules should be within the limits stated in USP <729>.

Droplet size limits defined in USP <729> apply throughout the assigned shelf life, which for a commercial pharmaceutical formulation may extend to 2-3 years or longer. All true emulsions are thermodynamically unstable and may over time undergo a range of processes which tend to increase the droplet size. These include direct droplet coalescence, when two droplets collide and form a single new droplet, and aggregation, in which droplets adhere together

to form larger masses. Aggregation may in some cases be a precursor of further coalescence into larger droplets. These processes may result in large aggregates rising to the surface of the container, a phenomenon known as 'creaming', and ultimately to free oil being visible on the emulsion surface, known as 'cracking'.

Droplet size measurements such as those defined in USP<729> can measure the initial increases in size, and hence are predictive of emulsion physical stability, at early times, long before the formulation shows macroscopic visible changes. Accordingly, the emulsions as described herein are stable compositions having an intensity-weighted mean droplet diameter less than about 500 nm, 400 nm, 300 nm, 200 nm or 100 nm.

The oil or particle droplet size, i.e. diameter, according to the present disclosure is measured using a dynamic light scattering (DLS) instrument, such as the Malvern Zetasizer 4000, Malvern Zetasize Nano S90 or preferably the Malvern Zetasizer Nano ZS. Intensity-weighted particles sizes were recorded, since they do not require the knowledge of the refractive index of the particle. In Malvern Zetasizer instruments, there are two fits for determining the intensity-weighted diameter of the oil droplet size. The first is a cumulant fit that is used to determine the Z-average diameter; this fit can additionally give the polydispersity index (PDI). This cumulant fit is recommended for monodisperse samples possessing a PDI of lower than 0.2. The second is a non-negative least squares (NNLS) fit. This gives the Peak 1 diameter, Peak 2 diameter and Peak 3 diameter. This is more suitable for polydisperse samples having a PDI of greater than 0.2.

The emulsion preparations as described herein may further comprise a preservative in quantities that preserve the composition. Suitable preservatives used in some of the embodiments of present disclosure include, but are not limited to, disodium edetate, tocopherol, benzalkonium chloride, methyl, ethyl, propyl or butylparaben, benzyl alcohol, phenylethyl alcohol, benzethonium, chlorobutanol, potassium sorbate or combination thereof.

## III. MEDICAL USE

The pharmaceutical compositions of the present disclosure can be used for the prevention or treatment of emesis and provide a non-oral option for patients undergoing highly or moderately emetogenic chemotherapy. The disclosure thus encompasses a method of treatment comprising intravenously administering an aprepitant emulsion as described herein to a subject undergoing highly or moderately emetogenic chemotherapy.

Another embodiment relates to the use of the pharmaceutical formulations of the disclosure in the manufacture of a medicament for use preventing or treating emesis in a subject in need thereof.

The amount of the aprepitant and optionally dexamethasone required for use in the methods of the disclosure may vary with the method of administration and condition of the patient, and the degree of therapy required, and will be ultimately at the discretion of the attendant physician or clinician.

## IV. EXAMPLES

The following examples are illustrative in nature and are in no way intended to be limiting.



### Example 1

### Preparing of Aprepitant Emulsions for Intravenous Injection

To prepare the aprepitant emulsion, an oil phase was first prepared by combining 750 mg of aprepitant and 15.0 g of egg lecithin (LIPOID E 80) with 12.0 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added in 10.0 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 5.60 g of sucrose and 0.500 g of sodium oleate in 70.0 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 1 below and a microscope image of the sample is provided in FIG. 1A. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using non-negative least squares (NNLS) fit gave a Peak 1 diameter of 99 nm. The intensity-weighted mean particle size determined using cumulant fit provided a Z-average diameter of 87 nm. The zeta potential was measured to be −43 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.74. This aprepitant-containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

TABLE 1

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.750 | 0.679 | 1 |
| Lipoid E 80 | 15.0 | 13.6 | 20 |
| Soybean Oil | 10.0 | 9.05 | 13.3 |
| Ethanol[1] | 8.59 | 7.78 | 11.5 |
| Sucrose | 5.60 | 5.07 | 7.5 |
| Sodium Oleate | 0.500 | 0.453 | 0.667 |
| Water for Injection | 70.0 | 63.4 | 93.3 |
| Total | 110 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

### Example 2

To prepare the aprepitant emulsion, an oil phase was first prepared by combining 450 mg of aprepitant and 9.00 g of egg lecithin (LIPOID E 80) with 4.0 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added 6.00 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 3.36 g of sucrose and 0.300 g of sodium oleate in 42.0 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to

produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 2 below and a microscope image of the sample is provided in FIG. 1B. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using NNLS fit gave a Peak 1 diameter of 127 nm. The intensity-weighted mean particle sized determined using cumulant fit provided a Z-average diameter of 101 nm. The zeta potential was measured to be −47 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.77. This aprepitant-containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

TABLE 2

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.450 | 0.714 | 1 |
| Lipoid E 80 | 9.00 | 14.3 | 20 |
| Soybean Oil | 6.00 | 9.52 | 13.3 |
| Ethanol[1] | 1.89 | 3.00 | 4.20 |
| Sucrose | 3.36 | 5.33 | 7.47 |
| Sodium Oleate | 0.300 | 0.476 | 0.667 |
| Water for Injection | 42.0 | 66.7 | 93.3 |
| Total | 63.0 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

Example 3

To prepare the aprepitant emulsion, an oil phase was first prepared by combining 450 mg of aprepitant and 9.00 g of egg lecithin (LIPOID E 80) with 6.0 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added in 6.00 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 15.62 g of sucrose and 0.300 g of sodium oleate in 42.0 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 3 below and a microscope image of the sample is provided in FIG. 1C. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using NNLS fit gave a Peak 1 diameter of 88 nm. The intensity-weighted mean particle sized determined using cumulant fit provided a Z-average diameter of 68 nm. The zeta potential was measured to be −42 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.80. This aprepitant-containing emulsion is to be diluted with water for injection by 4-fold prior to injection.



TABLE 3

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.450 | 0.587 | 1 |
| Lipoid E 80 | 9.00 | 11.7 | 20 |
| Soybean Oil | 6.00 | 7.83 | 13.3 |
| Ethanol[1] | 3.27 | 4.26 | 7.26 |
| Sucrose | 15.6 | 20.4 | 34.7 |
| Sodium Oleate | 0.300 | 0.391 | 0.667 |
| Water for Injection | 42.0 | 54.8 | 93.3 |
| Total | 76.6 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

Example 4

Alternate Aprepitant Emulsion Formulation for Intravenous Injection

An aprepitant emulsion was prepared which has less than 10% wt/wt of the phospholipid emulsifier and which was adjusted to a pH of less than 8.0. To prepare the aprepitant emulsion, an oil phase was first prepared by combining 450 mg of aprepitant and 6.67 g of egg lecithin (LIPOID E 80) with 7.2 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm. Heating and stirring was carried out until the ethanol was evaporated and a thick residue was observed. To the resultant solution was added in 6.00 g of soybean oil and an appropriate amount of ethanol to obtain a clear oil phase upon heating at 60° C. The aqueous phase was prepared by dissolving 3.36 g of sucrose in 50.5 ml of water for injection at 60° C. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. The pH of this crude emulsion was adjusted to 7.0 and then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 4 below. Within 4 days post preparation at room temperature, crystals were observed in the product by microscopy.

TABLE 4

| Component | Amount (g) | Concentration (w/w %) | Ratio to Aprepitant |
|---|---|---|---|
| Aprepitant | 0.450 | 0.672 | 1 |
| Lipoid E 80 | 6.67 | 9.95 | 14.8 |
| Soybean Oil | 6.00 | 8.96 | 13.3 |
| Sucrose | 3.36 | 5.02 | 7.47 |
| Water for Injection | 50.5 | 75.4 | 112 |
| Total | 67.0 | 100 | — |

Example 5

An aprepitant emulsion was prepared which contains oleic acid. To prepare the aprepitant emulsion, an oil phase was first prepared by combining 250 mg of aprepitant, 2.50 g of egg lecithin (LIPOID E 80), 15.0 g of soybean oil and 125 mg of oleic acid. Ten ml of ethanol was added to dissolve the mixture at 70° C. The ethanol was removed by pressure reduction in a 70° C. water bath to yield a clear oil phase. A preheated aqueous phase containing 82.1 ml of water for injection at 70° C. was added to the oil phase and

subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion composition are provided in Table 5 below. Within 4 days post-preparation at room temperature, crystals were observed in the product by microscopy.

TABLE 5

| Component | Amount (g) | Concentration (w/w %) | Ratio to aprepitant |
|---|---|---|---|
| Aprepitant | 0.250 | 0.250 | 1 |
| Lipoid E 80 | 2.50 | 2.50 | 10 |
| Soybean Oil | 15.0 | 15.0 | 60 |
| Oleic Acid | 0.125 | 0.125 | 0.5 |
| Water for Injection | 82.1 | 82.1 | 328 |
| Total | 100 | 100 | — |

Example 6

Preparing of Emulsions Containing Aprepitant and Dexamethasone Sodium Phosphate for Intravenous Injection

To prepare an injectable emulsion containing aprepitant and dexamethasone sodium phosphate, an oil phase was first prepared by combining 773 mg of aprepitant and 15.5 g of egg lecithin (LIPOID E 80) with 10.3 ml of ethanol. This mixture was dissolved by heating and stirring at 60° C. and 200 rpm for 15 min. To the resultant solution was added in 10.3 g of soybean oil. Heating at 60° C. and stirring at 200 rpm was continued for another 15 min. The aqueous phase was prepared by dissolving 5.77 g of sucrose and 0.515 g of sodium oleate in 71.1 ml of water for injection. This mixture was stirred at 300 rpm at room temperature for 30 min. The aqueous phase was then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion was then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. Dexamethasone sodium phosphate (93.5 mg) dissolved in 1 ml of water for injection was mixed into the fine emulsion. This resultant fine emulsion containing both aprepitant and dexamethasone sodium phosphate was sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). The details of the emulsion



composition are provided in Table 6 below and a microscope image of the sample is provided in FIG. 1D. By dynamic light scattering (Malvern® Zetasizer Nano ZS), the intensity-weighted particle size analyzed using NNLS fit gave a Peak 1 diameter of 95 nm. The intensity-weighted mean particle size determined using cumulant fit provided a Z-average diameter of 70 nm. The zeta potential was measured to be −43 mV by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). The pH of the injectable emulsion was 8.92. This aprepitant and dexamethasone sodium phosphate containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

TABLE 6

| Component | Amount (g) | Concentration (w/w %) | Ratio to aprepitant |
|---|---|---|---|
| Aprepitant | 0.773 | 0.688 | 1 |
| Dexamethasone Sodium Phosphate | 0.0935 | 0.0832 | 0.121 |
| Lipoid E 80 | 15.5 | 13.8 | 20 |
| Soybean Oil | 10.3 | 9.17 | 13.3 |
| Ethanol[1] | 7.31 | 6.51 | 9.47 |
| Sucrose | 5.77 | 5.14 | 7.47 |
| Sodium Oleate | 0.515 | 0.459 | 0.667 |
| Water for Injection | 72.1 | 64.2 | 93.3 |
| Total | 112 | 100 | — |

[1]Final amount after taking into account the ethanol that was evaporated during processing.

Example 7

Stability of the Aprepitant Emulsion at Room Temperature and 5° C.

Stability of the aprepitant emulsions prepared as described in Examples 1, 2 3 and 6 was measured by incubating each emulsion preparation at room temperature (about 25° C.) or at 5° C. Mean particle size and percentage of fat globules above 5 μm were measured using DLS and light obscuration respectively to determine if they satisfy USP <729>. The emulsions were also inspected by microscopy for aprepitant crystals. Example 1 was stable at room temperature for 2 months, that is, the mean particle size and percentage of fat globules above 5 μm satisfied USP <729>. Additionally, no aprepitant crystals were visible by microscopy. After 2 months storage at room temperature, creaming was observed in Examples 1 and 6. This corresponded with the observation of aprepitant crystals. Examples 2 and 3 were stable at room temperature for 3 and 2 months respectively. After these time points, aprepitant crystals were observed in these formulations. Storage at 5° C. resulted in longer emulsion stability for Examples 1, 2, 3 and 6. Table 7 shows the characterizations of Examples 1, 2, 3 and 6 and their respective stabilities at room temperature and at 5° C.

TABLE 7

| Sample | PDI | Particle Size as Peak 1 Diameter (nm) | Particle Size as Z-Average Diameter (nm) | Zeta Potential (mV) | pH | Stability at 25° C. per USP <729> (months) | Stability at 5° C. per USP <729> |
|---|---|---|---|---|---|---|---|
| Example 1 | 0.122 | 99 | 87 | −43 | 8.74 | 2 | >10 months |
| Example 2 | 0.200 | 127 | 101 | −47 | 8.77 | 3 | >10 months |
| Example 3 | 0.219 | 88 | 68 | −42 | 8.80 | 2 | >10 months |
| Example 6 | 0.244 | 95 | 70 | −43 | 8.92 | 2 | >10 months |

### Example 8

### Stability of the Aprepitant Emulsion to Freeze-Thaw Cycle

The aprepitant emulsions prepared according to Examples 1, 2, 3 and 6 were tested for stability upon exposure to a freeze-thaw cycle. Samples from the Examples 1, 2, 3 and 6 were stored at −20° C. overnight. They were thawed to room temperature the next day and visualized by microscopy. Prior to freezing, all samples did not present any visible particles under the microscope. FIG. **1** shows microscope images, at 10×, of emulsions after the freeze-thaw cycle (Examples 1, 2, 3 and 6 are shown as FIGS. **1** A, B, C, and D, respectively). Emulsions prepared as described in examples 1, 2 and 6 showed visible particles after exposure to freezing. Only Example 3 was stable after freezing. As FIG. **1**C shows, no visible particles were observed for the formulation of Example 3. This enhanced stability was conferred by the presence of a large concentration of sucrose (20 w/w % in Example 3 compared to 5 w/wt % in Examples 1, 2 and 6).

### Example 9

The pharmacokinetics of an aprepitant emulsion prepared according to Example 1 was determined. Two groups of six male Sprague-Dawley rats each were injected intravenously with, respectively, fosaprepitant in solution or aprepitant emulsion prepared according to Example 1. All drugs were administered at an effective concentration equivalent to 14 mg/kg aprepitant. Blood from all rats was collected at the appropriate time intervals and processed to plasma by centrifugation. Plasma samples were analyzed by LC-MS/MS for aprepitant and fosaprepitant, as appropriate. A plasma concentration versus time curve of aprepitant for the emulsion described in Example 1 and for fosaprepitant is presented in FIG. **2** (fosaprepitant in solution, ●; aprepitant emulsion, ▲). The curves indicate the initial aprepitant level reached immediately after injection of the aprepitant emulsion was almost 3 times higher than the initial aprepitant level reached immediately after injection of the fosaprepitant solution. Plasma levels of aprepitant resulting from each injection, however, were essentially the same by the 3-hour time point indicating the formulations were bioequivalent except for a delay in the conversion of fosaprepitant to aprepitant.

### Example 10

The pharmacokinetics of an aprepitant and dexamethasone sodium phosphate combination emulsion prepared according to Example 6 was determined. Male Sprague-Dawley rats each were injected intravenously with fosaprepitant solution (group 1), dexamethasone sodium phosphate solution (group 2), or an emulsion containing aprepitant and dexamethasone sodium phosphate prepared according to Example 6 (group 3). Groups 1 and 2 consisted of six rats each; for group 3, twelve rats were injected with the aprepitant and dexamethasone sodium phosphate combination emulsion to allow for the collection of sufficient samples for the measurement of both active ingredients.

In groups 1 and 3, a dose was administered at an effective drug concentration equivalent to 2 mg/kg aprepitant. In groups 2 and 3, a dose was administered at an effective drug concentration equivalent to 0.24 mg/kg dexamethasone sodium phosphate. Blood from all rats was collected at the



appropriate time intervals and processed to plasma by centrifugation. Plasma samples were analyzed by LC-MS/MS for dexamethasone, aprepitant, and fosaprepitant, as appropriate.

FIGS. **3** and **4** present the plasma concentration versus time curve of aprepitant and dexamethasone, respectively. FIG. **3** compares the aprepitant plasma concentration versus time curve resulting from injection of the emulsion described in Example 6 (FIG. **3**, ●) vs. injection of a solution of fosaprepitant (FIG. **3**, ▲). FIG. **4** compares the dexamethasone plasma concentration versus time curve resulting from injection of a dexamethasone sodium phosphate solution (FIG. **4**, ●) vs. injection of the emulsion described in Example 6. The curves indicate that the aprepitant in the emulsion is released approximately simultaneously with the dexamethasone sodium phosphate. The presence of dexamethasone sodium phosphate in the emulsion does not affect the pharmacokinetics of aprepitant.

### Example 11

To prepare the aprepitant emulsion comprising a buffering agent, an oil phase is first prepared by combining 750 mg of aprepitant, 15.0 g of egg lecithin (LIPOID E 80), 10.0 g of soybean oil and 3.75 ml of ethanol. This mixture is dissolved by heating and stirring at 70° C. and 200 rpm for 30 min. The aqueous phase is prepared by dissolving 2.17 g of sucrose and 0.500 g of sodium oleate in a mixture of 4.1 ml of 1M Tris buffer (pH 8.4) and 65.9 ml of water for injection. This mixture is stirred at 300 rpm at room temperature for 30 min. The aqueous phase is then added to the oil phase and subsequently subjected to high-speed homogenization (Ultra-Turrax® IKA T25) at a speed of 20,000 rpm for 1 min to produce the crude emulsion. This crude emulsion is then passed 8 times through an ice-cooled high-pressure microfluidizer (Microfluidizer® M-110L, F12Y interaction chamber) at a pressure of 18,000 psi. The resultant fine emulsion is sterilized by passing it through a 0.2 μm nylon syringe filter (Corning). Dynamic light scattering is used to determine the intensity-weighted particle size using NNLS fit to give the Peak 1 diameter, the intensity-weighted mean particle sized is determined using cumulant fit to provide the Z-average diameter. The zeta potential is measured by laser Doppler micro-electrophoresis (Malvern® Zetasizer Nano ZS). This aprepitant-containing emulsion can be injected as is, or diluted for infusion with 5% dextrose or 0.9% saline.

While a number of exemplary aspects and embodiments have been discussed above, those of skill in the art will recognize certain modifications, permutations, additions and sub-combinations thereof. It is therefore intended that the following appended claims and claims hereafter introduced are interpreted to include all such modifications, permutations, additions and sub-combinations as are within their true spirit and scope.

What is claimed is:

**1**. A physically stable pharmaceutical composition comprising:

0.4 wt/wt % to 1.0 wt/wt % aprepitant;

13 wt/wt % to 15 wt/wt % egg yolk lecithin;

9 wt/wt % to 10 wt/wt % soybean oil; and

a pH modifier, wherein the pH modifier is sodium oleate; wherein the pH of the composition ranges from 7.5 to 9.0, wherein the ratio of egg yolk lecithin to aprepitant (wt %:wt %) ranges from about 18:1 to 22:1.

**2**. The composition according to claim **1**, wherein the composition comprises 0.7 wt/wt % aprepitant.

**3**. The composition according to claim **1**, wherein the composition comprises 14 wt/wt % egg yolk lecithin.

**4**. The composition according to claim **1**, wherein the composition further comprises 3 wt/wt % to 8 wt/wt % sucrose.

**5**. The composition according to claim **1**, wherein the composition further comprises 5 wt/wt % sucrose.

**6**. The composition according to claim **1**, wherein the composition further comprises 2 wt/wt % to 6 wt/wt % ethanol.

**7**. The composition according to claim **1**, wherein the composition further comprises less than 6 wt/wt % ethanol.

**8**. A physically stable pharmaceutical composition suitable for intravenous administration comprising:

0.7 wt/wt % aprepitant;

14 wt/wt % egg yolk lecithin;

9 wt/wt % to 10 wt/wt % soybean oil; and

a pH modifier, wherein the pH modifier is sodium oleate;

wherein the pH of the composition ranges from 7.5 to 9.0.

**9**. The composition according to claim **8**, wherein the composition further comprises 5 wt/wt % sucrose.

**10**. The composition according to claim **8**, wherein the composition further comprises 2 wt/wt % to 6 wt/wt % ethanol.

**11**. The composition according to claim **8**, wherein the composition further comprises less than 4 wt/wt % ethanol.



**12**. A method for treating nausea and vomiting in a subject in need thereof comprising administering to the subject the pharmaceutical composition according to claim **1**.

**13**. The method according to claim **12**, wherein the nausea and vomiting is chemotherapy induced nausea and vomiting.

**14**. The method according to claim **13**, wherein the chemotherapy induced nausea and vomiting is in response to highly emetic chemotherapy.

**15**. The method according to claim **13**, wherein the chemotherapy induced nausea and vomiting is in response to moderately emetic chemotherapy.

**16**. The method according to claim **12**, wherein the administering is intravenous.

**17**. A method for treating nausea and vomiting in a subject in need thereof comprising administering to the subject the pharmaceutical composition according to claim **8**.

**18**. The method according to claim **17**, wherein the nausea and vomiting is chemotherapy induced nausea and vomiting.

**19**. The method according to claim **18**, wherein the chemotherapy induced nausea and vomiting is in response to highly emetic chemotherapy.

**20**. The method according to claim **18**, wherein the chemotherapy induced nausea and vomiting is in response to moderately emetic chemotherapy.

**21**. The method according to claim **17**, wherein the administering is intravenous.

* * * * *