**2025-1355**

# United States Court of Appeals for the Federal Circuit

HERON THERAPEUTICS, INC.,

*Plaintiff-Appellee*,

*v.*

FRESENIUS KABI USA, LLC,

*Defendant-Appellant*.

*Appeal from the United States District Court for the District of Delaware in No. 1:22-cv-00985-WCB (Hon. William C. Bryson, Circuit Judge).*

**BRIEF FOR APPELLEE HERON THERAPEUTICS, INC.**

Benjamin W. Snyder
Igor V. Timofeyev
Karthik R. Kasaraneni
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C. 20036
(202) 551-1700

Isaac S. Ashkenazi
Bruce M. Wexler
Ben Gifford
Christopher P. Hill
Mark Russell Sperling
Justin T. Fleischacker
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

*Counsel for Appellee Heron Therapeutics, Inc.*

August 4, 2025

## CLAIMS AT ISSUE

### U.S. Patent No. 9,561,229
### Claims 9, 10 and 21

**8.** An injectable pharmaceutical emulsion comprising:
0.7 wt/wt % aprepitant;
14 wt/wt % egg yolk lecithin;
9 wt/wt % to 10 wt/wt % soybean oil; and
a pH modifier, wherein the pH modifier is sodium oleate;
wherein the pH of the emulsion ranges from 7.5 to 9.0.

**9.** The emulsion according to claim **8**, wherein the emulsion further comprises 5 wt/wt % sucrose.

**10.** The emulsion according to claim **8**, wherein the emulsion further comprises 2 wt/wt % to 6 wt/wt % ethanol.

**17.** A method for treating nausea and vomiting in a subject in need thereof comprising administering to the subject the pharmaceutical emulsion according to claim **8**.

**21.** The method according to claim **17**, wherein the administering is intravenous.

### U.S. Patent No. 9,574,794
### Claims 9 and 10

**8.** A physically stable pharmaceutical composition suitable for intravenous administration comprising:
0.7 wt/wt % aprepitant;
14 wt/wt % egg yolk lecithin;
9 wt/wt % to 10 wt/wt % soybean oil; and
a pH modifier, wherein the pH modifier is sodium oleate;
wherein the pH of the composition ranges from 7.5 to 9.0.

**9.** The composition according to claim **8**, wherein the composition further comprises 5 wt/wt % sucrose.

**10.** The composition according to claim **8**, wherein the composition further comprises 2 wt/wt % to 6 wt/wt % ethanol.

# CERTIFICATE OF INTEREST

Counsel for Appellee Heron Therapeutics, Inc. certifies the following:

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| Heron Therapeutics, Inc. | None/Not Applicable | None/Not Applicable |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Paul Hastings LLP: Stephen W. Kruse; Kedar Venkataramani*

Morris Nichols Arsht & Tunnell LLP: Jeremy A. Tigan; Jack B. Blumenfeld*; Anthony D. Raucci

*No longer with the firm

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes (see below)

*Heron Therapeutics, Inc. v. Azurity Pharmaceuticals, Inc.*, No. 1:24-cv-00830-WCB (D. Del.) & No. 1:24-cv-01363-WCB (D. Del.);

*Heron Therapeutics, Inc. v. Qilu Pharmaceutical Co., Ltd.*, No. 1:25-cv-00357-WCB (consolidated with No. 1:25-cv-00829-WCB) (D. Del.).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable

Dated: August 4, 2025

/s/ Isaac S. Ashkenazi
Isaac S. Ashkenazi

*Counsel for Appellee*
*Heron Therapeutics, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................ 1

ISSUES PRESENTED ........................................ 4

STATEMENT OF THE CASE ........................................ 5

A. Pre-existing Treatments for Chemotherapy-Induced Nausea and Vomiting ........................................ 5

B. The Prior Art and the Invention of the Patents-in-Suit ........................................ 7

C. The Patents-in-Suit ........................................ 10

D. Fresenius's Infringing Product and Heron's Suit ........................................ 12

E. The District Court's Decision ........................................ 13

1. The District Court's Analysis of the Motivation to Combine and Reasonable Expectation of Success ........................................ 13

2. The District Court's Analysis of the Objective Considerations of Nonobviousness ........................................ 17

SUMMARY OF ARGUMENT ........................................ 19

STANDARD OF REVIEW ........................................ 23

ARGUMENT ........................................ 23

I. THE DISTRICT COURT CORRECTLY FOUND THAT THE ASSERTED CLAIMS WERE NOT OBVIOUS ........................................ 23

A. The District Court Correctly Found That a POSA Would Not Have Been Motivated to Increase the Emulsifier Concentration Beyond the Range Disclosed in the Prior Art ........................................ 24

1. The Evidence as a Whole Demonstrated That a POSA Would Not Have Been Motivated to Increase Egg Lecithin Concentration to 14% ........................................ 25

2. The District Court Properly Considered Zhou ........................................ 32

3. Fresenius's Reliance on the USP Stability Requirements Is Unavailing ........................................ 34

4. The District Court Correctly Rejected Fresenius's Argument Regarding a POSA's Motivation to Increase the Surface Area ........................................ 35

5. The District Court Correctly Rejected Fresenius's Argument Regarding Complexation ....................................37

6. The District Court Correctly Rejected Fresenius's Reliance on Microemulsion References ..................................38

B. The District Court Correctly Found That a POSA Would Not Have Had a Reasonable Expectation of Success from Increasing Egg Lecithin Concentration ..............................................................41

1. The District Court Properly Found That Routine Optimization Analysis Was Inapposite...................................41

2. The Emulsifier-to-Drug Ratios Disclosed in CN845 Are Irrelevant to the Obviousness Analysis ..................................46

C. Fresenius's Inherency Challenge to the Claims of the '794 Patent Is Meritless ........................................................................47

II. THE DISTRICT COURT CORRECTLY FOUND THAT OBJECTIVE INDICIA OF NONOBVIOUSNESS FAVORED HERON............................................................................................48

A. There Was a Long-Felt Unmet Need for an Injectable Aprepitant Formulation ....................................................................49

1. Fresenius Fails to Rebut the Presumption of Nexus................51

2. There Was Sufficient Evidence at Trial to Show a Long-Felt Need ..........................................................................53

3. Workarounds Reinforce the Long-Felt Unmet Need..............54

4. The Number of Patients Affected by the Long-Felt Need Is Irrelevant ..........................................................................55

B. The Failure of Others and Unexpected Results Weigh in Heron's Favor......................................................................................57

C. Heron's Commercial Success Is Evidence of Nonobviousness.........61

CONCLUSION...........................................................................................63

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32 and Federal Circuit Rule 28.1(b)(1)(A). ...................................................................64

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). ....................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afga Corp. v. Creo Prods. Inc.*,
451 F.3d 1366 (Fed. Cir. 2006) ....................37

*Amgen Inc. v. Sandoz Inc.*,
66 F.4th 952 (Fed. Cir. 2023) ....................52, 55

*Amgen, Inc. v. Sandoz Inc.*,
No. 3:18-cv-11026, 2021 WL 5366800 (D.N.J. Sept. 20, 2021) ....................56

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................48

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ....................31

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ....................23

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) ....................45

*Cubist Pharms., Inc. v. Hospira, Inc.*,
75 F. Supp. 3d 641 (D. Del. 2014)....................56

*Cubist Pharms., Inc. v. Hospira, Inc.*,
805 F.3d 1112 (Fed. Cir. 2015) ....................56

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ....................57, 59

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................52

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
655 F.3d 1291 (Fed. Cir 2011) ....................46

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
365 F.3d 1054 (Fed. Cir. 2004) ....................................................................23, 46

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)..........................................................................................49

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ...................................................................48

*Intendis GMBH v. Glenmark Pharms. Inc., USA*,
822 F.3d 1355 (Fed. Cir. 2016) ...................................................................44

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997) ...................................................................61

*ModernaTx, Inc. v. Arbutus Biopharma Corp.*,
18 F.4th 1364 (Fed. Cir. 2021) ....................................................................44

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ...................................................................53

*In re Paulsen*,
30 F.3d 1475 (Fed. Cir. 1994) .....................................................................49

*Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*,
323 F. Supp.3d 566 (D. Del. 2018), *aff'd sub nom. Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019).........................................................................................48

*In re Peterson*,
315 F.3d 1325 (Fed. Cir. 2003) ...................................................................45, 46

*Pfizer Inc. v. Sanofi Pasteur Inc.*,
94 F.4th 1341 (Fed. Cir. 2024) ....................................................41, 42, 44

*Richardson-Vicks Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997) ...................................................................23

*Sjolund v. Musland*,
847 F.2d 1573 (Fed. Cir. 1988) ...................................................................51

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ...................................................................39

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ........................................................50, 53, 54, 55

## STATEMENT OF RELATED CASES

This is an appeal from a judgment of the United States District Court for the District of Delaware (William C. Bryson, Circuit Judge) in Case No. 1:22-cv-00985-WCB, finding that Appellant Fresenius Kabi USA, LLC's ("Fresenius's") Abbreviated New Drug Application infringed claims 9, 10, and 21 of U.S. Patent No. 9,561,229 and claims 9 and 10 of U.S. Patent No. 9,974,794, held by Appellee Heron Therapeutics, Inc. ("Heron"). No appeal in this matter was previously before this Court or another court.

There are several other pending proceedings that involve the patents at issue in this appeal, as well as additional related patents:

*Heron Therapeutics, Inc. v. Azurity Pharmaceuticals, Inc.*, No. 1:24-cv-00830-WCB (D. Del.) & No. 1:24-cv-01363-WCB (D. Del.); and

*Heron Therapeutics, Inc. v. Qilu Pharmaceutical Co., Ltd.*, No. 1:25-cv-00357-WCB (consolidated with No. 1:25-cv-00829-WCB) (D. Del.).

## INTRODUCTION

The district court (Hon. William C. Bryson, sitting by designation) upheld the validity of the patents-in-suit in a thorough opinion following a four-day bench trial and extensive post-trial briefing. This Court should affirm.

The claimed invention, embodied by Heron's Cinvanti® product, is the first and only intravenous aprepitant formulation approved by the U.S. Food and Drug Administration for treating patients with chemotherapy-induced nausea and vomiting. Although aprepitant had been known for decades, its extremely low solubility (akin to "cement dust," Appx7) was long thought to preclude formulation as a drug that would remain stable long enough to be safe for intravenous use. After others had spent years trying and failing to formulate such a product, Heron scientists Drs. Thomas Ottoboni and Hannah Han finally succeeded by pursuing emulsion formulations and including an unprecedented amount—14%—of the emulsifier egg lecithin. Their invention was remarkably stable—for up to 3 months as compared to less than 4 days for the closest prior art—and enabled commercialization of Cinvanti®.

Fresenius, after using Heron's invention for itself, challenged the patents protecting Cinvanti® as obvious over a Chinese patent application (CN845) that disclosed substantially less stable (shorter than 4 days) aprepitant emulsions containing between 0.5% and 10% egg lecithin. The trial court weighed all the

evidence, judged the credibility of the testimony, and rightly rejected Fresenius's arguments that a person of ordinary skill in the art ("POSA") (1) would have been motivated to increase CN845's 10% limit to 14% through routine optimization, and (2) would have reasonably expected to achieve a stable aprepitant emulsion when using so much emulsifier.

In reaching its conclusion, the district court made several key factual findings: First, a POSA would not have ignored that the first-named inventor of CN845 subsequently published an article (Zhou) revealing an "optimal formulation" with only 2.5% egg lecithin. Appx34; Appx38. Second, a POSA would have recognized that the other prior art, including art that post-dated CN845 and Zhou, consistently taught egg lecithin concentrations of about 1.2%. Appx38. And third, a POSA would have expected that using too much emulsifier would actually *destabilize* an emulsion. Appx34. Taken together, the evidence led the district court to conclude the prior art would "suggest to a POSA that formulators should focus on emulsifier concentrations *well below* 10% rather than concentrations in excess of 10%." Appx38 (emphasis added). There was neither a motivation to pursue, nor an expectation of success at, 14%. Appx43.

On appeal, Fresenius fails to demonstrate any error—let alone clear error—in the district court's findings. Fresenius plucks isolated statements from the decision below instead of focusing on the court's analysis of the prior art and expert testimony

as a whole. And Fresenius simply ignores the district court's factual findings that are contrary—and usually fatal—to its arguments. Ultimately, Fresenius has no persuasive response to the court's analysis of what a POSA would have derived from CN845 in view of Zhou's subsequent 2.5% "optimal" egg lecithin concentration and the other relevant prior art that consistently taught concentrations "close to or below" Zhou's level. Appx38.

Instead, Fresenius reads non-existent disclosures and theories into prior art references to argue that the district court overlooked evidence about regulatory requirements, surface-area dynamics, complexation, and "microemulsion" systems that would have purportedly motivated a POSA to ignore Zhou and the other prior art and increase CN845's egg lecithin concentration to 14%. Yet Fresenius's own expert "admitted that he 'did not identify a single prior art document that disclosed a formulation containing more than 10 percent egg lecithin.'" Appx38 (citation omitted). The district court fully considered and rejected Fresenius's arguments in view of the entire evidence. It likewise correctly applied this Court's precedent on routine optimization, and its factual findings of nonobviousness preclude Fresenius's reliance on inherency principles.

Finally, Fresenius identifies no error in the district court's supplemental finding that objective indicia of nonobviousness favored Heron. The record at trial demonstrated that the long-felt unmet need, failure of others and unexpected results,

and commercial success indicia all support nonobviousness, further confirming the district court's determination that the asserted patents are valid.

For all of those reasons, and others discussed below, this Court should affirm.

## ISSUES PRESENTED

1. Whether the district court correctly found that a POSA would not have been motivated to use a concentration of 14% egg yolk lecithin as the emulsifier in an intravenous emulsion of aprepitant and would not have expected success with that high of a concentration where:

   (a) the primary references from a group of researchers in China (CN845 and Zhou) disclosed a concentration range between 0.5% and 10%, with an optimal concentration of 2.5%;

   (b) other prior art consistently disclosed emulsifier concentrations of 1.2% or less; and

   (c) undisputed evidence demonstrated that increasing the concentration of the emulsifier component could have a destabilizing effect.

2. Whether the district court correctly found that the evidence of objective considerations supported a finding of nonobviousness.

# STATEMENT OF THE CASE

## A. Pre-existing Treatments for Chemotherapy-Induced Nausea and Vomiting

Chemotherapy-induced nausea and vomiting ("CINV"), as the name suggests, poses a significant problem for cancer patients. Appx6. CINV can delay treatment, require a reduction in a patient's chemotherapy medication dose, and even cause the patient to stop treatment prematurely. Appx6-7. A critical class of drugs for preventing CINV are "NK-1 receptor antagonists," so called because they block the neurokinin-1 (or "NK-1") receptor, which plays a central role in causing nausea and vomiting. Appx6-7; Appx3268-69 (894:11-895:8); Appx2958-59 (584:22-585:5).

The first NK-1 receptor antagonist used to treat CINV was the drug aprepitant. Appx7. Merck developed aprepitant as an oral product, and the FDA first approved the drug in 2003 under the brand name Emend®. *Id.* While oral aprepitant was a substantial advancement in the treatment of CINV, it also presented problems. Appx8. When aprepitant is administered orally, the body metabolizes much of the drug before it reaches the brain, limiting its effectiveness. *Id.* Moreover, oral administration of aprepitant—as of any drug—depends on patient compliance, which is not guaranteed. *Id.*; Appx2951-52 (577:23-578:16). Patients may also be too sick to take an anti-nausea drug or may begin vomiting before the drug is digested. Appx8.

Given the problems with oral aprepitant, scientists at Merck tried to develop an injectable aprepitant formulation. *Id.* Their efforts were unsuccessful, though, because the aprepitant molecule is insoluble in either oil or water. Appx7-8; *see* Appx3274 (900:10-14). Aprepitant molecules tend to form solid crystals and, even when rendered soluble, to re-crystallize afterwards. Appx8-9; Appx3273-76 (899:4-902:5); Appx3277-79 (903:8-905:10); Appx3308-10 (934:10-936:24); Appx3644-45 (1270:7-1271:15). Indeed, aprepitant's solubility was considered so poor that it was compared to "cement dust." Appx3273-76 (899:19-900:14, 901:17-902:1). These properties were thought to preclude aprepitant's use in an intravenous formulation. Appx3291 (917:3-22). Eventually, Merck abandoned its search for an injectable aprepitant formulation. Appx9. Instead, Merck focused on creating an intravenous formulation of a prodrug of aprepitant called fosaprepitant, which is not itself pharmacologically active but is more soluble than aprepitant and is converted into aprepitant in the body. *Id.*; Appx2498 (124:11-23); Appx3311-13 (937:12-939:8); Appx4384. Merck obtained FDA approval of an intravenous fosaprepitant product in 2008 under the brand name Emend IV®. Appx9.

Although Emend IV®—and later generic intravenous fosaprepitant—was effective in treating CINV, practitioners reported injection-site reactions, including inflammation in blood vessels and soft-tissue death. *Id.*; Appx3397-400 (1023:16-1026:25). Many experts attributed those reactions to polysorbate 80, an ingredient

in intravenous fosaprepitant. Appx9; Appx3409 (1035:6-12); Appx3428 (1054:3-10). The injection-site reactions were so significant that—despite the problems associated with oral aprepitant—the Mayo Clinic changed its guidelines to recommend administering oral aprepitant rather than intravenous fosaprepitant to patients receiving certain kinds of chemotherapy. Appx10; Appx3405-07 (1031:10-1033:2). Accordingly, there remained a need for an injectable aprepitant product that did not have serious adverse injection-site effects.

### B. The Prior Art and the Invention of the Patents-in-Suit

In 2012, Dr. Thomas Ottoboni—one of the inventors of the patents-in-suit—began researching injectable forms of aprepitant that did not have the same side effects as intravenous fosaprepitant emulsions. Appx19. As noted, aprepitant is insoluble in both oil and water. By February 2014, Dr. Ottoboni had suggested formulating it in an oil-in-water emulsion, Appx2894-95 (520:7-521:1); Appx2926-27 (552:7-553:5), which is "a combination of [the] two mutually immiscible liquids," along with an emulsifying agent that "reduces" their "mutual repulsion," Appx2507-09 (133:25-134:5, 134:19-135:4). Dr. Ottoboni supervised and worked closely with Dr. Hannah Han, the other inventor of the patents-in-suit, and together they experimented with many different types of emulsions, including a variety of ingredients and ingredient amounts. *E.g.*, Appx19-20; Appx2882 (508:1-16); Appx2914 (540:13-24); Appx2916-17 (542:15-543:2); Appx7095; Appx7119-29.

The same year that Dr. Ottoboni began his research, a group of Chinese scientists disclosed an aprepitant emulsion, albeit not one that was stable enough for commercialization. Appx10-11. Those scientists published their results in a Chinese patent application, referred to as CN845. *Id.*; Appx4341-57 (CN845). Later that year, the first-named CN845 inventor, Wei Zhou, published a related article on the preparation of aprepitant emulsions that supplemented the disclosures in CN845. Appx10; Appx12; Appx4562-74 (Zhou). As relevant here, CN845 and Zhou called for the use of egg lecithin as an emulsifier. Appx11-12. CN845 listed an emulsifier concentration range of 0.5% to 10%, and Zhou, after multiple rounds of optimization work, further specified that the optimal concentration of egg lecithin in an aprepitant emulsion was 2.5%. *Id.*; Appx4341; Appx3627-31 (1253:6-1257:14); Appx2696-98 (322:11-324:11); Appx4568; Appx4570.[1]

To be safely administered to patients, an oil-in-water emulsion must meet certain stability criteria, including those set forth in the United States Pharmacopeia ("USP") and be stable enough to not form crystals for at least one week. Appx30; Appx48 (citing Appx2915-16 (541:23-542:7)); *see also* Appx5; Appx4587;

[1] Heron began working on aprepitant emulsions with over 10% lecithin no later than February 10, 2014, *e.g.*, Appx2926-27 (552:7-553:5 (citing Appx6985)), did not obtain a translated copy of CN845 until March 25, 2014, Appx2861-63 (487:18-489:11), and did not make a CN845 emulsion until July 24-25, 2014, Appx2862-65 (488:21-491:19); Appx2872 (498:5-7); Appx5915-18; Appx6254-55.

Appx4589. CN845 disclosed no stability test data, *see* Appx2691-92 (317:10-318:11), and Zhou tested stability using a standard that differs from the USP standard, Appx16; Appx2582-83 (208:9-209:11). Thus, while CN845 and Zhou reported aprepitant emulsions, there is no evidence that those emulsions were sufficiently stable to be safe for patients. Indeed, the only evidence of record is that their emulsions were *not* sufficiently stable, with crystals forming within four days. Appx17; *see* Appx32; Appx48 (citing Appx3718-20 (1344:20-1346:14)).

By contrast, Drs. Ottoboni and Han developed an injectable aprepitant emulsion that *was* sufficiently stable for intravenous patient use. *See* Appx19-21. As Dr. Han explained, they arrived at their invention through "a lot of trial-and-error experiments," and many of their experiments resulted in failures. Appx2882 (508:1-16); Appx21; Appx2865-66 (491:15-492:16). In fact, Drs. Ottoboni and Han's only successful emulsions were those with emulsifier concentrations beyond anything in the prior art. Appx21; Appx2916-17 (542:15-543:2); Appx2865-66 (491:15-492:16); Appx7031-41; Appx7088-92; Appx7095-104; Appx7130-32.

In particular, their emulsion with 14.3% egg lecithin—far higher than anything in the prior art—provided *three months* of room temperature stability and formed the basis of Cinvanti®, the first intravenous aprepitant product stable enough to be given to patients. Appx21; Appx75-78 (Examples 2, 7); Appx3783-85 (1409:12-1411:9); Appx3719-20 (1345:10-1346:5). Cinvanti® was subsequently

approved by the FDA and now enables cancer patients to undergo chemotherapy with minimal side effects compared to the prior intravenous NK-1 receptor antagonist, Emend IV®. Appx21; *see* Appx3414 (1040:15-23); Appx3432-33 (1058:17-1059:2); Appx3434-35 (1060:9-1061:2); Appx3717-18 (1343:13-1344:6).

### C. The Patents-in-Suit

The patents-in-suit—the ’229 and ’794 patents—are titled “Emulsion Formulations of Aprepitant” and describe novel pharmaceutical emulsion formulations of aprepitant suitable for intravenous administration for the treatment of nausea and vomiting. Appx4.[2] Emulsions for intravenous use typically comprise oil suspended in water, along with other excipients such as a phospholipid emulsifier like egg lecithin. Appx4.

The patents provide exemplary formulations and data from research conducted by Heron’s scientists. Examples 1-3 and 6 disclose inventive aprepitant emulsion formulations, and Example 7 provides stability testing of the formulations in Examples 1-3 and 6. *See* Appx75-78. The inventors found that the formulations of Examples 1, 3, and 6 were stable at 25° C for 2 months, while the formulation of Example 2 was stable under the same conditions for 3 months. *Id.*; Appx71 (8:5-21). Examples 1-3 and 6 were also stable at 5° C for more than 10 months. *Id.*

[2] The specifications of the patents-in-suit are substantially the same. Accordingly, references to the specification cite only the ’229 patent.

The specifications identify Examples 4 and 5 as "Alternate Aprepitant Emulsion Formulation for Intravenous Injection." Appx76-77 (18:16-19:26). These examples describe formulations using ingredients and concentrations disclosed in the prior art. *See* Appx3700-01 (1326:2-1327:25); Appx3776 (1402:2-5). Specifically, Example 4 lists the formulation with ingredients and concentrations disclosed in CN845, *see* Appx76 (18:20-58), while Example 5 lists the ingredients and concentrations of Zhou—an "optimized" formulation within the disclosure of CN845, *see* Appx76-77 (18:60-19:26); *see also* Appx3719 (1345:8-11). As the specifications note, the formulations disclosed in Examples 4 and 5 were not physically stable, with crystals observed within four days. Appx76 (18:44-46); Appx77 (19:12-14); Appx48; *see* Appx2780 (406:4-9); Appx2783 (409:7-11); Appx3620-21 (1246:15-1247:9); Appx3643-44 (1269:12-1270:1).

Claims 9, 10, and 21 of the '229 patent and claims 9 and 10 of the '794 patent are at issue in this appeal. Claim 8 of the '794 patent is representative of all five asserted claims, and recites:

> **8.** A physically stable pharmaceutical composition suitable for intravenous administration comprising:
>
> 0.7 wt/wt % aprepitant;
> 14 wt/wt % egg yolk lecithin;
> 9 wt/wt % to 10 wt/wt % soybean oil; and
> a pH modifier, wherein the pH modifier is sodium oleate;
> wherein the pH of the composition ranges from 7.5 to 9.0.

Appx97 (23:13-20); *see also* Appx5.

Claims 9 and 10 of the ’794 patent depend from claim 8 and add limitations regarding the concentrations of sucrose (5 wt/wt %) and ethanol (between 2 and 6 wt/wt %), respectively. Appx97 (23:21-25); *see* Appx5.

The claims of the ’229 patent largely mirror those of the ’794 patent, but do not require that the composition be “physically stable.” Appx79 (23:30-24:4); *see* Appx5. Claim 21 of the ’229 patent is directed to a method of treating nausea and vomiting with the claimed composition by intravenous administration. Appx79 (24:33-34).

### D. Fresenius’s Infringing Product and Heron’s Suit

Fresenius filed an Abbreviated New Drug Application (“ANDA”) with the FDA seeking approval for a product containing an injectable aprepitant emulsion. Appx3-4. The reference listed drug for Fresenius’s ANDA product is Heron’s Cinvanti®. Appx4. On July 27, 2022, Heron filed a complaint against Fresenius asserting infringement of the patents-in-suit based on Fresenius’s ANDA and the corresponding use, sale, and/or offer for sale of its ANDA product. *See* Appx4; Appx117-39.

In April 2024, Heron moved for summary judgment that Fresenius’s ANDA product infringes all claims of the ’229 and ’794 patents. Appx109-10. The district court granted Heron’s motion in part, finding that Fresenius infringed claims 1-11 of the ’229 patent. Appx1279. The parties then dismissed all claims other than

claims 9, 10, and 21 of the ’229 patent and claims 9 and 10 of the ’794 patent. Appx2150-53. Fresenius also stipulated that it infringed claim 21 of the ’229 patent. Appx2152.

### E. The District Court’s Decision

The district court held a four-day bench trial in June 2024. Following extensive post-trial briefing, the court issued its findings of fact and conclusions of law. Appx1-61. The court found that Fresenius’s ANDA product infringed claims 9 and 10 of the ’794 patent. Appx25. The district court also rejected Fresenius’s invalidity challenge, finding that the asserted claims were not invalid for obviousness or for lack of written description. Appx25-57.

#### 1. The District Court’s Analysis of the Motivation to Combine and Reasonable Expectation of Success

In framing the obviousness question, the district court found that a POSA “would have identified creating a stable intravenous aprepitant formulation as the problem to be solved.” Appx29. As the court observed, “a POSA would have been motivated to overcome aprepitant’s inherent solubility problems to develop an intravenous formulation.” Appx30. The court then examined “whether it would have been obvious, based on the prior art, to devise a stable aprepitant formulation suitable for injection that would satisfy the limitations of the asserted claims of the ’229 and ’794 patents.” Appx31 (internal quotation marks omitted).

The district court credited the explanation of one of the inventors, Dr. Han, that the emulsion is "'very complex,'" that "'everything is important to make a stable emulsion,'" and that the "claimed invention was developed through 'a lot of trial-and-error experiments.'" Appx40 (citation omitted). The court also examined carefully the differences between the claimed invention and the formulations in CN845 and Zhou. The court found "that the patented formulations were shown to have superior physical stability as compared to aprepitant emulsions similar to those disclosed in CN845 and Zhou." Appx32. Specifically, the inventive formulations "were found to pass the microscopy test and also to satisfy the requirements of USP<729>," whereas in Examples 4 and 5, corresponding to CN845 and Zhou, "crystal formation was observed within four days." *Id*. The court acknowledged that one of the "important differences between the claimed formulations and the Chinese prior art references" was "the concentration of egg yolk lecithin." Appx33.

The district court then examined whether, at the time of the invention, a POSA would have been motivated to increase the concentration of egg lecithin in an aprepitant formulation beyond the range disclosed in CN845. The court acknowledged that CN845 "recommended the use of an emulsifier at the top of the 0.5% to 10% range disclosed in that publication," specifically 8% to 10%, and did not indicate that higher than 10% "would cause the emulsion to fail." Appx33-34. At the same time, there was "evidence that would not have encouraged a POSA to

consider an emulsifier concentration as high as 14%"—the amount claimed in the patents-in-suit. Appx34. The court found that "a POSA confronted with CN845's broad range of emulsifier concentrations would look to the [CN845] inventors' later work—namely, the results reported in the Zhou article—for further guidance when picking the concentration within CN845's range to focus on." Appx34 (citation omitted). And the Zhou article "disclosed that the 'optimal formulation' of an aprepitant emulsion would contain only 2.5% egg yolk lecithin." *Id.* (citations omitted).

The district court also considered "the undisputed expert testimony that, above a certain level, increasing the emulsifier level will not further improve stability." Appx35 (citation omitted). As Heron's expert testified, "there was no general rule that increasing the concentration of the emulsifier component would result in a more stable emulsion." Appx34 (citation omitted). And, as Fresenius's own expert admitted, "there is a point at 'which the amount of the emulsifier clearly becomes counterproductive.'" Appx35 (quoting Appx2623-26 (249:18-252:1)); *see* Appx3662 (1288:7-13).

The district court noted the admission of Fresenius's expert that "he 'did not identify a single prior art document that disclosed a formulation containing more than 10 percent egg lecithin.'" Appx38 (citation omitted). And as the court further observed, "the evidence showed that as of 2014, all FDA-approved emulsions based

on egg yolk lecithin used concentrations of 1.2% or less." *Id.* (citation omitted). The court therefore found unpersuasive the testimony of Fresenius's expert that "a POSA would have been motivated to increase the concentration of egg yolk lecithin above the range disclosed in CN845 [0.5% to 10%] and up to as much as 14%." Appx39.

The district court also rejected Fresenius's argument that "a POSA would be able to derive a 14% concentration of egg yolk lecithin as the appropriate emulsifier concentration as a matter of 'routine optimization.'" *Id.* The court explained that "this is not a case involving routine optimization within a range of values disclosed in the prior art," because "[t]he 14% lecithin concentration in the '229 and '794 patents was not within the 0.5% to 10% range discussed in CN845." *Id.* (citing cases).

The district court therefore found that "a POSA would not have had a motivation to increase the concentration of lecithin above 10%, including a concentration of at least 14%, and would not have had a reasonable expectation of success with an emulsifier level that high." Appx40-41. As the court emphasized, "the limitation requiring a 14% concentration of egg yolk lecithin was a substantial departure from what was taught in the relevant prior art and what a POSA would have been motivated to use in such an emulsion with a reasonable expectation of

success." Appx43. The district court accordingly found the asserted claims of the patents-in-suit to be nonobvious. *Id.*

**2. The District Court's Analysis of the Objective Considerations of Nonobviousness**

Though noting that it had already found the asserted claims to be nonobvious, the court nonetheless examined the objective indicia of nonobviousness—including long-felt unmet need, failure of others and unexpected results, and commercial success—because they are "'part of the overall § 103 obviousness inquiry.'" Appx43-44 (citations omitted). The court concluded that, although "the objective considerations are not powerful factors" in this case, they further supported the finding of nonobviousness. Appx52.

Regarding long-felt unmet need, the district court found that healthcare providers were aware of the risk of adverse reactions from intravenous fosaprepitant products such as Emend IV®, though "the level of concern was moderate and could be minimized by countermeasures." Appx47. The court therefore found that "there was some degree of interest in developing an aprepitant formulation that would avoid the side effects of the fosaprepitant treatments," and that the "long-felt, unmet need" factor moderately favored Heron. *Id.*

Addressing failure of others and unexpected results, the district court credited the undisputed evidence that the formulations disclosed in CN845 and the Zhou article formed crystals within four days, and thus were not sufficiently stable for

commercial use, while the formulations recited in the asserted claims were shown to have long-term stability. Appx48. The court found that was "a difference in kind, not just in degree." *Id.* (citing Appx3720 (1346:10-14)).

The district court also found it "significant" that "Merck was unsuccessful in its efforts to develop an injectable aprepitant formulation." *Id.* The court credited the testimony of Dr. Jeffrey Hale, an inventor of the aprepitant molecule and former Merck scientist, that he was surprised someone had "cracked this problem" that neither Merck nor anyone else was able to solve. Appx 48-49. The court therefore found that the "failure of others" and "unexpected results" factors also moderately favored Heron. Appx49.

The district court then found that "the commercial success of Cinvanti® has been at least partly attributable to its properties compared to the competing products," since "unlike the injectable fosaprepitant products, it does not come with the risk of side effects in the form of injection-site adverse reactions." Appx51-52. The court therefore found that the commercial success factor also favored Heron, if only slightly. Appx52.[3]

The court entered final judgment on December 9, 2025. Appx59. This appeal followed. Appx3829.

[3] The court found that "industry skepticism, praise, and copying" were "neutral," but that the objective considerations "[t]aken all together" favored Heron. Appx49-52.

## SUMMARY OF ARGUMENT

**I.** The district court correctly determined, with ample evidentiary support, that the asserted claims were nonobvious.

**A.** Contrary to Fresenius's contentions, the district court carefully considered the evidence as a whole in finding that a POSA would not have been motivated to increase egg lecithin concentration above CN845's upper limit of 10% to 14%. The court found that neither CN845 itself, Zhou's 2.5% "optimal" formulation, nor the other prior art (which consistently taught low-single-digit emulsifier concentrations before and after publication of CN845) provided any motivation to go beyond CN845's disclosed range. And as the court recognized, uncontested expert testimony established that too much emulsifier would decrease stability. The court properly took all of that evidence—not just the isolated pieces of evidence on which Fresenius focuses on appeal—into account in finding that the asserted patents were nonobvious.

**B.** The district court did not go "astray" by relying on Zhou. Br. 17. Rather, it correctly found a POSA would have appreciated that Zhou, having been authored by CN845's first-listed inventor, expanded on CN845's work and supplemented its disclosure to identify an "optimal formulation of an aprepitant emulsion" that contained just 2.5% egg lecithin. The court's determination that a POSA would not

have been motivated to pursue egg lecithin concentrations above CN845's range correctly accounted for that additional prior art.

**C.** Fresenius exaggerates the importance of a handful of the court's findings and ignores contrary findings and evidence. Fresenius points to a finding that a POSA would have been motivated to improve CN845's formulations to meet USP stability requirements, but the USP standards provide no guidance on the amount of any particular ingredient.

Likewise, Fresenius overstates the significance of the court's recognition that a POSA would have been motivated to achieve an emulsion with smaller droplets and, thus, more total surface area to increase stability. As the court found, the Washington reference on which Fresenius relied for this argument addressed the surface-area not by increasing the emulsifier concentration, but by post-loading the drug into the emulsion. Indeed, Washington used the then-industry-standard 1.2% emulsifier.

Nor did the district court ignore Fresenius's argument about complexation. The court found that the complexation-related references had nothing to do with aprepitant or intravenous emulsions, and would not have motivated a POSA to increase egg lecithin concentration above CN845's levels.

The district court also properly discounted Fresenius's reliance on the Liu reference, which concerned microemulsions rather than ordinary emulsions.

Microemulsions are markedly different systems from the aprepitant emulsions, and the court noted specific factual reasons why Liu would not apply.

**D.** The district court correctly found that, as of the priority date, a POSA would not have reasonably expected success in obtaining a stable aprepitant emulsion with emulsifier concentrations above CN845's disclosed range. In particular, the court correctly rejected Fresenius's "routine optimization" argument. Routine optimization analysis does not apply in this case, where the 0.5-10% range disclosed in CN845 was markedly different from the claimed amount of 14%. Indeed, Fresenius could not point to a single prior art intravenous emulsion containing greater than 10% egg lecithin. Nor would a POSA have engaged in such routine optimization where CN845's first-listed inventor (Zhou) already reported an optimal concentration of 2.5%.

Fresenius also argues that the district court should have examined the lecithin-to-aprepitant ratios in the prior art. As the court's analysis properly reflects, however, the limitation at issue deals with a specific egg lecithin concentration, not a lecithin-to-aprepitant ratio, and CN845 included a 10% limit. Fresenius identifies nothing in the prior art that would have led a POSA to reasonably expect success from the claimed egg lecithin concentration based on past formulations with significantly different concentrations but similar ratios.

**E.** Fresenius's inherency challenge runs afoul of this Court's settled precedent that inherency cannot be used to establish motivation to modify or reasonable expectation of success.

**II.** The district court also correctly found that objective indicia of nonobviousness weighed in Heron's favor.

**A.** The lack of an injectable aprepitant formulation was a persistent problem in treating CINV. Heron solved that problem by inventing an aprepitant formulation that was stable and would not cause injection-site reactions. And Heron presented ample evidence—which the district court credited—of a nexus between the asserted claims and the satisfaction of the long-felt unmet need.

**B.** The evidence also supports the district court's findings that others had tried and failed to invent an injectable aprepitant formulation, whereas Heron achieved unexpected results. Aprepitant had been known for twenty years prior to the claimed invention, yet no injectable aprepitant formulation had been brought to market.

**C.** Finally, the district court correctly found that Cinvanti®'s commercial success was undisputed, and that Heron was entitled to a presumption that its success was due to the asserted claims. Fresenius failed to rebut that presumption. The formulations disclosed by CN845 and Zhou cannot explain away Cinvanti®'s success because they were not stable and were never on the market, and the evidence showed that Cinvanti® was successful for reasons beyond just pricing.

## STANDARD OF REVIEW

On appeal from a bench trial, this Court reviews the district court's conclusions of law de novo and its findings of fact for clear error. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1058 (Fed. Cir. 2004). The ultimate conclusion about whether a claimed invention would have been obvious is one of law based on underlying findings of fact. *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997). Those underlying factual findings "include findings as to the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, the presence or absence of a motivation to combine or modify with a reasonable expectation of success, and objective indicia of non-obviousness." *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015) (citations omitted). The party challenging the validity of issued claims in a district court proceeding bears the burden of proving that the claims would have been obvious by clear and convincing evidence. *Golden Blount*, 365 F.3d at 1058.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY FOUND THAT THE ASSERTED CLAIMS WERE NOT OBVIOUS

The district court, in a lengthy and detailed opinion, carefully examined the evidence presented by both parties—including extensive expert testimony—on whether the challenged claims were obvious in light of the prior art. Based on the

trial record, the court correctly found that the claims were not invalid on obviousness grounds because they represented "a substantial departure from what was taught in the relevant prior art" and what a POSA "would have been motivated to use . . . with a reasonable expectation of success." Appx43. Fresenius's contrary arguments lack merit, and in any event come nowhere close to establishing that the court's critical findings were clearly erroneous.

### A. The District Court Correctly Found That a POSA Would Not Have Been Motivated to Increase the Emulsifier Concentration Beyond the Range Disclosed in the Prior Art

At the outset, Fresenius contends (Br. 13) that the district court's own factual findings "establish motivation and reasonable expectation of success" for a POSA to increase the egg lecithin concentration beyond the range disclosed in the prior art. That argument fails. The district court acknowledged that Fresenius had identified support for "various" aspects of "its claim that the asserted claims would have been obvious," but the court ultimately "concluded that Fresenius's showing was not clear and convincing, and that Fresenius therefore did not satisfy that demanding standard of proof." Appx57-58. Fresenius's effort to cherry-pick isolated favorable findings ignores the court's countervailing findings and its assessment of the evidence as a whole.

### 1. The Evidence as a Whole Demonstrated That a POSA Would Not Have Been Motivated to Increase Egg Lecithin Concentration to 14%

Fresenius argues that a POSA "would have recognized the scientific rationale behind CN845's technique of increasing emulsifier to increase aprepitant solubility, so as *to extend* the added-emulsifier approach" of CN845 (Br. 15 (emphasis added)), and that the district court "unreasonably restricted the POSA's implementation to only what CN845 already disclosed" (Br. 26). Fresenius's argument ignores the full record and is self-defeating. CN845 itself set an upper limit of 10% for egg lecithin despite utilizing a "technique of increasing emulsifier to increase aprepitant solubility." Br. 15. The court acknowledged that "a POSA would have known that, *up to a point*, increasing the concentration of the emulsifier in the aprepitant emulsion would increase the surface area of the interface between the oil and water phases of the emulsion, thus potentially increasing the stability of the composition." Appx34 (emphasis added). Taking all the evidence into account, however, the court found that "a POSA would not have had a motivation to increase the concentration of lecithin about 10%" disclosed in CN845, let alone to the claimed 14%. Appx40.

Fresenius's argument reduces itself to the proposition that because CN845 purportedly succeeded by "us[ing] a significantly higher level of emulsifier [*i.e.*, egg yolk lecithin] than other formulations," Br. 18, other artisans would have been motivated to use *even more* emulsifier to be *even more* successful. Fresenius,

however, ignores the fact that CN845 did *not* achieve any meaningful stability. When Heron evaluated the stability of CN845's formulation—something CN845's researchers never did—the emulsion formed large, needle-like aprepitant crystals within just 1-4 days, rendering it inappropriate for intravenous use:




Appx5917-18 (depicting crystals after 1, 4, 8, and 15 days); *see also* Appx3619-21

(1245:24-1247:4). Thus, CN845 fell far short of establishing that using high emulsifier concentrations could achieve the stability needed for a commercially viable product,[4] and provided a POSA with no motivation "to extend [its] added-emulsifier approach" beyond CN845's own limit to achieve such commercial viability. Br. 15.

The follow-on work of Wei Zhou, the first-named inventor of CN845, confirms that understanding. In seeking to identify the "'optimal formulation' of an aprepitant emulsion," Appx34 (citation omitted), Zhou did not—as Fresenius's position would suggest—just add even more egg lecithin to the formulation than he and his colleagues had disclosed in CN845. Rather, as the district court emphasized, the Zhou article "disclosed that the 'optimal formulation' of an aprepitant emulsion would contain only 2.5% egg yolk lecithin, in contrast to the 8% to 10% concentration level suggested in CN845." Appx34 (citing Appx4562 (Abstract);

[4] Fresenius is incorrect that "Heron's own reproduction of CN845 demonstrated 4 days of stability for formulations containing 9.95% lecithin," and that "the patent examples using 14% lecithin correspond to 7 days of stability." Br. 34-35. Each of the inventive patent examples demonstrated at least *2 months* of room temperature stability (including 3 months for Example 2 with 14.3% egg lecithin), compared to *less than 4 days* for CN845 and Zhou. Appx75-78 (Examples 4, 5, 7); Appx3620-21 (1246:15-1247:4), Appx3643-44 (1269:12-1270:1), Appx3777-78 (1403:11-1404:3), Appx3783-85 (1409:12-1411:9), Appx3719-20 (1345:10-1346:5); Appx6232-44 (Example 2), Appx6254-55 (Example 4). Fresenius is wrong that this was not a "substantial difference[]" in "stability impact," and that it does not support the court's finding that 14% egg lecithin was a "substantial departure" from the prior art. Br. 34-35 (citing Appx43).

Appx4562; Appx4567-68; Appx3631 (1257:10-14); Appx2723 (349:2-7)).

That Zhou *reduced* egg lecithin rather than increasing it is a powerful indication that CN845 (or any other knowledge of a POSA) did not provide a motive to explore egg lecithin concentrations above 10%.[5] As Heron's expert explained, "a POSA confronted with CN845's broad range of emulsifier concentrations would look to the inventors' other work—namely, the results reported in the Zhou article—for further guidance when picking the concentration within CN845's range to focus on." Appx34 (citing Appx3628-29 (1254:4-1255:25)).

And Zhou was hardly alone in pointing toward lower egg lecithin concentrations. Before Heron, *no one* had ever attempted to use greater than 10% egg lecithin in an intravenous emulsion, let alone found that doing so would increase stability. Indeed, Fresenius's expert "admitted that he 'did not identify a single prior art document that disclosed a formulation containing more than 10 percent egg lecithin.'" Appx38 (quoting Appx2712 (338:2-9)); Appx3657 (1283:17-24). On the contrary, there was a "general consistency of the references disclosing emulsifier concentrations well below 10%," Appx40, and as of 2014, every FDA-approved intravenous emulsion used the industry-standard 1.2% egg lecithin. Appx38 (citing

---

[5] Zhou discloses that it tested certain ranges via "orthogonal design" based on the authors' previous optimization work, *i.e.*, "pre-experimental and single-factor analysis." Appx3627-31 (1253:6-1257:14); Appx2696-98 (322:11-324:11); Appx2565-66 (191:9-192:14).

Appx2701 (327:5-9)); *see* Appx35 & n.8 (citing Appx3656 (1282:13-19)); Appx3657 (1283:17-24).

Subsequent prior art shows that even after CN845 and Zhou, scientists were not motivated to exceed 10% emulsifier, choosing instead to continue the established practice of using about 1.2% egg lecithin. For example, Hingorani—"the only [other] reference dealing specifically with aprepitant"—was filed in 2013, after Zhou, and "used a concentration of only about 1% egg yolk lecithin." Appx38 (citing Appx4303; Appx2701-02 (327:25-328:5); Appx3660 (1286:2-7)). Attempting to distract from its burden of proving obviousness by clear and convincing evidence, Fresenius responds that a POSA "is not required to simply copy the numeric values used for other formulations." Br. 22-23. But the district court imposed no such requirement. Rather, the court found that the prior art as a whole consistently taught low emulsifier concentrations and "would therefore suggest to a POSA that formulators should focus on emulsifier concentrations *well below* 10% rather than concentrations in excess of 10%. Appx38 (emphasis added).

Fresenius asserts that "the evidence *uniformly showed* that a POSA understood the principle that increasing emulsifier increased stability." Br. 18 (emphasis added). That assertion flies in the face of "the undisputed expert testimony that, above a certain level, increasing the emulsifier level will not further

improve stability." Appx35 (citing Appx3660-61 (1286:24-1287:20)).[6] Indeed, Heron presented expert evidence that "there was no general rule that increasing the concentration of the emulsifier component would result in a more stable emulsion," and that, to the contrary, a POSA would have expected that a "high level of emulsifier would have a destabilizing effect." Appx34 (citing Appx3660-62 (1286:14-1288:13)). And Fresenius's own expert conceded that, prior to Heron's inventions, a POSA would have understood "there is a point at 'which the amount of the emulsifier clearly becomes counterproductive.'" Appx35 (quoting Appx2623-26 (249:18-252:1)). Moreover, a 2011 review article by Khan, "Basics of Pharmaceutical Emulsion: A Review," relied on by Fresenius, *see* Appx18, instructed that "'[a]t high emulsifier concentration[,] emulsion instability occurs because of rapid coalescence.'" Appx35 (quoting Appx4411); Appx3660-62 (1286:14-1288:13). Fresenius failed to prove that Khan or any other prior art would have encouraged a POSA to exceed CN845's 10% upper limit.

Nor, as Fresenius argues, did the district court apply the "teaching away"

[6] Fresenius argues the prior art did not identify 10% as the "upper boundary beyond which emulsifiers would hinder aprepitant emulsions." Br. 21-22. The question, however, is not whether the prior art taught away from emulsifier content over 10%, but whether a POSA, based on the prior art as a whole, would have been motivated to use 14% and expect success. The court asked that precise question and concluded, after weighing expert testimony and evidence, that a POSA would not. Appx40-41; Appx39.

analysis when finding that a POSA would not be motivated to increase CN845's emulsifier percentage to 14%. Br. 20. Rather, the court found the totality of the prior art taught a POSA that low-single-digit concentrations of egg lecithin—whether the 2.5% described as the optimal level in Zhou or the 1.2% disclosed in Hingorani and elsewhere—were most conducive to an emulsion's stability. Appx38. The court then found those references would suggest that a POSA "focus on emulsifier concentrations well below 10% rather than concentrations in excess of 10%." *Id.* As this Court has explained, "evidence may not rise to the level of teaching away," but nonetheless support a "determination [of] no motivation to make [a] particular combination." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1363 (Fed. Cir. 2017). Especially when viewed against undisputed expert evidence that high emulsifier levels could have a destabilizing effect, the district court's finding was appropriate and at the very least not clearly erroneous.

For all these reasons, Fresenius is wrong that the district court failed to "review the prior art as a whole," and instead "looked to whether or not there was any example that did not use 14% lecithin." Br. 19-20. So, too, is Fresenius's suggestion that the district court "did not explain why 14% reflected a 'substantial departure' from the prior art." Br. 34 (quoting Appx43). The court considered the entire prior art, including the evidence presented by Fresenius, none of which disclosed or provided a motivation to increase egg lecithin concentration above 10%.

Appx38, 40.[7] While acknowledging "some support for Fresenius's obviousness argument," in weighing *all* the evidence, the court ultimately determined there was "not enough . . . to justify the conclusion that a POSA would be motivated to increase the level of emulsifier concentration as high as 14%" and have "a reasonable expectation of success in producing a stable emulsion with an emulsifier concentration that high." Appx40. In doing so, the court performed its quintessential role of weighing expert testimony and assessing competing trial evidence, and there was no error—much less clear error—in its factual findings.

### 2. The District Court Properly Considered Zhou

Fresenius also argues (Br. 17) that the district court "perhaps went astray" when evaluating a POSA's motivation to increase emulsifier by "focusing the starting point on the Zhou reference," and that it "relied upon Zhou's 2.5% egg yolk lecithin concentration as somehow limiting motivation to use even CN845's lecithin concentration range." Br. 20-21 (citing Appx34). That argument mischaracterizes the district court's opinion. The court considered the prior art and expert testimony as a whole, and properly assessed Zhou's relevance in the context of the entire prior art. Section I.A.1, *supra*. As the district court observed, Wei Zhou—"one of the

[7] Fresenius also compares the claimed emulsions with 14% egg lecithin to Example 3 of the patents-in-suit, which used 11.7% egg lecithin. Br. 34. But Example 3 is not prior art; it is part of the inventors' experimentation in arriving at the successful invention. The proper obviousness analysis is the one the district court performed.

inventors on the [CN845] Chinese patent application"—"expanded on the work described in [CN845]," "supplemented the disclosures in the CN845 application," and "reported the optimal concentration of ingredients," including a 2.5% egg lecithin concentration. Appx10; Appx12; Appx3627 (1253:6-9); Appx2723 (349:2-7); Appx2598 (224:8-20). Record evidence amply supports the weight the court placed on Zhou in its overall analysis of the prior art. As Heron's expert explained, "a POSA confronted with CN845's broad range of emulsifier concentrations would look to the inventors' other work—namely, the results reported in the Zhou article—for further guidance when picking the concentration within CN845's range to focus on." Appx34 (citing Appx3628-29 (1254:4-1255:25)); Appx3627 (1253:6-9); Appx2723 (349:2-7); Appx2598 (224:8-20).

Fresenius counters that the district court "did not expressly make any findings crediting Heron's characterization of Zhou as an 'optimized' formulation." Br. 20. But the issue was not in dispute. As the district court pointed out, both sides' experts agreed that Zhou—one of the authors of CN845—presented "the 'optimal formulation' of an aprepitant emulsion." Appx34 (citing Appx3631 (1257:10-14) (Dr. Little); Appx2723 (349:2-7) (Dr. Rabinow)). The evidence showed that Zhou's objective was to determine "[t]he optimal formulation" of an intravenous aprepitant formulation. Appx3628 (1254:4-24); Appx4562; Appx4568; Appx4570. And "Zhou reported the optimal concentration of ingredients in the formulation to be

0.25% aprepitant [and] 2.5% egg yolk phospholipid." Appx12 (citing Appx4570).

Fresenius responds that Zhou was "not optimizing a formulation to meet USP standards" and "was using much less drug (0.25% aprepitant in its proof-of-concept formulations), which a POSA would have understood required less emulsifier." Br. 21 (citations omitted). But the fact that Zhou was not seeking to meet USP standards is irrelevant. *See* Section I.A.3, *infra*. And Zhou's use of a smaller percentage of aprepitant that CN845 is similarly uninstructive. The asserted claims do not contain limitations directed to the ratio of egg lecithin to aprepitant; they are directed to the weight percentage of egg lecithin. Thus, neither ground Fresenius offers for distinguishing Zhou undermines the district court's factual finding—supported by uncontested expert testimony—that a POSA would view Zhou as the "optimal formulation" of an intravenous aprepitant emulsion, and would look to Zhou for further guidance when picking the concentration within CN845's broad range for further work. Appx34.

#### 3. Fresenius's Reliance on the USP Stability Requirements Is Unavailing

Fresenius latches onto the district court's finding that a POSA would have been motivated to "improve the CN845 formulations to meet regulatory guidelines, including USP stability requirements." Br. 14 (citing Appx29-30). But that finding—which the district court made when framing the obviousness question—has no bearing on whether a POSA would be motivated to go beyond the range of

egg lecithin concentration disclosed in the prior art. The USP is simply a compendium of quality control standards for the pharmaceutical industry; it provides a POSA with "no guidance whatsoever" on how to meet its criteria, let alone on whether to increase (or decrease) any particular ingredient in a pharmaceutical product. Appx3641-42 (1267:1-1268:15). As Heron's expert explained, it is "difficult . . . to understand" how "the presence of all these USP standards makes somebody optimize, especially in a given direction for any drug product." Appx3641-42 (1267:1-1268:15).

#### 4. The District Court Correctly Rejected Fresenius's Argument Regarding a POSA's Motivation to Increase the Surface Area

The district court also correctly rejected Fresenius's argument that a POSA would have been motivated to increase the egg lecithin concentration over CN845's 10% limit to achieve smaller droplets with a larger total surface area. Br. 14. Fresenius fails to explain why a POSA would think CN845's droplet diameters were insufficient in the first place. While CN845 has no stability data, it does state "[t]he particle size of the aprepitant microemulsion for injection is 50 nm – 150 nm." Appx4353. Those hypothetical droplet diameters thus *already* fall within the <500 nm requirement of USP 729, *see* Appx5 (citing Appx4587), that Fresenius asserts would have motivated a POSA to modify CN845. Br. 14.

Fresenius relies on a 1996 article by Washington, "Stability of Lipid

Emulsions for Drug Delivery," Appx17, to argue that aprepitant would be "loaded at the interface between the oil and the water" and that the interface is "the only real estate available to accommodate the drug," Br. 16. According to Fresenius, Washington would motivate a POSA to add more emulsifier to get smaller droplets, increase the surface area, and create "'more space for aprepitant to be held in the emulsion,'" thereby providing stability. *Id.* (quoting Appx14). But Washington—which does not reference aprepitant or emulsions containing more than 1.2% emulsifier, Appx35 n.8; *see* Appx38—cannot bear the weight Fresenius places on it.

Even if one were to accept Fresenius's premise that aprepitant could be loaded only on the emulsifier interface (*i.e.*, on the surface of the emulsion droplets), the district court recognized that Washington's solution for "drugs that are poorly soluble in both water and oil (such as aprepitant)" was not to increase the amount of emulsifier, as Fresenius suggests. Appx17. Instead, Washington's solution was to "post-load" emulsions with drug by *first* forming the emulsion droplets and *then* adding the drug, rather than the other way around, so that more droplet surface area is available at the actual moment of drug loading. Appx17 (citing Appx4547); Appx38. And the court also recognized that Washington addressed only situations that used 1.2% egg lecithin, undermining Fresenius's argument that it would teach a POSA to use any more, let alone 14%, emulsifier. Appx38 (citing Appx2739 (365:15-21); Appx3738 (364:21-365:1)); Appx35 n.8. Indeed, almost two decades

after Washington published, Fresenius could not identify a single emulsion with greater than 10% emulsifier. Appx38.

### 5. The District Court Correctly Rejected Fresenius's Argument Regarding Complexation

Fresenius argues the district court ignored that a POSA would have been motivated to increase the egg lecithin concentration to facilitate complexing between the aprepitant and emulsifier molecules. Br. 24-26. But the court "credit[ed] Dr. Little's testimony that a POSA would not understand those references to indicate that the concentration of egg yolk lecithin should be increased above the levels suggested in the CN845 or Zhou references."[8] Appx38-39 n.9. This Court "defer[s] heavily to the trial court's credibility determinations." *Afga Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (citation omitted). Indeed, the district court observed that Fresenius put these references forward "only as examples of complexation, and not to show that a POSA would use a high concentration of lecithin in an aprepitant emulsion." Appx38-39 n.9. Further, the references "do not discuss intravenous formulations" at all, *id.*, but rather oral administration, aqueous suspensions, and viscous creams, Appx3676-80 (1305:20-1306:5). *See, e.g.*, Appx4340 (discussing "oral bioavailability"); Appx4554 (same); Appx4364-65 (discussing "capsules" and "topical formulations," including "aqueous

---

[8] These references, EP '279, Yue, and Agarwal, were the only ones Fresenius put forward discussing complexation. Appx38-39 n.9; Appx2729 (355:10-12).

microdispersions" and "creams"). As the court correctly concluded, "those references [are] not probative of the issues in this case." Appx38-39 n.9; Appx3676-79 (1302:22-1305:19).

That the district court considered "the possibility of complexation" as a "factor encouraging a POSA to *consider* using an increased concentration of the emulsifier," Appx40 (emphasis added), does not mean, as Fresenius suggests, that it erred in concluding a POSA would not have ultimately been motivated to increase the amount of emulsifier to more than 10% with a reasonable expectation of success. Br. 18. For example, the court further noted these references disclosed only "a lecithin-to-active-ingredient ratio of 3:1 or less" (*i.e.*, at most 6% egg lecithin if applied to CN845's disclosed 0.05-2% aprepitant concentration). Appx38-39 n.9. Moreover, CN845 provides no motivation to exceed its 10% upper limit, regardless of any "possibility of complexation." Appx40; *see* Appx2728 (354:12-19). In any event, the district court considered Fresenius's complexation argument as just one "factor" alongside the totality of the evidence, and determined that Fresenius failed to prove by clear and convincing evidence that a POSA would have been motivated to increase the amount of emulsifier disclosed in CN845 to the claimed amount.

#### 6. The District Court Correctly Rejected Fresenius's Reliance on Microemulsion References

Unable to find a single intravenous emulsion with more than 10% egg lecithin in the prior art, Fresenius relies on Liu's discussion of 5-30% emulsifier in

"microemulsions" as a reason why the claimed emulsions with 14% egg lecithin were not "substantially different" from the relevant prior art. Br. 35. Yet it was undisputed at trial that the formulations in CN845, Zhou, and the patents-in-suit were standard emulsions, not microemulsions. Appx36; *see, e.g.*, Appx3672-73 (1298:19-1299:5); Appx2535-36 (161:3-162:24); Appx2714 (340:4-16); Appx3663-64 (1289:13-1290:24); Appx3675-76 (1301:20-1302:12). As the district court observed, microemulsions are a different system, form in different ways, and have markedly different properties and formulation considerations than the aprepitant emulsions at issue in this case. Appx36.

Beyond that overarching difference, the district court also identified other more specific reasons for "discount[ing] the relevance of Liu to establishing motivation for a POSA to use an emulsifier concentration above 10%." Appx37. In particular, the relevant focus of Liu was on (i) different oils; (ii) water-in-oil microemulsions; (iii) a wide range of surfactants; and (iv) "not aprepitant emulsions at all." *Id.* Accordingly, the court properly concluded "the Liu reference does not teach the use of concentrations of up to 30% of egg yolk lecithin." *Id.* Fresenius argues only that the first and third reasons given by the court are "clearly erroneous," Br. 35, but does not actually explain why. "[M]ere statements of disagreement with the district court as to the existence of factual disputes do not amount to a developed argument." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed.

Cir. 2006) (collecting cases). And they certainly do not render the court's *other* factual findings—which Fresenius does not even address—clearly erroneous.

Finally, Fresenius (Br. 35) points to the district court's finding that a POSA "would consider the Liu reference to have at least some application to an emulsion such as the emulsions in CN845 and Zhou." Appx37. But Fresenius omits that the court "discount[ed] the relevance of Liu to establishing motivation for a POSA to use an emulsifier concentration above 10%." *Id.* The trial evidence supports the district court's evidentiary assessment. The only basis Fresenius's expert, Dr. Rabinow, offered for Liu's relevance was that emulsions and microemulsions are similar with respect to "[b]iocompatibility and safety." Appx36; Appx2712-13 (338:20-339:17). Fresenius proffered no other reason for why a POSA would look to Liu. *See id.* Given that there was no dispute that egg lecithin was safe for administration, *see* Appx17, the court appropriately recognized that any limited relevance of Liu to emulsions in general had no particular application in the circumstances of this case.

Indeed, Liu's emulsifier range would exclude every single FDA-approved emulsion prior to the patents-in-suit (1.2% egg lecithin), the purportedly "optimal formulation of aprepitant emulsion" in Zhou (2.5% egg lecithin), and several of the "preferred embodiments" of CN845 (*e.g.*, 3% egg lecithin and 0.5% egg lecithin). Appx2701(327:5-9); Appx2697-98 (323:20-324:7); Appx2594-95 (1220:2-1221:5);

Appx4354-57; *see* Appx3657 (1283:17-24).

### B. The District Court Correctly Found That a POSA Would Not Have Had a Reasonable Expectation of Success from Increasing Egg Lecithin Concentration

#### 1. The District Court Properly Found That Routine Optimization Analysis Was Inapposite

The district court properly rejected Fresenius's argument that a POSA would have arrived at a 14% egg lecithin concentration "as the appropriate emulsifier concentration as a matter of 'routine optimization.'" Appx39. As the court observed, "[t]he 14% lecithin concentration in the '229 and '794 patents was not within the 0.5% to 10% range discussed in CN845," and therefore precedents involving "routine optimization within a range of values disclosed in the prior art" are "inapplicable here." *Id.* (citing *Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341, 1347-49 (Fed. Cir. 2024) (Lourie, J., joined by Bryson & Stark, JJ.); *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1005-10 (Fed. Cir. 2018)).

Fresenius contends that the district court misapplied the routine optimization analysis because this Court's decision in *Pfizer* "does not require a range expressly disclosed in the prior art" when considering the claimed amount of a result-effective variable. Br. 29 (citing *Pfizer*, 94 F.4th at 1348). But it is Fresenius, not the district court, that misunderstands *Pfizer*. There, this Court explained that while there is a presumption of obviousness when "an overlap between a claimed range and a prior art range" exists for a result-effective variable, the routine optimization analysis also

"generally requires consideration whether a person of ordinary skill in the art would have been motivated, with a reasonable expectation of success, to bridge any gaps in the prior art to arrive at a claimed invention." *Pfizer*, 94 F.4th at 1347-48. The *Pfizer* court then considered a scenario where, even though no prior art reference taught "a molecular weight for the particularly claimed serotype 22F glycoconjugate," the prior art disclosed "both a serotype 22F glycoconjugate and the molecular weights for fourteen other *S. pneumoniae* serotype glycoconjugates," and "those molecular weights . . . *overlap[ped]* with the claimed range." *Id.* at 1348 (emphasis added). The court noted "conjugation techniques and conditions were routine such that a person of ordinary skill in the art would have understood the claimed molecular weight to be typical of immunogenic conjugates." *Id.* (internal quotation marks and citation omitted). That is, a POSA would have been motivated to look to the molecular weights of the other glycoconjugates disclosed by the prior art, and would have had a reasonable expectation of success in experimenting within those weights in the context of a serotype 22F glycoconjugate.

Here, by contrast, the claimed amount of 14% did not overlap with *any* range disclosed by the prior art, and in fact it differed markedly from those ranges. As Heron's expert, Dr. Little, explained, it would be counterintuitive to employ a routine optimization analysis outside the scope of CN845 or where Zhou had already performed an optimization of CN845, arriving at an optimal concentration of 2.5%,

and where "a person of ordinary skill in the art ha[d] access to [that optimization]." Appx3657 (1283:1-6). A POSA seeking to optimize CN845 would not have ignored that the same researchers had already gone on to report an optimized system in Zhou. In this situation, where the optimal emulsion concentration "went down from what was disclosed in CN845," to a level "more consistent [with] what you see in the standard concentrations in the field, like 1.2 percent," going up, in the opposite direction, "is not something somebody would be thinking of in terms of routine optimization. It's anything but routine . . . ." Appx3657 (1283:7-16). That is particularly true where, as here, Dr. Little testified that, before the patents-in-suit, a POSA would have expected that a "high level of emulsifier would have a destabilizing effect," Appx34 (citing Appx3660-62 (1286:14-1288:13)), and Fresenius's expert agreed "there is a point at 'which the amount of the emulsifier clearly becomes counterproductive,'" Appx35 (quoting Appx2623-26 (249:18-252:1)); *see also id.*

Fresenius contends that its expert "provided unrebutted testimony that the lecithin level is the result-effective variable, and that all of the other formulation components were used in ordinary amounts as compared to ordinary emulsions." Br. 30 (citations omitted). That argument again mischaracterizes the record. Unlike with the claimed molecular weight in *Pfizer*, the district court here made no finding that egg lecithin content was known to be the result-effective variable for the stability

of aprepitant emulsions. In fact, Heron presented extensive testimony that, before the disclosures of the patents-in-suit, the purported "optimization" would not have been routine (or had a reasonable expectation of success) as it was not until the patents-in-suit that a POSA could predict how the components of aprepitant emulsions would interact. *See, e.g.*, Appx3690-93 (1316:17-1319:5) (Dr. Little); Appx2880 (506:13-20) (Dr. Han); Appx2882 (508:1-16) (same); Appx2884 (510:1-7) (same); Appx2921-22 (547:23-548:2) (Dr. Ottoboni); Appx2923-24 (549:19-550:4) (same). Indeed, as Fresenius acknowledges (Br. 30), the district court credited Dr. Han's testimony about the research leading to the patents-in-suit that "'[t]he emulsion is very complex.' The ratio of lecithin to aprepitant, oil to aprepitant, sodium oleate used, everything is important to make a stable emulsion." Appx40 (quoting Appx2882 (508:1-16)).[9] Here, "[t]he unpredictable interactivity between the various . . . components" before the disclosure of the patents-in-suit "renders the claims . . . nonobvious." *ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1364, 1377 (Fed. Cir. 2021) (citation omitted); *see Intendis GMBH v. Glenmark Pharms. Inc., USA*, 822 F.3d 1355, 1366 (Fed. Cir. 2016) (affirming district court's finding of nonobviousness based on fact and expert testimony that

[9] Fresenius argues that Dr. Little "conceded 'the performance of a stability test is routine.'" Br. 30 (quoting Appx3767 (1393:7-14)). But performing a stability *test* is not the same as designing a stable formulation.

"swapping ingredients in complex chemical formulations is anything but 'routine'" (internal quotations marks and citation omitted)). Indeed, the district court found that a POSA would not have had a motivation to increase the amount of egg lecithin "well above the range disclosed in CN845, especially when the person would be working within the ranges disclosed in CN845 for every other ingredient." Appx41. And "[t]he district court has wide discretion to weigh expert credibility." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 929 (Fed. Cir. 2012) (citations omitted).

Finally, relying on *In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003), Fresenius contends that "the trial evidence showed no proof of criticality that the claimed 14% was special." Br. 31. But Fresenius fails to establish a predicate to its criticality argument. Where a claimed range overlaps with a range in the prior art, that may sometimes make out a *prima facie* case of obviousness that a patentee must then rebut by "'establishing that the [claimed] range is critical, generally by showing that the claimed range achieves unexpected results relative to the prior art range.'" *In re Peterson*, 315 F.3d at 1330 (quoting *In re Geisler*, 116 F.3d 1465, 1469-70 (Fed. Cir. 1997)). Here, though, the claimed range of 14% egg lecithin does not overlap

with the 0.5-10% emulsifier range disclosed in CN845.[10,11] Nor is this a case where the claimed range and the prior art range "are close enough such that one skilled in the art would have expected them to have the same properties." *In re Peterson*, 315 F.3d at 1329 (citation omitted). As the district court found, a POSA would not have expected that increasing egg lecithin content beyond the 10% upper limit of CN845 would yield a physically stable aprepitant emulsion. Appx40-41. Rather, as the stability-oriented optimization work in Zhou indicated, the optimal egg lecithin concentration was thought to be 2.5%. Appx38. In fact, as Example 4 of the patents-in-suit shows, using a 9.95% egg lecithin concentration resulted in an *unstable* aprepitant emulsion, such that CN845 itself would create no expectation of success in exceeding its 10% upper limit. *See* Appx76 (18:44-46).

### 2. The Emulsifier-to-Drug Ratios Disclosed in CN845 Are Irrelevant to the Obviousness Analysis

Fresenius next argues that the district court erred by "look[ing] only for an express teaching of 14% lecithin as an *absolute amount*, rather than broader disclosures about lecithin-to-aprepitant *ratios*, when the two correspond to one

[10] And "*Peterson* does not extend" to situations where disclosures of ingredient and percentage choices, such as those in CN845, is "so broad as to encompass a very large number of possible distinct compositions." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1306-07 (Fed. Cir 2011).

[11] CN845 also does not disclose the use of sodium oleate. *See* Appx41-42; Appx3593 (1219:2-4); Appx3590 (1216:7-17).

another numerically." Br. 31. Fresenius fails to explain how the lecithin-to-aprepitant ratio is relevant to the analysis of the relevant limitation, which claims a specific concentration (14%) of egg lecithin. The claims at issue and CN845 itself are both directed to the weight percentage of emulsifier in the formulation, not to a ratio between specific ingredients (egg lecithin and aprepitant) in the formulation. Whether the very low levels of aprepitant that fell within CN845's teachings meant it also disclosed certain lecithin-to-active-ingredient ratios is simply irrelevant to the question of whether the claims at issue are obvious, particularly where CN845's teachings are capped at 10% emulsifier, regardless of any ratio.[12,13]

### C. Fresenius's Inherency Challenge to the Claims of the '794 Patent Is Meritless

As a last resort, Fresenius argues "the POSA would have sought to increase the stability of CN845 formulations to meet USP stability" and that "[o]nce arrived at the claimed formulation components, the corresponding stability goes hand-in-hand with the formulation itself, making stability an inherent property." Br. 37. But

[12] Fresenius asserts the district court "acknowledged that these ratios would have been relevant." Br. 33 (citing Appx38-39 n.9). That mischaracterizes the court's opinion. As the court observed, Fresenius relied on those references "only as examples of complexation, and not to show that a POSA would use a high concentration of lecithin in an aprepitant emulsion." Appx39 n.9.

[13] Fresenius's remaining arguments regarding reasonable expectation of success merely refer to its prior arguments concerning the lack of a motivation to combine, *see* Br. 28-29, and fail for the same reasons. *See* Section I.A, *supra*.

a party may not rely on inherency to prove a motivation to combine or reasonable expectation of success. *See Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017); *see also Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp.3d 566, 607 (D. Del. 2018) (Bryson, J.) (*Honeywell* reversed the Patent Trial and Appeal Board because "[t]he Board's obviousness analysis . . . erroneously relied on inherent but unknown properties in finding a motivation to combine" (footnote omitted)), *aff'd sub nom. Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019). Here, the district court's careful factual findings regarding the lack of motivation to use the claimed 14% egg lecithin with a reasonable expectation of success preclude a finding of obviousness based on inherency.

## II. THE DISTRICT COURT CORRECTLY FOUND THAT OBJECTIVE INDICIA OF NONOBVIOUSNESS FAVORED HERON

For the reasons discussed, the district court correctly held that the asserted claims would not have been obvious over the prior art. Nonetheless, the court also addressed objective indica of nonobviousness and correctly found they weighed in Heron's favor. Appx43-52. Objective indicia "serve to 'guard against slipping into use of hindsight,' and to resist the temptation to read into the prior art the teachings of the invention in issue." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966)). They include such considerations as "commercial success, long felt but unsolved needs,

[and] failure of others." *Graham*, 383 U.S. at 17. There must also be a "nexus"—"a sufficient relationship between that evidence and the patented invention." *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).

Although the district court stated the objective indicia in this case were "not powerful factors," it found the "long-felt unmet need for an injectable form of aprepitant," "failure of others to satisfy that need and . . . unexpected nature of the invention," and "commercial success of the product based on the invention" supported the conclusion of nonobviousness. Appx44; *see* Appx44-52. Those findings were correct, and certainly not clearly erroneous.

### A. There Was a Long-Felt Unmet Need for an Injectable Aprepitant Formulation

The evidence at trial established a persistent problem in treating CINV was the lack of a safe and effective injectable aprepitant formulation. Medical providers' only options were to administer aprepitant orally or inject the prodrug fosaprepitant, which converts into aprepitant in the bloodstream. Appx2496-97 (122:5-123:7). Both approaches were imperfect.

Oral aprepitant administration has limited effectiveness because the body metabolizes much of the drug before it reaches the brain, Appx3283-84 (909:6-910:8); Appx3315 (941:6-14), and has issues with patient compliance, Appx3391-92 (1017:12-1018:7). And while intravenous fosaprepitant administration avoided those issues, it caused injection-site reactions such as blood-

vessel inflammation and soft-tissue death. Appx3397-00 (1023:16-1026:2). Those reactions were so significant that the Mayo Clinic recommended against using intravenous fosaprepitant with certain kinds of chemotherapy. Appx3405-07 (1031:6-1033:2).

Heron solved those problems by inventing an aprepitant formulation that could be injected without injection-site reactions. As the district court found, "there was pressure in the industry to find a solution to the problems that were associated with oral aprepitant formulations and injectable fosaprepitant formulations that were eventually solved by Cinvanti®." Appx45.

There is a nexus, moreover, between the asserted claims and satisfaction of the long-felt unmet need. "[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016) (internal quotation marks omitted). Here, Cinvanti® is "an embodiment of the asserted claims." Appx3714 (1340: 21-22) (Little). And as demonstrated at trial, Cinvanti® addressed a long-felt unmet need by providing the benefits of an injectable CINV drug without intravenous fosaprepitant's drawbacks. *See* Appx3434 (1060:9-16); Appx3438-39 (1064:5-1065:22).

Fresenius resists this straightforward conclusion on several grounds, but none is persuasive.

**1. Fresenius Fails to Rebut the Presumption of Nexus**

Fresenius argues there is no nexus between the asserted claims and long-felt unmet need for an injectable aprepitant formulation. *See* Br. 41-43. It raises several points, including that: "[t]he trial court did not address why the claimed 14% lecithin addressed any long-felt need, as opposed to any other formulation with lecithin and without polysorbate 80," *id.* at 41; "PS80 is not excluded from the Asserted Claims," *id.*; "the Asserted Claims do not require a product that reduces any adverse events, and do not compare adverse event rates with fosaprepitant," *id.*; "physicians already addressed any concerns with other measures," *id.* at 42; "the prior art [i.e., CN845] already solved any alleged need," *id.*; and "Cinvanti® did not show a measurable improvement in [injection-site reactions] over fosaprepitant," *id.* Those points, however, are either factually wrong or legally irrelevant.

Taking them in order, Heron was not required to show that other, non-existent formulations could not address the long-felt need at issue, or that particular ingredients were excluded from the claimed formulation.[14] Heron is entitled to a presumption of nexus, and the burden was on Fresenius to rebut that nexus. It would

---

[14] *Sjolund v. Musland*, 847 F.2d 1573 (Fed. Cir. 1988), which Fresenius cites (Br. 41), is inapposite. There, the patentee could not show it addressed a long-felt need based on a feature that was not part of the claimed invention. *Id.* at 1582.

turn the objective indicia framework on its head to require a patent holder to prove that no ingredient, if used in conjunction with the claimed invention, could undermine the invention's ability to address the long-felt need. As this Court has explained in the related context of commercial success (discussed below), "[a] requirement for proof of the negative . . . would be unfairly burdensome, and contrary to the ordinary rules of evidence." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1394 (Fed. Cir. 1988).

Nor was Heron required to prove the asserted claims themselves referenced the long-felt need they addressed. Fresenius points to no such requirement in the case law, and this Court has regularly affirmed findings that asserted claims addressed a long-felt need where the claims did not reference that need. *See, e.g.*, *Amgen Inc. v. Sandoz Inc.*, 66 F.4th 952, 956, 964 (Fed. Cir. 2023) (affirming "there was a long-felt need for a psoriasis treatment that was suitable for oral administration to a patient without the risks and barriers to adherence that were common with other psoriasis treatments," despite claim not referencing that need).

Fresenius's remaining points also fail. The "other measures" Fresenius references did not solve injection-site reactions for all patients, particularly those who could not use a central line. *See* Section II.A.3, *infra*. CN845 did not solve any need, because it did not disclose a safe, commercially viable injectable aprepitant formulation. *See* Section II.B, *infra*. And Cinvanti® did in fact show an

improvement in injection-site reactions over intravenous fosaprepitant, notwithstanding Fresenius's arguments to the contrary. Appx51-52; *see* Appx46-47.

**2. There Was Sufficient Evidence at Trial to Show a Long-Felt Need**

Fresenius contends there was insufficient evidence to show a long-felt need for an injectable aprepitant formulation. Fresenius argues the need was only "moderate" before Heron's invention. Br. 46. It also tries to analogize to *PAR Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.*, 773 F.3d 1186 (Fed. Cir. 2014), where this Court held the district court did not clearly err in finding an "equivocal statement" that one "formulation may be preferable to" another failed to show the former formulation satisfied a long-felt need. *Id.* at 1200; *see* Br. 46. Those arguments fail.

Unlike in *PAR*, Heron presented *unequivocal* evidence of "an articulated identified problem"—namely, "an NK-1 receptor antagonist that was equally efficacious [as fosaprepitant] with fewer related side effects," Appx44—and "evidence of efforts to solve that problem." *WBIP*, 829 F.3d at 1334 (internal quotation marks omitted). That is sufficient to show long-felt unmet need. Fresenius cherry-picks trial-record excerpts to argue "doctors were not concerned with fosaprepitant's safety," and "there was no biological link between [injection-site reactions] and the PS80 in fosaprepitant." Br. 46-47. But contrary evidence

persuaded the district court, including "a number of publications that reached the opposite conclusion." Appx46 n.11 (citations omitted). Fresenius also argues the Mayo Clinic changed its guidelines because a different drug, rather than intravenous fosaprepitant, was causing injection-site reactions. *See* Br. 47. Again, trial evidence directly refuted that point. *See* Appx3409 (1035:9-12) ("[A]cross most key opinion leaders in this space, we attribute the side effects to the polysorbate 80 that's included in the drug."). Even Fresenius's expert testified polysorbate 80 had "known problems," including "some allergic type of reactions." Appx2497(123:1-3); Appx2521 (147:1-12).

### 3. Workarounds Reinforce the Long-Felt Unmet Need

Fresenius argues medical professionals had already developed "workarounds"—such as administering fosaprepitant through a "central line"[15]—to address intravenous fosaprepitant's injection-site reactions. *See* Br. 47-48. Those workarounds, however, merely reinforce the district court's finding that the relevant need was unmet. *See WBIP*, 829 F.3d at 1334 (efforts to solve carbon monoxide poisoning through workaround of replacing pipes on older generators were "substantial evidence" of "long-felt need").

[15] An intravenous drug administered via a "central line" or "central port" is administered through a vein closer to the heart than a peripheral vein. Appx2987-90 (613:15-616:19).

Fresenius attempts to distinguish *WBIP* by arguing the workaround there "did not solve th[e] problems." Br. 49. But nor did it here. As the district court correctly found, "workarounds such as the use of a central line or port were not available or advisable in all cases, so the risk of adverse reactions to the fosaprepitant-based drugs remained a concern in at least some instances." Appx45. Indeed, Dr. Markman, Fresenius's cancer-treatment expert, testified that intravenous fosaprepitant could be administered via central line for patients who already had a central line for chemotherapy, but central lines are not inserted for all chemotherapy patients, and administration of intravenous fosaprepitant would not by itself be a reason to insert one. Appx3083-84 (709:23-710:9). Importantly, where the central line workaround was not available, physicians could "substitute[e] Cinvanti" because it can be safely administered peripherally without injection-site reactions. Appx4605.

**4. The Number of Patients Affected by the Long-Felt Need Is Irrelevant**

Fresenius asserts there was no long-felt need because the number of patients who could not use a central line—and thus could not benefit from the workarounds—was relatively small. *See* Br. 49-50. There is no rule, however, that a long-felt need must affect a large population. Otherwise, treatments for uncommon diseases (and, more generally, inventions for niche problems) would categorically fail to benefit from this objective consideration. *Contra, e.g.*, *Amgen Inc.*, 66 F.4th

at 964 (no error in finding long-felt need for oral psoriasis treatment); *Amgen, Inc. v. Sandoz Inc.*, No. 3:18-cv-11026, 2021 WL 5366800, at *2 (D.N.J. Sept. 20, 2021) ("[P]soriasis affects approximately three percent of the U.S. population.").

This Court's decision in *Cubist Pharmaceuticals, Inc. v. Hospira, Inc.*, 805 F.3d 1112 (Fed. Cir. 2015)—which Fresenius invokes, Br. 49—is not to the contrary. There, the Court (in an opinion by Judge Bryson) affirmed the district court's finding that the claims were "not truly commensurate with the [asserted] long-felt need" because they covered treatment of bacterial infections generally, whereas the long-felt need existed only for a subset of infections. *Cubist Pharms., Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 666 (D. Del. 2014) (citation omitted). Here, by contrast, the asserted claims are commensurate with the long-felt need—the lack of an injectable aprepitant formulation.

In any event, Fresenius misstates the relative frequencies with which patients could and could not benefit from the asserted workarounds. Fresenius claims "[t]he trial court confirmed . . . a vast majority of patients were administered their drugs through a central line." Br. 50 (citing Appx45). But the district court said no such thing. To the contrary, the court found "workarounds such as the use of a central line or port were not available or advisable in all cases, so the risk of adverse reactions to the fosaprepitant-based drugs remained a concern in at least some instances." Appx45. Fresenius also claims "85% of patients used [a] central line."

Br. 50 (citing Appx4604). But the cited source is just a study in which anti-emetics "were given via central line in over 85% of cycles *in our sample*." Appx4604. The study says nothing about the real-world frequency with which providers use a central line. At bottom, Fresenius offers no basis to believe that workarounds were available only for some *de minimis* number of patients. And any such argument conflicts with the trial evidence, which "showed that the side effects from the available fosaprepitant formulations, which included the surfactant polysorbate 80, were a matter of some concern to practitioners." Appx46-47; *see also* Appx4641 (Mayo Clinic study noting "infusion site adverse events were a prominent and substantial problem for a significant number of patients").

### B. The Failure of Others and Unexpected Results Weigh in Heron's Favor

For similar reasons, the failure of others to invent an injectable aprepitant formulation and the unexpected results Heron achieved also weigh in favor of nonobviousness. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012) ("Longfelt need is closely related to the failure of others."). As this Court has explained, "when the evidence indicates that others found development of the claimed invention difficult and failed to achieve any success . . . evidence of failed attempts by others could be determinative on the issue of obviousness." *Id.* at 1081 (internal quotation marks omitted). Here, the evidence established aprepitant had been known for twenty years

prior to the claimed invention, but no injectable aprepitant formulation had been brought to market despite efforts by companies like Merck. *See* Appx3329-30 (955:10-956:9); Appx3696-97 (1322:21-1323:21). Indeed, Dr. Hale—one of the inventors of aprepitant and fosaprepitant—testified that, upon learning of Heron's invention, his reaction was "surprise[], but kudos, good job," because "someone had cracked this problem that we weren't able to solve." Appx3329-30 (955:24-956:5). It is hard to imagine a clearer statement of the failure of others to develop an injectable aprepitant formulation, and the unexpected nature of Heron's success.

Given that Heron succeeded by developing Cinvanti®—and given that Cinvanti® embodies the asserted claims—Heron is entitled to a presumption of nexus. Fresenius attempts to rebut this presumption by arguing that "the court did not compare the stability of the Asserted Claims to the closest prior art"—*i.e.*, Zhou and CN845—and that "there was no showing others failed to make a stable aprepitant IV formulation at any time, much less after CN845 published." Br. 43-44. The district court did, however, compare the asserted claims to Zhou and CN845, and correctly found the latter "were not sufficiently stable for commercial use, while the formulations recited in the [asserted] claims were shown to have long-term stability." Appx48; *see* Appx17. Likewise, the evidence showed others failed to make an injectable aprepitant formulation that was sufficiently stable for commercialization—including CN845 and Zhou. Heron was not required to show

that still others failed after the closest prior art became known, when that art was itself a failure. *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d at 1081-82 (the failure of a single competitor "strongly supports a nonobviousness finding").

Likewise, Fresenius's argument that the district court's analysis was internally inconsistent lacks merit. Br. 50-51. The district court correctly recognized that others, including the CN845 and Zhou authors, had failed to develop a stable, injectable aprepitant formulation. Appx48. As just discussed, Heron was not required to show additional, more recent failures. And the district court correctly found that Dr. Hale's surprise at Heron's success—along with corroborating publications—supported a finding of unexpected results. Appx49. Fresenius argues those findings are inconsistent with the district court's recognition that publication of CN845 mitigated the strength of the "failure of others" and "unexpected results." But the court properly accounted for that mitigation by finding those factors favored Heron "only moderately." *Id.*

Fresenius's remaining arguments are similarly unavailing. Fresenius again asserts that the district court failed to compare the asserted claims to the closest prior art and contends that Heron's reproduction of CN845 was flawed for purposes of measuring stability. Br. 51-52. But CN845 did not disclose any stability data of its own. *See* Appx3619. And although Zhou disclosed some stability data, the district court correctly recognized that data did not meet USP standards. Appx16 (citing

Appx2582-83 (208:9-209:11)). Moreover, as the district court found, unrebutted testimony established based on Examples 4 and 5 of the patents-in-suit that "the formulations disclosed in CN845 and the Zhou article formed crystals within four days, and thus were not sufficiently stable for commercial use." Appx48.

Relatedly, Fresenius argues that the district court erred in finding "a difference in kind and not degree between the 4 days of stability Heron achieved with its 'reproduction' of CN845 and the 7 days of stability required by the Asserted Claims." Br. 52. As Dr. Little explained, though, "if a formulation isn't stable for one week, it becomes almost impossible to commercialize." Appx2916 (542:4-7). Patients cannot use a less stable product. *See* Appx3721 (1347:1-4). The district court was entitled to credit that "unrebutted" testimony, and it was correct in rejecting Fresenius's "assert[ion] that the ability to commercialize a product is irrelevant." Appx48 & n.12. As the court explained, "[i]t is readily apparent that a drug that cannot be commercialized is of reduced value and does not represent success for an industry that is focused on bringing new pharmaceutical products to market." *Id.*

Finally, Fresenius renews its argument that there was no evidence of failures following CN845. Br. 53-54. As Heron has already explained, CN845 was itself a failure because it did not disclose an injectable aprepitant formulation that was sufficiently stable for commercial use. That failure supported the district court's

finding of nonobviousness, and Heron was not required to introduce evidence of other, more recent failures.

### C. Heron's Commercial Success Is Evidence of Nonobviousness

The district court also correctly found that the commercial success of Cinvanti® was evidence of nonobviousness. "When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). There was no dispute that Cinvanti® has enjoyed considerable commercial success. Appx51 ("Fresenius acknowledged that Cinvanti® is 'doing exceedingly well in the market . . . .'" (citation omitted)). Accordingly, Heron was entitled to a presumption that Cinvanti®'s commercial success was due to the asserted claims.

Fresenius tries to rebut that presumption by arguing that Cinvanti® "was not on the market at the same time as the prior art aprepitant formulation," and that "[n]one of the purported benefits the court found that made Cinvanti® successful . . . are connected to the Asserted Claims at all." Br. 45 (internal quotation marks omitted). But if the "prior art" to which Fresenius is referring are the formulations of CN845 and Zhou, then those were never on the market at all because they were not stable enough to provide to patients. And the benefits the district court found

made Cinvanti® successful—in particular, "the benefits of intravenous delivery, while being free of polysorbate 80, and thus . . . [avoiding] the risk of side effects in the form of injection-site adverse reactions," Appx51—are connected to the asserted claims. Indeed, the core of Heron's success was development of a stable, injectable aprepitant formulation that does not cause injection-site reactions.

Fresenius also argues Cinvanti®'s commercial success was caused by its pricing. Br. 54-55. The district court correctly found, though, that Cinvanti®'s success was attributable both to pricing strategy and the advantages of its patented formulation. Appx52. Fresenius points to evidence that Cinvanti® lost market share upon introduction of a lower-priced, generic intravenous fosaprepitant. Br. 54 (citing Appx3555-56). But the same evidence showed that, in the years after those lower-priced generics were introduced, Cinvanti® consistently retained a substantial market share, notwithstanding the pricing differential. *See* Appx3550-51 (1176:18-1177:9). Moreover, Cinvanti® has retained its market share even at times when net-cost recovery—that is, "how much [hospitals] can make by using" a drug, Appx3201 (827:11-14)—was higher for generic intravenous fosaprepitant. *See* Appx5082. That evidence supported the district court's finding that Heron's success was attributable at least in part to the asserted claims.

* * *

The district court correctly found that the objective indicia, though not "powerful factors" in this case, further supported the nonobviousness finding. In any event, Fresenius cannot succeed in showing that the district court clearly erred in finding no motivation to combine and no reasonable expectation of success.

## CONCLUSION

The district court's judgment should be affirmed.

Date: August 4, 2025

Respectfully submitted,

*/s/ Isaac S. Ashkenazi*

Benjamin W. Snyder
Igor V. Timofeyev
Karthik R. Kasaraneni
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C. 20036
(202) 551-1700

Isaac S. Ashkenazi
Bruce M. Wexler
Ben Gifford
Christopher P. Hill
Mark Russell Sperling
Justin T. Fleischacker
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

*Counsel for Appellee*
*Heron Therapeutics, Inc.*

August 4, 2025

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

**1. This brief complies with the type-volume limitation of Federal Circuit Rule 32 and Federal Circuit Rule 28.1(b)(1)(A).**

The brief contains 13,838 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

**2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).**

The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font.

Date: August 4, 2025 BY: /s/ Isaac S. Ashkenazi

Isaac S. Ashkenazi
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000