**2025-1355**

# United States Court of Appeals for the Federal Circuit

HERON THERAPEUTICS, INC.,

*Plaintiff-Appellee,*

– v. –

FRESENIUS KABI USA, LLC,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Delaware in Case No. 1:22-cv-00985-WCB*

## REPLY BRIEF FOR DEFENDANT-APPELLANT

IMRON T. ALY
HELEN H. JI
KEVIN M. NELSON
ARENTFOX SCHIFF LLP
*Counsel for Defendant-Appellant*
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500
imron.aly@afslaw.com
helen.ji@afslaw.com
kevin.nelson@afslaw.com

SEPTEMBER 24, 2025

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1355

**Short Case Caption** Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC

**Filing Party/Entity** Fresenius Kabi USA, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/24/2025

Signature: /s/Helen H. Ji

Name: Helen H. Ji

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Fresenius Kabi USA, LLC | | Fresenius Kabi Pharmaceuticals Holding, LLC; Fresenius Kabi AG; Fresenius SE & Co. KGaA |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC

**CERTIFICATE OF INTEREST**

**4. Legal Representatives** (continued from page 3):

ArentFox Schiff LLP:

- Imron T. Aly
- Kevin M. Nelson
- Helen H. Ji
- Mallory McMahon
- Chad Watson
- Julie Vernon

Smith, Katzenstein & Jenkins, LLP:

- Neal C. Belgam
- Daniel A. Taylor
- Eve Ormerod

## TABLE OF CONTENTS


ARGUMENT ..... 1

I. HERON DISREGARDS THE TRIAL COURT'S FINDINGS AND THE FACTUAL RECORD ..... 2

- A. Heron Misrepresents CN845 As Teaching An "Upper Limit" ..... 3
- B. Heron Misrepresents Zhou, Which Supported Obviousness ..... 5
- C. No "Subsequent Prior Art" Weighs Against Obviousness ..... 8
- D. The Trial Court Never Rejected Complexation And Motivation To Increase Surface Area ..... 9
- E. Heron Misrepresents Washington ..... 11
- F. The Trial Court Rejected Liu Without Basis ..... 12
- G. Heron's Internal Confidential Testing Is Irrelevant To A POSA's Understanding Of The Prior Art ..... 15

II. THE TRIAL COURT'S FINDINGS ALSO CONFIRMED REASONABLE EXPECTATION OF SUCCESS ..... 16

- A. Heron Misunderstands The Case Law For Routine Optimization ..... 17
- B. The Trial Court Selectively Ignored The Emulsifier-to-Drug Ratios ..... 19

III. HERON'S ATTEMPT TO TIE INHERENCY TO MOTIVATION AND/OR REASONABLE EXPECTATION OF SUCCESS IS LEGALLY FLAWED ..... 20

IV. HERON HIGHLIGHTS THE TRIAL COURT'S FLAWED SECONDARY CONSIDERATIONS ANALYSIS ..... 21

A. The Trial Court Overlooked Nexus And The Scope Of The Asserted Claims ....................22

B. Heron Cannot Reconcile The Trial Court's Remaining Secondary Considerations Analyses ....................23

1. Heron Ignores The Law To Justify The Trial Court's Long-Felt But Unmet Need Analysis ....................24

a. ISAE Reduction Is Not Within The Scope Of The Claims, And Was Addressed By The Industry ....................24

b. Prior Art Also Addressed The Alleged Needs ....................26

2. Heron Does Not Address The Trial Court's Inconsistencies Where Evidence Showed No ISAE Improvement ....................26

3. Heron Relies On A Flawed Failure And Expectations Analysis ....................28

4. Heron Fails To Support The Trial Court's Incorrect Commercial Success Analysis ....................29

CONCLUSION ....................30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS ....................31

# TABLE OF AUTHORITIES

## Cases

*ABT Sys., LLC v. Emerson Elec. Co.*,
797 F.3d 1350 (Fed. Cir. 2015) ........ 23, 26

*Agfa Corp. v. Creo Prods. Inc.*,
451 F.3d 1366 (Fed. Cir. 2006) ........ 9

*Asyst Techs., Inc. v. Emtrak, Inc.*,
544 F.3d 1310 (Fed. Cir. 2008) ........ 26

*Boston Sci. SciMed, Inc. v. Iancu*,
811 F. App'x 618 (Fed. Cir. 2020) ........ 24

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) ........ 28, 29

*Cubist Pharms., Inc. v. Hospira, Inc.*,
805 F.3d 1112 (Fed. Cir. 2015) ........ 25

*Dey, L.P. v. Teva Parenteral Medicines, Inc.*,
6 F. Supp. 3d 651 (N.D.W.V. 2014) ........ 15

*Ethicon Endo-Surgery, Inc. v. Covidien LP*,
812 F.3d 1023 (Fed. Cir. 2016) ........ 22

*Galderma Lab'ys, L.P. v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013) ........ 2

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ........ 2

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ........ 21

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
946 F.3d 1322 (Fed. Cir. 2020) ........ 21

*Intendis GMBH v. Glenmark Pharms. Ltd.*,
117 F. Supp. 3d 549 (D. Del. 2015), *aff'd*, *Intendis GMBH v. Glenmark Pharms. Inc., USA*, 822 F.3d 1355 (Fed. Cir. 2016) ........ 18

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ........................................................................ 2, 14

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007)..........................................................................21

*ModernaTx, Inc. v. Arbutus Biopharma Corp.*,
18 F.4th 1364 (Fed. Cir. 2021) .........................................................................18

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*,
139 F.3d 877 (Fed. Cir. 1998)...........................................................................24

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2020)..........................................................................26

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006).................................................................. 22, 29

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009)..........................................................................27

*Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*,
323 F. Supp.3d 566 (D. Del. 2018) , *aff'd sub nom. Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019). .......................21

*Pfizer Inc. v. Sanofi Pasteur Inc.*,
94 F.4th 1341 (Fed. Cir. 2024) ................................................................. 17, 18

*Pfizer, Inc. v. Apotex Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)..........................................................................28

*Sjolund v. Musland*,
847 F.2d 1573 (Fed. Cir. 1988)..........................................................................23

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)..........................................................................14

*Spectrum Pharms., Inc. v. Sandoz, Inc.*,
802 F.3d 1326 (Fed. Cir. 2015)..........................................................................27

*Teva Pharms. Int'l v. Eli Lilly & Co.*,
8 F.4th 1349 (Fed. Cir. 2021) ...........................................................................22

## ARGUMENT

In responding to the trial court's findings showing obviousness, Heron repeatedly ignores and outright contradicts the trial court's findings to cobble together support for its position. Importantly, Heron does not dispute the trial court's determination that the prior art would have motivated the POSA to reach 14% lecithin; instead, it attempts to redirect focus onto art that used lower lecithin amounts for other drugs and other purposes. Heron and the trial court erred by selectively relying on these other references, none of which pointed away from the disclosures that already established a POSA's understanding of how to formulate ***aprepitant emulsions in particular***. In other words, the trial court ignored the knowledge and motivation of a POSA based on pertinent prior art, and, instead, required Fresenius Kabi to show all of the claim elements in one reference. But obviousness is not anticipation: whether the art specifically disclosed 14% lecithin is not required to show obviousness. A POSA would have arrived at that amount in view of the prior art trend of using more lecithin for aprepitant emulsions using routine experimentation. The trial court's failure to reject the "weak" secondary considerations due to lack of nexus to the patent claims similarly was legal error. For these reasons, the trial court's own findings should have resulted in an obviousness holding, and it was error to conclude otherwise. This Court should therefore reverse the trial court's ruling. *See, e.g.*, *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731,

737-38 (Fed. Cir. 2013) (reversing the district court's obviousness analysis for error); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 404 (2007) (same); *Graham v. John Deere Co.*, 383 U.S. 1, 25, 37 (1966) (same).

## I. Heron Disregards the Trial Court's Findings and the Factual Record

Heron incorrectly accuses Fresenius of "cherry picking" from the trial court's findings. Br. 24. Instead, the additional "facts" Heron relies upon in its brief are actually contradicted by the trial court's factual findings. The trial court expressly found a POSA would have:

**(i) Recognized** CN845:

- "was a 'game changer' that 'transformed' the state of the art for aprepitant formulations," Appx11;
- taught all claimed components, including 0.5% to 10% egg yolk lecithin as the emulsifier, Appx32-33; and
- "recommended the use of an emulsifier at the **top** of the 0.5% to 10% range," Appx33 (emphasis added).

**(ii) Been motivated to**:

- further improve the CN845 formulations to increase stability, specifically to meet USP, Appx29-31; and

- "[c]onsider using an increased concentration of the emulsifier" because a POSA would have recognized the "possibility of complexation—and the resulting increase in stability of the emulsion," Appx40.

**(iii) Reasonably expected**, or even "[k]nown that":

- "increasing the concentration of the emulsifier [i.e. egg yolk lecithin] in the aprepitant emulsion would increase the surface area of the interface between the oil and water phases of the emulsion, thus potentially increasing the stability of the composition," Appx34.

While the trial court called this a "close" case, Appx57, the court's factual findings actually showed all of the requirements for obviousness were undoubtedly met: CN845 showed working emulsions with aprepitant; a POSA would have sought to add more emulsifier to increase stability; and a POSA would have reasonably expected the increased stability in view of increased surface area where drug could be present within the emulsion. In view of these express findings, the trial court erred by concluding Fresenius had not shown obviousness.

### A. Heron Misrepresents CN845 As Teaching An "Upper Limit"

Heron erroneously alleges "CN845 itself set an upper limit of 10% for egg lecithin despite utilizing a 'technique of increasing emulsifier to increase aprepitant solubility.'" Br. at 25. While CN845 did employ a range that went up to 10%, a POSA would not have understood it to set or even imply any upper limit. To the

contrary, CN845 proved (and represented the first disclosure of) the concept that aprepitant emulsions worked; it is far from the last word as Heron implies. In fact, the trial court itself expressly found "nothing in [CN845] indicated that a concentration any higher than 10% would cause the emulsion to fail." Appx33-34. The court further confirmed a POSA would have recognized increasing egg lecithin would be beneficial, Appx34, and there was no reason to believe that 10% lecithin represented a cutoff, FK Br. at 22-24.

Heron's assertion regarding this alleged upper limit ignores the fact that the trial court credited CN845 as a "game changer" because it taught the POSA a *new* way of using egg yolk lecithin specific to aprepitant, upon which a POSA could improve and build. Appx11. Before CN845, the conventional use of emulsions was for drugs insoluble in water alone. Appx11. CN845's breakthrough was realizing that drugs like aprepitant—insoluble in *both* water and oil—could be formulated in emulsions by using much higher levels of emulsifier than previously employed for other drugs or other applications. Appx11. In contrast, references using lower amounts of egg yolk lecithin under the "conventional" approach reserved for water-insoluble only drugs simply did not require additional lecithin to achieve optimal stability. Appx11. Thus, CN845 taught the concept of *increasing* emulsifier—not *limiting* emulsifier, and the POSA would have found it obvious to extend that concept after seeing CN845's initial successful report.

### B. Heron Misrepresents Zhou, Which Supported Obviousness

Heron's brief relies heavily on Zhou, which like CN845 used egg lecithin to "successfully solubilize[] aprepitant in an emulsion." Appx33. But Zhou supports obviousness because it confirmed CN845's emulsion method works. Zhou even tested the concept with a further series of stability tests, continuing the same theme: varying egg lecithin quantities will impact stability testing through routine optimization. Appx27 ("the POSA would have known from the Zhou article that the method used in CN845 produced an aprepitant emulsion that was stable"). The next step for a POSA would have been to extend CN845 and Zhou's work, by updating the formulations to comply with USP standards. Appx29-30 ("After learning that CN845 and Zhou had success with solubilizing aprepitant in an emulsion suitable for intravenous injection, a POSA would recognize that the next step toward, commercializing an intravenous aprepitant emulsion would be to modify the formulation to meet regulatory requirements in the United States, including the USP guidelines."). The question was therefore whether a POSA would have found it obvious to modify lecithin amounts for the specific goal of meeting the full set of USP standards—of which Zhou had tested only one. Heron acts as if Zhou already tested and confirmed all USP standards could be satisfied with lower than 14% lecithin—in which case it would have made sense to question why a POSA would have changed Zhou at all; but the trial court already found Zhou did ***not*** test to USP

and a POSA ***would*** have been motivated to "improve the stability of the formulation to meet the USP standard." Appx27, Appx49. Heron is thus wrong to assert that a POSA would have relied on Zhou as a strict recipe, and to assume the trial court found that a POSA would have been limited to the lecithin amounts used therein; that analysis implies anticipation, not obviousness.

Heron also misrepresents Zhou in two significant ways. *First*, Heron repeatedly asserts Zhou's 2.5% egg lecithin concentration was "optimal" and incorrectly alleges this would have prevented a POSA from engaging in further routine optimization. Br. at 27, 34. However, Zhou was addressing a limited purpose, and for ***that*** purpose, 2.5% was enough. The trial court recognized that a POSA would not expect what was optimal to achieve $K_e$ (Zhou's goal) had to be the same as what is optimal to achieve USP (the POSA's goal for obviousness here). *See* Appx27. Heron argues "the fact that Zhou was not seeking to meet USP standards is irrelevant," Br. at 34, but that argument undermines Heron's position. After all, the entire point of using CN845 and Zhou was to show that a POSA would have been motivated to continue developing aprepitant emulsions, with the final step of varying lecithin levels to meet USP standards. Heron's assertion also completely disregards the trial court's findings that "after learning that CN845 and Zhou had success with solubilizing aprepitant in an emulsion suitable for intravenous injection, a POSA would recognize that the next step toward commercializing an intravenous aprepitant

emulsion would be to modify the formulation to meet regulatory requirements in the United States, including the USP guidelines." Appx29-30. Thus, it was central to the obviousness analysis that Zhou had not yet tested or achieved USP standards, and a POSA would have been keenly motivated to routinely optimize its excipients to do so. Heron also argues "Zhou's use of a smaller percentage of aprepitant that CN845 is similarly uninstructive" because the claims are directed to the weight ***percentage*** of egg lecithin and not weight ***ratios***. Br. at 34. But these are two terms describing the same concept: using excess egg lecithin improves stability. The trial court even expressly found that a POSA would have understood the function of egg lecithin to create complexes that increase the oil/water interface surface area until it is enough to hold (i.e., solubilize) aprepitant. Appx14-15. In short, a POSA would have understood more lecithin provides more stability; that was the state of the art and what was left for a POSA was to identify what that upper bound was. Appx2603-2604 (229:14-230:6).

Second, Heron baselessly alleges Zhou was "follow-on work" to CN845 to suggest the inventors moved from the 8-10% recommendation in CN845 down to the 2.5% used in Zhou. Br. at 27. Not so. CN845 and Zhou—especially in view of the POSA's knowledge as shown in Washington—confirmed that adding more lecithin increased stability. To the extent the trial court viewed Zhou a "follow-on" to CN845, which somehow limited the reference, that was error. Both CN845 and

Zhou were published in the same year (2012) and, although Zhou published slightly after CN845, Dr. Rabinow confirmed it was unclear which research was performed first. Appx2694-2695 (321:13-16). Heron did not dispute this position. The trial court's opinion treated CN845 and Zhou as collective research so Heron cannot reasonably conclude that a POSA would have viewed work in one as somehow narrowing the other. *See, e.g.*, Appx10, Appx12.

### C. No "Subsequent Prior Art" Weighs Against Obviousness

Heron wrongly asserts "[s]ubsequent prior art" shows scientists were not motivated to exceed 10% emulsifier. Br. at 29. However, in supporting this argument, the only reference Heron identifies is not "subsequent." Heron claims Hingorani "was filed in 2013, after Zhou," Br. at 29; Heron omits the fact that Hingorani claimed priority to a provisional application dated May 24, 2012—contemporaneous with the CN845 and Zhou publications, Appx4296. In any event, this is not a situation where Hingorani discussed CN845 or Zhou, and there is no basis to assume Hingorani even knew about those references. The trial court certainly made no such findings, which Heron now deems important to its position. In fact, the only "subsequent" art known to have had relied on these references is the Heron patents themselves, based expressly on CN845 and Zhou. Appx20. The trial court expressly found "[t]here was no evidence at trial that others who had access to the CN845 application had tried and failed to formulate an emulsion stable enough

to satisfy the USP standards, and there was no evidence that others in the field regarded Heron's success as unexpected after the groundbreaking work had been done by the Chinese scientists." Appx49.

### D. The Trial Court Never Rejected Complexation And Motivation To Increase Surface Area

Heron alleges the trial court "rejected Fresenius's argument regarding complexation," Br. at 37, but the record in fact shows the opposite. The trial court found: "Heron challenges Dr. Rabinow's testimony about complexing and his conclusion that a POSA would have considered increasing the emulsifier concentration in order to facilitate complexing between the aprepitant and emulsifier molecules, ***but, as explained above, I find Dr. Rabinow's testimony about the phenomenon of complexing to be credible***." Appx39 (emphasis added); *see also Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (noting this Court "defer[s] heavily to the trial court's credibility determinations" (citation omitted)). Additionally, the trial court correctly found a POSA would have been "encourag[ed]" to increase emulsifier concentration based on complexation and surface area principles known to the POSA, Appx40, but erred by disregarding this finding in favor of other references that happened to be different (though they did not teach away), FK Br. at 24-26.

Heron also points to EP'279, Yue, and Agarwal, Br. at 37, but none of these references were cited in Fresenius's opening brief, and the trial court determined

those references are "not probative of the issues in this case." *See* Br. at 37-38. Moreover, Heron's arguments concerning these references support Fresenius's position: the trial court determined EP'279, Yue, and Agarwal demonstrated "examples of complexation," and also confirmed that the POSA would have focused on references closer to the problem to be solved: CN845, Zhou, and Washington (all of which support obviousness). *See* Appx39.

Heron next alleges "the district court [. . .] rejected Fresenius's argument that a POSA would have been motivated to increase the egg lecithin concentration over CN845's 10% limit to achieve smaller droplets with a larger total surface area." Br. at 35. Again, the record shows the exact opposite. The trial court expressly credited Dr. Rabinow's explanation for how the emulsifier forms an interface between the oil and water phases where aprepitant can remain stable, stating: "I ***found his testimony on the science of emulsions to be credible and consistent*** with the other evidence in the case." Appx13-14 (emphasis added). The trial court also expressly found "a POSA would have known that, up to a point, increasing the concentration of the emulsifier in the aprepitant emulsion would increase the surface area of the interface between the oil and water phases of the emulsion, thus potentially increasing the stability of the composition." Appx34. The trial court certainly did not identify 10% as a "limit," based on the finding that "nothing in the [CN845] publication indicated that a concentration any higher than 10% would cause the emulsion to fail."

Appx33-34. Based on the trial court's own findings, the obvious next step would have been to identify that point, which Heron never showed was known *a priori*.

**E. Heron Misrepresents Washington**

Heron alleges that Washington should be distinguished because "post-load" is somehow different from what the Asserted Claims require. Br. at 36. But the claims require no such order of events, and the trial court made no other finding supporting Heron's view. Appx36. To the contrary, the trial court relied on Dr. Rabinow's explanation of Washington and post-loading to explain why increased surface area is important. *Compare* Appx17-18, *with* Appx2549-2551 (175:24-177:2). In fact, despite Heron's assertions, the trial court actually found that Washington ***confirmed*** Dr. Rabinow's explanations of POSA knowledge, including that "drugs that are poorly soluble in both water and oil (such as aprepitant) 'can only be loaded into an emulsion by adsorbing to the [oil] droplet interface,'" such that the "large surface area available for loading" is "often necessary." Appx17.

While the example the court cited from Washington did contain 1.2% egg lecithin, that disclosure was relevant to a drug other than aprepitant, and Washington never discussed or described 1.2% as a cap. In addition, because the drug in Washington was soluble in oil, unlike aprepitant, Dr. Rabinow explained a POSA would have known it accordingly would require less interface surface area (and thus less lecithin) to achieve adequate stability. Appx4551, Appx2822-2823 (448:2-

449:11). It certainly would not have deterred a POSA's expectations on using higher amounts for aprepitant—particularly in view of the lead references CN845 and Zhou that actually formulated aprepitant.

### F. The Trial Court Rejected Liu Without Basis

Heron next addresses Liu, Br. at 38-40, which taught using 5-30% emulsifier in pharmaceutical formulations, Appx34, and supports obviousness by disclosing emulsifier ranges that include the claimed 14%. While CN845, Zhou, and Washington alone were sufficient to show obviousness, Liu provided consistent additional evidence showing that a POSA would have had guidance on available emulsifier concentration ranges during routine optimization. Appx27. The trial court discounted Liu's guidance, Appx37, but the trial court never found Liu weighs *against* obviousness. Appx35-36 (summarizing Heron argument that Liu "has no application to the emulsions at issue in this case"). In the context of CN845, Zhou, and Washington, the trial court's analysis of Liu was legal error.

The trial court erred by viewing Liu under an anticipation lens instead of obviousness. It focused on whether Liu matched all the limitations of the claims—and itemized differences—rather than assessing what a POSA would have taken away. Appx37. Under the proper analysis, because Liu provided an emulsion range up to 30%, a POSA would have considered it to predefine an operable range. Heron's attempt to distinguish Liu is based on semantics: Liu used the word

"microemulsions" and the claims are directed to "emulsions." Br. at 38-39. But the claims do not require the composition to be an emulsion or exclude microemulsions. Appx5. Further, Heron's argument fails because the trial court already found to the contrary: "I agree with Fresenius that a person of skill in the art would consider the Liu reference to have at least some application to an emulsion such as the emulsions in CN84[5] and Zhou, in which the particles were much smaller than in classical emulsions." Appx36-37. That finding, in turn, was based on Dr. Rabinow's testimony that, "a POSA would have understood Liu's reference to a suitable emulsifier concentration of between 5 and 30% in microemulsions to be equally applicable to classical emulsions" because "[b]iocompatibility and safety are similar for microemulsions or emulsions." Appx36-37. A proper obviousness analysis would not have completely disregarded Liu in view of the finding that the POSA would have considered that reference.

Heron exaggerates the relatively minor differences between Liu and the claims. Br. at 39. The specific examples in Liu did list certain excipient examples; however, a POSA would not have required Liu to list every alternative. Rather, as the trial court found, a POSA would have recognized CN845 and Zhou added excess emulsifier—in particular lecithin—Appx16, and a POSA would have sought to add lecithin concentration to increase stability, Appx34. In other words, CN845 provided the recipe and Liu provided additional parameters confirming the POSA's

knowledge about known emulsion concentrations. Appx4489 ("This paper primarily discusses the consideration factors for and stability evaluation of injectable microemulsions during the preparation thereof."). Liu also disproved Heron's central assumption that a POSA would not have used more than 10% lecithin.

Liu provides the very type of context that a POSA would have identified to assess safe and effective emulsifier amounts. *See KSR.*, 550 U.S. at 418. Indeed, Heron never rebutted Dr. Rabinow's testimony that Liu taught ranges that corresponded to safe and effective emulsifier concentrations. Plaintiffs instead now cite to *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006), for the proposition that "mere statements of disagreement with the district court as to the existence of factual disputes do not amount to a developed argument." Br. at 39. But Fresenius did not raise a mere factual disagreement; the error is that the trial court made a factual finding that Liu was relevant but then failed to apply the appropriate obviousness analysis for how a POSA would have considered Liu. The trial court instead appeared to require an express teaching, suggestion, or motivation—which proposition *KSR* has overruled. *See KSR*, 550 U.S. at 418. Heron still makes this argument, even going so far as to say that Liu's emulsifier range was not identical to other prior art formulations, so should be discredited for that reason. Br. at 40. The central question for obviousness is whether a POSA would have been motivated to combine references with a reasonable expectation of success;

the answer to that question—in view of the trial court's own findings—should undoubtedly have been yes.

### G. Heron's Internal Confidential Testing Is Irrelevant To A POSA's Understanding Of The Prior Art

The trial court relied heavily on Heron's own internal confidential testing to support non-obviousness. *See, e.g.*, Appx16-17, Appx20-21. Internal confidential testing is irrelevant to the obviousness analysis because it says nothing about what a POSA would have known or expected: "[o]bviousness is concerned only with public knowledge, what a person of ordinary skill in the art would know based on the prior art"—not undisclosed internal testing. *Dey, L.P. v. Teva Parenteral Medicines, Inc.*, 6 F. Supp. 3d 651, 678 (N.D.W.V. 2014) ("Thus, such [internal] data is not relevant to an assessment of whether the Asserted Claims were obvious"). Nevertheless, repeating the trial court's error, Heron points to its own internal testing of CN845 to argue "CN845 did not achieve any meaningful stability." Br. at 26. Even if a POSA were to rely on Heron's internal confidential testing, the evidence showed the POSA would have reached the same conclusion: confirm that CN845 did not use enough lecithin to achieve the claimed USP test results and add more lecithin through routine experimentation and confirm that result is achieved. This is regardless of the fact that Heron did not accurately reproduce the CN845 and Zhou prior art references. For example, Heron's alleged reproduction of Zhou contained much lower emulsifier and a different pH. *See, e.g.*, Appx2918-2921; Appx2875; Appx2887;

Appx3793-3795. And Heron never followed *any* examples of CN845 let alone its Example 1. Appx2864; Appx2908-2909; Appx2914-2915; Appx2664.

At bottom, Heron does not overcome the trial court's findings that both "CN845 and Zhou reported success in creating an injectable aprepitant formulation" and "a POSA would recognize that the next step toward commercializing an intravenous aprepitant emulsion would be to modify the formulation to meet regulatory requirements in the United States, including the USP guidelines." Appx16, Appx29-30.

## II. The Trial Court's Findings Also Confirmed Reasonable Expectation of Success

The trial court found that a POSA would have understood increasing emulsifier concentration would increase stability, and CN845 did not raise any concerns with going above 10%. Appx33-34. Coupled with the scientific principles known to a POSA—and documented in Washington—the POSA would have had a reasonable expectation of success that CN845 and Zhou already did the inventive work. The remaining step was to routinely optimize to meet USP specifications, and that was the supposed crux of what Heron did. As a result, Heron is now left with weak responses to routine optimization and ratios, including a series of footnotes. *See* Br. at 41-47.

### A. Heron Misunderstands The Case Law For Routine Optimization

On the merits, Heron is wrong as a matter of law; it argues that "routine optimization" cannot be applied where the range of values is not expressly disclosed in the prior art. Br. at 41. *Pfizer* already found the opposite: the prior art did not need to expressly disclose ***any*** of the claimed molecular weight ranges for the claimed serotype 22F glycoconjugate where motivation and reasonable expectation of success pointing toward that range otherwise existed. *Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341, 1347-49 (Fed. Cir. 2024). The same is true here. In fact, Heron's description of *Pfizer* underscores its similarity to the facts in the present matter. Heron itself emphasizes that, in *Pfizer*, the prior art did not disclose the claimed molecular weight of the claimed serotype, but instead disclosed molecular weights of *other* glycoconjugates. Br. at 42. So too here, even under Heron's own argument that Liu's injectable microemulsions are *other* types of emulsions, Liu disclosed 5-30% emulsions, which undoubtedly includes the claimed 14% egg lecithin value. Appx34. Moreover, the trial court here found CN845 did not deter a POSA from exceeding 10% specifically for aprepitant, Appx33-34, so there again the prior art justified the POSA's next step. Zhou even did some limited stability testing (though not all of the USP tests) and already confirmed that aprepitant emulsions met some of the stability criteria. Appx16. Heron's own expert Dr. Little conceded "the performance of a stability test is routine," Appx3767, just like the routine

"conjugation techniques and conditions" required in *Pfizer*, 94 F.4th 1348. Against all this evidence, Heron never showed adding emulsifier beyond 10% caused the emulsion to fail or somehow negatively impacted stability. Appx3800-3801. The trial court erred in finding no obviousness, and Heron's attempt to defend that error falls flat in view of the one-sided evidence confirming a reasonable expectation of success.

Heron cites to *ModernaTx* and *Intendis* to allege the formulation was too "unpredictable" for routine optimization. Br. at 44. Neither case supports Heron's allegations. *ModernaTx* discusses a situation where multiple and inter-connected result-effective variables are present in a claimed formulation. *See ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1364, 1376 (Fed. Cir. 2021). Here, in contrast, the evidence showed one variable was result-effective, and that was emulsifier concentration. FK Br. at 30. Similarly, *Intendis* is inapposite because unlike the extensive testimony and admissions in this case explaining the routine optimization a POSA would have undertaken, there the challenger had not described the "routine nature of optimizing a formulation." *Intendis GMBH v. Glenmark Pharms. Ltd.*, 117 F. Supp. 3d 549, 590-91 (D. Del. 2015), *aff'd*, *Intendis GMBH v. Glenmark Pharms. Inc., USA*, 822 F.3d 1355 (Fed. Cir. 2016). Trying to distract from the clear teachings of CN845 and Zhou, Heron attempts to marshal trial transcript references to any other variable from the trial transcript. Br. at 44. Those references, however, simply

list other variables and do not show why any of them would be relevant to stability, or more importantly, why they would be relevant to the USP stability goal. This is not a case where the trial court weighed evidence either, because the court found Dr. Rabinow to be credible on this issue, and made no ultimate finding that lecithin was not the result-effective variable. Heron cites testimony from Dr. Han alleging that the emulsion was "complex"; however, that testimony was referring to the formulation as a whole, and discussing selection of the pH modifier and not stability, *see* Appx2880, and the trial court separately confirmed the pH modifier selection would have been obvious, Appx43.

Finally, with respect to criticality, Heron does not and cannot dispute it has no evidence suggesting the claimed 14% egg lecithin amount was critical. *See* Br. at 45. Instead, Heron resorts back to the same debunked assertions that CN845 taught an upper limit, and that Heron's own internal testing (e.g., Example 4 of the patents-in-suit) is relevant.

**B. The Trial Court Selectively Ignored The Emulsifier-to-Drug Ratios**

Heron does not dispute the ratios disclosed in the prior art for lecithin to aprepitant, and defies what the trial court found: "the lecithin-to-aprepitant ratio is relevant to the analysis of the relevant limitation," i.e., amount of egg lecithin. Br. at 47. When discussing Zhou, the trial court expressly found a POSA would have understood the function of egg lecithin to create complexes that increase the

oil/water interface surface area until it is enough to hold (i.e., solubilize) aprepitant. Appx13-15 ("I found his testimony on the science of emulsions to be credible and consistent with the other evidence in the case"); Appx17-18 ("if you want to have a good chance of loading the drug onto the interface, you've got to have a large interface" and "you need a lot more emulsifier to generate the increased surface area so that you can situate your drug at that interface"). But when it came to the prior art assessment, the trial court looked away from the ratios and exclusively focused on actual percentages. Appx21. The amount of lecithin and aprepitant are mathematically related by the principles explained by the trial court such that the prior art ratios alone should have been sufficient to find obviousness for the claimed 14% lecithin.

## III. Heron's Attempt to Tie Inherency to Motivation and/or Reasonable Expectation of Success Is Legally Flawed

Heron simply asserts that "a party may not rely on inherency to prove a motivation to combine or reasonable expectation of success." Br. at 47-48.[1] That is not even disputed. Of course inherency is separate from motivation to combine or reasonable expectation of success. And that is exactly how Fresenius presented it: the tested result of an obvious formulation, if inherent, adds nothing to patentability.

[1] Heron cites three cases to describe the facts of a single case: *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017).

Like in *Pernix*, which discussed *Honeywell*, that case was distinguished as "inapposite because that case involved using an unknown but inherent property as a teaching in an obviousness analysis; it did not involve a limitation that recites an inherent property." *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp.3d 566, 606-07 (D. Del. 2018) , *aff'd sub nom. Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019).

For the '794 patent claims, which require a certain "physically stable" condition to be achieved, those conditions are nothing more than an inherent property of the obvious formulation. For that reason, those claims are too invalid as obvious. *See Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1329-30 (Fed. Cir. 2020).

## IV. Heron Highlights the Trial Court's Flawed Secondary Considerations Analysis

The trial court's findings about motivation and reasonable expectation of success showed a strong case of obviousness, which cannot be overcome even by "substantial evidence" of secondary considerations. *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007). Here, the trial court found the secondary considerations were weak, Appx52, and Heron reiterates the trial court's mistakes by assuming nexus and ignoring the scope of the Asserted Claims. The trial court did not find Cinvanti is commensurate with the Asserted Claims' scope and, yet, relied on Cinvanti evidence to support secondary considerations. That was legal

error. Ultimately, even the trial court found evidence "weak" for secondary considerations, and under the proper nexus analysis should have favored Fresenius.

### A. The Trial Court Overlooked Nexus And The Scope Of The Asserted Claims

Heron as "[t]he patentee bears the burden of showing that a nexus exists." *Teva Pharms. Int'l v. Eli Lilly & Co.*, 8 F.4th 1349, 1360 (Fed. Cir. 2021). A rebuttable presumption of nexus may apply only if a commercial product is coextensive with the claims. *Id*. Heron argues, without any analysis about coextensiveness, that because Cinvanti is Heron's commercial product, it is entitled to a presumption of nexus. Br. at 50. Not so. Heron also did not demonstrate that its Asserted Claims related to (provided a nexus for) each alleged secondary consideration.

Heron asserts two allegedly unique features of Cinvanti. First, the lack of PS80, which allegedly causes ISAEs. But no Asserted Claim excludes PS80, so there cannot be any nexus. Appx79, Appx97. Moreover, CN845 already disclosed injectable aprepitant that did not contain PS80. Appx4354-4357, Appx2626-2627, Appx2629. Where "non-patented features and features known in the prior art underlay" the commercial product, then secondary considerations are not pertinent. *See Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1034 (Fed. Cir. 2016); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006). Second, Heron argues Cinvanti is "sufficiently stable." Br. at 58. But the '229 patent

does not even require any particular stability, and even the ’794 patent required only one week stability—with no factual support for the conclusion that four days (what Heron’s “reproduction” showed) was not sufficiently stable, but seven days somehow was.

Regardless of whether Cinvanti is itself coextensive with the Asserted Claims, ignoring what the claims actually covered was legal error that justifies reversal. *See ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1362 (Fed. Cir. 2015) (reversing non-obviousness judgment and finding patentee’s long-felt need analysis ignored scope of claims). No claims require less ISAEs, nor are the claims limited to only certain patients; they are not even method of administration claims. Heron footnotes its response to *Sjolund*, Br. at 51, but does not address the fact that the case showed nexus cannot be justified based on unclaimed features. *See Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) (reversing non-obviousness verdict where alleged benefit not part of claim). Put another way, Heron is free to try to obtain claims regarding PS80-free formulations and reduced ISAEs; but that is not what it did here with respect to the patents-in-suit.

### B. Heron Cannot Reconcile The Trial Court’s Remaining Secondary Considerations Analyses

The trial court erred in its specific findings that the secondary considerations of long-felt, unexpected results, and commercial success “moderately” favored Heron because it lacked the predicate findings to reach any such conclusion.

### 1. Heron Ignores The Law To Justify The Trial Court's Long-Felt But Unmet Need Analysis

The trial court erred by failing to define any particular need. To try to salvage the opinion, Heron argues the need was a formulation without PS80 or with less ISAEs than fosaprepitant, but the claims contain no such limitations and the evidence uniformly showed the prior art already addressed both issues.

#### a. ISAE Reduction Is Not Within The Scope Of The Claims, And Was Addressed By The Industry

The trial court found that ISAEs were only a "moderate" concern, because there were ample adequate solutions. Appx47. That was an important holding because long-felt need is not viewed in isolation but instead focuses on whether the long-felt need was <u>*unmet*</u> at the time of the invention. *See Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 884 (Fed. Cir. 1998). There is no unsolved need where "workarounds" or "strategies" were already in use. *Boston Sci. SciMed, Inc. v. Iancu*, 811 F. App'x 618, 628 (Fed. Cir. 2020) (citing *Monarch*, 139 F.3d at 884). Other "strategies" already in use to address the alleged need preclude a finding of long-felt, unmet need. *Id*. The trial court here expressly found that healthcare providers knew how to administer fosaprepitant safely to reduce or eliminate ISAEs. Appx47 (finding ISAEs "could be minimized by countermeasures").

Heron relies on the trial court's reference to a small number of patients that may not tolerate central line administration, commonly used as one approach to avoid ISAEs. Br. at 56-57. The expert testimony on that point did not rely on any actual evidence of such patients or show any issue with fosaprepitant. In any event, no claims are limited to specific patient populations or even reduced ISAEs at all. *See Cubist Pharms., Inc. v. Hospira, Inc.*, 805 F.3d 1112, 1126 (Fed. Cir. 2015) (finding alleged need that only addressed 5% of cases where daptomycin was administered not commensurate with the full claim scope).

The issue is not one of whether the number of patients is big or small—but rather whether any need was identified at all for aprepitant, and whether that supposed need connects to the claims. Heron showed no evidence on either prerequisite. In fact, Heron ignores all the studies in the record that reported that a central line was the majority of use and that the patients that experienced ISAEs received vesicant chemotherapy through a peripheral line. *See* Appx4644, Appx2988-2997, Appx3001-3003, Appx3028-3029, Appx3033-3034, Appx4634, Appx4644. In addition, the Mayo Clinic article itself stated that the majority of providers use a central line when administering antiemetics and chemotherapy, and that Mayo's use of a peripheral line was the minority use. Appx4644. Thus, the prior art evidence showed that the absence of a long-felt need, as it discussed the vast majority of patients and did not single out or identify a special problem with any

special subset of patients. *ABT*, 797 F.3d at 1362 (finding successful countermeasure for addressing air flow "eliminate any serious contention that there was a long-felt need for the invention").

**b. Prior Art Also Addressed The Alleged Needs**

The trial court failed to account for the teachings of CN845, which was error since it already taught PS-80 free formulations; Heron cannot rely on secondary considerations without showing a ***nexus as compared to*** the prior art. *See Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008). To the extent Heron attempts to justify the trial court's error by asserting that CN845 was not commercially available, that argument also fails. *See Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1330 (Fed. Cir. 2020) (rejecting argument that feature "known in the art but not actually available to the market…cannot be used to disprove" secondary considerations).

**2. Heron Does Not Address The Trial Court's Inconsistencies Where Evidence Showed No ISAE Improvement**

Even assuming that there was an identified long-felt, unmet need for a "safer" aprepitant formulation than fosaprepitant, Cinvanti failed to address it. Heron cites the trial court's statement that "there was pressure in the industry to find a solution to the problems that were associated with oral aprepitant formulations and injectable fosaprepitant formulations that were eventually solved by Cinvanti." Br. at 50. But the article on which Heron relies at best supports Cinvanti had statistically the

same—not less—ISAEs as prior art fosaprepitant. Appx4602-4603; Appx3027-3032. Additional data and Heron surveys of healthcare professionals showed ISAEs were not a concerning issue with fosaprepitant and that Cinvanti's formulation was not expected to provide any benefit. FK Br. at 46-47. There was, in fact, no evidence the PS80 in fosaprepitant caused any ISAEs. Appx3476-3477; Appx2973-2975; Appx3040-3048. Where there is no supporting data, there cannot be any finding that any alleged long-felt need was met. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332-33 (Fed. Cir. 2009).

Heron also argues that the Mayo Clinic changed its dosing recommendations for fosaprepitant. Br. at 50. But this allegation entirely ignores that the Mayo Clinic expressly identified a separate co-administered drug (the vesicant chemotherapeutic agent) as the cause of the ISAEs—not fosaprepitant. Appx2991-2997; Appx4641; Appx4644.

Finally, Heron does not address that fosaprepitant is still used by doctors today Appx3544, and that Cinvanti was approved because it was deemed ***interchangeable*** with fosaprepitant, *see* Appx2896-2897, Appx3455-3456. *See Spectrum Pharms., Inc. v. Sandoz, Inc.*, 802 F.3d 1326, 1335-36 (Fed. Cir. 2015) (finding no long-felt need where product interchangeable with prior art).

### 3. Heron Relies On A Flawed Failure And Expectations Analysis

The trial court properly held that there was no evidence at trial that others had tried and failed ***after*** the disclosures of CN845. Appx49. That should have ended the analysis; however, the trial court erred by looking for "unexpected results" against much older references that were not the closest prior art. Unexpected results must be based on a comparison to the closest prior art and assessing differences against what a ***POSA*** would expect. *See Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014). What the ***inventor*** expected is irrelevant. *Id*. at 978. There was no finding of any *a priori* stability expectation regarding CN845 (Appx3807-Appx3808), let alone objective evidence showing CN845 formulations were expected to be not "sufficiently stable" in order to show any alleged unexpected result. *See Pfizer, Inc. v. Apotex Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).

Heron also fails to support—other than with a conclusory assertion from its own expert—that there was anything more than a difference in kind between the prior art stability (CN845 showed four days even under Heron's testing) and the claimed composition stability (seven days). In fact, the undisputed evidence shows the compositions worked the same despite the alleged three-day difference in stability. Appx2667-2668. Thus, the trial court's finding that four days would not be commercially viable, yet seven days somehow would be was not supported by the

evidence. The slight difference in stability is one of degree and not kind. *See Bristol-Myers*, 752 F.3d at 977.

#### 4. Heron Fails To Support The Trial Court's Incorrect Commercial Success Analysis

The trial court's finding that any success was "attributable to Heron's pricing strategy rather than to advantages of the patented formulation" should have ended the analysis, because it shows that pricing—not the claimed invention—drove sales. *See Ormco*, 463 F.3d at 1312. That finding also undercuts any findings of long-felt need or unexpected results, because it shows what really happened in the limited window of time where Heron showed its product made sales. Heron has no response to the undisputed evidence that doctors to this day continue to use formulations that contain PS80. There certainly was no commercial success based on the patients—however limited they may be in number—who could not tolerate a central line.

Further, Civanti provided no commercial benefits beyond what was already known in the industry and the prior art, which explains why Heron had to resort to its pricing tactics. FK Br. at 54-55. Healthcare professionals could safely administer fosaprepitant. FK Br. at 47-49. And PS80-free, stable formulations were already disclosed in the prior art. *See Ormco*, 463 F.3d at 1312 (finding commercial success not pertinent where "the feature that creates the commercial success was known in the prior art").

## CONCLUSION

For the foregoing reasons (and those set forth in Fresenius' Opening Brief), the judgment of the trial court should be reversed.

Respectfully Submitted,

*/s/ Helen H. Ji*

Imron T. Aly
Helen H. Ji
Kevin M. Nelson
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500
imron.aly@afslaw.com
helen.ji@afslaw.com
kevin.nelson@afslaw.com
*Counsel for Defendant-Appellant*

September 24, 2025

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITS**

Case No. 2025-1355

Fresenius Kabi USA, LLC Reply Brief

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally-spaced typeface (MS Word, New Times Roman 14 point) and includes 6,841 words.

*/s/ Helen H. Ji*
Imron T. Aly
Helen H. Ji
Kevin M. Nelson
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500
imron.aly@afslaw.com
helen.ji@afslaw.com
kevin.nelson@afslaw.com
*Counsel for Defendant-Appellant*

September 24, 2025